

October 28, 2007

*Via Facsimile*

Honorable Jed S. Rakoff
United States District Court
United States Court House
500 Pearl Street
New York, NY 10007

     Re: Diesel Props S.r.l. v. GBMI, 07 CV 9580 (HB)

Dear Judge Rakoff:

  Plaintiffs Diesel Kid, S.r.l. ("Kid") and Diesel Props, S.r.l. ("Props") (collectively, "Diesel") respectfully submit this reply in response to the letter from Greystone's counsel of today and in further support of their motion for a temporary restraining order ("TRO"), pursuant to Fed. R. Civ. P. 65, enjoining defendants Global Brand Marketing, Inc. ("GBMI") and Greystone Business Credit II LLC ("Greystone") (collectively "Defendants") from seizing, liening, taking any action with respect to, transferring, selling, effecting, distributing or otherwise disturbing, or asserting control over 158,927 pairs (the "Warehouse Product") of Diesel brand shoes that GBMI is holding in a warehouse it uses in Chino, California and directing that GBMI transfer the Warehouse Product to Diesel.[1]

  As is more fully set forth below, the TRO entered by this Court on October 26, 2007 should be continued. Defendants are correct that a key issue with respect to the present motion is whether Props and Kid own the Warehouse Product. But as Greystone well knows, that determination is governed by Italian law and the suggestion that U.C.C. ("UCC") § 2-401 bars relief is baseless. Under Italian law, retention of title provisions are given effect and no transfer of title occurs until payment for the goods in question has been made.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in Plaintiffs' Memorandum of Law in support of their Motion for a TRO and Preliminary Injunction.

Honorable Jed S. Rakoff
October 28, 2007
Page -2-

Moreover, Defendants are not faced with any harm by the continuation of the TRO. The only effect of the continuation of the TRO is that orders for Diesel footwear will be delayed in delivery. But that delay irreparably impacts Plaintiffs, not Defendants.

Finally, there is no reason for the Court to disturb the requirement of a $25,000 bond pending the hearing of the preliminary injunction motion in just four days. Defendants have failed to pay for the Warehouse Product and have demonstrated no risk of damages in the event the Warehouse Product cannot be sold in the next four days

I.     **THE PASSAGE OF TITLE IS DETERMINED UNDER ITALIAN LAW**

There is no legitimate dispute that the passage of title of shoes from Props/Kid to GBMI is governed by Italian law, not by the UCC. As we have previously shown, on November 4, 2005, both Props and Kid entered into a distribution agreement with GBMI (the "Distribution Agreements"). *See* Exhibit B; Mezzasoma Decl. ¶ 6; Ferraro Decl. ¶ 6. The Distribution Agreements governed the sale of shoes by Props/Kid to GBMI.

Importantly, ¶ 5.4 of the Distribution Agreements expressly provided that title did not pass from Props/Kid to GBMI unless and until the product was fully paid for by GBMI. Thus, pursuant to ¶ 5.4 of the Distribution Agreements:

> 5.4 *Delivery*. The Distributor undertakes to withdraw the Products from the warehouses and/or factories that the Company shall communicate from time to time, wherever located, through a carrier duly appointed by the distributor…Without prejudice to what is agreed above, the ownership of the Products will be transferred to the Distributor ***only*** when total payment of the same is collected by the Company (emphasis added).

*See* Exhibit B.[2]

Moreover, the Distribution Agreements were governed by Italian law. Exhibit B, ¶21.1. Thus the Distribution Agreements' provide: "21.1 This Agreement shall be governed by and construed in accordance with Italian law."

Courts in the Second Circuit routinely enforce such controlling law provisions, negotiated by the parties and with significant contacts with the transactions. "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or a violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 3939 (2d Cir. 2001)(internal quotes omitted). The Distribution Agreements had significant contacts with Italy. The Diesel parties are incorporated and

---

[2] References to exhibits are to the Exhibit Binder previously served and provided to the Court.

Honorable Jed S. Rakoff
October 28, 2007
Page -3-

located there. *See* Exhibit B, p. 4 of each Distribution Agreement and Complaint ¶3. The contracts were negotiated, in part, in Italy, and payments were made to Italy. These contacts with Italy are sufficient to apply Italian law to the issue of transfer of title. *Woodling v. Garrett Corp.*, 813 F.2d 543, 552 (2d Cir. 1987)(Connecticut contractual choice of law honored where one party had principal place of business in Connecticut).

Sale with retention of title is governed under Italian law by Chapter 1(3) of Title III in Book IV of the Civil Code.[3] Article 1523 of the Civil Code, entitled "Transfer of title and risk" provides:

> In a sale on installment credit terms with retention of title, the buyer shall assume ownership of the thing upon payment of the final installment of the price but shall bear the risks associated with the thing upon delivery of it.[4]

It is clear that the Distribution Agreements contain retention of title until payment, that GBMI has failed to pay for the Warehouse Product and the Distribution Agreements predate Greystone's attachment proceedings. Accordingly under Italian law, Props and Kid own the Warehouse Product outright.

In addition, Greystone's reliance on *Usinor Industeel v Leeco Steel Products, Inc*, 209 F. Supp.2d 880 (N.D.Ill 2002) is misplaced. In fact, *Usinor* actually supports plaintiffs' arguments herein. The holding in Usinor is dependent upon a finding that ownership of the goods in question was governed by Illinois law and as a result the Uniform Commercial Code and specifically § 2-401 applied. To reach that result, the court applied a choice of law analysis and concluded that Illinois law – rather than French law – applied. However,

---

[3] If required, Props and Kid will prove Italian law at the preliminary injunction hearing and give notice thereof pursuant to Rule 44.1 of the Federal Rules of Civil Procedure.

[4] In addition, pursuant to Article 1524(1) of the Civil Code, retention of title is enforceable against creditors of the buyer if provision is made for it in writing in a document bearing a specific date that is prior to any attachment procedure by such creditor.

The actual texts are:

Art. 1523. Passaggio della proprietà e dei rischi. Nella vendita a rate con riserva della proprietà, il compratore acquista la proprietà della cosa col pagamento dell'ultima rata di prezzo, ma assume i rischi dal momento della consegna.

Art. 1524. Opponibilità della riserva di proprietà nei confronti di terzi a riserva della proprietà è opponibile ai creditori del compratore, solo se risulta da atto scritto avente data certa (2704) anteriore al pignoramento.

The English translation for these provisions was obtained from the General Counsel of Diesel SpA and confirmed from a case at the following web address: **http://europa.eu.int/eur-lex/lex/Notice.do?val=434929:cs&lang=mt&list=434929:cs,396303:cs,285805:cs,276169:cs,257515:cs,325832:cs,&pos=1&page=1&nbl=6&pgs=10&hwords=&checktexte=checkbox&visu=**

Honorable Jed S. Rakoff
October 28, 2007
Page -4-

dispositively, in *Usinor*, the agreement at issue did <u>not</u> have a choice of law provision making French law controlling. As the Court in Usinor noted: "[u]nder French law [like Italian law here] the seller of goods has an absolute right to contract for retention of title until payment and therefore the retention of title clause in the Agreement would be determinative." *Id.* at 886. Thus, applying *Usinor* here, Italian law governs and the UCC is irrelevant.

As a result, Italian law and the terms of the Distribution Agreements govern the timing of transfer of title, and not the UCC.[5] Under the Distribution Agreements, the Warehouse Product is owned by Props/Kid and are not subject to a security interest to Greystone. The Loan Agreement grants a security interest to Greystone essentially in all property of GBMI. (Exhibit C.) But the Warehouse Product is not property of GBMI.[6]

Greystone cannot claim surprise that the Distribution Agreements are governed by Italian law. On the contrary, as the Loan Agreements, the TPA, and the agreements signed by Spa, Props and/or Kid at the request of Greystone in connection with – and as a condition to the execution of the Loan Agreement by Greystone – Greystone was fully aware of the Distribution Agreements at the time it entered into the Loan Agreement.

First, the Loan Agreement itself refers to the "Diesel Payments": "[GBMI] hereby authorize [Greystone] to wire the proceeds of Revolving Loans of [GBMI] to Diesel pursuant to the terms of the Diesel Agreement." (Loan Agreement, ¶ 1.6). The Diesel Agreement referred to the TPA. (Loan Agreement, Schedule B). The Loan Agreement Closing Checklist required the "Licensor Agreements re inventory liquidation" from Spa and Kid (Loan Agreement, Closing Checklist).

Thus, in the December 2, 2006 letter from Diesel S.p.A. to <u>Greystone and GBMI</u>, Spa, Kid and Props confirmed its willingness to consent to the Loan Agreement on the

---

[5] What is more, the cases interpreting UCC § 2-401 relied upon by Greystone grossly distort those sections. In each of §§ 2-401(a), 401(2) and 401(3), the UCC allows for a contrary result if "explicitly agreed" by the parties. *See, e.g.*, UCC § 2-401(a)("Subject to the provisions and to the provisions of the Article on Secured Transactions, title to goods passes from the buyer to the Seller <u>in any manner and on any condition explicitly agreed upon by the parties</u>); §UCC 2-401(2)("<u>Unless otherwise explicitly agreed</u>, title passes to the buyer at the time and place at which the seller completes his performance with reference to physical delivery"). Those courts have eviscerated then rights of the parties to contract around the UCC presumptions in the absence of such agreements. Indeed, in *In Re J. Adrian Sons, Inc.*, 205 B.R. 24, 26-27 (Bank. W.D.N.Y. 1997), the court noted the confusing and inconsistent structure to the subsections of UCC 2-401 and actually felt compelled to rewrite the sections to be able to apply the UCC.

This court need not stretch to enforce or ignore UUC § 2-401. The express intent of the parties was that title would not pass until full payment for the goods. That is governed by Italian law. And Greystone entered into the Loan Agreement in full knowledge of that arrangement.

[6] What is more, even if Props and Kid did not own the Warehouse Product, both Props and Kid have the right to purchase– and have exercised the right to purchase – that Warehouse Product from GBMI at cost pursuant to paragraph 12.3 of the Distribution Agreements. *See* Exhibit L; Mezzasoma Decl. ¶ 24; Ferraro Decl. ¶ 23. That paragraph was amended at the time of the execution of the Loan Agreement with the full knowledge and consent of Greystone. *See* Exhibit L

Honorable Jed S. Rakoff
October 28, 2007
Page -5-

following conditions, which we attached and described in detail. *See* Exhibit E. The letter clearly outlines that Kid and Props were willing to agree to:

> (a) Execute the detailed Amendments n. 1 to the Distribution Agreement between Diesel Props and GBMI, dated November 4, 2005 as per Schedule A of the letter dated November 8, 2006.
>
> (b) Execute the detailed Amendments n. 1 to the Distribution Agreement between Diesel Props and GBMI, dated November 4, 2005 as per Schedule A of the letter dated November 8, 2006.
>
> (c) Extend the duration of the above mentioned Distribution Agreements for one year (to include Spring Summer 2009 and Fall /Winter 2009 Collections), conditioned on numerous required changes.
>
> (d) Enter into the proposed TPA, again on several specified terms.

*See* Exhibit E. Greystone was copied on all of those Amendments, having requested them in the first instance.

The December 2, 2006 offer was accepted by GBMI on December 7, 2006. *See* Exhibit E). In that acceptance, GBMI confirmed that the Loan Agreement with Greystone had closed. GBMI indicated that it "greatly appreciated the utmost cooperation that we received throughout these negotiations from [Spa, Props and Kid]. Without this assistance and cooperation these transactions would not have closed." GBMI also enclosed executed copies of the TPA – executed by Greystone – "that were signed in connection with the closing [of the Loan Agreement.]" Exhibit E.

The TPA, to which Greystone is a party, also refers to the Distribution Agreement, and expressly reserves all parties' rights under the Distribution Agreement. It provides, in relevant part:

> This letter agreement is not in any way intended to limit any of Supplier [Kid/Props] Obligations of Borrower [GBMI] to Supplier, and shall in all respects be cumulative thereto.

*See* Exhibit F. Therefore, it is clear that Greystone was well aware of the Distribution Agreement, and acknowledged its continuing force and effect.

Finally, in a December 1, 2006 letter, Greystone expressly acknowledged in a letter to which Kid was a party that "Notwithstanding the foregoing, nothing in this letter agreement

Honorable Jed S. Rakoff
October 28, 2007
Page -6-

shall relieve the Company [GBMI] of its obligations under any agreement [GBMI] has with you [Kid]." *See* Exhibit D.

There is no legitimate issue that neither GBMI nor Greystone has paid for the Warehouse Product. Indeed, as the declarations in support demonstrate, GBMI ordered – and Props and Kid shipped – approximately $27.6 million in product under the TPA. Without justification, GBMI and Greystone paid for only $7.6 million; sold $16 million without paying for it (at prices no doubt far higher than $16 million) and took the full proceeds; and have $4 million in product remaining in the warehouse – the Warehouse Product – for which they have not paid. It is time for that contractual manipulation to cease.

> **II.     PLAINTIFFS – AND NOT DEFENDANTS – ARE THREATENED WITH IRREPARABLE HARM**

Nor can there be any question that the harm from an absence of a TRO to Plaintiffs is irreparable, whereas the harm from the continuation of the TRO is non-existent. As we have shown, if the TRO is not continued, Defendants will be able to sell off the Warehouse Product at whatever prices they choose – since they have no cost basis in the goods – to whomever they please – since they have shown no regard for their contractual obligations.

As we have previously shown, the goodwill of Props and Kid and their customer relations are the lifeblood of its business. Customers expect prompt delivery of the goods that they have ordered, and they require a level of comfort and certainty that they can rely upon the supplier or distributor with whom they are dealing. If Greystone wrongly takes possession of the Warehouse Product, those customer expectations and relationships will be irreparably harmed. Diesel footwear for fall and winter 2007 will not be delivered, in a timely fashion or at all. Customers will lose money and/or switch to other brands. And this will occur just at the point that spring and summer 2008 order must be taken and shipped. Thereafter, product will be missing in normal retail channels causing consumers to switch to other brands further irreparably harming our business and the Diesel brand. In addition, the unavailability of Diesel branded footwear to consumers will lead consumers loyal to the Diesel brand to purchase another company's footwear product, leading to the potential loss of such customer forever. Finally, if GBMI or Greystone is allowed to ship the Warehouse Product, much of it will be shipped to improper off-price outlets – as GBMI has already done with other product – further injuring the brand. *See* Mezzasoma Decl. ¶ 26; Ferraro Decl. ¶ 25. The harm will be enormous and incalculable.

> **III.     THE PRESENT BOND AMOUNT IS ADEQUATE**

Greystone asserts that the present bond is inadequate to secure the damages, if any, which may be sustained by Greystone or GBMI in the event of the issuance of an injunction, and, instead, suggests a bond of $16 million based upon the damages sought by plaintiffs in the Complaint or a substantial proportion thereof. That suggestion is nonsense.

First, the TRO will last until the preliminary injunction hearing. Second, the $16 million in damages sought by plaintiffs in the Complaint relate to product shipped by

Honorable Jed S. Rakoff
October 28, 2007
Page -7-

plaintiffs to GMBI and already delivered to customers and have no relation to the Warehouse Product.  If the Warehouse Product is not returned to Plaintiffs, GBMI and Greystone will owe Plaintiffs an additional $4 million.  Indeed, Greystone brazenly request a $16 million bond even though it does not dispute that it and GBMI have failed to pay a single penny for the Warehouse Product.

The harm to Defendants from the continuation of the TRO will be non-existent.  As we have shown, the Distribution Agreements have been properly terminated.  Even if the Warehouse Product was subject to Greystone's lien – which it is not – at most, GBMI has a sell off period, subject to the rights of Props and Kid to buy back the Warehouse Product at GBMI's cost.  *See* note 6 *supra*.  Respecting those contractual rights –including Plaintiffs' rights to buy back the Warehouse Product at cost – is no different that what Props and Kid seek in injunctive relief.  Moreover, even if GBMI and Greystone had the right to sell off the product – which they do not – a short delay in such sales cannot harm Defendants.  Rather, to the extent retailers are upset as a result of delays, that harm will flow through to the brand – and will harm Spa, Props and Kid – and not Defendants.

A bond more substantial than that previously ordered by the Court is not warranted under the present facts.  Accordingly, the Court has no reason to alter the amount of the bond set herein.

For all the foregoing reasons and for the reasons previously set forth, the Court should continue the TRO.

                                        Respectfully,

                                        s/ Ira S. Sacks

                                        Ira S. Sacks
                                        Mark S. Lafayette

cc:    Daniel P. Shapiro, Esq. (via email)
        Steven M. Eden, Esq. (via email)
        Mark Parry, Esq. (via email)