UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
DIESEL PROPS S.R.L. and
DIESEL KID S.R.L.,

       Plaintiffs/Counter-Defendants,

       -against-

GREYSTONE BUSINESS CREDIT II LLC
and GLOBAL BRAND MARKETING INC.,

       Defendants/Counter-Plaintiffs

       -against-

DIESEL S.p.A.

       Third-Party Defendant.
----------------------------------------------------------------x

Civil Action No. 07CV9580 (HB)

**SUPPLEMENTAL DECLARATION OF IRA S. SACKS**

       IRA S. SACKS, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

       1.    I am a partner at Dreier LLP, counsel to Diesel Props S.r.l. ("Props") and Diesel Kid S.r.l. ("Kid") in the above captioned action. I submit this supplemental declaration in support of the motion of Diesel Props S.r.l. ("Props") and Diesel Kid S.r.l. ("Kid") for a preliminary injunction and request for leave to amend their complaint to add causes of action for account stated, breach of contract and fraud (the "Motion").[1] This declaration is made on personal knowledge except as expressly set forth herein.

       2.    As set forth in detail below, this relief is necessary because Plaintiffs withdrew their previous request for a preliminary injunction – and chose not to renew that request in late November 2007 – based solely on what now appears to be two egregious misrepresentations

---
[1] A Proposed Second Amended Complaint is attached hereto as Exhibit A.

and/or fraudulent omissions by counsel for Defendant Greystone Business Credit II, LLC's ("Greystone").

3.   First, I was told by Greystone's counsel that, by the date of the then scheduled preliminary injunction hearing, all but approximately **15,000 to 25,000 pairs** of Diesel branded shoes would be sold to authorized accounts. That representation – which was the basis for the withdrawal of the preliminary injunction motion – was false; it turns out that over 100,000 pairs of Diesel branded shoes remained in Defendants' inventory.

4.   In addition, after Plaintiffs withdrew their request for a preliminary injunction, Plaintiffs decided not to seek reinstatement of such motion in connection with a proposed "private sale" of "all Inventory" of Defendant Global Brand Marketing, Inc. ("GBMI") (in which Greystone held an alleged perfected security interest) based upon counsel for Greystone's further representation that such sale **did not include any Diesel branded inventory** and that Greystone would inform Diesel in advance of such sale if that turned out not to be the case. It now appears that this representation was false as well and that Greystone failed to abide by its agreement to give Diesel advance notice of any such sale of Diesel branded inventory.

5.   As the Court is aware, on October 29, 2007, Judge Rakoff, sitting as emergency judge, entered a temporary restraining order ("TRO") which prohibited Defendants from selling, distributing or otherwise disturbing "158,927 pairs of Diesel branded footwear presently believed to be stored at a warehouse used by Defendant Global Brand Marketing, Inc. located in Chino, California, except that the footwear may be sold to any outlets previously approved in the distribution agreement between Diesel Props. S.R.L. and [GBMI]." A copy of that TRO is attached hereto as Exhibit B.

6. Judge Rakoff entered this TRO in response to Plaintiffs' arguments that Plaintiffs owned the footwear in question and that Defendants' unrestrained sale of Diesel footwear to unknown outlets would irreparably harm the Diesel brand because existing customers' orders would go unfilled and because product would not reach the intended channels of distribution, causing retail customers and retailers to choose other brands and causing the Diesel brand to be otherwise irreparably tarnished (for example, if current season goods were shipped to off-price retail stores or to outlets not consistent with Diesel's established and intended market image).

7. Subsequent to the entry of this TRO, the TRO was modified by this Court on November 1, 2007 as follows:

> "Greystone's counsel has represented that pending the hearing of the motion, **in addition to** complying with the temporary restraining order dated October 29, 2007, that no Diesel brand footwear will be sold except in a manner consistent with the ordinary course of dealing between defendant GBMI and plaintiffs."

A copy of a memo endorsed letter is attached hereto as Exhibit C.

8. Thus, the TRO only allowed sales to approved outlets and only in a manner consistent with the ordinary course of dealing between GBMI and Diesel. This Court scheduled the preliminary injunction hearing for November 19, 2007.

9. In the days after entry of the TRO, I had several conversations with Daniel Shapiro of Goldberg Kohn, attorneys for Greystone, during which I was told that little or no Diesel product would remain in Defendants' possession by the date of the hearing on Plaintiffs' preliminary injunction motion, thereby rendering moot any preliminary injunction order which would have issued. Specifically, I asked Mr. Shapiro whether it made sense to continue with the expense of expedited discovery, further briefing and the hearing in light of Defendants' ability to sell Diesel product in the interim under the TRO. Mr. Shapiro advised me

that no more than approximately 15,000 to 25,000 pairs of Diesel branded shoes would remain in inventory by the date of the preliminary injunction hearing.

  10. Accordingly, on November 8, 2007, I wrote a letter to this Court advising that the motion for preliminary injunction was being withdrawn "in light of the ability of Defendants to sell the Warehouse Product during the time period prior to the scheduled preliminary injunction hearing and the likelihood that most of the product will have been sold by the time of the preliminary injunction hearing." A copy of that letter is annexed hereto as Exhibit D.

  11. If Mr. Shapiro later learned that his "estimate" was grossly in error, he had an obligation to inform me of such change, both as a professional matter and in light of the express reliance I had made on his "estimate." He did not advise me of any such change until, as set forth below, early February 2008.

  12. On November 28, 2007, I received from Greystone's attorneys a "Notice of Private Sale" advising that Greystone, as secured creditor, intended to sell, at a private sale conducted in accordance with the Uniform Commercial Code, all right, title and interest of GBMI in many assets, including "**all Inventory**." A copy of this Notice of Sale is attached hereto as Exhibit E. Upon receipt of this Notice, I e-mailed Greystone's attorneys and indicated that "[i]n order to avoid unnecessary motion practice . . . please inform me immediately to whom the private sale is and the details of the Diesel Inventory to be sold." A copy of this e-mail is attached hereto as Exhibit F.

  13. Thus, the express reason for my inquiry was that, to the extent that the Private Sale involved significant quantities of Diesel footwear, such sale would be contrary to my understanding of the amount of Diesel footwear that was unsold as represented to me by Mr. Shapiro. In the event that Greystone intended to include Diesel branded inventory in the "Private

Sale," Diesel was prepared, and, in fact, did prepare, to renew its request for a temporary restraining order and preliminary injunction.

      14.    Greystone's attorneys responded to my e-mail on November 30, 2007. In that e-mail, David Chizewer of Goldberg Kohn indicated as follows:

> **Greystone does not expect that the private sale (referenced in your e-mail below) will include any Diesel branded inventory. We believe that all Diesel branded inventory will be sold prior to the sale. If it turns out that we do intend to include the Diesel branded inventory in the private sale, we will give you advance notice of that fact as well as the identity of the purchaser**.

A copy of this e-mail is attached hereto as Exhibit G.

      15.    There were two significant components to the e-mail from Greystone's counsel: (i) the representation that no Diesel branded inventory was included in the private sale; and (ii) the agreement that if Diesel branded inventory was to be included in the private sale of "all Inventory" of GBMI, we would receive advance notice of that fact. No such notice was ever given. Indeed, subsequent to this e-mail, I received no further communication from Greystone's attorneys regarding the "Private Sale." Plaintiffs relied on the representation and agreement in the November 30, 2007 e-mail in connection with their sales efforts for the 2008 seasons.

      16.    As with Mr. Shapiro's earlier representation, Mr. Chizewer had an obligation to inform me if he learned that his representation to me was in error. Indeed, there can be no doubt about that obligation since Mr. Chizewer expressly stated that "[i]f it turns out that we do intend to include the Diesel branded inventory in the private sale, we will give you advance notice of that fact as well as the identity of the purchaser."

      17.    Mr. Shapiro has asserted that the representations made by him and Mr. Chizewer to me regarding (a) the quantity of Diesel branded shoes which would remain in inventory prior to the hearing date of Plaintiffs' earlier motion for a preliminary injunction and (b) whether

Greystone's Private Sale would include Diesel branded footwear, were made in the context of settlement conversations. That is palpably false.

18. Both discussions were initiated to avoid costly motion practice. The early November discussion with Mr. Shaprio was initiated by me to determine whether the preliminary injunction motion would be made materially moot by Defendants' continued sale of Diesel footwear. My inquiry was <u>not</u> made in the context of settlement conversations, but rather was an attempt by Plaintiffs to ascertain whether to withdraw or to proceed with their motion. Based on Mr. Shapiro's representation that the estimated inventory would be 15,000 to 25,000 or fewer by the time of the hearing, we withdrew the motion.

19. The same is true with respect to the representations and agreements made by Mr. Chizewer regarding whether Diesel branded inventory would be included as part of Greystone's Private Sale. I requested that we be informed of any inclusion of Diesel inventory in the Private Sale "<u>in order to avoid unnecessary motion practice</u>." Mr. Chizewer responded that Diesel branded footwear was not expected to be included in the Private Sale and agreed to notify us "if it turns out that we do intend to include Diesel branded inventory in the private sale." Again, this was not a settlement communication, and in reliance on Mr. Chizewer's agreement, Plaintiffs did not seek to enjoin the Private Sale.

20. Nor can there be any doubt that Greystone knew that Diesel branded footwear would be included in its Private Sale and Mr. Chizewer breached his agreement by failing to advise us of this fact. The Private Sale was conducted by Greystone. *See* Notice of Private Sale annexed hereto as Exhibit E. What is more, Greystone entered into a Loan and Security agreement with Titan Apparel, Inc, ("Titan"), the **buyer**, financing the buyer's purchase in the

Private Sale and granting Greystone a security interest in all of the sold inventory.  *See* Exhibits H and I annexed hereto.

21. In late January, I received a call from my clients in which they advised me that "GBMI" was apparently attempting to sell large amounts of Diesel branded footwear and inquired how this could be possible if, in fact, GBMI had little or no inventory as of November 2007.  In response to this inquiry, I e-mailed Mr. Shapiro on January 31, 2008, to ascertain whether, despite his earlier representation, Defendants maintained a large inventory of Diesel branded footwear.  In response to my e-mail, Mr. Shapiro advised me by phone on February 6, 2008 that 101,000 pairs of Diesel branded footwear remained in inventory and was going to be sold to a single purchaser.  Mr. Shapiro also offered to allow Plaintiffs to purchase this inventory for $2 million – despite the fact that Defendants paid nothing for this inventory and despite the fact that Plaintiffs are the true owners of this inventory.  A copy of my January 31 e-mail and an e-mail reply to Mr. Shapiro's February 6 phone call are attached hereto as Exhibit J.

22. The information that there are 101,000 pairs of Diesel branded footwear remaining in inventory belies Defendants' earlier representations to me that: (i) only approximately 15,000 to 25,000 pairs of Diesel branded footwear would remain unsold by the date of the scheduled preliminary injunction hearing; and (ii) no Diesel branded inventory would be sold in the private sale of all of GBMI's inventory.

23. As set forth in the Declarations of Stephen G. Birkhold and Anthony N. Strippoli, both dated February 8, 2008, the sale of large quantities of Diesel branded footwear will result in irreparable harm to Plaintiffs.  In selling and positioning the Diesel line, representations were made to customers that there were not substantial amounts of old inventory available in the marketplace and that the line would be positioned as a mid-price to luxury line.  Those

representations to customers were based, in turn, on the representations I received from Greystone's counsel. If 101,000 pairs of Diesel branded product at severely reduced prices floods the market, the harm to Plaintiffs customer relations and goodwill will be incalculable.

24. In an attempt to divert the attention of the Court, Mr. Shapiro has asserted that Plaintiffs, in October 2007, sought to define "ordinary course" to specify that Fall/Winter 2007 footwear may not be sold to discount outlets until January 2008. That is true; it was an attempt to strengthen what Plaintiffs' believed to be an inadequate and unduly vague TRO (which would not prevent irreparable harm to Plaintiffs). Plaintiffs' position has changed since October, due to the misrepresentations of Greystone's counsel, and the irreparable harm that Plaintiffs now seek to avoid has also changed. The irreparable harm that Plaintiffs now seek to prevent includes the harm to customer relationships due to assurances given to customers that substantial amounts of additional old inventory would not be available in the marketplace beyond that which was present as of mid-December 2007. These assurances will prove to be false if huge amounts of discounted merchandise are now permitted to hit the market..

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 22, 2008
      New York, New York

                                                s/ Ira S. Sacks
                                                Ira S. Sacks