UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

DIESEL PROPS S.R.L. and
DIESEL KID S.R.L.,

                    Plaintiffs,

    -against-

GREYSTONE BUSINESS CREDIT II LLC
and GLOBAL BRAND MARKETING INC.,

                    Defendants.
-----------------------------------------------------------------x

Civil Action No. 07CV9580 (HB)

**[PROPOSED]
SECOND
AMENDED
COMPLAINT**

**TRIAL BY JURY
DEMANDED**

      Plaintiffs Diesel Props S.r.l. ("Props") and Diesel Kid S.r.l. ("Kid"), by their attorneys Dreier LLP, allege on knowledge as to their own acts and otherwise on information and belief as follows:

## NATURE OF THE ACTION

      1.    This is an action for breach of contract, unjust enrichment, conversion, account stated, breach of contract, and fraud involving Defendants failure to pay for $20 million in Diesel branded shoes, millions of dollars in consequential damages, the attempt by Defendants to convert 158,527 pairs of Diesel branded shoes owned by Plaintiffs, breach of an oral agreement made by Defendants, and fraud by Defendants after the filing of this action. Plaintiffs seek an injunction, damages, return of all of their property and related relief.

## JURISDICTION AND VENUE

      2.    This Court has jurisdiction over this matter pursuant to 15 U.S.C. § 1332. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is

between citizens of a foreign state and citizens of different states. Venue is properly founded in this district pursuant to 28 U.S.C. § 1391(a).

## THE PARTIES

3.  Plaintiff Diesel Props S.r.l. ("Props") is a corporation organized under the laws of Italy with registered offices at Via Fosse 14, Marostica (Vicenza), Italy. Among other things, Props is involved in the sale of men's and women's footwear bearing the Diesel trademarks owned by Diesel S.p.A. ("SpA"). Props is also the exclusive licensee of SpA, the owner of the "Diesel" trademarks, for the manufacture and sale worldwide for adult footwear bearing the trademarks belonging to SpA.

4.  Plaintiff Diesel Kid S.r.l. ("Kid") is a corporation organized under the laws of Italy with registered offices at Via Fosse 14, Marostica (Vicenza), Italy. Among other things, Kid is involved in the sale of children's footwear bearing the Diesel trademarks owned by SpA ("SpA"). Kid is also a licensee of SpA for the manufacture and sale worldwide for children's footwear bearing the trademarks belonging to SpA.

5.  SpA is a corporation organized under the laws of Italy with registered offices at Via dell'Industria 7, Molvena (Vicenza), Italy. Among other things, SpA is involved in the ownership and licensing of the Diesel trademarks.

6.  Defendant Greystone Business Credit II LLC ("Greystone") is a limited liability company organized under the laws of the State of Delaware, with a principal place of business at 152 W. 57th St., New York, NY 10019.

7.  Defendant Global Brand Marketing Inc. ("GBMI") is a corporation organized under the laws of the State of California, with a principal place of business at 6410 Via Real, Carpinteria, CA 93013.

**FACTUAL BACKGROUND**

8. SpA, Props and Kid are involved in the licensing, manufacture, distribution and/or sale of Diesel branded clothing, footwear, accessories and other items worldwide. SpA is the owner of numerous valuable trademarks in the United States and elsewhere using the Diesel name, and those trademarks, from time to time, have been licensed to Props and Kid by SpA.

9. On November 30, 2001, SpA and GBMI entered into a license agreement for GBMI to make and sell Diesel branded adult shoes in numerous areas of the world. That license expired by its terms on December 31, 2006.

10. On June 3, 2002, Kid and GBMI entered into a license agreement for GBMI to make and sell Diesel branded children's shoes in numerous areas of the world. That license expired by its terms on December 31, 2006.

11. GBMI was in severe default of its royalty and advertising contribution obligations under the aforementioned licenses as of December 31, 2006. At that time, GBMI owed SpA and Kid over $11.2 million in back royalties and advertising contributions excluding accrued interest. That amount remains unpaid. Indeed, interest continues to accrue. Under the license agreements, which are governed by Italian law, the exclusive forum to recover those amounts is in Milan, Italy.

12. On November 4, 2005, Props and Kid entered into similar distribution agreements with GBMI (the "Props Distribution Agreement" and the "Kid Distribution Agreement", respectively, and collectively the "Distribution Agreements"). The term of the Distribution Agreements was from May 1, 2006 (for the Spring/Summer 2007 collection) through December 31, 2008 (for the Fall/Winter 2008 collection), unless earlier terminated under the agreements.

13. GBMI continued in severe financial difficulty. As a result, GBMI negotiated a loan and security agreement with Greystone (the "Loan Agreement"). That Loan Agreement was effective December 4, 2006. It is governed by New York law and provided for jurisdiction in the state and federal courts in New York County, New York to hear and determine any claims or disputes pertaining to the Loan Agreement or any matter arising out of or related to the Loan Agreement.

14. In its essence, the Loan Agreement provided for revolving loans of up to $25 million from Greystone to GBMI. Importantly, the Loan Agreement expressly provided that GBMI expressly authorized Greystone to wire proceeds of revolving loans of GBMI to Diesel pursuant to the terms of an agreement between GBMI, Greystone and Props/Kid with respect to the payment of Diesel invoices. (Loan Agreement, ¶1.6).

15. In connection with the Loan Agreement, and prior to its execution, Greystone sought from SpA and Kid – as licensors who were owed substantial amounts for past due royalties and advertising contributions – an acknowledgment that SpA and Kid each consented to GBMI's entry into the Loan Agreement and agreed not to assert security interests, liens, retentions of title or similar rights **in assets of GBMI** until Greystone was paid in full under the Loan Agreement. No such letter was requested from – or signed by – Props; and no such letter was requested from Kid under the Distribution Agreement.

16. Also in connection with the Loan Agreement, SpA, Kid and Props entered into amendments of their prior agreements with GBMI (the "12/7/06 Letter Agreements"). In the 12/7/06 Letter Agreements, (a) SpA, Kid and GBMI agreed on a mechanism for the payment of the past dues royalties and advertising contributions; (b) Kid and Props amended the Distribution Agreements with GBMI; and (c) Kid and Props conditioned their assent to the Loan Agreement

on strict adherence to the payment provisions in a tripartite agreement between GBMI, Greystone and Props/Kid.

17.     Two tripartite agreements – one involving Kid and one involving Props – were executed effective December 4, 2006 (the "TPA").  The TPA provided that GBMI would send copies of purchase orders for Diesel product to Props/Kid and Greystone.  Props/Kid would then send a Diesel Invoice to GBMI and Greystone for the ordered goods.  <u>Upon request</u>, Greystone would confirm to Props/Kid that the proposed customer was a *bona fide* customer and that there was availability for revolving loans under the Loan Agreement to pay for the goods.  Relying on such availability, Props/Kid would then ship the product to GBMI.  When GBMI invoiced the retailer for the products ordered, it would send a copy of the Customer Invoice to Props/Kid and Greystone, and Greystone was required to pay Props/Kid the proceeds of a revolving loan in an amount equal to the corresponding Diesel Invoice within two business days.  Greystone also <u>unconditionally</u> agreed to provide Props/Kid with written notice of any request for a revolving loan for a Diesel Invoice that was not permitted to be made pursuant to the terms of the Loan Agreement.

18.     That procedure was intended to insure that Props and Kid were paid for shipments.  If payment was not made, however, the products remained property of Props or Kid under the Distribution Agreements, which expressly provided that product shipped to GBMI remained the property of Props or Kid until full payment for the shipment by GBMI.  (Distribution Agreements, ¶ 5.4).  The rights of Props and Kid under the Distribution Agreements were expressly preserved by the TPA.

19. The TPA was governed by New York law and GBMI, Greystone, Props and Kid all submitted to the jurisdiction of the state and federal courts in New York County, New York for the resolution of disputes.

20. The TPA procedure was streamlined slightly in March 2007.

21. Pursuant to the TPA, Props/Kid sent Diesel Invoices to Greystone commencing in January 2007, through and including September 3, 2007. The total amount of those Diesel Invoices due under the TPA was $23.5 million. The balance owing from Greystone (and GBMI) is approximately $20 million, plus return of unpaid product. That relates to hundreds of thousands of pairs of Diesel branded shoes, many of which have been sold by GBMI to its customers.

22. With each Diesel Invoice it sent, Props/Kid requested notice from Greystone under the TPA as to whether (i) there was availability under the Loan Agreement for revolving loans to pay the invoice, (ii) GBMI was otherwise prevented from requesting such revolving loans, or (iii) GBMI was not in compliance with, or was in default of, any of the covenants and/or warranties of the Loan Agreement. Greystone sat mute. On only two occasions – on January 29, 2007 and on August 2, 2007 – did Greystone indicate any issue with the availability of revolving loans. Indeed, after the January 29, 2007 notice, Greystone paid over $7.6 million in Diesel Invoices.

23. Neither Greystone nor GBMI objected to any of the invoices or the amount of the invoices which were submitted by Diesel.

24. On June 1, 2007, Props wrote to Greystone to inquire as to why Greystone was five (5) weeks behind in paying Diesel Invoices. Greystone did not reply.

25. On September 4, 2007, Props and Kid notified Greystone that it had thirty (30) days to cure the specified outstanding defaults under the TPA. Greystone did not reply and did not cure the defaults.

26. On September 4, 2007, Props and Kid notified GBMI that it had thirty (30) days to cure the specified outstanding defaults under the Distribution Agreements. GBMI did not cure the defaults.

27. As a result, on October 17, 2007, Props and Kid notified that the Distribution Agreements were terminated effective October 4, 2007. At the same time, SpA and Kid informed GBMI of its default under the 12/7/06 Agreement regarding past-due royalties, advertising contributions, accrued interest, and liquidated damages, and demanded immediate payment of all overdue royalties and advertising contributions. In addition, in or around October 2007, Props advised GBMI that it was terminating the Sourcing Agreement due to GBMI's default.

28. In their October 17, 2007 letters, Props and Kid demanded, *inter alia*, that

- Pursuant to paragraph 12.1 of the Distribution Agreement, within 15 (fifteen) days of October 4, 2007, GBMI shall communicate to the Company its complete inventory of the Products by season of reference;

- GBMI return to the Company all Products in its inventory which has not been paid for by GBMI to the Company. As you know, under paragraph 5.4 of the Distribution Agreement, the ownership of the Products will be transferred to the Distributor only when total payment of the same is collected by the Company;

- Alternatively, that GBMI return to Props/Kid all Diesel Props/Kid product in inventory pursuant to paragraph 12.3 of the Distribution Agreements at the original cost price that GBMI paid for such product –which to date is zero (and as to which Props and Kid will waive their right to be paid).

- Pursuant to paragraphs 11.3 of the Distribution Agreements, GBMI cease taking orders from customers; and

- Pursuant to paragraph 4.3 of the Distribution Agreements, GBMI provide the Company a complete list, and copies, of all open orders in relation to Fall/Winter 2007 and Spring/Summer 2008 seasons.

29. GBMI did not comply with any of the demands of the October 17, 2007 letters, except for giving Props and Kid a detailed accounting of Diesel branded shoes in its warehouse, which totaled approximately 164,467 pairs. Of that amount, Greystone and GBMI have not paid for 154,627 pairs of adult shoes and 4,300 pairs of children's shoes, a total of 158,927 pairs (the "Warehouse Product").

30. Also on October 17, 2007, Luigi Mezzasoma, Managing Director of Props, received an email from Sudeepto Datta, the President of GBMI. Mr. Datta forwarded to Mr. Mezzasoma an email from Greystone indicating that Greystone asserted that the Warehouse Product was subject to its liens under the Loan Agreement, and that it intended to take possession of the Warehouse Product. Furthermore, on October 23, 2007, Mr. Mezzasoma received a telephone call from Mr. Datta who advised Mr. Mezzasoma that Greystone intended to take possession of and eventually sell the Warehouse Product on Friday October 26, 2007.

31. The Warehouse Product does not belong to GBMI and Greystone has no rights in the product. The Warehouse Product belongs to Props and Kid under ¶ 5.4 of the Distribution Agreements. What is more, even if it did not, Props and Kid have the right to purchase that Warehouse Product from GBMI at cost.

32. The actions of Defendants have already seriously injured Plaintiffs in their businesses.

33. The goodwill of Props and Kid and its customer relations are the lifeblood of its business. Customers expect prompt delivery of the goods that they have ordered, and they require a level of comfort and certainty that they can rely upon the supplier or distributor with whom they are dealing. If Greystone wrongly takes possession of the Warehouse Product, those

customer expectations and relationships will be irreparably harmed. Diesel footwear for fall and winter 2007 will not be delivered, in a timely fashion or at all. Customers will lose money and/or switch to other brands. And this will occur just at the point that spring and summer 2008 order must be taken and shipped. Thereafter, product will be missing in normal retail channels causing consumers to switch to other brands further irreparably harming Props and Kid's business and the Diesel brand. Finally, if GBMI or Greystone is allowed to ship the Warehouse Product, much of it will be shipped to improper off-price outlets – as GBMI has already done with other product – further injuring the brand. The harm will be enormous and incalculable.

## POST FILING MISCONDUCT

34.     To prevent irreparable harm to the Diesel Brand by Greystone's threatened seizure and sale of the Warehouse Product, on October 26, 2007, Props and Kid instituted this action, and sought a temporary restraining order ("TRO") and preliminary injunction restraining Greystone and GBMI and their officers, members, agents, servants, employees and attorneys and those in active concert or participation with them who receive actual notice, from transferring, selling, distributing or otherwise disposing of the Warehouse Product.

35.     On October 29, 2007, Judge Rakoff, sitting as emergency judge, entered a TRO which prohibited Defendants from selling, distributing or otherwise disturbing "158,927 pairs of Diesel branded footwear presently believed to be stored at a warehouse used by Defendant Global Brand Marketing, Inc. located in Chino, California, except that the footwear may be sold to any outlets previously approved in the distribution agreement between Diesel Props. S.R.L. and [GBMI]." Judge Rakoff entered this TRO in response to Plaintiffs' argument that Plaintiffs owned the footwear in question and that Defendants' unrestrained sale of Diesel footwear to unknown outlets would irreparably harm the Diesel brand.

36. Subsequent to the entry of the TRO, it was modified by Judge Baer on November 1, 2007 as follows:

> "Greystone's counsel has represented that pending the hearing of the motion, **in addition to** complying with the temporary restraining order dated October 29, 2007, that no Diesel brand footwear will be sold except in a manner consistent with the ordinary course of dealing between defendant GBMI and plaintiffs."

Thus, the TRO only allowed sales to approved outlets and only in a manner consistent with the ordinary course of dealing between GBMI and Diesel. A preliminary injunction hearing was scheduled for November 19, 2007.

37. However, in the days after entry of the TRO, Ira S. Sacks, counsel for Plaintiffs, had several conversations with Daniel Shapiro, counsel for Greystone, during which Mr. Sacks was told that little or no Diesel product would remain in Defendants' possession by the date of the preliminary injunction hearing, thereby rendering moot any preliminary injunction order which would have issued. Specifically, Mr. Shapiro advised Mr. Sacks that no more than approximately 15,000 to 25,000 pairs of Diesel product, at most, would remain in GBMI's inventory by such date. Mr. Shapiro was aware that Mr. Sacks was relying on these representations in deciding whether to go forward or withdraw Diesel's motion for preliminary injunction.

38. Based upon Mr. Shapiro's representations, Plaintiffs withdrew their motion for a preliminary injunction. Plaintiffs wrote a letter to the Court advising it that the motion for preliminary injunction was being withdrawn "in light of the ability of Defendants to sell the Warehouse Product during the time period prior to the scheduled preliminary injunction hearing and the likelihood that most of the product will have been sold by the time of the preliminary injunction hearing."

39. Thereafter, on November 28, 2007, Mr. Sacks received from Greystone's counsel a "Notice of Private Sale" advising that Greystone, as secured creditor to the assets of GBMI, would be conducting a private sale of all right, title and interest of GBMI assets, including "**all Inventory**" (the "Private Sale").

40. Upon receipt of the Notice of Private Sale, Mr. Sacks e-mailed Greystone's counsel and requested to know who the Private Sale was to and the details of any Diesel product to be sold.

41. Mr. Sacks sought clarification of the Private Sale because, to the extent that the Private Sale involved significant quantities of Diesel footwear, such sale would be contrary to Plaintiffs' understanding of the amount of Diesel footwear that was unsold as represented to Mr. Sacks by Mr. Shapiro.

42. Mr. Sacks informed Greystone's counsel that he was requesting this information "in order to avoid unnecessary motion practice."

43. In the event that Greystone intended to include Diesel branded inventory in the Private Sale, Diesel prepared to renew its request for a temporary restraining order and preliminary injunction.

44. Greystone's attorneys responded to Plaintiffs' e-mail on November 30, 2007. In that e-mail, David Chizewer of Goldberg Kohn represented and agreed as follows:

> Greystone does not expect that the private sale…will include any Diesel branded inventory. We believe that all Diesel branded inventory will be sold prior to the sale. If it turns out that we do intend to include the Diesel branded inventory in the private sale, we will give you advance notice of that fact as well as the identity of the purchaser.

11

45.     This email constituted an agreement that no Diesel branded inventory would be included in the Private Sale but if Diesel branded inventory was to be included in the Private Sale, Diesel would receive advance notice of that fact.  No such notice was ever given.

46.     Thus, and without any indication to the contrary, Plaintiffs relied on Mr. Chizewer's representation and agreement in the November 30, 2007 e-mail in connection with their sales efforts for the 2008 seasons.

47.     The Private Sale was conducted by Greystone on December 14, 2007, and GBMI's assets were sold to Titan Apparel, Inc. ("Titan").  Greystone entered into a Loan and Security Agreement with Titan as the buyer, essentially financing Titan's purchase and granting Greystone a security interest in all sold inventory.

48.     In late January 2008, Plaintiffs learned that GBMI was apparently attempting to sell large amounts of Diesel branded footwear to retailers, despite the representations by Mr. Shapiro and Mr. Chizewer that GBMI had "little or no inventory" as of November 2007.

49.     On January 31, 2008, Mr. Sacks e-mailed Mr. Shapiro to ascertain whether, despite his earlier representation, Defendants maintained a large inventory of Diesel branded footwear.  In response, Mr. Shapiro advised Mr. Sacks by phone on February 6, 2008 that 101,000 pairs of Diesel branded footwear remained in inventory and were going to be sold to a single purchaser.

50.     The information that there are 101,000 pairs of Diesel branded footwear remaining in inventory establishes the falsity of Defendants' earlier representations to Mr. Sacks that: (i) only approximately 15,000 to 25,000 pairs of Diesel branded footwear would remain unsold by the date of the scheduled preliminary injunction hearing; (ii) no Diesel branded

inventory would be sold in the Private Sale; and (iii) Diesel would be notified if any Diesel inventory was to be sold in the Private Sale.

51.     The misrepresentations of Greystone's counsel with respect to the amount of Diesel branded footwear that remained in GBMI's inventory and whether Diesel inventory would be sold in the Private Sale will cause immeasurable damage to Diesel's business, because Diesel relied on those representations to is detriment in going forward with its business for the 2008 season. In fact, Defendants' actions have already seriously injured Plaintiffs in their businesses.

52.     In reliance on Greystone's misrepresentations, Plaintiffs represented to numerous high-end retailers that little, if any, old GBMI product remained to be distributed into the marketplace. Those high-end retailers have informed Plaintiffs that they will not carry Diesel branded footwear if old GBMI inventory appears in substantial quantities at discount retailers.

53.     Greystone has represented that 101,000 pairs of old GBMI inventory will be sold to a single purchaser at $20 per pair. At that price, the retail selling price is likely to be $30 to $40 per pair. If 101,000 pairs of old GBMI inventory of Diesel branded shoes were to flood the marketplace and sell at $30 to $40 at retail (or even slightly higher), Plaintiffs' goodwill and brand will be severely and irreparably injured. Plaintiffs' credibility will be destroyed and the high-end accounts will cancel their orders and cease doing business with Plaintiffs and Diesel USA if those 101,000 pairs of shoes are released into the marketplace.

54.     The goodwill of Props and Kid, and the Diesel brand as a whole, is the lifeblood of its business. Customers require a level of comfort and certainty that they can rely upon the supplier or distributor with whom they are dealing, and Diesel will lose credibility if their representations to their customers prove to be false. Indeed, Diesel's high-end retail accounts

have made it plain that they will not carry Diesel branded footwear if old GBMI inventory appears in substantial quantities at discount retailers. Those accounts have placed orders based on representations about the lack of old GBMI inventory that will hit the market. Thus, if Greystone and/or its affiliates wrongly sell the old GBMI inventory, those customer expectations and relationships will be irreparably harmed. The harm will be enormous and incalculable.

## FIRST CAUSE OF ACTION
### (Breach of Contract Against Greystone and GBMI)

55. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 54 as if fully set forth herein.

56. Plaintiffs fully complied with all of their material obligations under the TPA.

57. As described above, Greystone and GBMI have breached their material obligations under the TPA by failing to pay over $20 million due to Plaintiffs. Moreover, those breaches have seriously injured Plaintiffs' businesses.

58. As a result, Greystone and GBMI are jointly and severally liable to Plaintiffs in an amount to be proved at trial, presently estimated to exceed $20 million plus interest and consequential damages in the millions of dollars.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment Against Greystone and GBMI)

59. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 58 as if fully set forth herein.

60. Greystone and GBMI received the proceeds and benefit of the sale of shoes shipped by Plaintiffs to GBMI without paying for those shoes. It is unfair and unjust for Greystone and GBMI to be allowed to retain those proceeds without payment for the underlying goods.

61. As a result, Greystone and GBMI are jointly and severally liable to Plaintiffs in an amount to be proved at trial, presently estimated to exceed $20 million plus interest.

### THIRD CAUSE OF ACTION
(**Conversion Against Greystone and GBMI**)

62. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 61 as if fully set forth herein.

63. The Warehouse Product, as well as related orders concerning product to be shipped to customers, is the property of Props and Kid. GBMI has no right to sell the Warehouse Product, as it has not been paid for in full remains the property of Plaintiffs. Plaintiffs have demanded the return of the Warehouse Product and orders and GBMI has wrongfully refused to do so. As a result, GBMI has converted the Warehouse Product and orders. GBMI and Greystone have also converted the Warehouse Product by wrongfully seizing it and selling it to Titan Apparel, Inc. ("Titan") in the Private Sale and otherwise.

64. The foregoing acts and threatened acts of GBMI and Greystone threaten Plaintiffs with immediate irreparable harm, for which Plaintiffs have no adequate remedy at law.

65. As a result, Plaintiffs are entitled to an injunction requiring the return of the Warehouse Product and orders and enjoining GBMI and Greystone from transferring, selling, distributing or otherwise disposing of the Warehouse Product.

### FOURTH CAUSE OF ACTION
(**Account Stated Against Greystone and GBMI**)

66. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 65 as if fully set forth herein.

67. Diesel sent invoices to Greystone and GBMI for Diesel footwear that was sent to GBMI. Neither Greystone nor GBMI objected to these invoices or the amount of these invoices. However, Greystone and GBMI failed to pay for over $20 million due on such invoices.

68. Accordingly, Greystone and GBMI are jointly and severally liable to Plaintiffs in an amount to be proved at trial, presently estimated to exceed $20 million plus interest.

## FIFTH CAUSE OF ACTION
### (Breach of Oral Agreement Against Greystone)

69. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 68 as if fully set forth herein.

70. Greystone promised Plaintiffs that if any Diesel branded footwear was going to be sold in the Private Sale, it would inform Plaintiffs prior to that sale.

71. Subsequently, Greystone never contacted Plaintiffs regarding the Private Sale. However, on December 16, 2007, 101,000 pairs of Diesel branded footwear were sold in a Private Sale by GBMI to Titan.

72. Greystone breached its oral agreement to inform Plaintiffs if any Diesel footwear was to be sold in the Private Sale.

73. Accordingly, Diesel seeks damages in an amount to be proved at trial.

## SIXTH CAUSE OF ACTION
### (Fraud Against Greystone)

74. Plaintiffs repeat and reallege the allegations of paragraphs 1 through 73 as if fully set forth herein.

75. Greystone's representation to Plaintiffs that only 15,000 to 25,000 pairs of Diesel branded footwear would remain in GBMI's and Greystone's possession by the scheduled preliminary injunction hearing was a knowing material, false representation of fact made by

Greystone with the intent to defraud Plaintiffs. Greystone's failure to correct this misrepresentation constituted further fraud on Plaintiffs.

    76.    Plaintiffs reasonably relied on Greystone's representation when they withdrew their motion for a preliminary injunction, and were damaged by the subsequent sale of Diesel branded footwear by GBMI and Greystone.

    77.    Greystone's misrepresentation to Diesel's counsel that no Diesel branded footwear would be sold as in the Private Sale was a knowing material, false representation of fact made by Greystone with the intent to defraud Plaintiffs. Greystone's failure to correct this misrepresentation constituted further fraud on Plaintiffs. Plaintiffs reasonably relied on Greystone's representation in negotiating with customers and have been damaged by these misrepresentations.

    78.    Greystone's actions constitute fraud on Plaintiffs. Accordingly, Diesel seeks damages in an amount to be proved at trial.

    WHEREFORE, Plaintiffs demand judge as follows:

- A.    On the First Cause of Action, damages in an amount to be proven at trial, presently estimated to exceed $20 million plus interest and consequential damages in the millions of dollars;
- B.    On the Second Cause of Action, damages in an amount to be proven at trial, presently estimated to exceed $20 million plus interest;
- C.    On the Third Cause of Action, directing that GBMI and Greystone return the Warehouse Product and orders to Plaintiffs and enjoining and restraining GBMI and Greystone, and their officers, members, agents, servants, employees and attorneys and those in active concert or participation with them, from seizing,

        liening, transferring, selling, effecting, taking any action with respect to, distributing or otherwise disturbing or asserting control over the Warehouse Product;

D. On the Fourth Cause of Action, damages in an amount to be proven at trial, presently estimated to exceed $20 million plus interest;

E. On the Fifth Cause of Action, damages in an amount to be proven at trial;

F. On the Sixth Cause of Action, damages in an amount to be proven at trial;

G. Prejudgment interest and costs; and

H. Granting Plaintiffs such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

**Props and Kid hereby demand a trial by jury on all issues so triable.**

Dated: New York, New York
       February 22, 2008                    Respectfully submitted,

                                                                       _____
                                                                         Ira S. Sacks
                                                                         Mark S. Lafayette
                                                                         Dreier LLP
                                                                         499 Park Avenue
                                                                         New York, NY 10022
                                                                         (212) 328-6100