EX-10.1 2 v097860_ex10-1.htm
**Greystone Business Credit II, L.L.C.**

## Loan and Security Agreement

This Loan and Security Agreement (as it may be amended, this "*Agreement*") is entered into on December 14, 2007 between **Greystone Business Credit II, L.L.C.** ("*Lender*"), having an address at 152 West 57th Street, 60th Floor, New York, New York 10019 and **Titan Apparel, Inc.** ("*Borrower*"), a Delaware corporation, whose principal office is located at 1700 Jay Ell Drive, Suite 200, Richardson, Texas 75081 ("*Borrower's Address*"). The Schedules to this Agreement are an integral part of this Agreement and are incorporated herein by reference. Terms used, but not defined elsewhere, in this Agreement are defined in Schedule B.

1. **LOANS.**

    **1.1 Amount.** Subject to the terms and conditions contained in this Agreement, Lender will:

    (a) **Revolving Loans and Credit Accommodations.** From time to time during the Term at Borrower's request, make revolving loans to Borrower ("*Revolving Loans*"), and make letters of credit, bankers acceptances and other credit accommodations ("*Credit Accommodations*") available to Borrower, in each case to the extent that there is sufficient Availability for Borrower at the time of such request to cover, dollar for dollar, the requested Revolving Loan or Credit Accommodation of Borrower; *provided*, that after giving effect to such Revolving Loan or Credit Accommodation, (x) the outstanding balance of all monetary Obligations (*excluding* the principal balance of any Term Loans and *including* the Credit Accommodation Balance) will not exceed the Maximum Facility Amount set forth in Section 1(a) of Schedule A and (y) none of the other Loan Limits for Revolving Loans set forth in Section 1 of Schedule A will be exceeded. For this purpose, "*Availability*" means, with respect to Borrower:

    (i) the aggregate amount of Borrower's Eligible Accounts (less maximum existing or asserted taxes, discounts, credits and allowances) multiplied by the Accounts Advance Rate set forth in Section 1(b)(i) of Schedule A;

    *plus*

    (ii) the lower of cost or market value of Borrower's Eligible Inventory multiplied by the applicable Inventory Advance Rate set forth in Section 1(b)(ii) of Schedule A, but not to exceed the Inventory Sublimit set forth in Section 1(c) of Schedule A;

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

*minus*

(iii) all Reserves with respect to Borrower which Lender has established pursuant to Section 1.2 (including those to be established in connection with the requested Revolving Loan or Credit Accommodation);

*minus*

(iv) the outstanding balance of all monetary Obligations with respect to Borrower (*excluding* the principal balance of the Term Loan but *including* the Credit Accommodation Balance).

(b) **Term Loan.** Make on the date of this Agreement an advance to Borrower in the principal amount set forth in Section 2(a) of Schedule A (the "*Advance*"). The Advance is referred to as a "*Term Loan Advance*" and the "*Term Loan*" and will be wired to Borrower's Bank set forth in Section 16 of Schedule A. The Term Loan will be evidenced by a term note in the form attached hereto as Exhibit A.

**1.2 Reserves.** Lender may from time to time establish and revise such reserves as Lender deems appropriate in its sole discretion ("***Reserves***") to reflect (i) events, conditions, contingencies or risks which affect or may affect (A) the Collateral or its value, or the security interests and other rights of Lender in the Collateral or (B) the assets, business or prospects of Borrower or any Obligor, (ii) Lender's good faith concern that any Collateral report or financial information furnished to Lender by or on behalf of Borrower or any Obligor is or may have been incomplete, inaccurate or misleading in any material respect, (iii) any fact or circumstance which Lender determines in good faith constitutes, or could constitute, a Default or Event of Default or (iv) any other events or circumstances which Lender determines in good faith make the establishment or revision of a Reserve prudent. Without limiting the foregoing, Lender shall (x) in the case of each Credit Accommodation issued for the purchase of Inventory (a) which meets the criteria for Eligible Inventory set forth in clauses (i), (ii), (iii), (v) and (vi) of the definition of Eligible Inventory, (b) which is or will be in transit to one of the locations set forth in Sections 9(d) of Schedule A, (c) which is fully insured in a manner satisfactory to Lender and (d) with respect to which Lender is in possession of all bills of lading and all other documentation which Lender has requested, all in form and substance satisfactory to Lender in its sole discretion, establish a Reserve equal to the cost of such Inventory (plus all duties, freight, taxes, insurance, costs and other charges and expenses relating to such Credit Accommodation or such Eligible Inventory) multiplied by a percentage equal to 90% minus the Inventory Advance Rate applicable to such Eligible Inventory and (y) in the case of any other Credit Accommodation issued for any other purpose, establish a Reserve equal to the full amount of such Credit Accommodation plus all costs and other charges and expenses relating to such Credit Accommodation. Lender may, in its discretion, establish and revise Reserves by deducting them in determining Availability or by reclassifying Eligible Accounts or Eligible Inventory as ineligible. In no event shall the establishment of a Reserve in respect of a particular actual or contingent liability obligate Lender to make advances to pay such liability or otherwise obligate Lender with respect thereto.

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

**1.3 Other Provisions Applicable to Credit Accommodations.** Lender may, in its sole discretion and on terms and conditions acceptable to Lender, make Credit Accommodations available to Borrower either by issuing them, or by causing other financial institutions to issue them supported by Lender's guaranty or indemnification; *provided*, that after giving effect to each Credit Accommodation, the Credit Accommodation Balance will not exceed the Credit Accommodation Limit set forth in Section 1(d) of Schedule A. Any amounts paid by Lender in respect of a Credit Accommodation to Borrower will be treated for all purposes as a Revolving Loan to Borrower which shall be secured by the Collateral and bear interest, and be payable, in the same manner as a Revolving Loan. Borrower agrees to execute all documentation required by Lender or the issuer of any Credit Accommodation in connection with any such Credit Accommodation.

**1.4 Repayment.** Accrued interest on all monetary Obligations shall be payable on the first day of each month. Principal of the Term Loan shall be repaid as set forth in Section 2(b) of Schedule A. Payments of principal in respect of the Term Loan may not be reborrowed. If at any time any of the Loan Limits are exceeded, Borrower will immediately pay to Lender such amounts (or provide cash collateral to Lender with respect to the Credit Accommodation Balance in the manner set forth in Section 7.3) as shall cause Borrower to be in full compliance with all of the Loan Limits. Notwithstanding the foregoing, Lender may, in its sole and absolute discretion, make or permit Revolving Loans, the Term Loan, any Credit Accommodations or any other monetary Obligations to be in excess of any of the Loan Limits; *provided*, that Borrower shall, upon Lender's demand, pay to Lender such amounts as shall cause Borrower to be in full compliance with all of the Loan Limits. Borrower shall pay to Lender as a mandatory prepayment, promptly after the receipt thereof by Borrower, all refunds of value added tax received by Borrower in respect of periods prior to the date hereof (the "*VAT Refunds*"). Prior to the Maturity Date, such VAT Refunds indefeasibly received by Lender (net of any costs and expenses paid or advanced by Lender in connection with the collection thereof) shall be first applied by Lender to the then outstanding balance of the Term Loan until the Term Loan is paid in full, and thereafter paid to Lender as a fee. Borrower shall pay to Lender as a mandatory prepayment, promptly after the receipt thereof by Borrower, 50% of all proceeds of receivables included in the Collateral but deemed ineligible, as of the date hereof, for borrowing base purposes ("*Ineligible Receivable Payments*"). Prior to the Maturity Date, such Ineligible Receivable Payments indefeasibly received by Lender shall be applied by Lender to the then outstanding balance of the Term Loan until the Term Loan is paid in full, and thereafter paid to Lender as a fee. All unpaid monetary Obligations shall be payable in full on the Maturity Date (as defined in Section 7.1) or, if earlier, the date of any early termination pursuant to Section 7.2.

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

## 2. INTEREST AND FEES.

**2.1 Interest.** Except where expressly set forth to the contrary in this Agreement or another Loan Document, all Revolving Loans and other monetary Obligations shall bear interest at the Interest Rate set forth in Section 3(a) of Schedule A and the Term Loan shall bear interest at the Interest Rate set forth in Section 3(b) of Schedule A; *provided*, that (i) after the occurrence of an Event of Default, all Loans and other monetary Obligations shall, at Lender's option, bear interest at a rate per annum equal to three percent (3%) in excess of the rate otherwise applicable thereto until paid in full (notwithstanding the entry of any judgment against Borrower or the exercise of any other right or remedy by Lender), and all such interest shall be payable on demand and (ii) after the occurrence of an Event of Default under either of clauses (vii) or (viii) of Section 8, the increase described in the foregoing clause (i) shall occur automatically and shall continue until all Loans and other monetary Obligations are paid in full. Changes in the Interest Rate shall be effective as of the date of any change in the Prime Rate. Notwithstanding anything to the contrary contained in this Agreement, the aggregate of all amounts deemed to be interest hereunder and charged or collected by Lender is not intended to exceed the highest rate permissible under any applicable law, but if it should, such interest shall automatically be reduced to the extent necessary to comply with applicable law and Lender will refund to Borrower any such excess interest received by Lender.

**2.2 Fees.** Borrower shall pay Lender the following fees, which are in addition to all interest and other sums payable by Borrower to Lender under this Agreement, and are not refundable:

(a) **Credit Accommodation Fees.** The fees relating to Credit Accommodations (or guaranties thereof by Lender) in the amount set forth in Section 6(a) of Schedule A (the "*Credit Accommodation Fees*"), payable, in arrears, on the first day of each month so long as any of the Obligations are outstanding and on the Maturity Date, plus all costs and fees charged by the issuer, payable as and when such costs and fees are charged.

(b) **Net Sales Participation**. Borrower agrees to pay to Lender, monthly in arrears beginning 120 days from the date hereof and on the first day of each calendar month thereafter, an amount equal to five percent (5%) of Borrower's Net Sales (the "Net Sales Participation"). Such Net Sales Participation shall be applied by Lender to the outstanding balance of the Term Loan until the Term Loan is paid in full and thereafter shall be paid to Lender as a fee.

(c) **Sharing Fee.** Borrower agrees to pay to Lender a fee in the amount of twenty-five percent (25%) of Borrower's Net Profits with respect to each of the first four full fiscal quarters of Borrower occurring after the date hereof. Such fee shall be deemed to be fully earned as of the last day of each such fiscal quarter, and payable on the date on which the financial statements of Borrower for such fiscal quarter are to be delivered pursuant to Section 5.15.

-4-

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

**2.3 Computation of Interest and Fees.** All interest and fees shall be calculated daily on the closing balances in the Loan Account based on the actual number of days elapsed in a year of 360 days. For purposes of calculating interest and fees, if the outstanding daily principal balance of the Revolving Loans is a credit balance, such balance shall be deemed to be zero.

**2.4 Loan Account; Monthly Accountings.** Lender shall maintain a loan account for Borrower reflecting all advances, charges, expenses and payments made pursuant to this Agreement (the "*Loan Account*"), and shall provide Borrower with a monthly accounting reflecting the activity in the Loan Account as soon as reasonably practicable. Each accounting shall be deemed correct, accurate and binding on Borrower and an account stated (except for reverses and reapplications of payments made and corrections of errors discovered by Lender), unless Borrower notifies Lender in writing to the contrary within sixty days after such account is rendered, describing the nature of any alleged errors or omissions. However, Lender's failure to maintain the Loan Account or to provide any such accounting shall not affect the legality or binding nature of any of the Obligations. Interest, fees and other monetary Obligations due and owing under this Agreement (including fees and other amounts paid by Lender to issuers of Credit Accommodations) may, in Lender's discretion, be charged to the Loan Account, and will thereafter be deemed to be Revolving Loans and will bear interest at the same rate as other Revolving Loans.

3.     SECURITY INTEREST.

**3.1 Grant of Security Interest.** To secure the full payment and performance of all of the Obligations, Borrower hereby assigns to Lender and grants to Lender a continuing security interest in the following property of Borrower, whether tangible or intangible, now or hereafter owned, existing, acquired or arising and wherever now or hereafter located, and whether or not eligible for lending purposes: (i) all Accounts (whether or not Eligible Inventory) and all Goods whose sale, lease or other disposition by Borrower has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, Borrower; (ii) all Chattel Paper, Instruments, Documents and General Intangibles (including all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contracts rights, payment intangibles, security interests, security deposits and rights to indemnification); (iii) all Inventory (whether or not Eligible Accounts); (iv) all Goods (other than Inventory), including Equipment, vehicles and Fixtures; (v) all Investment Property; (vi) all Deposit Accounts, bank accounts (including without limitation the Deposit Accounts and bank accounts described in Section 15 of Schedule A), deposits and cash; (vii) all Letter-of-Credit Rights; (viii) all Commercial Tort Claims listed in Section 14 of Schedule A; (ix) all Supporting Obligations; (x) any other property of Borrower now or hereafter in the possession, custody or control of Lender or any agent or any parent, Affiliate or Subsidiary of Lender or any participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise) and (xi) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including proceeds of all insurance policies insuring the foregoing property, and all of Borrower's books and records relating to any of the foregoing and to Borrower's business.

-5-

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

      **3.2 Possessory Collateral.** Immediately upon Borrower's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including any Tangible Chattel Paper and any Investment Property consisting of certificated securities, Borrower shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance acceptable to Lender). If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as Borrower's attorney and agent-in-fact, to endorse or assign the same on Borrower's behalf.

      **3.3 Preservation of Collateral and Perfection of Security Interest Therein.** Borrower shall, at Lender's request, at any time and from time to time, authenticate, execute and deliver to Lender such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Lender) and do such other acts and things or cause third parties to do such other acts and things as Lender may deem necessary or desirable in its sole and absolute discretion in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Lender (free and clear of all other liens, claims, encumbrances and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens) to secure payment of the Obligations and to facilitate the collection of the Collateral. Borrower authorizes Lender to file, transmit, or communicate, as applicable, financing statements and amendments describing the Collateral as "all personal property of debtor" or "all assets of debtor" or words of similar effect, in order to perfect Lender's security interest in the Collateral without Borrower's signature. Borrower also hereby ratifies its authorization for Lender to have filed in any jurisdiction any financing statements filed prior to the date hereof.

**4.     ADMINISTRATION.**

      **4.1 Lock Boxes and Blocked Accounts.** Borrower will, at its expense, establish (and revise from time to time as Lender may require) procedures acceptable to Lender, in Lender's sole and absolute discretion, for the collection of checks, wire transfers and other proceeds of Accounts ("*Account Proceeds*"), which may include (i) directing all Account Debtors to send all such proceeds directly to a post office box designated by Lender either in the name of Borrower (but as to which Lender has exclusive access) or, at Lender's option, in the name of Lender (a "*Lock Box*") or (ii) depositing all Account Proceeds received by Borrower into one or more bank accounts maintained in Lender's name (each, a "*Blocked Account*"), under an arrangement acceptable to Lender with a depository bank acceptable to Lender, pursuant to which all funds deposited into each Blocked Account are to be transferred to Lender in such manner, and with such frequency, as Lender shall specify or (iii) a combination of the foregoing. Borrower agrees to execute, and to cause its depository banks to execute, such Lock Box and Blocked Account agreements and other documentation as Lender shall require from time to time in connection with the foregoing.

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

**4.2 Remittance of Proceeds.** Except as provided in Section 4.1, all Proceeds arising from the sale or other disposition of any Collateral, shall be delivered, in kind, by Borrower to Lender in the original form in which received by Borrower not later than the following Business Day after receipt by Borrower. Until so delivered to Lender, Borrower shall hold such Proceeds separate and apart from Borrower's other funds and property in an express trust for Lender. Nothing in this Section 4.2 shall limit the restrictions on disposition of Collateral set forth elsewhere in this Agreement.

**4.3 Application of Payments.** Lender may, in its sole and absolute discretion, apply, reverse and re-apply all cash and non-cash Proceeds of Collateral or other payments received with respect to the Obligations, in such order and manner as Lender shall determine, whether or not the Obligations are due, and whether before or after the occurrence of a Default or an Event of Default. For purposes of determining Availability, such amounts will be credited to the Loan Account and the Collateral balances to which they relate upon Lender's receipt of an advice from Lender's Bank (set forth in Section 11 of Schedule A) that such items have been credited to Lender's account at Lender's Bank (or upon Lender's deposit thereof at Lender's Bank in the case of payments received by Lender in kind), in each case subject to final payment and collection. However, for purposes of computing interest on the Obligations, such items shall be deemed applied by Lender three (3) Business Days after Lender's receipt of advice of deposit thereof at Lender's Bank.

**4.4 Notification; Verification.** Lender or its designee may, from time to time, whether or not a Default or Event of Default has occurred: (i) verify directly with the Account Debtors the validity, amount and other matters relating to the Accounts and Chattel Paper, by means of mail, telephone or otherwise, either in the name of Borrower or Lender or such other name as Lender may choose; (ii) notify Account Debtors that Lender has a security interest in the Accounts and that payment thereof is to be made directly to Lender; and (iii) demand, collect or enforce payment of any Accounts and Chattel Paper (but without any duty to do so).

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

**4.5 Power of Attorney.** Borrower hereby grants to Lender an irrevocable power of attorney, coupled with an interest, authorizing and permitting Lender (acting through any of its officers, employees, attorneys or agents), at any time (whether or not a Default or Event of Default has occurred and is continuing, except as expressly provided below), at Lender's option, but without obligation, with or without notice to Borrower, and at Borrower's expense, to do any or all of the following, in Borrower's name or otherwise: (i) execute on behalf of Borrower any documents that Lender may, in its sole and absolute discretion, deem advisable in order to perfect and maintain Lender's security interests in the Collateral, to exercise a right of Borrower or Lender, or to fully consummate all the transactions contemplated by this Agreement and the other Loan Documents (including such financing statements and continuation financing statements, and amendments thereto, as Lender shall deem necessary or appropriate) and to file as a financing statement any copy of this Agreement or any financing statement signed by Borrower; (ii) execute on behalf of Borrower any document exercising, transferring or assigning any option to purchase, sell or otherwise dispose of or lease (as lessor or lessee) any real or personal property which is part of the Collateral or in which Lender has an interest; (iii) execute on behalf of Borrower any invoices relating to any Accounts, any draft against any Account Debtor, any proof of claim in bankruptcy, any notice of Lien or claim, and any assignment or satisfaction of mechanic's, materialman's or other Lien; (iv) execute on behalf of Borrower any notice to any Account Debtor; (v) receive and otherwise take control in any manner of any cash or non-cash items of payment or Proceeds of Collateral; (vi) endorse Borrower's name on all checks and other forms of remittances received by Lender; (vii) pay, contest or settle any Lien, charge, encumbrance, security interest and adverse claim in or to any of the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (viii) after the occurrence of a Default or Event of Default, grant extensions of time to pay, compromise claims relating to, and settle Accounts, Chattel Paper and General Intangibles for less than face value and execute all releases and other documents in connection therewith; (ix) pay any sums required on account of Borrower's taxes or to secure the release of any Liens therefor; (x) pay any amounts necessary to obtain, or maintain in effect, any of the insurance described in Section 5.14; (xi) settle and adjust, and give releases of, any insurance claim in an amount in excess of $50,000 (or upon the occurrence and during the continuance of an Event of Default, any insurance claim regardless of its amount) that relates to any of the Collateral and obtain payment therefor; (xii) instruct any third party having custody or control of any Collateral or books or records belonging to, or relating to, Borrower to give Lender the same rights of access and other rights with respect thereto as Lender has under this Agreement; (xiii) after the occurrence of a Default or Event of Default, change the address for delivery of Borrower's mail and receive and open all mail addressed to Borrower; and (xiv) endorse or assign to Lender on Borrower's behalf any portion of Collateral evidenced by an agreement, Instrument or Document if an endorsement or assignment of any such items is not made by Borrower pursuant to Section 3.2. Any and all sums paid, and any and all costs, expenses, liabilities, obligations and reasonable attorneys' fees incurred, by Lender with respect to the foregoing shall be added to and become part of the Obligations, shall be payable on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations. Borrower agrees that Lender's rights under the foregoing power of attorney or any of Lender's other rights under this Agreement or the other Loan Documents shall not be construed to indicate that Lender is in control of the business, management or properties of Borrower.

-8-

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

**4.6 Disputes.** Borrower shall promptly notify Lender of all disputes or claims relating to Accounts and Chattel Paper. Borrower will not, without Lender's prior written consent, compromise or settle any Account or Chattel Paper for less than the full amount thereof, grant any extension of time of payment of any Account or Chattel Paper, release (in whole or in part) any Account Debtor or other person liable for the payment of any Account or Chattel Paper or grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any Account or Chattel Paper; except that prior to the occurrence of an Event of Default, Borrower may take any of such actions in the ordinary course of its business, *provided* that Borrower promptly reports the same to Lender.

**4.7 Invoices.** At Lender's request, Borrower will cause all invoices and statements which it sends to Account Debtors or other third parties to be marked, in a manner satisfactory to Lender, to reflect Lender's security interest therein.

**4.8 Inventory.**

(a) **Returns.** Provided that no Event of Default has occurred and is continuing, if any Account Debtor returns any Inventory to Borrower in the ordinary course of its business, Borrower will promptly issue a credit memorandum in an amount in excess of $10,000 to the Account Debtor in an appropriate amount and send a copy thereof to Lender. After the occurrence of an Event of Default, Borrower will not accept any return without Lender's prior written consent. If an Event of Default has occurred, Borrower will (i) hold the returned Inventory in trust for Lender; (ii) segregate all returned Inventory from all of Borrower's other property; (iii) conspicuously label the returned Inventory as Lender's property; and (iv) immediately notify Lender of the return of such Inventory, specifying the reason for such return, the location and the condition of the returned Inventory and, at Lender's request, deliver such returned Inventory to Lender at an address specified by Lender.

(b) **Other Covenants.** Borrower will not, without Lender's prior written consent, (i) store any Inventory with any warehouseman or other third party other than subject to a warehouseman's or landlord's agreement in form and substance satisfactory to Lender and at a location set forth in Section 9(d) of Schedule A or (ii) sell any Inventory on a sale-or-return, guaranteed sale, consignment, or other contingent basis. All of the Inventory has been produced only in accordance with the Fair Labor Standards Act of 1938 and all rules, regulations and orders promulgated thereunder.

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

**4.9 Access to Collateral, Books and Records.** At reasonable times, and on one Business Day's notice prior to the occurrence of a Default or an Event of Default and at any time and with or without notice after the occurrence of a Default or an Event of Default, Lender or its agents shall have the right to inspect the Collateral, and the right to examine and copy Borrower's books and records. Lender shall take reasonable steps to keep confidential all information obtained in any such inspection or examination, but Lender shall have the right to disclose any such information to its auditors, regulatory agencies, attorneys and participants, and pursuant to any subpoena or other legal process. Borrower agrees to give Lender access to any or all of Borrower's premises to enable Lender to conduct such inspections and examinations. Such inspections and examinations shall be at Borrower's expense and the charge therefor shall be $1,000 per person per day (or such higher amount as shall represent Lender's then current standard charge), plus reasonable out-of-pocket expenses. Lender may, at Borrower's expense, use Borrower's personnel, computer and other equipment, programs, printed output and computer readable media, supplies and premises for the collection, sale or other disposition of Collateral to the extent Lender, in its sole discretion, deems appropriate. Borrower hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Lender, at Borrower's expense, all financial information, books and records, work papers, management reports and other information in their possession regarding Borrower. Borrower will not enter into any agreement with any accounting firm, service bureau or third party to store Borrower's books or records at any location other than Borrower's Address without first obtaining Lender's written consent (which consent may be conditioned upon such accounting firm, service bureau or other third party agreeing to give Lender the same rights with respect to access to books and records and related rights as Lender has under this Agreement).

5.  **REPRESENTATIONS, WARRANTIES AND COVENANTS.**

To induce Lender to enter into this Agreement, Borrower represents, warrants and covenants as follows, after giving effect to the Related Transactions (it being understood that (i) each such representation and warranty will be deemed remade as of the date on which each Loan is made and each Credit Accommodation is provided and shall not be affected by any knowledge of, or any investigation by, Lender, and (ii) the accuracy of each such representation, warranty and covenant will be a condition to each Loan):

**5.1 Existence and Authority.** Borrower is, and at all times will be, duly organized, validly existing and in good standing under the laws of the State of Delaware and its state organizational indemnification number is DE4458560. Borrower is, and at all times will be, qualified and licensed to do business in all jurisdictions in which any failure to do so would have a material adverse effect on Borrower. The execution, delivery and performance by Borrower of this Agreement and all of the other Loan Documents have been duly and validly authorized, do not violate Borrower's articles or certificate of incorporation, by-laws or other organizational documents, or any law or any agreement or instrument or any court order which is binding upon Borrower or its property, do not constitute grounds for acceleration of any indebtedness or obligation under any agreement or instrument which is binding upon Borrower or its property, and do not require the consent of any Person. This Agreement and such other Loan Documents have been duly executed and delivered by, and are enforceable against, Borrower, and all other Obligors who have signed them, in accordance with their respective terms. Sections 9(g) and 9(h) of Schedule A set forth the ownership of Borrower and the names and ownership of Borrower's Subsidiaries as of the date of this Agreement.

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

**5.2 Name; Trade Names and Styles.** The name of Borrower set forth in the heading to this Agreement is its correct and complete legal name as of the date hereof. Listed in Sections 9(a), 9(b) and 9(c) of Schedule A are all prior names of Borrower and all of Borrower's present and prior trade names. Borrower shall give Lender at least thirty days' prior written notice before changing its name or doing business under any other name. Borrower has complied with all laws relating to the conduct of business under a fictitious business name. Borrower represents and warrants that (i) each trade name does not refer to another corporation or other legal entity; and (ii) all Accounts invoiced under any such trade names are owned exclusively by Borrower and are subject to the security interest of Lender and the other terms of this Agreement.

**5.3 Title to Collateral; Permitted Liens.** Borrower has good and marketable title to the Collateral. The Collateral now is and will at all times remain free and clear of any and all liens, charges, security interests, encumbrances and adverse claims, except for Permitted Liens. Lender now has, and will continue to have, a first-priority perfected and enforceable security interest in all of the Collateral, subject only to the Permitted Liens, and Borrower will at all times defend Lender and the Collateral against all claims of others. None of the Collateral which is Equipment is or will be affixed to any real property in such a manner, or with such intent, as to become a fixture. Except for leases or subleases as to which Borrower has delivered to Lender a landlord's waiver in form and substance satisfactory to Lender, Borrower is not, and will at no time be, a lessee or sublessee under any real property lease or sublease pursuant to which the lessor or sublessor may obtain any rights in any of the Collateral, and no such lease or sublease now, or at any time, prohibits, restrains, impairs or conditions, or will prohibit, restrain, impair or condition, Borrower's right to remove any Collateral from the premises. Except for warehouses as to which Borrower has delivered to Lender a warehouseman's waiver in form and substance satisfactory to Lender, Borrower is not, and will at no time be, a bailor of any Goods at any warehouse under an arrangement pursuant to which the warehouseman may obtain any rights in any of the Collateral. Prior to causing or permitting any Collateral to be located upon premises in which any third party has an interest (whether as owner, mortgagee, beneficiary under a deed of trust, lienholder or otherwise), Borrower shall, whenever requested by Lender, cause each such third party to execute and deliver to Lender, in form and substance acceptable to Lender, such waivers and subordinations as Lender shall specify, so as to ensure that Lender's rights in the Collateral are, and will continue to be, superior to the rights of any such third party. Borrower will keep in full force and effect, and will comply with all the terms of, any lease of real property where any of the Collateral now or in the future may be located.

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

**5.4 Accounts and Chattel Paper.** As of each date reported by Borrower, all Accounts which Borrower has reported to Lender as being Eligible Accounts comply in all respects with the criteria for eligibility established by Lender and in effect at such time. All Accounts and Chattel Paper are genuine and in all respects what they purport to be, arise out of a completed, bona fide and unconditional and non-contingent sale and delivery of goods or rendition of services by Borrower in the ordinary course of its business and in accordance with the terms and conditions of all purchase orders, contracts or other documents relating thereto, each Account Debtor thereunder had the capacity to contract at the time any contract or other document giving rise to such Accounts and Chattel Paper were executed, and the transactions giving rise to such Accounts and Chattel Paper comply with all applicable laws and governmental rules and regulations.

**5.5 Electronic Chattel Paper.** To the extent that Borrower obtains or maintains any Electronic Chattel Paper, Borrower shall create, store and assign the record or records comprising the Electronic Chattel Paper in such a manner that (i) a single authoritative copy of the record or records exists which is unique, identifiable and except as otherwise provided below, unalterable, (ii) the authoritative copy identifies Lender as the assignee of the record or records, (iii) the authoritative copy is communicated to and maintained by the Lender or its designated custodian, (iv) copies or revisions that add or change an identified assignee of the authoritative copy can only be made with the participation of Lender, (v) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy and (vi) any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

**5.6 Investment Property.** Borrower will take any and all actions required or requested by Lender, from time to time, to (i) cause Lender to obtain exclusive control of any Investment Property in a manner acceptable to Lender and (ii) obtain from any issuers of Investment Property and such other Persons as Lender shall specify, for the benefit of Lender, written confirmation of Lender's exclusive control over such Investment Property and take such other actions as Lender may request to perfect Lender's security interest in such Investment Property. For purposes of this Section 5.6, Lender shall have exclusive control of Investment Property if (A) pursuant to Section 3.2, such Investment Property consists of certificated securities and Borrower delivers such certificated securities to Lender (with appropriate endorsements if such certificated securities are in registered form); (B) such Investment Property consists of uncertificated securities and either (x) Borrower delivers such uncertificated securities to Lender or (y) the issuer thereof agrees, pursuant to documentation in form and substance satisfactory to Lender, that it will comply with instructions originated by Lender without further consent by Borrower, and (C) such Investment Property consists of security entitlements and either (x) Lender becomes the entitlement holder thereof or (y) the appropriate securities intermediary agrees, pursuant to documentation in form and substance satisfactory to Lender, that it will comply with entitlement orders originated by Lender without further consent by Borrower.

**5.7 Commercial Tort Claims.** Borrower has no Commercial Tort Claims pending other than those listed in Section 14 of Schedule A, and Borrower shall promptly notify Lender in writing upon incurring or otherwise obtaining a Commercial Tort Claim after the date hereof against any third party. Such notice shall constitute Borrower's authorization to amend such Section 14 to add such Commercial Tort Claim.

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

**5.8 State of Organization; Location of Collateral.** Borrower's Address is Borrower's chief executive office and the location of its books and records. In addition, except as provided in the immediately following sentence, Borrower has places of business and Collateral located only at the locations set forth on Sections 9(d) and 9(e) of Schedule A. Borrower will give Lender at least thirty days' prior written notice before changing Borrower's state of organization, opening any additional place of business, changing its chief executive office or the location of its books and records, or moving any of the Collateral to a location other than Borrower's Address or one of the locations set forth in Sections 9(d) and 9(e) of Schedule A, and will execute and deliver all financing statements and other agreements, instruments and documents which Lender shall require as a result thereof.

**5.9 Financial Condition, Statements and Reports.** All financial statements delivered to Lender by or on behalf of Borrower have been, and will at all times continue to be, prepared in conformity with GAAP and completely and fairly reflect the financial condition of Borrower, at the times and for the periods therein stated. Between the last date covered by any such financial statement provided to Lender and the date hereof (or, with respect to the remaking of this representation in connection with the making of any Loan or providing of any Credit Accommodation, the date such Loan is made or such Credit Accommodation is provided) there has been no material adverse change in the financial condition or business of Borrower. Borrower is solvent and able to pay its debts as they come due, and has sufficient capital to carry on its business as now conducted and as proposed to be conducted. All schedules, reports and other information and documentation delivered by Borrower to Lender with respect to the Collateral are, or when delivered will be, true, correct and complete as of the date delivered or the date specified therein.

**5.10 Tax Returns and Payments; Pension Contributions.** Borrower has timely filed, and shall at all times continue to timely file, all tax returns and reports required by applicable law or a request for an extension thereof, has timely paid, and shall continue to timely pay, all applicable taxes, assessments, deposits and contributions owing by Borrower and will timely pay all such items in the future as they become due and payable. Borrower may, however, defer payment of any contested taxes; *provided*, that Borrower (i) in good faith contests its obligation to pay such taxes by appropriate proceedings promptly and diligently instituted and conducted; (ii) notifies Lender in writing of the commencement of, and any material development in, the proceedings; (iii) posts bonds or takes any other steps required to keep the contested taxes from becoming a Lien upon any of the Collateral and (iv) maintains adequate reserves therefor in conformity with GAAP. Borrower is unaware of any claims or adjustments proposed for any of Borrower's prior tax years that could result in additional taxes becoming due and payable by Borrower and shall give prompt written notice to Lender if it becomes aware of any such claims or adjustments. Borrower has paid, and shall continue to pay, all amounts necessary to fund all present and future pension, profit sharing and deferred compensation plans in accordance with their terms, and Borrower has not withdrawn from participation in, permitted partial or complete termination of, or permitted the occurrence of any other event with respect to, any such plan which could result in any liability of Borrower, including any liability to the Pension Benefit Guaranty Corporation or any other governmental agency.

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

**5.11 Compliance with Laws.** Borrower has complied, and shall at all times continue to comply, in all material respects with all provisions of all applicable laws and regulations, including those relating to Borrower's ownership of real or personal property, the conduct and licensing of Borrower's business, the payment and withholding of taxes, ERISA and other employee matters, safety and environmental matters.

**5.12 Litigation.** Section 9(f) of Schedule A discloses all claims, proceedings, litigation or investigations pending or (to the best of Borrower's knowledge) threatened against Borrower. There is no claim, suit, litigation, proceeding or investigation pending or (to the best of Borrower's knowledge) threatened by or against or affecting Borrower in any court or before any governmental agency (or any basis therefor known to Borrower) which may result, either separately or in the aggregate, in any material adverse change in the financial condition or business of Borrower, or in any material impairment in the ability of Borrower to carry on its business in substantially the same manner as it is now being conducted. Borrower will promptly inform Lender in writing of any claim, proceeding, litigation or investigation in the future threatened or instituted by or against Borrower.

**5.13 Use of Proceeds.** All proceeds of all Loans will be used solely for lawful business purposes, including to finance the Related Transactions.

**5.14 Insurance.** Borrower will at all times carry property, liability and other insurance, with insurers acceptable to Lender, in such form and amounts, and with such deductibles and other provisions, as Lender shall require, and Borrower will provide Lender with evidence satisfactory to Lender that such insurance is, at all times, in full force and effect. Each property insurance policy shall name Lender as loss payee and shall contain a lender's loss payable endorsement in form acceptable to Lender, each liability insurance policy shall name Lender as an additional insured, and each business interruption insurance policy shall be collaterally assigned to Lender, all in form and substance satisfactory to Lender. All policies of insurance shall provide that they may not be cancelled or changed without at least thirty days' prior written notice to Lender, shall contain breach of warranty coverage, and shall otherwise be in form and substance satisfactory to Lender. Upon receipt of the proceeds of any such insurance, Lender will apply such proceeds in reduction of the Obligations as Lender shall determine in its sole discretion. Borrower will promptly deliver to Lender copies of all reports made to insurance companies.

-14-

| Greystone Business Credit II, L.L.C. | Loan and Security Agreement |
|---|---|

**5.15 Financial and Collateral Reports.** Borrower has kept and will keep adequate records and books of account with respect to its business activities and the Collateral in which proper entries are made in accordance with GAAP reflecting all its financial transactions, and will cause to be prepared and furnished to Lender the following (all to be prepared in accordance with GAAP, unless Borrower's certified public accountants concur in any change therein and such change is disclosed to Lender):

(a) **Collateral Reports.** On or before the fifteenth (15) day of each month, an aging of Borrower's Accounts, Chattel Paper and notes receivable, and on a monthly basis, or more frequently as requested by Lender Inventory reports, all in such form, and together with such additional certificates, schedules and other information with respect to the Collateral or the business of Borrower or any Obligor, as Lender shall request; *provided*, that Borrower's failure to execute and deliver the same shall not affect or limit Lender's security interests and other rights in any of the Accounts, nor shall Lender's failure to advance or lend against a specific Account affect or limit Lender's security interest and other rights therein. Together with each such schedule, Borrower shall furnish Lender with copies (or, at Lender's request, originals) of all contracts, orders, invoices, and other similar documents, and all original shipping instructions, delivery receipts, bills of lading, and other evidence of delivery, for any goods the sale or disposition of which gave rise to such Accounts, and Borrower warrants the genuineness of all of the foregoing. In addition, Borrower shall deliver to Lender the originals of all Instruments, Chattel Paper, security agreements, guaranties and other documents and property evidencing or securing any Accounts, immediately upon receipt thereof and in the same form as received, with all necessary endorsements. Lender may destroy or otherwise dispose of all documents, schedules and other papers delivered to Lender pursuant to this Agreement (other than originals of Instruments, Chattel Paper, security agreements, guaranties and other documents and property evidencing or securing any Accounts) six months after Lender receives them, unless Borrower requests their return in writing in advance and arranges for their return to Borrower at Borrower's expense;

(b) **Annual Statements.** Not later than one hundred and five (105) days after the close of each fiscal year of Borrower, unqualified (except for a qualification for a change in accounting principles with which the accountant concurs) audited financial statements of Borrower and its Subsidiaries as of the end of such year, on a consolidated and consolidating basis, certified by a firm of independent certified public accountants of recognized standing selected by Borrower but acceptable to Lender, together with a copy of any management letter issued in connection therewith and a letter from such accountants acknowledging that Lender is relying on such financial statements;

(c) **Interim Statements.** Not later than thirty (30) days after the end of each month hereafter, including the last month of Borrower's fiscal year, (i) unaudited interim financial statements of Borrower and its Subsidiaries as of the end of such month and of the portion of Borrower's fiscal year then elapsed, on a consolidated and consolidating basis, certified by the principal financial officer of Borrower as prepared in accordance with GAAP and fairly presenting the consolidated financial position and results of operations of Borrower and its Subsidiaries for such month and period subject only to changes from audit and year-end adjustments and except that such statements need not contain notes and (ii) a compliance certificate in form and substance satisfactory to Lender setting forth the financial covenants set forth in Section 8 of Schedule A for such month, as certified by officer of Borrower;