UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
DIESEL PROPS S.R.L. and
DIESEL KID S.R.L.,

                Plaintiffs/Counter-Defendants,

       -against-

GREYSTONE BUSINESS CREDIT II LLC
and GLOBAL BRAND MARKETING INC.,

           Defendants/Counter-Plaintiffs,

       -against-

DIESEL S.p.A.,

          Third-Party Defendant.
----------------------------------------------------------------x

Civil Action No.  07 CV 9580 (HB)

## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION

Ira S. Sacks
Mark S. Lafayette
DREIER LLP
499 Park Avenue
New York, New York 10022
(212) 328-6100
(212) 328-6101 (fax)
*Counsel for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND FACTS.....................................................................................3

ARGUMENT....................................................................................................15

I.    THE COURT SHOULD ISSUE A PRELIMINARY
INJUNCTION ENJOINING DEFENDANTS FROM
TRANSFERRING, SELLING, DISTRIBUTING OR
OTHERWISE DISPOSING OF THE OLD GBMI PRODUCT .......................................14

    A.    Plaintiffs Are Likely To Succeed On The Merits Of Their Conversion Claim .....15

        1.    The Distribution Agreements Are Governed By Italian Law,
And Pursuant To Paragraphs 5.4 And 12.3 Of Those Agreements,
GBMI And Greystone Have No Ownership Or Security Interest
In The Old GBMI Product ..........................................................................16

            a.    Plaintiffs Own The Old GBMI Pursuant To
Paragraph 5.4 Of The Distribution Agreements .......................................17

            b.    GBMI And Greystone Have No Rights In The Old GBMI Product
Because of Paragraph 12.3 Of The Distribution Agreements....................18

        2.    Even If The Distribution Agreements Were Governed By
The U.C.C., The Retention Of Title Provision Is Effective,
And The Old GBMI Product Is Owned By Diesel .........................................19

        3.    Greystone Is Estopped From Claiming A Security Interest
In The Old GBMI Product ..........................................................................23

    B.    Diesel Will Be Irreparably Harmed In The
Absence Of A Preliminary Injunction ..................................................................26

        1. Diesel's Business Will Be Irreversibly Damaged.............................................26

        2. Diesel Will Suffer A Significant Loss Of Goodwill And Reputation ..............28

        3. Monetary Damages Are Inadequate Or Cannot Be Reasonably Calculated.....29

    C.    A Balancing Of The Equities Clearly Favors Interim Relief.................................30

CONCLUSION....................................................................................................31

## TABLE OF AUTHORITIES

### Case

*Bear U.S.A. v. Kim*,
    71 F. Supp.2d 237 (S.D.N.Y. 1999)......................................................................13

*Briarpatch Ltd, L.P. v. Pate*,
    81 F. Supp.2d 509 (S.D.N.Y. 2000)....................................................................15

*Brenntag Int'l Chems. Inc. v. Bank of India*,
    175 F.3d 245 (2d Cir. 1999)................................................................................26

*Buric v. Kelly*,
    No. 03 Civ. 9376(HB), 2003 WL 22990082 (S.D.N.Y. Dec. 18, 2003) .................14

*Calva Prod. v. Security Pacific Nat'l Bank*,
    111 Cal. App. 3d 409 (Cal. Ct. App. 1980) .........................................................25

*Day Spring Enters., Inc. v. LMC Int'l, Inc.*,
    No. 98-CV-0658A(F), 2004 WL 2191568 (W.D.N.Y. Sep. 24, 2004) .............16, 17

*Dunkin' Donuts Inc. v. Albireh Donuts, Inc.*,
    96 F. Supp.2d 146 (N.D.N.Y. 2000)..........................................................15, 28, 30

*EMI Latin v. Bautista*,
    No. 03 CV 0947 (WHP), 2003 WL 470333 (S.D.N.Y. Feb. 24, 2003)...................29

*Eng v. Smith*,
    849 F.2d 80 (2d Cir. 1988)..................................................................................15

*Fieger v. Pitney Bowes Credit Corp.*,
    251 F.3d 386 (2d Cir. 2001)...........................................................................17, 21

*Hamilton Watch Co. v. Benrus Watch Co.*,
    206 F.2d 738 (2d Cir. 1953)................................................................................15

*Hartford Fire Ins. Co. v Orient Overseas Containers Lines*,
    230 F.3d 549 (2d Cir. 2000)................................................................................17

*Hong Kong & Shanghai Banking Corp. v. HFH USA Corp.*,
    805 F. Supp. 133 (W.D.N.Y. 1992) ............................................................20, 21-22

*In re Iroquois Energy Mgm't, LLC*,
    284 B.R. 28 (Bankr. W.D.N.Y. 2002) ..................................................................19

*In re J. Adrian Sons, Inc.*,
    205 B.R. 24 (Bankr. W.D.N.Y. 1997) ............................................................21, 23

*Italverde Trading, Inc. v. Four Bills of Lading*,
    485 F. Supp.2d 187 (E.D.N.Y. 2007) ...............................................................21

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
    323 F. Supp.2d 525 (S.D.N.Y. 2004)................................................................26

*Jones v. Dana*,
    No. 06 Civ. 0159(RPP), 2006 WL 1153358 (S.D.N.Y. May 2, 2006)...................26

*Murjani Int'l, Ltd. v. Sun Apparel, Inc.*,
    No. 87 CIV. 4628 (PKL), 1987 WL 15110 (S.D.N.Y. July 31, 1987)...................29

*NBA Prop. v. Untertainment Record LLC*,
    No. 99 CIV. 2933(HB), 1999 WL 335147 (S.D.N.Y. May 26, 1999) ...................14

*Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*,
    No. 07 CV 1562(ERK)(RML), 2008 WL 207843 (E.D.N.Y. Jan. 24, 2008).............15, 26, 28

*Painewebber Inc. v. Nwogugu*,
    No. 98 Civ. 2441(DLC), 1998 WL 545327 (S.D.N.Y. Aug. 26, 1998)...................29

*Quezada v. BP Prod. North America, Inc.*,
    No. 06 CV 5378 SJ, 2006 WL 3837720 (E.D.N.Y. Dec. 1, 2006)..........................28

*Regatos v. North Fork Bank*,
    257 F. Supp.2d 632 (S.D.N.Y. 2003)................................................................19

*Register.com, Inc. v. Verio, Inc.*,
    126 F. Supp.2d 238 (S.D.N.Y. 2000)................................................................29

*Reuters Ltd. v. United Press Int'l, Inc.*,
    903 F.2d 904 (2d Cir. 1990)........................................................................26, 28

*Roso-Lino Beverage Distribs., Inc. v. Coca -Cola Bottling Co. of New York, Inc.*,
    749 F.2d 124 (2d Cir. 1984)........................................................................26, 30

*Saban Entm't, Inc. v. 222 World Corp.*,
    865 F. Supp. 1047 (S.D.N.Y. 1994)................................................................28

*Schiavone Constr. Corp. v. City of New York*,
    99 F.3d 546 (2d Cir. 1996)........................................................................17

*S.E.C. v. Princeton Econ. Int'l, Ltd.,*
    73 F. Supp.2d 420 (S.D.N.Y. 1999)...............................................................26

*Shallcross v. Cmty. State Bank and Trust Co.,*
    180 N.J. Super. 273, 434 A.2d 671 (N.J. Super. Ct. 1981)......................................25

*Subaru Distribs. Corp. v. Subaru of America, Inc.,*
    No. 98 CIV 5566 CM, 2002 WL 188473 (S.D.N.Y. Feb. 5, 2002).........................20

*Symphony Fabric Corp. v. Podell Ind., Inc.,*
    No. 94 Civ. 4373 (BSJ), 1996 WL 497011 (S.D.N.Y. Aug. 30, 1996) ...................19

*Ticor Title Ins. Co. v. Cohen,*
    173 F.3d 63 (2d Cir. 1999)...........................................................................14, 26, 29

*Tom Doherty Assocs. v. Saban Entmt., Inc.,*
    60 F.3d 27 (2d Cir. 1995)..................................................................................14, 28

*Travelers Int'l AG v. Trans World Airlines, Inc.,*
    684 F. Supp. 1206 (S.D.N.Y. 1986)................................................................30

*TVT Records v. Island Def Jam Music,*
    225 F. Supp.2d 398 (S.D.N.Y. 2002)...............................................................28

*U.S. v. N.Y.S. Div. of the Lottery,*
    No. 92 Civ. 9001 BSJ, 2007 WL 1703656 (S.D.N.Y. Mar. 13, 2007) ...................15

*Usinor v. Leeco Steel Prod., Inc.,*
    209 F. Supp.2d 880 (N.D. Ill. 2002) .............................................................20, 21

*Welsbach Elec. Corp. v. Mastec North Amer., Inc.,*
    7 N.Y.3d 624, 859 N.E.2d 498 (2006)...............................................................17

*Woodling v. Garrett Corp.,*
    813 F.2d 543 (2d Cir. 1987)............................................................................17

*Xelus, Inc. v. Servigistics, Inc.,*
    371 F. Supp.2d 387 (W.D.N.Y. 2005) ...............................................................28

*Young v. Republic Nat'l Factors Corp.,*
    13 B.R. 600 (Bankr. S.D.N.Y. 1981)................................................................19

**Statutes and Rules**

Fed. R. Civ. P. 65 ................................................................................................................1

U.C.C. § 1-103 ..................................................................................................................25

U.C.C. § 1-302(a)..............................................................................................................19

U.C.C. § 2-401 .......................................................................................................19, 20, 23

U.C.C. § 9-301 ..................................................................................................................22

## PRELIMINARY STATEMENT

Plaintiffs Diesel Kid, S.r.l. ("Kid") and Diesel Props, S.r.l. ("Props") (collectively, "Diesel") respectfully submit this memorandum of law in support of their motion for a preliminary injunction, enjoining Defendants Global Brand Marketing, Inc. ("GBMI"), Greystone Business Credit II LLC ("Greystone") (together, the "Defendants"), and all others in active concert or participation with them (including but not limited to, Titan Apparel, Inc. ("Titan") from transferring, selling, distributing or otherwise disposing of approximately 101,000 pairs of Diesel branded shoes (the "Old GBMI Product"). Plaintiffs also seek leave to amend their complaint, *inter alia*, to add causes of action for breach of contract and fraud against Greystone, based on egregious representations made by Greystone subsequent to the filing of this action.

As set forth in more detail below, Diesel is threatened with immediate irreparable harm absent the issuance of a preliminary injunction. Greystone has, without right and under cover of misrepresentations, sold the Old GBMI Product to Titan; and Greystone has threatened to sell, or allow to be sold, all of the Old GBMI Product to a single buyer, at steeply discounted prices. These actions by Greystone are totally improper because:

- Neither GBMI nor Greystone paid Diesel for the Old GBMI Product;

- Greystone and GBMI know that the Old GBMI Product is owned by Diesel and that they had no right to sell it; and

- the existence and sale of the Old GBMI Product flies in the face of Greystone's earlier representations to Plaintiffs that little or no Diesel branded footwear still remained in GBMI's or Greystone's possession as of late November and early

December 2007, and Greystone's agreement that if any Diesel Product was to be sold in the Private Sale (to Titan), it would notify Plaintiffs in advance.

Plaintiffs are likely to succeed on their conversion, proposed breach of contract, and proposed fraud causes of action against Greystone and/or GBMI. Defendants have wrongfully retained and refused to return the Old GBMI Product, which plainly is owned by Props and Kid. As Greystone well knew, the sale of product to GBMI by Diesel was governed by Italian law, and title only passed to GBMI after full payment for goods shipped. In turn, Greystone's security interest only attached after title passed to GBMI. That never occurred with respect to $20 million of shoes shipped to GBMI, including virtually all of the Old GBMI Product. There is no basis in law or equity to overturn the choice of Italian law and the governing contractual provision regarding transfer of title.

In addition, it is beyond legitimate dispute that (a) Greystone, through its attorneys, misrepresented to Plaintiffs that only a small amount of Diesel branded footwear would remain unsold prior to the originally scheduled preliminary injunction hearing, causing Plaintiffs to withdraw their original motion, and (b) Greystone further misrepresented that no Diesel branded product would be sold at a "Private Sale," and agreed that Diesel would be informed in advance if that turned out not to be the case, when in fact, 101,000 pairs of shoes were sold in that Private Sale without further notice to Diesel.

The sale of 101,000 pairs of Old GBMI Product will irreparably harm Props and Kid, because Props' and Kid's relationships with customers, and the goodwill associated with their businesses, will be severely and immeasurably damaged. In reliance on the representations and agreement made by Greystone, Diesel informed many of its high-end retail customers that there was no additional Old GBMI Product that was not yet on the market. If Greystone is allowed to

now flood the discount retail market with 101,000 pairs of Diesel branded footwear, Props and Kid will suffer incalculable damage due to the loss of credibility and goodwill with customers.

Thus, without a preliminary injunction, these commitments to customers will be broken, causing customer relationships to be ruined, future profits lost, and the Diesel brand tarnished. Accordingly, a preliminary injunction should issue.

### BACKGROUND FACTS

Diesel S.p.A ("SpA"), Props, and Kid are involved in the licensing, manufacture, distribution and/or sale of Diesel branded clothing, footwear, accessories and other items worldwide. Props and Kid are corporations organized under the laws of Italy, with registered offices there. *See* Ex. D at 4.[1]   SpA is the owner of numerous Diesel trademarks in the United States and elsewhere. *See* Declaration of Luigi Mezzasoma, dated October 26, 2007 at ¶ 3 (the "Mezzasoma Dec."); Declaration of Germano Ferraro, dated October 26, 2007 (the "Ferraro Dec.") at ¶ 3; Ex. A. Those trademarks have been licensed to Props and Kid for the manufacturing and sale worldwide of adult and children's footwear.

On November 30, 2001, SpA and GBMI entered into a license agreement for GBMI to make and sell Diesel branded adult shoes in numerous areas of the world. That license expired by its terms on December 31, 2006. *See* Mezzasoma Dec., ¶ 4. On June 3, 2002, Kid and GBMI entered into a similar license agreement for GBMI to make and sell Diesel branded children's shoes in numerous areas of the world. That license also expired by its terms on December 31, 2006. *See* Ferraro Dec., ¶ 4

GBMI was in severe default of its royalty obligations under the aforementioned licenses as of December 31, 2006. At that time, GBMI owed SpA and Kid over $11.2 million in back

---

[1] "Ex. __" refers to the exhibits in the Exhibit Binder, which was submitted under seal in connection with the original motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction, dated October 26, 2007. Plaintiffs also rely on the declarations submitted therewith.

royalties and advertising contributions, excluding interest. That amount remains unpaid and interest continues to accrue. Under the license agreements, the exclusive forum to recover those amounts is in Milan, Italy, and the license agreements are governed by Italian law. Accordingly, SpA and Kid have <u>not</u> brought suit in New York to recover these amounts. *See* Mezzasoma Dec., ¶ 5; Ferraro Dec., ¶ 5.

On November 4, 2005, both Props and Kid entered into distribution agreements with GBMI (the "Distribution Agreements"). *See* Ex. B. The term of each of the Distribution Agreements was from May 1, 2006 (for the Spring/Summer 2007 collection) through December 31, 2008 (for the Fall/Winter 2008 collection), unless earlier terminated by either of the parties. *See* Mezzasoma Dec., ¶ 6; Ferraro Dec., ¶ 6.

The Distribution Agreements were governed by Italian law. The choice of law clauses of the Distribution Agreements expressly provided that "[t]his Agreement shall be governed by and construed in accordance with Italian law." *See* Ex. B, at ¶ 21.1.

In addition, Paragraph 5.4 of the Distribution Agreements provided, *inter alia*, that Diesel retained title to any Diesel product held by GBMI unless and until Diesel received payment in full for the goods (the "Retention of Title Provision"):

> 5.4    <u>Delivery.</u>  The Distributor undertakes to withdraw the Products from the warehouses and/or facilities that the Company shall communicate from time to time, wherever located, through a carrier duly appointed by the distributor . . . Without prejudice to what is agreed above, the ownership of the Products will be transferred to the Distributor **only** when total payment of the same is collected by the Company.

*Id.* (emphasis added).

Furthermore, Paragraph 12.3 of the Distribution Agreements, as amended by the parties effective October 27, 2006, provided that upon termination by either party, GBMI, upon demand

by Diesel, was obligated to immediately sell Diesel branded product back to Diesel (the "Buyback Provision"):

> 12.3 . . . The Company, or its representatives, will have the right to purchase totally or partially, the stock inventory at the following conditions: (a) any Product in new condition which the Company continues to produce will be purchased at the original cost price that the Distributor paid for such Product to the Company.

*See* Exs. B and E.

After the parties signed these agreements, GBMI continued in severe financial difficulty. As a result, GBMI negotiated a loan and security agreement with Greystone (the "Loan Agreement"). *See* Ex. C. That Loan Agreement was effective December 4, 2006.

In its essence, the Loan Agreement provided for revolving loans of up to $25 million from Greystone to GBMI. GBMI expressly authorized Greystone to wire proceeds of revolving loans to Props/Kid to pay for product shipped to GBMI pursuant to the terms of a tripartite agreement between GBMI, Greystone and Props/Kid with respect to the payment of Diesel invoices. *See* Ex. C at ¶ 1.6; Mezzasoma Dec., ¶ 9; Ferraro Dec., ¶ 9. In addition, the Loan Agreement granted Greystone a security interest in substantially all GBMI's assets, including its "Inventory" (as defined in the agreement). *See* Ex. C, § 3.1. In connection with that security interest, on November 17, 2006, Greystone filed a UCC Financing Statement in California, where GBMI was located.

Importantly, as evidenced below, Greystone entered into the Loan Agreement with full knowledge that the Distribution Agreements entered into by GBMI with Props and Kid (i) were governed by Italian law, and that (ii) pursuant to Paragraph 5.4 of the Distribution Agreements, Props and Kid retained title in Diesel branded footwear until it received full payment for it, and (iii) pursuant to Paragraph 12.3 of the Distribution Agreements, upon termination, GBMI was obligated to sell the Diesel branded footwear back to Diesel at GBMI's cost.

5

In connection with the Loan Agreement, and prior to its execution, Greystone sought from SpA and Kid – as <u>licensors</u> who were owed substantial amounts for past due royalties and advertising contributions – an acknowledgment that SpA and Kid each consented to GBMI's entry into the Loan Agreement and agreed not to "create, assert or possess any security interests, liens, retention of title or similar rights ***on the assets of [GBMI]*** (the "Collateral")." *See* Ex. D (emphasis added); Ex. D, Closing Checklist, ¶ 14.  No such letter was requested from, or signed by, Props.  *See* Mezzasoma Dec., ¶ 10; Ferraro Dec., ¶ 10.  These agreements only applied to SpA and Kid as licensors, and, as set forth above, only limited their ability to take certain actions with respect to GBMI's ***<u>assets</u>***.

In a December 2, 2006 letter from SpA, Props and Kid to Greystone and GBMI (the "December 2 Letter"), Props and Kid confirmed their willingness to agree to the tripartite agreement (the "TPA", as more fully described below) with GBMI and Greystone, and SpA and Kid confirmed their willingness to sign the "Consent of Licensor" to the Loan Agreement (referred to in the immediately preceding paragraph) "only and exclusively on the following conditions", *inter alia*:

> (a) Execution of the detailed Amendments n. 1 to the Distribution Agreement between Diesel Props and GBMI, dated November 4, 2005 as per Schedule A of the letter dated November 8, 2006;
>
> (b) Execution of the detailed Amendments n. 1 to the Distribution Agreement between Diesel Kid and GBMI, dated November 4, 2005 as per Schedule A of the letter dated November 8, 2006;
>
> (c) Extension of the duration of the above mentioned Distribution Agreements for one year (to include Spring Summer 2009 and Fall /Winter 2009 Collections), conditioned on numerous required changes; and
>
> (d) Agreement to the proposed TPA, again on several specified terms.

*See* Exhibit E. Greystone was copied on each of those amendments.

GBMI accepted the terms of the December 2 Letter by letter dated December 7, 2006, in which GBMI confirmed that the Loan Agreement with Greystone had closed (the "December 7 Letter Agreements"). *See* Ex. E. In the December 7 Letter Agreements, SpA, Kid and GBMI agreed on a mechanism for the payment of the past due royalties and advertising contributions, and both Props and Kid modified their Distribution Agreements with GBMI and conditioned their assent to the Loan Agreement on strict adherence to the payment provisions in a tripartite agreement between GBMI, Greystone and Props/Kid. *See* Mezzosoma Dec., ¶ 11; Ferraro Dec., ¶ 11.

Among the changes to the Distribution Agreements was a change to Paragraph 12.3 of the Distribution Agreements: Paragraph 12.3 of the Distribution Agreements was amended effective October 27, 2006, and provided that upon termination by either party, GBMI, upon demand by Diesel, was obligated to immediately sell Diesel branded product back to Diesel:

> 12.3  . . . The Company, or its representatives, will have the right to purchase totally or partially, the stock inventory at the following conditions: (a) any Product in new condition which the Company continues to produce will be purchased at the original cost price that the Distributor paid for such Product to the Company.

*See* Ex. E.

As noted above, two TPAs were executed effective December 4, 2006 among (i) Props or Kid, (ii) GBMI and (iii) Greystone. *See* Ex. F. Each TPA provided a procedure pursuant to which Props and Kid would be able to present invoices to Greystone, ship product to GBMI and be assured that Greystone would pay Props or Kid for such product within two business days. The Distribution Agreements are expressly referenced in the first paragraph of the TPAs and the rights of Props and Kid under the Distribution Agreements were expressly preserved by the TPA:

> This letter agreement is not in any way intended to limit any of Supplier [Kid and/or Props] Obligations of Borrower [GBMI] to Supplier, and shall in all respects be cumulative thereto.

*See* Ex. F.

Thus, at the time it entered into the Loan Agreement, Greystone clearly had knowledge of (i) the terms of the Distribution Agreements, (ii) the Retention of Title Provision (¶ 5.4), (iii) the Buyback Provision (¶ 12.3), and that the Distribution Agreements were governed by Italian law.

The procedure set forth in the TPA was intended to insure that Props and Kid were paid for shipments to GBMI. If payment was not made, however, <u>the products remained property of Props or Kid under Paragraph 5.4 of the Distribution Agreements</u>, which expressly provided that product shipped to GBMI remained the property of Props or Kid until full payment for the shipment by GBMI. *See* Ex. B, ¶ 5.4. <u>As a signatory to the TPA, Greystone was fully aware of this</u>: as noted above, the rights of Props and Kid under the Distribution Agreements were expressly preserved by the TPA. *See* Ex. F., Mezzasoma Dec., ¶ 13; Ferraro Dec., ¶ 13.

Pursuant to the TPA, Props and Kid sent invoices to Greystone commencing in January 2007, through and including September 3, 2007, totaling over $27.5 million. The balance owing from Greystone (and GBMI) is approximately $20 million. That relates to hundreds of thousands of pairs of Diesel branded shoes, many of which were sold by GBMI to its customers prior to the commencement of this litigation, with the proceeds flowing to Greystone under the Loan Agreement. *See* Mezzasoma Dec., ¶ 16; Ferraro Dec., ¶ 16.

On September 4, 2007, Props and Kid notified Greystone that it had thirty (30) days to cure specified outstanding defaults under the TPA. *See* Ex. J. Greystone did not reply and did not cure the defaults. *See* Mezzasoma Dec., ¶ 19; Ferraro Dec., ¶ 18. Also on September 4, 2007, Props and Kid notified GBMI that it had thirty (30) days to cure the specified outstanding

8

defaults under the Distribution Agreements. *See* Ex. K. GBMI did not cure the defaults. *See* Mezzasoma Dec., ¶ 20; Ferraro Dec., ¶ 19.

As a result, on October 17, 2007, Props and Kid notified GBMI that the Distribution Agreements were terminated effective October 4, 2007. *See* Ex. L. At the same time, SpA informed GBMI of its default under the December 7 Letter Agreements regarding past-due royalties and advertising contributions and demanded immediate payment of all overdue royalties, advertising contributions, accrued interest and liquidated damages. *See* Ex. L. In addition, in or around October 2007, Props advised GBMI that it was terminating the Sourcing Agreement due to GBMI's default.[2]

In their October 17, 2007 letters, Props and Kid demanded, *inter alia*, that:

- Pursuant to paragraph 12.1 of the Distribution Agreement, within 15 (fifteen) days of October 4, 2007, GBMI shall communicate to the Company its complete inventory of the Products by season of reference;

- GBMI return to the Company all Products in its inventory which has not been paid for by GBMI to the Company. As you know, **under paragraph 5.4 of the Distribution Agreement**, the ownership of the Products will be transferred to the Distributor only when total payment of the same is collected by the Company;

- Alternatively, that GBMI return to Props all Props product in inventory **pursuant to paragraph 12.3 of the Distribution Agreement** at the original cost price that GBMI paid for such product –which to date is zero (and as to which Props will waive its right to be paid).

- Pursuant to paragraphs 11.3 of the Distribution Agreement, GBMI cease taking orders from customers; and

- Pursuant to paragraph 4.3 of the Distribution Agreement, GBMI provide the Company a complete list, and copies, of all open

---

[2]  As a result of the termination of the Distribution Agreements with GBMI, Diesel USA has stepped in as the new distributor of Plaintiffs' footwear, and has recently made extensive efforts to market Plaintiffs' footwear as a mid-priced to luxury brand and sell to high-end retail accounts. *See* Birkhold Dec., ¶ 3, Strippoli Dec., ¶ 3.

orders in relation to Fall/Winter 2007 and Spring/Summer 2008 seasons.

*See* Ex. L.

GBMI did not comply with any of the demands of the October 17, 2007 letters, except for giving Props and Kid a detailed accounting of Diesel branded shoes, which totaled approximately 164,467 pairs of shoes, of which GBMI and Greystone had not paid for 158,927 pairs (the "Warehouse Product"). *See* Mezzasoma Dec., ¶¶ 22-23; Ferraro Dec., ¶¶ 21-22; Declaration of Rosanna Sartori, dated October 26, 2007 (the "Sartori Dec."), ¶ 5.

Also on October 17, 2007, Mr. Mezzasoma received an email from Sudeepto Datta, the President of GBMI. Mr. Datta forwarded to Mr. Mezzasoma an email from Greystone indicating that Greystone asserted that the Warehouse Product was subject to its liens under the Loan Agreement, and that it intended to take possession of the Warehouse Product. Furthermore, on October 23, 2007, Mr. Mezzasoma received a telephone call from Mr. Datta who advised Mr. Mezzasoma that Greystone intended to take possession of and sell the Warehouse Product on Friday October 26, 2007. *See* Mezzasoma Dec., ¶ 25.

In response, on October 26, 2007, Props and Kid filed a motion seeking a temporary restraining order ("TRO") and preliminary injunction to prevent GBMI and Greystone from taking any action with respect to the Warehouse Product. On October 29, 2007, Judge Rakoff, sitting as emergency judge, entered a TRO which prohibited Defendants from selling, distributing or otherwise disturbing "158,927 pairs of Diesel branded footwear presently believed to be stored at a warehouse used by Defendant Global Brand Marketing, Inc. located in Chino, California, except that the footwear may be sold to any outlets previously approved in the distribution agreement . . ." *See* the Supplemental Declaration of Ira S. Sacks, dated February 22, 2008 (the "Sacks Dec."), ¶ 5 and Ex. B thereto. Judge Rakoff entered this TRO in response

10

to Plaintiffs' argument that Plaintiffs owned the footwear in question and that Defendants' unrestrained sale of Diesel footwear to unknown outlets would irreparably harm the Diesel brand, because existing customers' orders would go unfilled and because product would not reach the intended channels of distribution, causing retail customers to choose other brands and causing the Diesel brand to be otherwise irreparably tarnished. *See* Sacks Dec., ¶ 6.

The TRO was modified by Judge Baer on November 1, 2007 as follows:

> "Greystone's counsel has represented that pending the hearing of the motion, in addition to complying with the temporary restraining order dated October 29, 2007, that no Diesel brand footwear will be sold except in a manner consistent with the ordinary course of dealing between defendant GBMI and plaintiffs."

*See* Sacks Dec., ¶ 7 and Ex. C thereto. Thus, the modified TRO only allowed sales to approved outlets and only in a manner consistent with the "ordinary course of dealing" between the parties. *See id.* at ¶ 8. The preliminary injunction hearing was scheduled for November 19, 2007. *Id.*

In the days after entry of the TRO, Mr. Sacks, counsel for Plaintiffs, had several conversations with Daniel Shapiro, counsel for Greystone, during which Mr. Sacks was told that little or no Diesel product would remain in Defendants' possession by the date of the scheduled preliminary injunction hearing, thereby rendering moot any preliminary injunction order that might issue (the "Shapiro Representation"). *See* Sacks Dec., ¶ 9. Specifically, Mr. Shapiro advised Mr. Sacks that **no more than approximately 15,000 to 25,000 pairs, or less, of Diesel product would remain in GBMI's inventory by such date**. *Id.* In reliance on that representation, Plaintiffs wrote a letter to the Court, copied to all counsel, advising the Court that the motion for a preliminary injunction was being withdrawn "in light of the ability of Defendants to sell the Warehouse Product during the time period prior to the scheduled preliminary injunction hearing and the likelihood that most of the product will have been sold by the time of the preliminary injunction hearing." Sacks Dec., ¶ 10 and Ex. D thereto.

Thereafter, on November 28, 2007, Mr. Sacks received from Greystone's counsel a "Notice of Private Sale", advising that <u>Greystone, as secured creditor to the assets of GBMI, would be conducting a private sale of all right, title and interest in GBMI's assets, including "all Inventory."</u> *See* Sacks Dec., ¶ 12 and Ex. E thereto. Upon receipt of the Notice, Mr. Sacks e-mailed Greystone's counsel and asked that "[i]n order to avoid unnecessary motion practice . . . please inform me immediately to whom the private sale is and the details of the Diesel Inventory to be sold." *See id.* at ¶ 12 and Ex. F thereto. Mr. Sacks sought that information because, to the extent that the Private Sale involved significant quantities of Diesel footwear, such sale would be contrary to Plaintiff's understanding of the amount of Diesel footwear that remained unsold, as earlier represented to Mr. Sacks by Mr. Shapiro. *Id.* at ¶ 13. In the event that Greystone intended to include significant Diesel branded inventory in the Private Sale, Diesel was prepared to renew its request for a temporary restraining order and preliminary injunction. *Id.* at ¶ 13.

On November 30, 2007, Greystone's counsel, David Chizewer of Goldberg Kohn, responded as follows:

> Greystone does not expect that the private sale . . . will include any Diesel branded inventory. **We believe that all Diesel branded inventory will be sold prior to the sale**. If it turns out that we do intend to include the Diesel branded inventory in the private sale, **we will give you advance notice of that fact as well as the identity of the purchaser**.

*See* Sacks Dec., ¶ 14 and Ex. G thereto (emphasis added).

There were two important aspects to Mr. Chizewer's email: (i) he represented that no Diesel branded inventory was to be included in the Private Sale, and (ii) Greystone agreed that if Diesel branded inventory was to be included in the Private Sale, Plaintiffs would receive advance notice of that fact (the "Chizewer Representation"). **No such notice was ever given**, and Mr.

Sacks received no further communication from Greystone's attorneys regarding the Private Sale. *Id.* at ¶ 15.

Without any indication to the contrary, Plaintiffs relied on the Shapiro and Chizewer Representations in connection with their sales efforts for the 2008 seasons. *See* Sacks Dec., ¶ 15; Declaration of Stephen G. Birkhold, dated February 8, 2008 (the "Birkhold Dec.") at ¶ 5; Declaration of Anthony N. Strippoli, dated February 8, 2008 (the Strippoli Dec.") at ¶ 5.[3]

The Private Sale was conducted by Greystone on December 14, 2007, and GBMI's assets were sold to Titan. *See* Sacks Dec., ¶ 20 and Exs. H and I thereto. Greystone entered into a Loan and Security Agreement with Titan, financing Titan's purchase of the GBMI inventory and Titan's business, and granting Greystone a security interest in Titan's assets.[4]

In late January 2008, Plaintiffs learned that "GBMI" was apparently attempting to sell large amounts of Diesel branded footwear, despite the Shapiro and Chizewer Representations that GBMI would have little or no inventory of Diesel branded footwear as of late-November 2007, and that all Diesel branded inventory would be sold prior to the Private Sale that took place in mid-December 2007. *See* Sacks Dec., ¶ 21. As a result, Mr. Sacks e-mailed Mr. Shapiro on January 31, 2008, to ascertain whether, despite the earlier representations, Defendants maintained a large inventory of Diesel branded footwear. *Id.* In response to Mr. Sacks' e-mail, Mr. Shapiro advised Mr. Sacks by phone on February 6, 2008 that 101,000 pairs of Diesel branded footwear remained in inventory and was going to be sold to a single purchaser. *Id.*

---

[3] These declarations were initially submitted in connection with Plaintiffs' Application for a Temporary Restraining Order and Order to Show Cause for a Preliminary Injunction, entered February 13, 2008.

[4] Fed. R. Civ. P. 65 provides that "[e]very order granting an injunction is binding upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order." *See* Fed. R. Civ. P. 65; *Bear U.S.A. v. Kim*, 71 F. Supp.2d 237, 246 (S.D.N.Y. 1999) (holder of inventory of trademark-infringing merchandise was bound by order enjoining infringing defendant from disposing such merchandise). Thus, in light of Greystone's relationship with Titan and Greystone's interest in Titan's inventory, should the Court issue a preliminary injunction in this case, it is clearly binding upon Titan.

Mr. Shapiro also offered to allow Plaintiffs to purchase this inventory for $2 million – despite the fact that Defendants paid nothing for this inventory and the fact that Plaintiffs are the rightful owners of this inventory. *Id.* at ¶ 21 and Ex. J thereto.

The goodwill of Props and Kid, and the Diesel brand as a whole, is the lifeblood of its business. Customers require comfort and certainty that they can rely upon the supplier or distributor with whom they are dealing. Indeed, Diesel's high-end retail accounts have made it plain that they will not carry Diesel branded footwear if additional Old GBMI Product appears in the retail market. *See* Birkhold Dec., ¶ 8; Strippoli Dec., ¶ 8. Those accounts have placed orders based on representations about the lack of additional Old GBMI Product that will hit the market. *Id.*

If the Old GBMI Product is sold, those customer expectations and relationships will be irreparably harmed. In fact, this irreparable harm will occur whether or not the Court finds that the Old GBMI Product belonged to Diesel, because Diesel conducted its business for the 2008 seasons based on the false Representations. Customers will lose faith in the Diesel brand, and will discontinue their business with Diesel. *See* Birkhold Dec., ¶ 8; Strippoli Dec., ¶ 8. The harm will be enormous and incalculable. As a result, a preliminary injunction is clearly warranted.

## I.    THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION ENJOINING DEFENDANTS FROM TRANSFERRING, SELLING, DISTRIBUTING OR OTHERWISE DISPOSING OF THE OLD GBMI PRODUCT

This Court should issue a preliminary injunction enjoining GBMI and Greystone from transferring, selling, distributing or otherwise disposing of the Old GBMI Product. As this Court is well aware, a "party seeking preliminary injunctive relief must establish (a) that the injunction is necessary to prevent irreparable harm and (b) either that (i) it is likely to succeed on the merits

of the underlying claim or (ii) there are sufficiently serious questions going to the merits of the claim as to make it a fair ground for litigation and that the balance of the hardships tips decidedly toward the movant." *Tom Doherty Assocs. v. Saban Entmt., Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995) (citations omitted). *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999); *Buric v. Kelly*, 2003 WL 22990082, at *4 (S.D.N.Y. Dec. 18, 2003) (Baer, J.); *NBA Prop. v. Untertainment Record LLC*, 1999 WL 335147, at *6 (S.D.N.Y. May 26, 1999) (Baer, J.). Plaintiffs have met each aspect of that standard:  Plaintiffs are likely to succeed on the merits; Plaintiffs have established that an injunction is necessary to prevent irreparable harm; and the balance of hardships tips decidedly towards Plaintiffs.

## A.    Plaintiffs Are Likely to Succeed On The Merits Of Their Conversion Claim[5]

It is well established that a party seeking injunctive relief based on a likelihood of success on the merits need not show that success is an absolute certainty.  The movant "need only make a showing that the probability of his prevailing is better than fifty percent.  There may remain considerable room for doubt." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (internal citations omitted); *see Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953). Plaintiffs will likely succeed on their conversion claim against Defendants.

"Under New York law, the elements of conversion are (i) plaintiff's legal ownership or an immediate superior right of possession to specific, identifiable personal property and (ii) defendant's exercise of unauthorized dominion over the thing in question to the exclusion of plaintiff's rights." *Briarpatch Ltd, L.P. v. Pate*, 81 F. Supp.2d 509, 516 (S.D.N.Y. 2000). *See U.S. v. N.Y.S. Div. of the Lottery*, 2007 WL 1703656, at *3 (S.D.N.Y. Mar. 13, 2007) ("to

---

[5]  In addition, Plaintiffs have annexed to the Sacks Declaration a proposed Second Amended Complaint, which includes claims for fraud and breach of contract against Greystone based upon actions taken by Greystone after this litigation commenced, and an additional claim based upon the account stated doctrine.  *See* Sacks Dec., Ex. A. Plaintiffs are likely to succeed on the merits of the new fraud and breach of contract claims as well.

establish a conversion action, a plaintiff must show legal ownership of, or a superior possessory right in, the disputed property").

Plaintiffs are likely to succeed on their conversion claim because GBMI and Greystone have unlawfully asserted control over the Old GBMI Product, which clearly is the property of Diesel. First, pursuant to the Retention of Title and Buyback Provisions in the Distribution Agreements – <u>which are governed by Italian law</u> – Diesel retained title to the Old GBMI Product, and also had the right to repurchase the Old GBMI Product from GBMI at GBMI's cost upon termination of those Agreements. What is more, even if the Distribution Agreements were not governed by Italian law, the Uniform Commercial Code (the "UCC") allows parties to vary by contractual agreement the UCC's retention of title provisions. Furthermore, Greystone is estopped from claiming a security interest in the Old GBMI Product, because Greystone knew full well from the outset that GBMI had entered into Distribution Agreements with GBMI, and that title would not pass to GBMI until product shipped by Diesel was fully paid for by GBMI.

1.    **The Distribution Agreements Are Governed By Italian Law, And Pursuant To Paragraphs 5.4 and 12.3 of Those Agreements, GBMI and Greystone Have No Ownership or Security Interest in the Old GBMI Product**

It cannot be disputed that the Distribution Agreements are governed by Italian law. As set forth above, the choice of law and forum selection clauses of the Distribution Agreements provide, in relevant part, "[t]his Agreement shall be governed by and construed in accordance with the Italian law." *See* Ex. B, ¶ 21.1. As this Court is aware, a federal court sitting in a diversity case is bound to apply the choice of law rules of the state in which the case was brought. *See Hartford Fire Ins. Co. v. Orient Overseas Containers Lines*, 230 F.3d 549, 556 (2d Cir. 2000); *Day Spring Enters., Inc. v. LMC Int'l, Inc.*, 2004 WL 2191568, at *20 (W.D.N.Y. Sep. 24, 2004). Therefore, New York choice of law rules apply here.

The law in New York is "unambiguous in the area of express choice of law provisions in a contract." *Day Spring*, 2004 WL 2191568, at *20. Pursuant to New York law, ". . . in cases involving a contract with an express choice of law provision, [a]bsent fraud or a violation of public policy, a court is to apply the law of the contract as long as the state selected has sufficient contacts with the transaction." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001); *Hartford Fire Ins. Co.*, 230 F.3d at 556. In other words, choice of law provisions will be enforced "so long as the chosen law bears a reasonable relationship to the parties or the transaction." *Welsbach Elec. Corp. v. Mastec North Amer., Inc.*, 7 N.Y.3d 624, 629, 859 N.E.2d 498, 500 (2006); *see Schiavone Constr. Corp. v. City of New York*, 99 F.3d 546, 548 (2d Cir. 1996) (under New York law, "a choice of law provision in a contract is valid and enforceable").

There is no basis to upset the choice of Italian law made by Plaintiffs and GBMI. It cannot be disputed that Italian law has a reasonable relationship both to the parties and the transactions, as both Props and Kid are Italian corporations, with their principle offices in Italy. *See* Ex. B. at 4. These contacts with Italy are sufficient to apply Italian law to the Distribution Agreements. *See Woodling v. Garrett Corp.*, 813 F.2d 543, 552 (2d Cir. 1987) (Connecticut choice of law provision upheld where court found sufficient contacts with the state because the party's principle place of business was in Connecticut). Nor can GBMI and Greystone claim that there was fraud in the choice of Italian law or that the application of Italian law would violate public policy. Thus, this Court must uphold the Italian choice of law in the Distribution Agreements in interpreting its provisions.

### a.    Plaintiffs Own the Old GBMI Product Pursuant To Paragraph 5.4 Of The Distribution Agreements

As noted above, the unambiguous language of the Retention of Title Provision – Paragraph 5.4 of the Distribution Agreements – provides that title of the Old GBMI Product

remained with Diesel until it was paid in full by GBMI. *See* Ex. B; Declaration of Carlo Pascotto, dated February 11, 2008 (the "Pascotto Dec.") at ¶¶ 7-8, 11.    Neither GBMI nor Greystone paid in full for the Old GBMI Product (*see* Mezzasoma Dec., ¶ 23; Ferraro Dec., ¶ 22) and, as a result, GBMI never owned the Old GBMI Product.    Consequently, the Old GBMI Product never became GBMI's "asset" or part of its "inventory" and therefore Greystone's security interest never attached to the Old GBMI Product. *See* Ex. C., ¶ 3.1.

There can be no doubt that retention of title provisions, such as in Paragraph 5.4 of the Distribution Agreements, are valid under Italian law.  As set forth in the Pascotto Declaration, ¶ 5.4 of the Distribution Agreement is to be interpreted and applied in accordance with the principles laid down in Articles 1523 and following of the Italian Civil Code. *Id.* at ¶ 6.  Under Italian law, Props and Kid effectively retained the title in and to its products until GBMI paid the full price as per the contractually agreed terms (*see* Supreme Court of Cassation, Civil Section II, decision no. 3415 of 8 April 1999, and Civil Section III, decision no. 2975 of 15 April 1988). *Id.* at ¶ 11. Thus, interpreting the Retention of Title Provision under Italian law, although the Old GBMI Product was physically transferred to GBMI, title to it was retained by Props/Kid. *Id.*

### b.    GBMI and Greystone Have No Rights In The Old GBMI Product Because Of Paragraph 12.3 Of The Distribution Agreements

Even if Props and Kid did not effectively retain title to the Old GBMI Product – which they did –  GBMI and Greystone have no rights to the Old GBMI Product because of the Buyback Provision – Paragraph 12.3 of the Distribution Agreements (as amended by the December 7, 2006 Letter Agreements). *See* Exs. B and E.  Upon termination of the Distribution Agreements, Kid and Props had the right to purchase any remaining Diesel inventory from GBMI at the original cost price which GBMI paid for the footwear. *See* Ex. E.

Diesel terminated the Distribution Agreements on October 4, 2007. *See* Ex. L.  Because

18

GBMI never paid anything for the footwear in question, Props and Kid were entitled, upon demand, to a return of the footwear at no cost.[6]  Props and Kid made such a demand on September 4, 2007, and GBMI – in further breach of the Distribution Agreements – failed to return such product to Props and Kid.  *See* Exs. K, L.  Props and Kid were entitled to return of the footwear at no cost; and GBMI and Greystone have no legitimate ongoing claim to the Old GBMI Product.

> **2.    Even If The Distribution Agreements Were Governed By The UCC, The Retention Of Title Provision Is Effective, And The Old GBMI Product Is Owned By Diesel**

Even if the Distribution Agreements were governed by the UCC – which they are not – the parties' contractual choice of a non-UCC retention of title provision is effective under the UCC because the passage of title provisions of the UCC may be varied by the contracting parties' agreement.  *See* UCC § 1-302(a) ("the effect of provisions of the Uniform Commercial Code may be varied by agreement"); *Symphony Fabric Corp. v. Podell Ind., Inc.*, 1996 WL 497011, at *5 (S.D.N.Y. Aug. 30, 1996) (contract clause in purchase order trumped UCC provision); *Regatos v. North Fork Bank*, 257 F. Supp.2d 632, 640 (S.D.N.Y. 2003) ("unless the statute designates a provision as one that may not be varied by agreement, the agreement of the parties will trump the provisions of the UCC").[7]

In particular, the UCC explicitly allows parties to contract to vary the passage of title provisions of the UCC:

---

[6]  As with the Warehouse Product, there may be a small number of shoes – approximately 4,100 pairs from the 2006 seasons or prior – for which GBMI paid and as to which Diesel would be required to pay GBMI its cost or at a market price to be agreed among the parties.  That has not yet been determined because Diesel has little information regarding the Old GBMI Product.

[7]  In addition, if this Court finds the UCC applicable, the California Uniform Commercial Code would apply, because (i) GBMI is a California corporation and (ii) the shoes were delivered by Diesel to GBMI in California.  *See* UCC § 9-301; *In re Iroquois Energy Mgm't, LLC*, 284 B.R. 28, 31 (Bankr. W.D.N.Y. 2002); *Young v. Republic Nat'l Factors Corp.*, 13 B.R. 600, 603 (Bankr. S.D.N.Y. 1981).

§ 2-401. <u>Passing of Title; Reservation for Security; Limited Application of This Section</u>.

(1) . . . Subject to the provisions and to the provisions of the Article on Secured Transactions, title to goods passes from the seller to the buyer <u>in any manner and on any condition explicitly agreed upon by the parties.</u>

(2) <u>Unless otherwise explicitly agreed</u>, title passes to the buyer at the time and place at which the seller completes his performance . . . despite any reservation of a security interest . . .

UCC § 2-401 (emphasis added).

Indeed, it has been specifically held that parties may vary by agreement the UCC's provision governing passing of title:

> [UCC §2-401] like almost all of the UCC, is an "unless otherwise agreed" provision. <u>As long as the parties to a contract explicitly agree that title shall pass at some other time, it does</u>…the parties are free to agree that title passes prior to or subsequent to delivery, and nothing in *Hong Kong & Shanghai Banking Corp. v. HFH USA Corp.*, 805 F. Supp. 133, 142 (W.D.N.Y. 1992) makes an agreement that title shall pass after delivery contrary to law.

*Subaru Distrib. Corp. v. Subaru of America, Inc.*, 2002 WL 188473, at *45 (S.D.N.Y. Feb. 5, 2002) (emphasis added).

Thus, even pursuant to the UCC, the Retention of Title Provision in the Distribution Agreements is enforceable. As a result, even under the UCC, title in the Old GBMI Product remained with Diesel.

Defendants' argument that, under the UCC, the Retention of Title Provision in the Distribution Agreements only creates an unperfected "security interest" in the Old GBMI Product ignores plain language of the UCC. The caselaw cited by Defendants in support of this argument – *Usinor v. Leeco Steel Prod., Inc.*, 209 F. Supp.2d 880 (N.D. Ill. 2002); *Hong Kong and Shanghai Banking Corp., Ltd. v. HFH+ USA Corp.*, 805 F. Supp. 133 (W.D.N.Y.

1992)("*HSBC*"); *Italverde Trading, Inc. v. Four Bills of Lading*, 485 F. Supp.2d 187 (E.D.N.Y. 2007); and *In Re J. Adrian Sons, Inc.*, 205 B.R. 24, 26-27 (Bank. W.D.N.Y. 1997) – largely supports application of Italian law and/or the effectiveness of the Retention of Title Provision. To the extent the cases suggest a different result, they distort UCC § 2-401, ignore controlling New York law cited above on the application and effectiveness of choice of law provisions, and are wrongly decided.

Defendants' reliance on *Usinor* is grossly misplaced; indeed, *Usinor* actually supports Plaintiffs' arguments. The court in *Usinor* applied Illinois law and § 2-401 of the Illinois UCC. To reach that result, the court applied a choice of law analysis and concluded that Illinois law – rather than French law – applied. However, in *Usinor*, the agreement at issue did <u>not</u> have a choice of law provision, unlike the Distribution Agreements here. As the Court in *Usinor* noted: "[u]nder French law [like Italian law here], the seller of goods has an absolute right to contract for retention of title until payment and therefore the retention of title clause in the Agreement would be determinative." *Id.* Similarly, because the Distributions Agreements clearly designate Italian law as controlling, the UCC is inapplicable, and the Retention of Title Provision should be enforced.

*Italverde* – also relied upon by Defendants – also actually supports the application of Italian law. In *Italverde*, the court honored the choice of law provision in the agreement signed by the parties, which provided that New Jersey law would govern: "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or a violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Italverde*, 485 F. Supp.2d at 196 (citing *Fieger,* 251 F.3d at 393). After finding that New Jersey law governed, the Court gave effect to New Jersey's

version of the UCC, which governed the retention of title provision of the agreement at issue. *Id.* at 197 (also noting that plaintiffs cited the UCC in their briefs, and defendant failed to argue that the UCC did not apply). So too here, this Court should recognize the choice of Italian law agreed to by the parties in the Distribution Agreements and, applying Italian law, find that the Retention of Title Provision should be enforced.

Defendants' reliance on *HSBC* is unavailing. There, Plaintiff asserted a claim for conversion, alleging that the Defendant had wrongfully possessed goods in which Plaintiff had a superior security interest. Defendant argued, however, that pursuant to a sales contract between its third-party affiliate and the debtor (which contained a retention of title provision and was governed by German law), the third-party affiliate held title in the goods, and thus Plaintiff's security interest did not attach. Although the *HSBC* court declined to uphold the choice of law provision in the sales contract, it did so because Plaintiff – as a "stranger" to the sales contract – lacked notice of any competing interest in the goods. The court also cautioned that if the dispute only involved the parties to the sales contract (or its agents), the German choice of law provision in the contract would apply and title in the goods would remain with the supplier. *See HSBC*, 805 F. Supp. at 140.

Here, Greystone is no such "stranger." Greystone was well aware of the Distribution Agreements and their terms. Greystone knew that title to product shipped from Diesel to GBMI remained with Diesel until the product had been paid for, and that Greystone's security interest did not attach until such time as title was transferred to GBMI. To the extent that *HSBC* suggests that the UCC (and not Italian law) governs, and/or that the Retention of Title Provision is ineffective, it is wrong decided. There simply is no public policy that is violated by holding Greystone to the deal that GBMI and Diesel struck. Nor is that a harsh result. All Greystone

needed to do for its security interest to attach was to pay for the goods which GBMI was then selling. Instead, Greystone seeks to have it both ways: pay nothing for the goods and reap the full benefits of resale. That must not be permitted.

*In re J. Adrian Sons, Inc.*, 205 B.R. 24 (W.D.N.Y. 1997) is inapposite. In *Adrian*, the contract between the parties did **not** contain a choice of law provision. Therefore, the court applied choice of law principles and found that New York law governed. Here, the Italian choice of law provision contained in the Distribution Agreements resolves any doubt that the retention of title provision is valid and enforceable.

What is more, the *Adrian* court went to great lengths to find that parties cannot make agreements that conflict with §2-401(1). That analysis is simply wrong. It ignores the basic freedom of contract principles contained in the UCC. *See* UCC § 1-302(a) ("the effect of provisions of the Uniform Commercial Code may be varied by agreement"). In fact, the *Adrian* court even noted that "the question is not free from doubt in light of the structure of § 2-401 and the paucity of case authority on this point." *Adrian*, 205 B.R. at 26. However, to the extent that the UCC applies to the Distribution Agreements, this Court should not distort the plain intent of the parties and the clear language of § 2-401.

Thus, for all of the foregoing reasons, even if the UCC applies, the Retention of Title Provision must be enforced.

### 3.   Greystone Is Estopped From Claiming A Security Interest In The Old GBMI Product

In addition, Greystone is estopped from claiming a security interest in the Old GBMI Product. Greystone had actual knowledge of the Distribution Agreements when it entered into the Loan Agreement with GBMI and the TPA with Plaintiffs. Greystone cannot now assert security interests in collateral that it knew full well was the property of Diesel.

23

In a December 2, 2006 letter from SpA, Props and Kid to Greystone and GBMI (the "December 2 Letter"), Props and Kid confirmed their willingness to agree to the TPA with GBMI and Greystone, and SpA and Kid confirmed their willingness to sign the "Consent of Licensor" to the Loan Agreement required by Greystone "only and exclusively on the following conditions", *inter alia*:

> (e) Execution of the detailed Amendments n. 1 to the **Distribution Agreement** between Diesel Props and GBMI, dated November 4, 2005 as per Schedule A of the letter dated November 8, 2006;

> (f) Execution of the detailed Amendments n. 1 to the **Distribution Agreement** between Diesel Kid and GBMI, dated November 4, 2005 as per Schedule A of the letter dated November 8, 2006;

> (g) Extension of the duration of the above mentioned **Distribution Agreements** for one year (to include Spring Summer 2009 and Fall /Winter 2009 Collections), conditioned on numerous required changes; and

> (h) Agreement to the proposed TPA, again on several specified terms.

*See* Exhibit E (emphasis added).  Greystone was copied on each of those amendments.

GBMI accepted the terms of the December 2 Letter by the December 7 Letter Agreements, in which GBMI also confirmed that the Loan Agreement with Greystone had closed.  *See* Ex. E.  In the December 7 Letter Agreements, SpA, Kid and GBMI agreed on a mechanism for the payment of the past due royalties and advertising contributions, and both Props and Kid modified their **Distribution Agreements** with GBMI and conditioned their assent to the Loan Agreement on strict adherence to the payment provisions in a tripartite agreement between GBMI, Greystone and Props/Kid.   *See* Mezzasoma Dec., ¶ 11; Ferraro Dec., ¶ 11. Among the changes to the **Distribution Agreements** was a change to ¶ 12.3 of the Distribution Agreements.

Two TPAs were executed effective December 4, 2006 among (i) Props or Kid, (ii) GBMI and (iii) Greystone. *See* Ex. F. Each TPA provided a procedure pursuant to which Props and Kid would be able to present invoices to Greystone, ship product to GBMI and be assured that Greystone would pay Props or Kid for such product within two business days. **The Distribution Agreements are expressly referenced in the first paragraph of the TPAs** and the rights of Props and Kid under the Distribution Agreements were expressly preserved by the TPA. *See* Ex. F.

Thus, it is plain that Greystone knew the details of the Distribution Agreements at the time it entered into the Loan Agreement. Nor is that surprising, since it would have been grossly negligent for Greystone to enter into the Loan Agreement without previously reviewing key supplier agreements.

In such circumstances, Greystone must be estopped from arguing that (i) GBMI had title in the Old GBMI Product; or (ii) Greystone had a security interest in the Old GBMI Product. *See, e.g.*, *Calva Prod. v. Security Pacific Nat'l Bank*, 111 Cal. App. 3d 409, 416-17 (Cal. Ct. App. 1980) (secured lender with actual knowledge of another's ownership in collateral could be estopped from claiming priority); *Shallcross v. Comm. State Bank and Trust Co.*, 180 N.J. Super. 273, 281, 434 A.2d 671, 676 (N.J. Super. Ct. 1981) (bad faith or inequitable conduct on the part of a secured lender could justify estoppel against the assertion of a priority).

Such estoppel applies even if this Court finds that the UCC is applicable. The UCC preserves common law principles of estoppel:

> § 1-103.    Construction of [UCC] to Promote Its Purposes and Policies; Applicability of Supplemental Principles of Law.
>
> (b) Unless displaced by the particular provisions of [the UCC], the principles of law and equity, including the law merchant and the law relative to the capacity to contract, principal and agent, **estoppel**, fraud, misrepresentations, duress,

coercion, mistake, bankruptcy, and other validating or invalidating cause supplements its provisions.

That is yet another independent reason why Greystone had no rights in the Old GBMI Product.

## B.    Diesel Will Be Irreparably Harmed In The Absence Of A Preliminary Injunction

Regardless of who owned the Old GBMI Product, the issuance of a preliminary injunction is warranted. In determining whether a preliminary injunction should be issued, courts have recognized that the most critical factor is the showing of irreparable harm. *See, e.g., Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990); *Roso-Lino Beverage Distribs., Inc. v. Coca -Cola Bottling Co. of New York*, Inc., 749 F.2d 124, 126 (2d Cir. 1984); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp.2d 525, 531 (S.D.N.Y. 2004); *Nat'l Elevator*, 2008 WL 207843, at * 4. "An injunction should be granted when the intervention of a court of equity is essential to protect a party's property rights against injuries that would otherwise be irremediable." *Ticor Title Ins.*, 173 F.3d 63, 68; *Jones v. Dana*, No. 06 Civ. 0159(RPP), 2006 WL 1153358, at *31 (S.D.N.Y. May 2, 2006). As set forth below, if Defendants are not enjoined from selling the Old GBMI Product, Diesel will experience irreparable harm because (i) its business will be irreversibly and adversely damaged, (ii) it will suffer a loss of goodwill, and (iii) it will suffer injury that cannot be adequately compensated by monetary damages.

### 1.    Diesel's Business Will Be Irreversibly Damaged

It is well-settled that irreparable harm exists where, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems. Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (in the absence of a preliminary injunction, the remedy available would

not make the plaintiff whole) (internal citation omitted); *S.E.C. v. Princeton Econ. Int'l, Ltd.*, 73 F. Supp.2d 420, 425 (S.D.N.Y. 1999) (attempt by defendant to thwart temporary restraining order made the likelihood that the plaintiff would be made whole unlikely, therefore establishing irreparable harm).  That is plainly the case here.

Without a preliminary injunction, Props and Kid will be irreparably harmed.    If Greystone (and/or any related parties acting in concert with Greystone) is allowed to now flood the market with 101,000 pairs of Diesel branded shoes, Diesel's customer relations will be substantially and irretrievably damaged.

As the Birkhold and Strippoli declarations explain, Diesel recently has made extensive efforts to market Diesel footwear as a mid-priced to luxury brand, and to sell to high-end retail accounts, such as Bloomingdales, Neiman Marcus and Nordstrom.  *See* Birkhold Dec., ¶ 3; Strippoli Dec., ¶ 3.   During negotiations with high-end retail customers, these customers specifically asked whether there were significant amounts of old GBMI product not yet on the market which would be distributed into the marketplace. *See* Birkhold Dec., ¶ 5; Strippoli Dec., ¶ 5.  As set forth above, Props, Kid and Diesel USA – the new Diesel branded footwear distributor – relied on the Shapiro and Chizewer Representations in connection with sales efforts for the 2008 seasons, and assured these customers that little, if any, old GBMI product remained to be distributed into the marketplace. *See* Sacks Dec., ¶ 21 and Ex. G thereto; Birkhold Dec., ¶ 5; Strippoli Dec., ¶ 5.  In addition, Diesel also informed these customers that Diesel branded footwear was going to be sold to a smaller group of higher-end accounts, and positioned as a mid-priced to luxury brand.  *See* Birkhold Dec., ¶ 6; Strippoli Dec., ¶ 6.   Diesel's customers have already indicated that they will leave the Diesel brand if additional old GBMI product appears in the discount retail market. *See* Birkhold Dec., ¶ 8; Strippoli Dec., ¶ 8.

27

Thus, without a preliminary injunction, Plaintiffs will suffer irreparable harm in the destruction of these customer relationships. *Nat'l Elevator*, 2008 WL 207843, at *5 ("loss of client relationships and customer good will built up over years constitutes irreparable harm")

### 2.    Diesel Will Suffer A Significant Loss Of Goodwill And Reputation

Irreparable harm also exists when a business will suffer a significant loss of goodwill or reputation. *See Tom Doherty Assocs. v. Saban Entmt., Inc.*, 60 F.3d 27, 37-39 (2d Cir. 1995) (loss of prospective goodwill constitutes irreparable harm); *Reuters Ltd.*, 903 F.2d at 908-09 (same); *Quezada v. BP Prod. North America, Inc.*, No. 06 CV 5378 SJ, 2006 WL 3837720, at *3 (E.D.N.Y. Dec. 1, 2006) (same); *Xelus, Inc. v. Servigistics, Inc.*, 371 F. Supp.2d 387, 390 (W.D.N.Y. 2005) (citing *TVT Records v. Island Def Jam Music*, 225 F. Supp.2d 398, 405 (S.D.N.Y. 2002)) (threatened loss of potential long term contractual business relationships constituted irreparable harm).    Without a preliminary injunction, Diesel's goodwill and reputation in the industry will suffer substantial, irreparable damage.

Damage to reputation is a harm that is impossible to calculate. *See, e.g., Saban Entmt., Inc. v. 222 World Corp.*, 865 F. Supp. 1047, 1056 (S.D.N.Y. 1994) (damage to reputation in the marketplace is "the sort of harm which is impossible to quantify . . . this sort of reputational erosion is sufficient to support a finding of irreparable harm"). Indeed, courts have repeatedly held that damage to goodwill and reputation is "not readily quantifiable and, thus, constitutes irreparable harm." *See Dunkin' Donuts*, 96 F. Supp.2d at 149.

Without a preliminary injunction, Diesel's goodwill and reputation in the industry will be damaged, because the promises and assurances it made to its customers will be worthless.[8]    If

---

[8]  Despite Greystone's claims that Diesel SpA, as the owner of the Diesel trademarks, is the only party that stands to lose goodwill and reputation from harm to the Diesel brand, the business of Props and Kid are founded on the Diesel trademarks licensed to them. Without those licensed trademarks, they would not be able to function as a business.

Greystone and/or those acting in concert or participation with Greystone sell the Old GBMI Product, customer expectations and relationships will be irreparably harmed, and Diesel's credibility will be destroyed. *See* Birkhold Dec., ¶ 8; Strippoli Dec., ¶ 8.

### 3.    Monetary Damages Are Inadequate Or Cannot Be Reasonably Calculated

Finally, irreparable harm also exists where a plaintiff demonstrates an injury for which monetary damages are inadequate or cannot be reasonably calculated. *See EMI Latin v. Bautista*, 2003 WL 470333, at *14 (S.D.N.Y. Feb. 24, 2003) (irreparable harm found where without a preliminary injunction, record label's goodwill, business relationships, and future sales would suffer, and such injuries were "incapable of being fully remedied by monetary damages"). Plaintiffs cannot reasonably calculate the monetary damages flowing from the sale of the Old GBMI Product. *See Register.com, Inc. v. Verio, Inc.*, 126 F. Supp.2d 238, 248 (S.D.N.Y. 2000) ("[n]either this Court nor the parties to this action could calculate with any precision the amount of the monetary loss which has resulted and which would result in the future from the loss of [plaintiff's] relationships with customers and co-brand partners"); *Ticor Title Ins.*, 173 F.3d at 69 ("it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come"). In addition, where the harm to a plaintiff is the undermining of "the confidence of present and future customers and creditors . . . [t]he extent of damages are incalculable." *Painewebber Inc. v. Nwogugu*, No. 98 Civ. 2441(DLC), 1998 WL 545327, at *2 (S.D.N.Y. Aug. 26, 1998).

For these reasons as well, it is clear that Diesel will suffer irreparable harm if a preliminary injunction is not issued.

---

*See Murjani Int'l, Ltd. v. Sun Apparel, Inc.*, 1987 WL 15110, at *12 (S.D.N.Y. July 31, 1987) (corporate entities which are granted the right to use a trademark can be harmed by diminution of the trademark's value).

C.   **A Balancing Of The Equities Clearly Favors Interim Relief**

To the extent that Defendants' actions create an "imbalance of hardships" in favor of Plaintiffs, Plaintiffs "need not show a likelihood of success, but need only raise substantial questions going to the merits of the case." *Travelers Int'l AG v. Trans World Airlines, Inc.*, 684 F. Supp 1206, 1216 (S.D.N.Y. 1986); *accord Roso-Lino Beverage. Distribs., Inc.*, 749 F.2d at 127; *Dunkin' Donuts*, 96 F. Supp.2d at 151. As we have shown, Plaintiffs have demonstrated likelihood of success on the merits; at the very least, there are serious questions going to the merits of Plaintiffs' conversion claim. Furthermore, the balance of hardships tips decidedly towards Plaintiffs.

As demonstrated above, the harm to Plaintiffs if the Old GBMI Product is sold is immeasurable. On the other hand, GBMI and Greystone will not suffer cognizable harm if they are prohibited from distributing goods for which they have not yet paid and which they do not own. In addition, this Court has required the posting of a $ 1 million bond to secure any money damages which Defendants may suffer as a result of the wrongful issuance of a preliminary injunction. Accordingly, the balance of hardships tips decidedly in Plaintiffs' favor.

Case 1:07-cv-09580-HB-RLE    Document 71    Filed 02/22/2008    Page 37 of 37

## <u>CONCLUSION</u>

For all the foregoing reasons set forth herein, the Court grant Diesel's motion for a preliminary injunction in its entirety, and grant Plaintiffs' leave to amend the Complaint.

Dated: New York, New York
      February 22, 2008

<div style="margin-left: 40%;">

DREIER LLP


By: <u>s/ Ira S. Sacks       </u>
    Ira S. Sacks
    Mark S. Lafayette
499 Park Avenue
New York, New York
Telephone: (212) 328-6100
Facsimile: (212) 328-6101
*Attorneys for Plaintiffs*

</div>