UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
DIESEL PROPS S.R.L. and
DIESEL KID S.R.L.,

               Plaintiffs/Counterdefendants,

         against

GREYSTONE BUSINESS CREDIT II LLC and
GLOBAL BRAND MARKETING INC.,

              Defendants/Counterplaintiffs

          -against-

DIESEL S.p.A.

            Third-Party Defendant.
-----------------------------------------------------------x

Civil Action No. 1:07 CV 9580 (HB)

**GREYSTONE BUSINESS
CREDIT II L.L.C.'S RESPONSE
TO PLAINTIFFS' MOTION FOR
<u>PRELIMINARY INJUNCTION</u>**

I.    <u>Introduction.</u>

       It is stipulated between the parties and undisputed that Greystone Business

Credit II, L.L.C. ("Greystone") is the senior secured lender to Defendant Global Brand

Marketing, Inc. ("GBMI") and that Greystone took a perfected security interest in the

101,000 pairs of shoes that are the subject of this injunction action ("Greystone's collateral").

Further, it is undisputed that GBMI has defaulted on its loan from Greystone. If this

injunction is issued, Greystone will be prevented from exercising its legitimate right under

Article 9 of the Uniform Commercial Code  (the "UCC") to liquidate its collateral. This

result would be unprecedented and contrary to the rich body of law that places supreme

importance on respecting properly created and perfected security interests and providing for certainty and predictability under Article 9 of the UCC.[1]

Although the UCC issues are determinative, the UCC is not the only source of Greystone's rights in these shoes.  Greystone also has rights pursuant to letter agreements in which Plaintiff Diesel Kid ("Kid") and Third-Party Defendant Diesel SpA ("SpA"), the parent of Kid and Plaintiff Diesel Props ("Props"), promised not to "create, assert or possess any security interests, liens, *retentions of title* or similar rights in the assets of [GBMI] . . . .[or] hinder or otherwise interfere with Greystone's rights and remedies under the Financing Agreements, including the liquidation of the Collateral by Greystone or its agents after a default under the Financing Agreements" (emphasis added).  In other words, SpA and Kid expressly promised not to assert the very positions that are now being asserted in this preliminary injunction action.  Notably, SpA is the parent of this small group of closely-related and closely-held entities and controls both Props and Kid.

Greystone thus has two independent sources of authority – the UCC and contract law – and numerous cases in support of its right to exercise control over these shoes. By contrast, the plaintiffs, despite now asking this Court to interfere with Greystone's rights in its collateral for at least the fourth time in the brief history of this litigation, have never cited a single case that supports their assertion of a superior right in these shoes.

Diesel's effort to interfere with the disposition of Greystone's collateral is only its latest effort to destroy GBMI, or what is left of it, in order to gain every possible advantage as the new distributor of Diesel shoes in the United States.  Diesel's motion for

---

[1] As Greystone previously advised this Court at the February 13, 2007 hearing, Greystone's collateral was sold to a third party on December 14, 2007 pursuant to a private sale under the UCC.  These facts are not contested.  It was, and is, Greystone's contention that injunctive relief is not available here for this reason alone.

injunctive relief is an important part of that strategy because it seeks to stop the sale of Diesel shoes that will compete with Diesel's own efforts in the marketplace. Diesel's motion also, however, will have the effect of stripping Greystone of its rights as a secured lender. Diesel has thus gone too far, and its motion should be denied.

II.    Background.

Greystone is a secured lender with its principal place of business in New York. (Amended Complaint at ¶ 6, Answer at ¶ 6.) Greystone entered a Loan and Security Agreement with GBMI dated December 4, 2006 (the "Loan Agreement"), in which Greystone agreed to make revolving loans and other credit accommodations to GBMI in exchange for the collateral assignment of a continuing security interest in virtually all of GBMI's assets, including, in relevant part, then-existing or after-acquired inventory. (Amended Complaint at ¶ 13; Answer at ¶ ¶ 13, 67-69; Exhibit A.)

Props, Kid and SpA are closely-related companies operating under the "Diesel" banner. (Amended Complaint at ¶¶ 3-5; Answer at ¶¶ 3-5; Affidavit of Killick Datta, Exhibit B, at ¶¶ 5-7.) SpA is the owner of the intellectual property rights in Diesel brand shoes. (Amended Complaint at ¶¶ 3, 4, 8; Answer at ¶¶ 3, 4, 8.) Props and Kid are licensees of certain of those rights. (Amended Complaint at ¶¶ 3, 4, 8; Answer at ¶¶ 3, 4, 8.) All three are Italian companies and are sometimes referred to collectively as "Diesel." (Amended Complaint at ¶¶ 3, 4, 8; Answer at ¶¶ 3, 4, 8; Datta Affidavit at ¶ 6.)

GBMI, although now essentially defunct, was at all relevant times in the business of designing, developing, and marketing Diesel-branded footwear in the United States and around the world. (Id. at ¶ 5.) Beginning in the late 1990s, GBMI was a licensee of the Diesel brand for purposes of manufacturing and distribution in the United States.

(Amended Complaint at ¶¶ 9, 10; Answer at ¶¶ 9, 10.)  That licensing relationship was later cancelled by SpA, and GBMI became a distributor only.  (Amended Complaint at ¶¶ 9, 10; Answer at ¶¶ 9, 10.)

Prior to entering the Loan Agreement with GBMI, Greystone entered letter agreements with Diesel SpA and Diesel Kid stating that Diesel consented to, and would not interfere with, Greystone's role as senior secured lender to GBMI.  (Amended Complaint at ¶ 15; Answer at ¶¶ 15, 73; Exhibits C and D.)  Diesel is a closely-held group of companies and SpA controls both Kid and Props.  (Datta Affidavit at ¶¶ 6-10.)

In 2007, GBMI became insolvent and went into default under the Loan Agreement.  (Amended Complaint at ¶ 22; Answer at ¶¶ 22, 98.)  In October 2007, Greystone began the process of collecting and liquidating its collateral, in accordance with its rights and obligations under the UCC.  (Amended Complaint at ¶ 30; Answer at ¶ 30.)  Its collection and liquidation efforts were interrupted on October 26, 2007, when Diesel filed a lawsuit and motion for temporary restraining order seeking control of certain shoes that were subject to Greystone's security interest.  (Amended Complaint at ¶¶ 28, 29; Answer at ¶¶ 28, 29.)  Diesel's lawsuit asserted the very retention-of-title rights that they had previously promised not to assert, and that the UCC denies in any event.  (Amended Complaint at ¶ 29; Answer at ¶ 29; Exhibits C and D.)

This Court (in part, by Judge Rakoff as emergency judge) rejected the vast majority of Diesel's request.  (October 29, 2007 Order, Docket Entry No. 14.)  The only relief given to Diesel was a temporary restraining order requiring Greystone and GBMI to sell the inventory in a manner consistent with GBMI's and Diesel's past course of dealing.  (Id.)  Diesel later tried, but again failed, to have the order amended to keep sales to certain

-4-

discount outlets from happening prior to January 2008. (Endorsed Letter Dated October 30, 2007, Docket Entry No. 17.)

In November 2007, as part of the parties' efforts to resolve the injunction issues, attorneys for Diesel and Greystone engaged in a series of informal conversations regarding the status of the shoes. (Affidavit of Daniel P. Shapiro, Exhibit E, at ¶ 3.) Sometime in the first week of November, Diesel's counsel asked Greystone's counsel to advise him if most of the Diesel shoes were likely to be sold before the scheduled November 19, 2007 preliminary injunction hearing. (Id.) If so, Diesel's counsel had determined that Diesel would withdraw its motion for preliminary injunction. (Id.) Greystone's counsel responded that Greystone did, at that time, expect that the majority of the shoes would likely be sold by November 19, 2007. (Id.) This information was consistent with the expectations at that time of both Greystone and GBMI. (Affidavit of Scott Home, Exhibit G, at ¶¶ 6, 9.)

Later in November, in accordance with the provisions of the UCC, Greystone arranged for the private sale of GBMI's remaining inventory to Titan Apparel, Inc. (Shapiro Affidavit at ¶ 6.) Although it was not obligated to do so, Greystone notified Diesel of that sale. (Id.; Affidavit of David J. Chizewer, Exhibit F, at ¶ 4.) In an e-mail dated November 30, 2007, Diesel's counsel asked whether any Diesel shoes would be included in the private sale. (Shapiro Affidavit at ¶ 6.) Greystone's counsel informed Diesel's counsel that no Diesel shoes were expected be included in the sale. (Id.) This information was consistent with GBMI's expectations, especially in light of a verbal agreement in place between GBMI and a prospective buyer for the remaining Diesel shoes in inventory. (Home Affidavit at ¶ 9.)

That verbal sale agreement ultimately fell through, and some Diesel inventory ended up in the private sale to Titan. (Id. at ¶ 11.) Upon learning this in early February 2008, Diesel's counsel advised Greystone's counsel of this fact and renewed yet again Diesel's motion for temporary restraining order, relying on the same arguments that had already been substantially rejected in the past. (Ira Sacks Letter Dated February 8, 2007.)

In October 2007, at approximately the same time it began interfering with Greystone's liquidation of its collateral, Diesel terminated the distributorship relationship with GBMI and announced immediately that it was going to hire its own sales staff and become its own distributor in the United States. (Amended Complaint at ¶ 26; Answer at 26; Affidavit of Guy Smith, Exhibit H at ¶ 5 and Attachment 1.) In the Official Diesel Release dated October 30, 2007, Diesel proclaims that the termination was done "in alignment with the decision to directly distribute this product [Diesel footwear] as in the major countries of the world," thus brazenly trumpeting the intentional destruction of GBMI's business that is the gravamen of several of the counterclaims filed against Diesel in this case. (Id.)

III.    Overview of Legal Arguments.

Diesel's request for injunctive relief should be denied for each of the following reasons:

First, Diesel's motion depends entirely on the assertion that Diesel has a property interest in Greystone's collateral that is superior to Greystone's interest. Diesel's argument is based upon a retention-of-title provision in its distribution agreement with GBMI which, if it were to apply and trump Greystone's security interest under Article 9 of the UCC, would leave title to the shoes in Diesel until Diesel is paid in full for those goods by GBMI. But the law is clear that the retention-of-title provision contained in Diesel's

contract with GBMI, even assuming that it is validly created under the law of Italy, is of no effect in the United States as against Greystone. As discussed below, it is incontestable as a matter of law that, under applicable conflict of laws principles, the validity, enforceability and priority of any security interest in tangible personal property that is physically located in a given jurisdiction is the law of *that* jurisdiction. In this case, the goods are located in the United States, and the applicable law is the UCC, under which a retention-of-title provision is relegated to the status of an unperfected security interest that is junior to a perfected security interest such as Greystone's. Any other result would turn the world of international secured asset-based lending on its head by allowing different secured transactions regimes to simultaneously govern the same collateral.

Diesel has not cited any case to the contrary, nor has Greystone found one. Moreover, Diesel sought the same injunctive relief in October 2007 that it seeks now, based upon the same legal argument. Diesel's October 2007 action failed and Diesel should not be permitted to come back again, asking for the same relief.

Second, Diesel has not met its burden of showing that irreparable injury would result from the sales it seeks to enjoin. Diesel attempts to distinguish its October argument from the argument now before the Court by alleging that certain, specific facts in the marketplace have changed. In particular, two Diesel employees state in affidavits that if Greystone's collateral is sold into the retail marketplace, Diesel customers – who are never identified – have said that they will buy fewer Diesel shoes now from Diesel for retail sale. These assertions, even if true, under applicable federal trademark law do not give rise to a cause of action that would entitle Diesel to block the impending sale. These affidavits are also rank hearsay and not a sufficient basis in these circumstances for an injunction order by

this Court. Diesel has not offered any viable legal theory that would entitle it to prevent the sale, nor any competent or credible proof to support its claim that it will suffer irreparable injury. Meanwhile, the harm to Greystone will be substantial if the preliminary injunction is granted. Greystone's new borrower, Titan Apparel, Inc., had an order in place and ready to be filled for all of these 101,000 shoes. That order is likely already lost as a result of the temporary restraining order; even if Titan can somehow resurrect it, it likely will bring in only a fraction of the approximately $1.5 million in revenue that Titan (and Greystone, its lender) would have realized originally.

Third, before Greystone became a lender to GBMI, it put Diesel on notice that Greystone's interests in its collateral were superior to any rights or claims in those goods by Diesel. Indeed, Diesel SpA, the parent company, as well as Diesel Kid, signed agreements acknowledging and agreeing to these facts and promising that they would not take any steps or do any acts to interfere with Greystone's rights in its collateral. This injunction action is a flagrant, willful violation of that agreement. For this reason alone, the motion for injunctive relief must be denied.

Fourth, the first step that Diesel takes in its renewed argument is that Diesel has been injured as the result of certain alleged misrepresentations conveyed to counsel for Diesel in communications with  counsel for Greystone. The letter sent to this Court on November 8, 2007, by Diesel's own counsel, Ira Sacks, makes clear these assertions by Diesel are unfounded. Diesel's counsel was making informal requests of Greystone's counsel for estimates regarding expected sales of inventory.  Greystone's counsel provided information as to these estimates and expectations. That information was accurate at the time it was conveyed. Now, in the absence of a substantive position, Diesel is trying to turn

those expectations into guarantees, and those communications into a trap for the unwary. In fact, whatever information was or was not conveyed to Mr. Sacks, Diesel has no legal rights to assert against Greystone, has not shown irreparable injury and is not entitled to injunctive relief.

IV.     Diesel Does Not Have A Property Interest To Support Its Claim And Is Not Entitled To An Injunction.

    A.     Diesel Does Not Have A Property Interest To Support Its Claim.

The predicate for all of Diesel's arguments is that its property interest in Greystone's collateral, based upon the retention-of-title provision in its contract with GBMI, is superior to Greystone's interest in its collateral as the holder of a perfected security interest. Diesel is wrong. Diesel's retention-of-title provision, if enforceable at all, is not enforceable as against Greystone and cannot defeat Greystone's rights in its collateral.

Retention-of-title clauses are a form of security interest recognized and used in many foreign countries. Under such a clause, a vendor of goods retains title to the goods until the purchase price is paid in full. However, in spite of their use in some other countries, retention-of-title clauses are treated in the United States as creating only security interests. The UCC provides that "[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest." UCC § 2-401(1). This concept is reinforced in the UCC's definition of "security interest," which provides in relevant part that "[t]he retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer under Section 2-401 is limited in effect to a reservation of a "security interest." Unless this security interest is "perfected" in the manner provided by the UCC (*e.g.,* by filing a UCC financing statement (UCC § 9-

310(a)) or possession (UCC § 9-313(a)), the security interest remains unperfected, and thereby loses out to a perfected security interest (UCC § 9-322(a)(2)).  Diesel has not asserted that its security interest was perfected under the UCC and, in fact, a search conducted by Greystone of the applicable UCC filing office at the time of Diesel's initial attempt to obtain injunctive relief in this case demonstrates that it had not perfected its security interest.

This issue turns on a question of conflict of laws (known in much of the world as "private international law"): whether U.S. or Italian law governs the creation, effectiveness against third parties and priority of a security device consisting of a retention-of-title provision created under Italian law.  There can be no dispute as to the answer to this question.  It is a bedrock of conflict of laws rules that, where the property in question consists of goods, these issues are governed by the location of the goods – known as the *lex situs* or *lex rei sitae*.  The rule is stated as follows in the Draft Legislative Guide on Secured Transactions recently developed by the United Nations Commission on International Trade Law (the "UNCITRAL Guide"), which is designed to provide a blueprint for countries that wish to modernize their secured transactions laws in order to promote the availability of low-cost secured credit:

> [T]he creation, the effectiveness against third parties and the priority of a security right in tangible assets are generally governed by the law of the State[2] in which the encumbered asset  is located (see recommendation 200). A frequent example of the application of this rule relates to security rights in inventory. If a grantor owns inventory located in a State that has this rule (State A), the law of that State will govern those issues.[3]

---

[2]  The term "State", as used in the UNCITRAL Guide, refers to a country.
[3]  UNCITRAL Guide, Chapter XII (Conflict of Laws). The complete text of the UNCITRAL Guide, which was approved by UNCITRAL last December, can be found at UNCITRAL's web site: www.uncitral.org

See also Hong Kong and Shanghai Banking Corp. v. HFH USA Corporation, 805 F. Supp. 133, 141 (W.D.N.Y. 1992).

It is not difficult to understand why this conflict of laws rule is so well-entrenched. A contrary situation, where the secured transactions regimes of different countries could compete with respect to the same collateral, would wreak havoc on secured transactions. For example, a bank would be far less likely to make a loan based on collateral consisting of goods if it were possible for another party, from another country, to appear and claim a valid security interest in the goods that was never reflected in the applicable U.S. filing system.

Although Greystone never agreed with Diesel to vary this choice-of-law principle (see Smith Affidavit, Ex. H, at ¶¶ 3, 4), any such agreement would not have been effective in any event. Although the UCC grants parties to a contract broad latitude in choosing the law applicable to that contract (UCC § 1-301(c)),that latitude is subject to two important limitations. The first limitation is contained in UCC § 1-301(f), which provides that an express choice-of-law provision "is not effective to the extent that application of the law of the...country designated would be contrary to a fundamental policy of the...country whose law would govern in the absence of an agreement under subsection (d) [e.g., the law of the relevant State's conflict of laws principles]." As is demonstrated so well by the Hong Kong case discussed below, such an express choice of law would, in the case at hand, violate the fundamental policy of promoting certainty and predictability in secured transactions. The second limitation is contained in UCC § 1-301(f), which provides, in relevant part, that the provisions of Sections 9-301 through 9-307 of the UCC may not be vaired by agreement. Included in those provisions are UCC § 9-301(3), which provides that, "while tangible

-11-

negotiable documents, goods, instruments, money, or tangible chattel paper is located in a jurisdiction, the local law of that jurisdiction governs...(C) the effect of perfection or nonperfection and the priority of a nonpossessory security interest in the collateral" (emphasis added.). Thus, the fact that the Distributorship Agreement between Diesel and GBMI contained an express choice of Italian law can have no bearing or effect on perfection, nonperfection, or the priority of Greystone's security interests.

      The leading case on this issue rejects exactly the argument that Diesel makes here. In Hong Kong and Shanghai Banking Corp. v. HFH USA Corporation, 805 F. Supp. 133, 141 (W.D.N.Y. 1992), the court refused to give a retention-of-title provision priority over a lender's perfected security interest because allowing such a result would upset the entire purpose of Article 9 of the New York UCC:

> It would violate a fundamental purpose of New York's U.C.C.
> Article 9: 'to create commercial certainty and predictability by
> allowing third party creditors to rely on the specific perfection
> and priority rules that govern collateral within the scope of
> Article 9. (citations omitted).'

Hong Kong, 805 F. Supp. at 141.

      The Hong Kong opinion is on all fours with this case. In Hong Kong, the lender, Hong Kong and Shanghai Banking Corp. ("HSBC"), took a perfected security interest in the inventory of its borrower, Eli Industries, a United States corporation. Hugo Finkenrath OHG ("Finkenrath"), a German company, was a vendor to Eli, and had been since before HSBC became Eli's lender. As in the instant case, it was uncontested that HSBC had a perfected security interest in the goods that had been shipped by Finkenrath and were in Eli's

inventory.[4]  Also as in the instant case, Finkenrath argued that it had agreed with Eli, before HSBC became a lender to Eli, that German law would govern the agreement between Eli and Finkenrath, and that, under the terms of that agreement, Finkenrath retained title in those goods that had not been paid for in full, including those goods HSBC subsequently claimed as its collateral.

The court determined that where a lender's security interest under Article 9 of the UCC is involved, the borrower and vendor cannot choose to apply foreign law to enforce a retention-of-title provision and defeat the senior perfected secured lender's rights in its collateral.  To the contrary, the UCC gives the vendor only an unperfected and subordinate security interest in the subject goods, and not title:

> [R]egardless of the parties' stipulation of German law, this Court must look to Article 9 of the U.C.C. to identify and prioritize the interests held by HSBC and [Finkenrath].

The court determined that under the UCC, the express choice-of-law provision between Eli and Finkenrath did not apply, and that the law of the forum state – where the goods sat – did.  See also Usinor Industrial v. Leeco Steel Products, Inc., 209 F. Supp. 2d 880 (N.D. Ill. 2002) (Vendor's replevin action denied because retention-of-title provisions between borrower and vendor gives the vendor only an unperfected security interest as against the lender.).

Similarly, in In re Eagle Enterprises, Inc., 223 B.R. 290 (Bank. E.D. Pa. 1998), the court relied upon the Pennsylvania UCC (which is in all relevant respects the same as New York's UCC) and rejected the argument that a choice-of-law provision between a seller and purchaser of certain equipment would determine the validity of a retention-of-title

---

[4] The parties have stipulated to the fact that Greystone took a perfected security interest in the goods at issue. See Exhibit I.

provision and control the determination of ownership and priority interests between the seller

and a trustee in bankruptcy. The seller had provided in its transaction with the purchaser that

German law would control the seller's rights and that the seller would retain title in the

subject property until the buyer had made a final lease payment. The trustee, however,

successfully argued that the UCC should apply because the issues involved the determination

of security interests and, under the UCC, the retention-of-title provision was unenforceable.

The court agreed and held that the seller had only an unperfected security interest

subordinate to the trustee's interest:

> The controlling law in Pennsylvania with respect to conflicts of laws problems involving secured transactions under the UCC is [§ 1105]. . . . Section [1105(a)] allows contracting parties to choose the law applicable to "their" relationship. The statute is silent, however, on the issue of whether parties may also make choice of law decisions that impact the rights of third parties who have not signed on to their contract. Fundamental principles of contract law, including most notably the rules governing offer and acceptance, strongly militate that they cannot. . . . Moreover, even if contracting parties could use 1105(a) to impose contractual choice of law decisions on third parties, section 1105(b) expressly makes those choice of law decisions inapplicable to issues concerning the perfection of security interests . . . . The cases addressing the issue are fairly uniform in holding that contractual choice of law provisions are not binding on third parties. . . . The case most on point with the present case is Hong Kong and Shanghai Banking Corp. v. HFH USA Corp., 805 F. Supp. at 133.

233 B.R. at 292-94. The court went on to explain why this outcome was essential under the

UCC:

> The substantive comment to section 1105 expresses a strong need for the uniform and consistent application of Article 9, stating 'Subsection (2) [1105(b)] spells out essential limitations on the parties' right to choose the applicable law....' . . . This comment makes clear that one uniformly applicable law is necessary to make Article 9 function as intended. Only one law,

> applied in a uniform manner, can assure the existence of a
> comprehensive filing system upon which parties may rely with
> confidence when dealing in secured transactions.

223 B.R. at 295.  See also In re High Line Aviation, Inc., 149 B.R. 730 (Bank. N.D. Ga.

1992) (rejecting argument that choice-of-law provision between manufacturer and consignee

can be applied to lender in a dispute regarding security interests and relative priority).

      Earlier, in Carlson v. Tandy Computer Leasing, 803 F.2d 391 (8th Cir. 1986),

the Eighth Circuit considered these same issues.  Tandy supplied computer equipment to its

customer under what Tandy contended was a lease.  The trustee in bankruptcy for Tandy's

customer determined that the transaction was an installment sale which gave Tandy only an

unperfected security interest rather than the right to repossession of the goods if the

transaction were a true lease.  Tandy argued that Texas law applied under the choice-of-law

provision of its contract with its customer.  The forum state, however, was Missouri and

because the rights of a third party (the trustee) would be affected, the court determined that

under the UCC the law of the forum state had to be used:

> The policy behind section 1-105(2), especially as it relates to the
> scope of Article 9 of the Missouri UCC, is to prohibit choice of
> law arguments when the rights of third parties are at stake.  See
> UCC comment 5 (Vernon 1965) (citations omitted). . . .  If we
> applied Texas law to determine whether a security interest
> existed here, this would violate a fundamental purpose of
> Article 9: to create commercial certainty and predictability by
> allowing third party creditors to rely on the specific perfection
> and priority rules that govern collateral within the scope of
> Article 9.

803 F.2d at 394.

      Thus far, the plaintiffs' response to this case law has been to request that this

Court reject Hong Kong, its reasoning and all similar cases, and instead deliberately inject

uncertainty into Article 9 of the UCC. The plaintiffs did not cite any legal authority to support their position in the October/November 2007 proceedings when this issue was first briefed and argued, nor did they do so when they argued their renewed motion on February 13, 2008. Indeed, Greystone is not aware of any case authority contrary to the ruling in Hong Kong.

The plaintiffs suggest that Hong Kong should not be applied here because Greystone, the lender, either knew or should have known of the contract between Diesel and GBMI and its choice-of-law provision, and should therefore be bound by that contract. This is an empty argument for numerous reasons. First, as the above cases make clear, the parties could not contract around the UCC on the choice-of-law issue even if they tried. The cases do not even discuss the lender's state of mind with regard to choice-of-law provisions, nor would such an inquiry be consistent with the reasoning of these opinions. The objective of Article 9, as clearly articulated in all of the cases, is certainly not to have courts make a case-by-case factual inquiry that would lead to further uncertainty.

Second, what the plaintiffs suggest would cause a reworking of basic contract law, to say nothing of the UCC. The plaintiffs argue that the lender should be bound by the underlying contract simply because it had notice of it, without expressing consent or agreement to its terms. In fact, the opposite presumption should control. All parties knew, or are presumed to know, the state of the law at the time that Greystone made its loan to GBMI in December 2006. Bona v. Barasch, 2003 U.S. Dist. Lexis 8760 (S.D.N.Y. May 22, 2003) (citing to a string of United States Supreme Court cases and holding that "the parties to a contract are presumed to have accepted all obligations imposed on their relationship by state or federal law. Relevant statutes and regulations are incorporated into each contract as

implied terms." (emphasis added)).  The law under the UCC is, and has been at all relevant times, that choice-of-law provisions such as Diesel's here are ineffective against third-party lenders.

Third, if notice and state of mind are to be taken into account, the facts cut sharply against Diesel.  Diesel acknowledges that in December 2006, before Greystone became GBMI's lender, Diesel SpA and Diesel Kid signed Non-Interference Agreements which, at the very least, put Diesel on notice of Greystone's security interest in its collateral, and that Greystone's security interest was, and would be, superior to any of Diesel's rights in those goods.  Indeed, this litigation, and certainly this injunction action, violates those Non-Interference Agreements, as discussed below in Section VI.  Thus, if any party was on notice here, it was Diesel that was on notice of and agreed to Greystone's superior rights in this property.[5]

> B.    The Absence of Diesel's Property Interest Has Already Been Decided By This Court.

On October 26, 2007 Diesel brought its motion for temporary restraining order against Greystone and GBMI in this lawsuit, seeking to assert property rights over Diesel brand shoes in the United States that were Greystone's collateral.  Diesel's October 28, 2007 letter to the Court in support of its motion for temporary restraining order argues precisely the same issues that are now before this Court again – whether Diesel's retention-of-title clause in its distribution agreement with GBMI trumps Greystone's security interest in those goods.  Diesel sought to prevent Greystone from doing anything with those shoes.  Diesel's

---

[5] Moreover, as demonstrated in the Smith Affidavit (Exhibit H), Greystone did not agree and would not have agreed to the application of Italian law to Greystone's rights as senior secured creditor.

argument failed, and Greystone was allowed to liquidate its collateral.    Indeed, in a

November 8, 2007 letter to this Court from Ira Sacks, counsel for Diesel, Mr. Sacks says:

> In light of the ability of defendants to sell Warehouse Product
> during the time period prior to the scheduled preliminary
> injunction hearing, and the likelihood that most of the product
> will have been sold by the time of the preliminary injunction
> hearing [November 19, 2007], plaintiffs hereby withdraw their
> motion for preliminary injunction.[6]

Mr. Sacks' letter came after multiple failed attempts by Diesel to prevent

Greystone from liquidating its collateral.    Diesel first sought injunctive relief by motion

dated October 26, 2007.    That request was substantially denied on October 29, 2007,

although a limited order was entered permitting Greystone and GBMI to dispose of the

collateral only to approved customers. Diesel requested reconsideration that same day.    That

request was denied.    The following day, Diesel again requested modification of the limited

order to include a provision stating that Greystone could not sell shoes from the Fall/Winter

2007 line to discounters until January 2008.    That request was denied.

On each occasion, the predicate for the relief Diesel sought was its argument

that Greystone's rights as a creditor with a perfected security interest should take a backseat

to Diesel's retention-of-title provision in its contract with GBMI.    On each occasion, Diesel's

argument failed.    Diesel makes the very same argument again now.    As discussed, Diesel's

argument has repeatedly failed because it is wrong on the law.    Diesel should not be

permitted to revisit this issue again and again.    U.S. v. Quintieri, 306 F.3d 1217, 1230 (2d

Cir. 2002) (law of the case doctrine militates strongly against revisiting the same legal issues

repeatedly in the same case); DiLaura v. Power Authority of State of N.Y., 982 F.2d 73, 76

---

[6]    Mr. Sacks' letter is an accurate representation of facts related by Mr. Shapiro, counsel for Greystone, at that time. Contrary to the arguments made by Diesel now, Mr. Shapiro stated what his client was then anticipating – there was a "likelihood that most of the product" would be sold. See Affidavit of Daniel P. Shapiro.

(2d Cir. 1992) (in the absence of clear error, a change in the law or new evidence, legal issues should not be revisited repeatedly in the same case). It is a waste of judicial resources, as well as those of the parties, to repeatedly brief and argue this issue, and this time Diesel has succeeded in interrupting a sale – an interruption that may well result in over $1 million in losses to the defendants.

V.    Diesel Has Not Shown Evidence To Support A Claim Of Irreparable Injury.

Federal courts have consistently held that the type of harm that Diesel asserts as the basis for its motion for preliminary injunction, based upon alleged injury to its trademark, goodwill, and authorized distribution network, is not cognizable under applicable law. See H.L. Hayden Co. v. Siemens Medical Systems, 879 F.2d 1005, 1023 (2nd Cir. 1989) (trademark claimant may not prevent sale of genuine product even if such sales occur outside of authorized distribution network). Throughout this litigation, Diesel has attempted to argue that it will be harmed by the sale of GBMI's inventory of shoes in unauthorized, discount channels instead of Diesel's authorized channels of "high-end retail accounts" carrying its "mid-price to luxury brand". See Affidavit of Stephen G. Birkhold, at ¶ 3. Diesel argues that such sales will diminish the goodwill in the Diesel trademark and cause consumer confusion. See affidavit of Germano Ferraro, ¶ 2 ("Kid [will] lose control over trademarked goods, causing consumer confusion"); and Plaintiffs' Memorandum of Law In Support of Motion for a Temporary restraining Order and Preliminary Injunction, p. 1 ("[Greystone's sale] will irreparably harm . . . the goodwill associated with their products"). Specifically, Diesel fears that despite its efforts to maintain high retail prices, the current sale will result in inventory bearing the Diesel brand being sold at discounted outlets instead of its authorized network, diminishing goodwill. See Birkhold Affidavit at ¶ 7 ("If 101,000 pairs

of old GBMI inventory of Diesel branded shoes were to flood the marketplace and sell at $30 to $40 at retail (or even slight higher) Plaintiff's goodwill and brand will be severely and irreparably injured."); accord Affidavit of Anthony Strippoli, ¶ 7.

But Diesel's purported concern for the harm to the Diesel brand and goodwill that might result from "significant sales at off-price to discount outlets" (see Birkhold Affidavit ¶ 4) is simply not a category of harm that the law will redress with injunctive relief. Sebastian International, Inc. v. Longs Drug Stores Corporation, 53 F.3d 1073 (9th Cir. 1995). In Sebastian, the brand owner was a provider of high-end personal care products that had contractually limited the sale of its product line only through qualified salons. Nonetheless, an authorized distributor of hair-care products violated its distributorship agreement by allowing an unauthorized discount store to gain possession of and distribute trademarked goods. Sebastian, upon learning that inventory bearing its marks had entered unauthorized sales channels, attempted to enjoin all sales by the unauthorized distributor, a drugstore-retailer. The Court, nonetheless, refused to enjoin the retailer's sale of the branded goods because the goods were, in fact, genuine. Id., at 1074. Accord Matrix Essentials, Inc. v. Emporium Drug Mart, Inc., 988 F.2d 587 (5th Cir. 1993) (genuine branded products may be sold in discount stores even if obtained outside of brand owner's authorized distribution network); Denbicare U.S.A. Inc. v. Toys "R" Us, Inc., 84 F.3d 1143 (9th Cir. 1996) (trademark owner may not prevent sale of genuine branded product even when sold outside of authorized distribution chain).

In the instant case, there is no dispute that the Greystone collateral consists of genuine, Diesel branded product. Diesel itself delivered the product to GBMI, which then re-sold the inventory into the stream of commerce through private sale. While a subsequent

sale to discount outlets might not be the channel that Diesel had ideally envisioned for these goods, the alleged harm associated with such out-of-network sales is simply not a basis for enjoining the instant sale. If Diesel believes that GBMI obtained or sold the inventory in violation of its distributorship agreement, it can of course seek redress for such breach in a damages action against GBMI. See Denbicare 84 F.3d at 1145-1146. In Denbicare, a purchaser/reseller of diaper products was contractually restricted from selling product into the United States. The reseller violated the geographic restriction, however, and as a result, Toys "R" Us ultimately began reselling the product in the US retail market. Id. at 1145-1146. The Ninth Circuit held, nonetheless, that the initial reseller's violation of the geographic sale restrictions did not entitle the trademark owner to enjoin Toys "R" Us from selling the inventory. Instead, the Court suggested that the trademark owner's claim, if any, would be against the original distributor for breach of the agreed-upon sale restrictions. Id., at 1152 (citing American International Pictures, Inc. v. Foreman, 576 F.2d 661, 664 (5th Cir. 1978) (buyer's disregard of restrictions on resale does not make a subsequent buyer an infringer; intellectual property holder's remedy is suit for breach of the original contract containing the restrictions)). As was true for the plaintiff in Denbicare, if Diesel believes it is being harmed, it may seek recourse for any breach of contract it believes is applicable, but that alleged harm does not support an injunction against the current proposed sale.

Moreover, Diesel's evidence of harm is submitted in the form of vague affidavits of Diesel employees who relate what customers have told them regarding the expected adverse effect in the event of sales to discounters. This is Diesel's newest version of its allegation of irreparable harm. This testimony, though, is the most basic form of hearsay and must be disregarded. A Diesel employee testifying in a perfunctory and

summary fashion to what a third party has told him is no support for a preliminary injunction order. In fact, the Diesel affidavits do not even identify the customers by name. See Affidavits of Stephen G. Birkhold at ¶ 4-8; Anthony N. Strippoli at ¶ 4-8.

It is Diesel's burden to show why they are entitled to injunctive relief. Separate and apart from the failure of Diesel's argument as to its property interest, it has utterly failed to carry its burden of proof to show, much less articulate any cognizable, irreparable injury. Diesel's requests for preliminary injunctive relief must be denied.

Greystone further expects the plaintiffs to take the position that the shoes should only be sold to certain discounters specified in the Distribution Agreements between them and GBMI. This position is flawed for several reasons. First, the Distribution Agreements are no longer in place, having been terminated by the plaintiffs themselves. Second, Greystone was never a party to the Distribution Agreements in any event and is not bound by their terms. Third, the plaintiffs have not and cannot demonstrate that sales to "their" selected discounters would not cause the injury they complain of, but that the planned sale would. The plaintiffs do not even know the customer to whom the planned sale will be made. Further, the shoes are much older now than they were in October and November 2007. Their value has diminished. Fourth, Greystone offered just last week to seek to arrange for the sale of the collateral to the plaintiffs so that they could protect their brand, if that were truly their interest. The plaintiffs rejected that offer out of hand, without any response on price or terms. It seems perfectly clear that the plaintiffs' interest here has little if anything to do with any alleged irreparable injury.

Finally, the plaintiffs' motion rests on the premise that they would have had the right to enjoin Greystone's private sale in mid-December 2007. For all of the reasons stated

herein, including the Non-Interference Agreements and the treatment of retention-of-title provisions under UCC §§ 1-201(35) and 2-401(1), they had no such right. Thus, they have suffered no irreparable harm.

VI.    The Non-Interference Agreements Bar Injunctive Relief.

The plaintiffs' newest request for injunctive relief is premised, like its earlier requests, on the notion that they have some basis for interfering with Greystone's disposition of its collateral.    Not only does the UCC provide to the contrary, but Diesel has acknowledged and agreed that its interests would be subordinate to Greystone's and that Diesel would not interfere with Greystone's rights in its collateral.

In December 2006, Greystone became the senior perfected secured lender to GBMI. GBMI had a long relationship with Diesel, first as a licensor and then distributor of Diesel brand shoes in the United States. The underlying damages action in this case is with regard to claims and counterclaims growing out of the relationships between Diesel and GBMI. Greystone agreed to become a lender to GBMI only with the acknowledgement and agreement of Diesel SpA, the parent company, and Diesel Kid, one of the subsidiaries and a movant here, that in the event of a default by GBMI on its obligations to Greystone, Diesel would not do anything to interfere with Greystone's rights to liquidate its collateral, which included all of the Diesel brand shoes in GBMI's possession.   (Copies of these "Non-Interference Agreements" have been stipulated to as authentic, see Exhibit I, and are attached hereto as Exhibits C and D.)

GBMI did, in fact, default on its obligations to Greystone, and Greystone therefore began in October 2007 the process of liquidating the Diesel inventory, among other collateral.  The plaintiffs simply ignore these Non-Interference Agreements and do not even

mention them or otherwise bring them to the Court's attention in their moving papers. The Non-Interference Agreements alone require that the motion for injunctive relief be denied.

The plaintiffs have argued in response that Diesel Props, the other movant here, did not sign a Non-Interference Agreement. That is true, but of no help to the plaintiffs. Diesel Kid did sign such an agreement. Moreover, the parent company, Diesel SpA, signed the Non-Interference Agreement, as well. Diesel SpA is the owner of the relevant Diesel trademarks and therefore is the party that would suffer if, as the plaintiffs allege, the Diesel brand will be harmed as a result of the pending sale. Diesel SpA conveniently has chosen not to join the plaintiffs' motion, no doubt recognizing that the Non-Interference Agreements would prohibit it from obtaining the desired relief. But this Court should not allow Diesel SpA to use its subsidiary to circumvent its own contractual restrictions, particularly where Diesel SpA itself is the party that would suffer the alleged harm if the request is denied.

In addition, Diesel SpA is directing and controlling all of the activities of Diesel Kid and Diesel Props. Diesel is a very successful but closely held and closely managed company. For example, when Diesel wanted to meet with GBMI in March 2007 to discuss performance under the Distribution Agreement, it sent Diesel SpA employees even though it was Kid and Props which had the formal contractual relationship with GBMI. See Affidavit of Sudeepto Datta, Exhibit B, at ¶ 8. Similarly, the decision to file this lawsuit and terminate the Distribution Agreements between the plaintiffs and GBMI was made by officers of Diesel SpA, not the plaintiffs. Id. at ¶ 10. Diesel has not offered any affidavit or other factual evidence to refute Mr. Datta's affidavit, or the assertion that Diesel SpA

controls both Kid and Props.    Thus, clearly, Diesel SpA is the one directing all of these business activities, and this litigation.

VII.    The Doctrine of Comity Does Not Support The Plaintiffs Here.

Perhaps knowing of the numerous and prohibitive problems with their position, both factual and legal, the plaintiffs attempt to cast them all aside by invoking the doctrine of comity.    That reliance is misplaced:

> International comity is recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation (citations omitted).... [C]omity remains a rule of practice, convenience and expediency rather than a rule of law. (citations omitted).... No nation is under unremitting obligation to enforce foreign interests which are fundamentally prejudicial to those of the domestic forum. (citations omitted).

Pravin Banker Associates, Ltd. v. Banco Popular, 109 F.3d 850 (2d Cir. 1997); In re Alison J. Treco v. The Bank of New York, 240 F.3d 148, 157 (2d Cir. 2001) ("It is implicit in the concept that deference should be withheld where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of the United States.").

The injunction that the plaintiffs seek would violate clear and well-established UCC law, contract law and trademark law, as discussed above.    Comity does not require, or permit, this result.

VIII.    The Discussions Between Counsel Were Not Misrepresentations And Are Irrelevant In Any Event.

Finally, in arguing for injunctive relief again now, the plaintiffs rely upon conversations and informal statements made by counsel that were, in any event, accurate at the time they were made.    Indeed, as the plaintiffs' counsel's November 8, 2007, letter to the Court acknowledges, the first of the two allegedly false statements was made in early November and dealt with the *approximate* number of Diesel shoes *expected* to be in

inventory as of some two or three weeks later. See November 8, 2007 Letter (discussing the "*likelihood* that *most* of the product will have been sold"). As the attached Affidavit of Scott Home, GBMI's Executive Vice-President of Sales, shows, the information provided to the plaintiffs by Greystone was, in fact, an accurate portrayal of GBMI's expectations at that time. See Home Affidavit, Exhibit G, at ¶¶ 6, 9. Thus, although fewer pairs of shoes were sold than expected, there was nothing improper or untrue about the information informally provided by Greystone's counsel regarding expectations.

The second of the statements was also accurate at the time it was made. GBMI had a verbal agreement with a customer, Ross, for a sale that was expected to be completed in early December – before the private sale. Id. at ¶ 9. It was only later, and unbeknownst to Greystone's counsel, that the sale to Ross fell through, thus resulting in the inclusion of some Diesel inventory in the private sale. Id.

Ironically, it appears that the discrepancies between what Greystone and GBMI expected in November and December 2007 regarding the anticipated sales of Diesel shoes in inventory and what ultimately happened in terms of sales were driven, at least in part, by Diesel's interference in the marketplace, which disrupted and ruined various expected sales by GBMI, and caused returns from customers. For example, Diesel was, at the time of these conversations between counsel, in the marketplace contacting GBMI customers directly, encouraging GBMI customers to cancel GBMI orders and luring those customers to do business instead directly with Diesel. See id. at ¶¶ 7-8. It is unfair and unfounded to suggest that any misrepresentation was made to Diesel when the representations were true at the time they were made and the failure of the expectations to match the actual outcome was based in part on Diesel's own conduct.

In the absence of a substantive position, the plaintiffs are trying to bootstrap informal statements, acknowledged by all to be only then-current reports of expectations, into guarantees.  In fact, even the plaintiffs' version of these conversations would not change that fact that there is no support for the injunction that the plaintiffs seek.

## CONCLUSION

For all of the above reasons, Greystone requests that the Plaintiffs' Motion for Preliminary Injunction be denied.

**GREYSTONE  BUSINESS  CREDIT  II  LLC**

By   _____

      One of Its Attorneys

Mark N. Parry
Danielle S. Friedberg
MOSES & SINGER LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 554-7800

Of Counsel:

Richard M. Kohn
Daniel P. Shapiro
Stephen H. Locher
GOLDBERG KOHN BELL BLACK
  ROSENBLOOM & MORITZ, LTD.
55 East Monroe Street
Suite 3300
Chicago, Illinois  60603
(312) 201-4000