Exhibit A

**Greystone Business Credit II LLC**

## LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement (as it may be amended, this *"Agreement"*) is entered into on December 4th, 2006 between GREYSTONE BUSINESS CREDIT II LLC (*"Lender"*), a Delaware limited liability company, having an address at 152 West 57th Street, 60th Floor, New York, New York 10019 and GLOBAL BRAND MARKETING INC., a California corporation (*"Borrower"*), whose principal office is located at 6500 Hollister Avenue, Santa Barbara, California 93117 (*"Borrower's Address"*). The Schedules to this Agreement are an integral part of this Agreement and are incorporated herein by reference. Terms used, but not defined elsewhere, in this Agreement are defined in Schedule B.

## 1.    LOANS AND CREDIT ACCOMMODATIONS.

1.1    **Revolving Loans and Credit Accommodations.** Subject to the terms and conditions contained in this Agreement, Lender will from time to time during the Term at Borrower's request, make revolving loans to Borrower (*"Revolving Loans"*), and make letters of credit, bankers acceptances and other credit accommodations (*"Credit Accommodations"*) available to Borrower, in each case to the extent that there is sufficient Availability at the time of such request to cover, dollar for dollar, the requested Revolving Loan or Credit Accommodation; *provided*, that after giving effect to such Revolving Loan or Credit Accommodation, (x) the outstanding balance of all Revolving Loans plus the Credit Accommodation Balance will not exceed the Maximum Facility Amount set forth in Section 1(a) of Schedule A and (y) none of the other Loan Limits set forth in Section 1 of Schedule A will be exceeded. For this purpose, *"Availability"* means:

      (i)    the aggregate amount of Eligible Accounts (less maximum existing or asserted taxes, discounts, credits and allowances) multiplied by the Accounts Advance Rate set forth in Section 1(b)(i) of Schedule A;

*plus*

      (ii)    the lower of cost or market value of Eligible Inventory multiplied by the Inventory Advance Rate set forth in Section 1(b)(ii) of Schedule A, but not to exceed the Inventory Sublimit set forth in Section 1(c) of Schedule A;

*plus*

      (iii)    the Overadvance Amount, if any, set forth in Section 1(f) of Schedule A;

*plus*

      (iv)    the Last Out Participation Amount, if any;

*minus*

(v)   all Reserves which Lender has established pursuant to Section 1.2 (including those to be established in connection with the requested Revolving Loan or Credit Accommodation); and

*minus*

(vi)   the outstanding balance of all of Revolving Loans (*excluding* the Credit Accommodation Balance).

1.2   **Reserves.**  Lender may from time to time establish and revise such reserves as Lender deems appropriate in its sole discretion (**"*Reserves*"**) to reflect (i) events, conditions, contingencies or risks which affect or may affect (A) the Collateral or its value, or the security interests and other rights of Lender in the Collateral or (B) the assets, business or prospects of Borrower or any Obligor, (ii) Lender's good faith concern that any Collateral report or financial information furnished by or on behalf of Borrower or any Obligor to Lender is or may have been incomplete, inaccurate or misleading in any material respect, (iii) any fact or circumstance which Lender determines in good faith constitutes, or could reasonably be expected to constitute, a Default or Event of Default or (iv) any other events or circumstances which Lender determines in good faith make the establishment or revision of a Reserve prudent (including without limitation with respect to federal, state and general sales taxes and other claims having known or potential priority over Lender's liens and security interests in the Collateral). Without limiting the foregoing, Lender shall (x) in the case of each Credit Accommodation issued for the purchase of Inventory (a) which meets the criteria for Eligible Inventory set forth in clauses (i), (ii), (iii), (v) and (vi) of the definition of Eligible Inventory, (b) which is or will be in transit as a drop shipment or to one of the locations set forth in Section 7(d) of Schedule A, (c) which is fully insured in a manner satisfactory to Lender and (d) with respect to which Lender is in possession of all bills of lading and all other documentation which Lender has requested, all in form and substance satisfactory to Lender in its sole discretion, establish a Reserve equal to the cost of such Inventory (plus all duties, freight, taxes, insurance, costs and other charges and expenses relating to such Credit Accommodation or such Eligible Inventory) multiplied by a percentage equal to 100% minus the Inventory Advance Rate applicable to Eligible Inventory and (y) in the case of any other Credit Accommodation issued for any purpose, establish a Reserve equal to the full amount of such Credit Accommodation plus all costs and other charges and expenses relating to such Credit Accommodation. Lender may, in its discretion, establish and revise Reserves by deducting them in determining Availability or by reclassifying Eligible Accounts or Eligible Inventory as ineligible. In no event shall the establishment of a Reserve in respect of a particular actual or contingent liability obligate Lender to make advances hereunder to pay such liability or otherwise obligate Lender with respect thereto.

**1.3   Other Provisions Applicable to Credit Accommodations.** Subject to Section 1.1, Lender shall from time to time during the Term, on terms and conditions acceptable to Lender, make Credit Accommodations available to Borrower either by issuing them, or by causing other financial institutions to issue them supported by Lender's guaranty or indemnification; *provided*, that after giving effect to each Credit Accommodation, the Credit Accommodation Balance will not exceed the Credit Accommodation Limit set forth in Section 1(d) of Schedule A.   Any amounts paid by Lender in respect of a Credit Accommodation will be treated for all purposes as a Revolving Loan which shall be secured by the Collateral and bear interest, and be payable, in the same manner as a Revolving Loan. Borrower agrees to execute all documentation required by Lender or the issuer of any Credit Accommodation in connection with any such Credit Accommodation.

**1.4   Repayment.** Accrued interest on all Revolving Loans shall be payable on the first day of each month. If at any time any of the Loan Limits are exceeded, Borrower will immediately pay to Lender such amounts (or provide cash collateral to Lender with respect to the Credit Accommodation Balance in the manner set forth in Section 7.3), as shall cause Borrower to be in full compliance with all of the Loan Limits.   Notwithstanding the foregoing, Lender may, in its sole discretion, make or permit Revolving Loans, any Credit Accommodations or any other monetary Obligations to be in excess of any of the Loan Limits; *provided*, that Borrower shall, upon Lender's demand, pay to Lender such amounts as shall cause Borrower to be in full compliance with all of the Loan Limits.   All unpaid monetary Obligations shall be payable in full on the Maturity Date (as defined in Section 7.1) or, if earlier, the date of any early termination pursuant to Section 7.2.

**1.5   Minimum Borrowing.** Subject to the terms and conditions of this Agreement, at all times prior to the Maturity Date, interest and fees shall be calculated, based upon the greater of either (a) the average daily outstanding principal balance of the Revolving Loans and the average daily Credit Accommodation Balance or (b) the Minimum Loan Amount set forth in Section 1(e) of Schedule A.   However, Lender shall not be obligated to loan Borrower the Minimum Loan Amount other than in accordance with all of the terms and conditions of this Agreement.

**1.6   Diesel Payments.** Subject to the terms and conditions of this Agreement, Borrower hereby authorizes Lender to wire the proceeds of Revolving Loans of Borrower to Diesel pursuant to the terms of the Diesel Agreement.

## 2.   INTEREST AND FEES.

**2.1   Interest.** All Revolving Loans shall bear interest at the Interest Rates set forth in Section 2 of Schedule A, except where expressly set forth to the contrary in this Agreement or another Loan Document; *provided*, that after the occurrence of and during the continuation of an Event of Default, all Revolving Loans and other monetary Obligations shall, at Lender's option, bear interest at a rate per annum equal to two percent (2%) in excess of the rate

Greystone Business Credit II LLC                    Loan and Security Agreement

otherwise applicable to Revolving Loans (the *"Default Rate"*) until paid in full (notwithstanding the entry of any judgment against Borrower or the exercise of any other right or remedy by Lender), and all such interest shall be payable on demand. Changes in the interest rate shall be effective as of the date of any change in the Prime Rate. Notwithstanding anything to the contrary contained in this Agreement, the aggregate of all amounts deemed to be interest hereunder and charged or collected by Lender is not intended to exceed the highest rate permissible under any applicable law, but if it should, such interest shall automatically be reduced to the extent necessary to comply with applicable law and Lender will refund to Borrower any such excess interest received by Lender.

2.2   **Fees and Warrant.**  Borrower shall pay Lender the following fees and issue Lender the following warrant, which are in addition to all interest and other sums payable by Borrower to Lender under this Agreement, and are not refundable:

(a)   **Closing Commitment Fee.**  A closing commitment fee (the *"Closing Commitment Fee"*) in the amount set forth in Section 3(a) of Schedule A.

(b)   **Closing Fee.**  A closing fee (the *"Closing Fee"*) in the amount set forth in Section 3(b) of Schedule A, which shall be deemed to be fully earned as of and payable on the date hereof.

(c)   **Servicing Fee.**  A monthly servicing fee (the *"Servicing Fee"*) in the ~~of the Obligations~~ amount set forth in Section 3(c) of Schedule A, in consideration of Lender's administration and other services for each month (or part thereof), which shall be fully earned as of, and payable in advance on, the date of this Agreement and on the first day of each month thereafter so long as any ~~Revolving Loans or Credit Accommodations~~ are outstanding.

(d)   **Unused Line Fee.**  An unused line fee (the *"Unused Line Fee"*) at a rate equal to the percentage per annum set forth in Section 3(d) of Schedule A of the amount by which the Maximum Facility Amount exceeds the average daily outstanding principal balance of the Revolving Loans and the Credit Accommodation Balance during the immediately preceding month (or part thereof), which fee shall be payable, in arrears, on the first day of each month prior to the Maturity Date and on the Maturity Date.

(e)   **Underwriting Fee.**  An underwriting fee (the *"Underwriting Fee"*) in the amount set forth in Section 3(e) of Schedule A.

(f)   **Credit Accommodation Fees.**  The fees relating to Credit Accommodations (or guaranties thereof by Lender) in the amount set forth in Section 3(g) of Schedule A (the *"Credit Accommodation Fees"*), payable, in arrears, on the first day of each month so long as any Credit Accommodations are outstanding and on the Maturity Date, plus all costs and fees charged by the issuer of any Credit Accommodations, payable as and when such costs and fees are charged.

4

(g)    **Overadvance Fee.** An overadvance fee of (the *"Overadvance Fee"*) in the amount set forth in Section 3(h) of Schedule A which shall be <u>fully earned as</u> of the date hereof, and payable in monthly installments in advance on the date of this Agreement and on the first day of each month thereafter.

(h)    **Warrant.** A Warrant to acquire the capital stock of Borrower (the *"Warrants"*), as summarized in Section 3(i) of Schedule A and as more fully set forth in a separate warrant agreement executed by Borrower contemporaneously with this Agreement.

Lender hereby represents and warrants that it is an "accredited investor", as such term is defined under Regulation D promulgated under the Securities Act of 1933, as amended, and is acquiring the Warrant issuable to it under this Agreement for its own account for investment and not with a view to or for sale in connection with any distribution thereof.

2.3    **Computation of Interest and Fees.** All interest and fees shall be calculated daily on the closing balances in the Loan Account based on the actual number of days elapsed in a year of 360 days. For purposes of calculating interest and fees, if the outstanding daily principal balance of the Revolving Loans is a credit balance, such balance shall be deemed to be zero.

2.4    **Loan Account; Monthly Accountings.** Lender shall maintain a loan account for Borrower reflecting all advances, charges, expenses and payments made pursuant to this Agreement (the *"Loan Account"*), and shall provide Borrower with a monthly accounting reflecting the activity in the Loan Account. Each accounting shall be deemed correct, accurate and binding on Borrower and an account stated (except for reverses and reapplications of payments made and corrections of errors discovered by Lender), unless Borrower notifies Lender in writing to the contrary within sixty days after such account is rendered, describing the nature of any alleged errors or omissions. However, Lender's failure to maintain the Loan Account or to provide any such accounting shall not affect the legality or binding nature of any of the Obligations. Interest, fees and other monetary Obligations due and owing under this Agreement (including fees and other amounts paid by Lender to issuers of Credit Accommodations) may, in Lender's discretion, be charged to the Loan Account, and will thereafter be deemed to be Revolving Loans and will bear interest at the same rate as other Revolving Loans.

3.    **SECURITY INTEREST.**

3.1    **Grant of Security Interest.** To secure the full payment and performance of all of the Obligations, Borrower hereby collaterally assigns to Lender and grants to Lender a continuing security interest in all right, title and interest of Borrower in the following property of Borrower, whether tangible or intangible, now or hereafter owned, existing, acquired or arising and wherever now or hereafter located, and whether or not eligible for lending purposes: (i) all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by Borrower has given rise to Accounts and have been

5

Greystone Business Credit II LLC                    Loan and Security Agreement

returned to, or repossessed or stopped in transit by, Borrower; (ii) all Chattel Paper, Instruments, Documents and General Intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, tradenames, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contracts rights, payment intangibles, security interests, security deposits and rights to indemnification); (iii) all Inventory (whether or not Eligible Inventory); (iv) all Goods (other than Inventory), including, without limitation, Equipment, vehicles and Fixtures; (v) all Investment Property (other than 35% of the voting securities of the Foreign Subsidiaries); (vi) all Deposit Accounts, bank accounts, deposits and cash; (vii) all Letter-of-Credit Rights; (viii) Commercial Tort Claims listed on Exhibit A hereto; (ix) all Supporting Obligations; (x) any other property of Borrower now or hereafter in the possession, custody or control of Lender or any agent or any parent, Affiliate or Subsidiary of Lender or any participant with Lender in the Revolving Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise) and (xi) all additions, and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including, without limitation, proceeds of all insurance policies insuring the foregoing property, and all of Borrower's books and records relating to any of the foregoing and to Borrower's business.

3.2    **Possessory Collateral.**  (a) Within two (2) Business Days of Borrower's receipt of any Collateral evidenced by an Instrument or Document with respect to in transit Inventory and (b) within ten (10) Business Days of Borrower's receipt of any other portion of the Collateral evidenced by an Instrument or Document having an individual or aggregate value in excess of $50,000 (including without limitation, any Tangible Chattel Paper and any Investment Property consisting of certificated securities), Borrower shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance acceptable to Lender).  If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as Borrower's attorney and agent-in-fact to endorse or assign the same on Borrower's behalf.

3.3    **Preservation of Collateral and Perfection of Security Interest Therein.** Borrower shall, at Lender's request, at any time and from time to time, authenticate, execute and deliver to Lender such financing statements, documents and other agreements and instruments (and pay the cost of filing or recording the same in all public offices deemed necessary or desirable by Lender) and do such other acts and things or use reasonable commercial efforts to cause third parties to do such other acts and things as Lender may deem necessary or desirable in its sole discretion in order to establish and maintain a valid, attached and perfected security interest in the Collateral in favor of Lender (free and clear of all other liens, claims, encumbrances and rights of third parties whatsoever, whether voluntarily or involuntarily created, except Permitted Liens) to secure payment of the Obligations, and in order to facilitate the collection of the Collateral.  Borrower authorizes Lender to file,

6

transmit, or communicate, as applicable, financing statements and amendments describing the Collateral as "all personal property of debtor" or "all assets of debtor" or words of similar effect, in order to perfect Lender's security interest in the Collateral without Borrower's signature. Borrower also hereby ratifies its authorization for Lender to have filed in any jurisdiction any financing statements filed prior to the date hereof. After the occurrence of an Event of Default, Borrower will cause 65% (or such greater percentage that, due to a change in applicable law after the date hereof, (1) could not reasonably be expected to cause the undistributed earnings of the applicable Foreign Subsidiary as determined for U.S. Federal income tax purposes to be treated as a deemed dividend to Borrower and (2) could not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and 100% of the issued and outstanding Equity Interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) in each Foreign Subsidiary to be subject at all times to a first priority, perfected Lien in favor of Lender pursuant to the terms and conditions of the Loan Documents or other security documents as Lender shall reasonably request.

4.     **ADMINISTRATION.**

     **4.1     Lock Boxes and Blocked Accounts.** Borrower will, at its expense, establish (and revise from time to time as Lender reasonably request) collection procedures acceptable to Lender, in Lender's sole discretion, for the collection of checks, wire transfers and other proceeds of Accounts (*"Account Proceeds"*), which may include (i) directing all Account Debtors to send all such proceeds directly to a post office box designated by Lender either in the name of Borrower (but as to which Lender has exclusive access) or, at Lender's option, in the name of Lender (a *"Lock Box"*) or (ii) depositing all Account Proceeds received by Borrower into one or more bank accounts maintained in Lender's name (each, a *"Blocked Account"*), under an arrangement acceptable to Lender with a depository bank acceptable to Lender, pursuant to which all funds deposited into each Blocked Account are to be transferred to Lender in such manner, and with such frequency, as Lender shall specify or (iii) a combination of the foregoing. Borrower agrees to execute, and to cause its depository banks to execute, such Lock Box and Blocked Account agreements and other documentation as Lender shall require from time to time in connection with the foregoing.

     **4.2     Remittance of Cash Collateral and Proceeds.** Except as provided in Section 4.1, all Collateral consisting of cash (excluding Collateral located at Bank of the West so long as such cash is collateralizing outstanding letters of credit issued by Bank of the West) and all Proceeds arising from the sale or other disposition of any Collateral (including without limitation proceeds of insurance where Lender is loss payee) shall be delivered, in kind, by Borrower to Lender in the original form in which received by Borrower not later than the following Business Day after receipt by Borrower. Until so delivered to Lender, Borrower shall hold such Proceeds separate and apart from Borrower's other funds and

property in an express trust for Lender. Nothing in this Section 4.2 shall limit the restrictions on disposition of Collateral set forth elsewhere in this Agreement.

**4.3    Application of Payments.** Lender may, in its sole discretion, apply, reverse and re-apply all cash and non-cash Proceeds of Collateral or other payments received with respect to the Obligations, in such order and manner as Lender shall determine, whether or not the Obligations are due, and whether before or after the occurrence of a Default or an Event of Default. For purposes of determining Availability, such amounts will be credited to the Loan Account and the Collateral balances to which they relate upon Lender's receipt of advice from Lender's Bank (set forth in Section 9 of Schedule A) that such items have been credited to Lender's account at Lender's Bank (or upon Lender's deposit thereof at Lender's Bank in the case of payments received by Lender in kind), in each case subject to final payment and collection. However, for purposes of computing interest on the Obligations, such items shall be deemed applied by Lender one Business Day after Lender's receipt of advice of deposit thereof at Lender's Bank.

**4.4    Notification; Verification.** Lender or its designee may, from time to time, whether or not a Default or Event of Default has occurred: (i) verify directly with the Account Debtors the validity, amount and other matters relating to the Accounts and Chattel Paper, by means of mail, telephone or otherwise, either in the name of Borrower or Lender or such other name as Lender may choose; (ii) notify Account Debtors that Lender has a security interest in the Accounts and that payment thereof is to be made directly to Lender; and (iii) demand, collect or enforce payment of any Accounts and Chattel Paper (but without any duty to do so).

**4.5    Power of Attorney.** Borrower hereby grants to Lender an irrevocable power of attorney, coupled with an interest, authorizing and permitting Lender (acting through any of its officers, employees, attorneys or agents), at any time an Event of Default has occurred and is continuing at Lender's option, but without obligation, with or without notice to Borrower, and at Borrower's expense, to do any or all of the following, in Borrower's name or otherwise: (i) execute on behalf of Borrower any documents that Lender may, in its sole discretion, deem advisable in order to perfect and maintain Lender's security interests in the Collateral, to exercise a right of Borrower or Lender, or to fully consummate all the transactions contemplated by this Agreement and the other Loan Documents (including such financing statements and continuation financing statements, and amendments thereto, as Lender shall deem necessary or appropriate) and to file as a financing statement any copy of this Agreement or any financing statement signed by Borrower; (ii) execute on behalf of Borrower any document exercising, transferring or assigning any option to purchase, sell or otherwise dispose of or lease (as lessor or lessee) any real or personal property which is part of the Collateral or in which Lender has an interest; (iii) execute on behalf of Borrower any invoices relating to any Accounts, any draft against any Account Debtor, any proof of claim in bankruptcy, any notice of Lien or claim, and any assignment or satisfaction of mechanic's, materialman's or other Lien; (iv) execute on behalf of Borrower any notice to any Account

Debtor; (v) receive and otherwise take control in any manner of any cash or non-cash items of payment or Proceeds of Collateral; (vi) endorse Borrower's name on all checks and other forms of remittances received by Lender; (vii) pay, contest or settle any Lien, charge, encumbrance, security interest and adverse claim in or to any of the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (viii) grant extensions of time to pay, compromise claims relating to, and settle Accounts, Chattel Paper and General Intangibles for less than face value and execute all releases and other documents in connection therewith; (ix) pay any sums required on account of Borrower's taxes or to secure the release of any Liens therefor; (x) pay any amounts necessary to obtain, or maintain in effect, any of the insurance described in Section 5.14; (xi) settle and adjust, and give releases of, any insurance claim that relates to any of the Collateral and obtain payment therefor; (xii) instruct any third party having custody or control of any Collateral or books or records belonging to, or relating to, Borrower to give Lender the same rights of access and other rights with respect thereto as Lender has under this Agreement; (xiii) change the address for delivery of Borrower's mail and receive and open all mail addressed to Borrower; and (xiv) endorse or assign to Lender on Borrower's behalf any portion of Collateral evidenced by an agreement, Instrument or Document if an endorsement or assignment of any such items is not otherwise made by Borrower pursuant to Section 3.2. Any and all sums paid, and any and all costs, expenses, liabilities, obligations and reasonable attorneys' fees incurred, by Lender with respect to the foregoing shall be added to and become part of the Obligations, shall be payable on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations. Borrower agrees that Lender's rights under the foregoing power of attorney or any of Lender's other rights under this Agreement or the other Loan Documents shall not be construed to indicate that Lender is in control of the business, management or properties of Borrower.

**4.6   Disputes.**  Borrower shall promptly notify Lender of all disputes or claims relating to Accounts and Chattel Paper that exceed $25,000 with respect to any Account Debtor; *provided* that Borrower shall not be obligated to notify Lender with respect to any dispute or claim with respect to the existence of which Lender or any of its Affiliates notified Borrower. Borrower will not, without Lender's prior written consent, compromise or settle any Account or Chattel Paper for less than the full amount thereof, grant any extension of time of payment of any Account or Chattel Paper, release (in whole or in part) any Account Debtor or other person liable for the payment of any Account or Chattel Paper or grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any Account or Chattel Paper; except that prior to the occurrence of an Event of Default, Borrower may take any of such actions in the ordinary course of its business, *provided* that Borrower promptly reports the same to Lender.

**4.7   Invoices.**  At Lender's request, Borrower will cause all invoices and statements which it sends to Account Debtors or other third parties to be marked, in a manner satisfactory to Lender, to reflect Lender's security interest therein.

Greystone Business Credit II LLC                                    Loan and Security Agreement

### 4.8  Inventory.

(a)  **Returns.**  Provided that no Event of Default has occurred and is continuing, if any Account Debtor returns any Inventory to Borrower in the ordinary course of its business, Borrower will promptly determine the reason for such return and promptly issue a credit memorandum to the Account Debtor in the appropriate amount (sending a copy to Lender).  After the occurrence of and during the continuance of an Event of Default, Borrower will not (i) intentionally authorize or approve any return with respect to any Account or (ii) accept any return with respect to Accounts with an aggregate value in excess of $25,000, in each case without Lender's prior written consent.  Upon Lender's demand, after the occurrence of and during the continuation of an Event of Default, Borrower will (i) hold the returned Inventory in trust for Lender; (ii) segregate all returned Inventory from all of Borrower's other property; (iii) conspicuously label the returned Inventory as Lender's property; and (iv) immediately notify Lender of the return of such Inventory, specifying the reason for such return, the location and condition of the returned Inventory and, at Lender's request, deliver such returned Inventory to Lender at an address specified by Lender.

(b)  **Other Covenants.**  Borrower will not, without Lender's prior written consent, (i) store any Inventory with any warehouseman or other third party other than as set forth in Section 7(d) of Schedule A or (ii) sell any Inventory on a sale-or-return, guaranteed sale, consignment, or other contingent basis.  All of the Inventory has been produced only in accordance with the applicable provisions of the Fair Labor Standards Act of 1938 and all rules, regulations and orders promulgated thereunder.

### 4.9  Access to Collateral, Books and Records.

At reasonable times during normal business hours, and on one Business Day's notice, prior to the occurrence of a Default or an Event of Default, and at any time and with or without notice after the occurrence of a Default or an Event of Default, Lender or its agents shall have the right to inspect the Collateral, and the right to examine and copy Borrower's books and records.  Lender shall take reasonable steps to keep confidential all information obtained in any such inspection or examination, but Lender shall have the right to disclose any such information to its auditors, regulatory agencies, attorneys and participants, and pursuant to any subpoena or other legal process.  Borrower agrees to give Lender access to any or all of Borrower's premises to enable Lender to conduct such inspections and examinations.  Such inspections and examinations shall be at Borrower's expense and the charge therefor shall be $950 per person per day (or such higher amount as shall represent Lender's then current standard charge), plus reasonable out-of-pocket expenses.  Lender may, at Borrower's expense, use Borrower's personnel, computer and other equipment, programs, printed output and computer readable media, supplies and premises for the collection, sale or other disposition of Collateral to the extent Lender, in its sole discretion, deems appropriate.  Borrower hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Lender, at Borrower's expense, all financial information, books and records, work papers, management reports and other information in their possession regarding Borrower.  Borrower will not enter into any agreement with any

accounting firm, service bureau or third party to store Borrower's books or records at any location other than Borrower's Address without first obtaining Lender's written consent (which consent may be conditioned upon such accounting firm, service bureau or other third party agreeing to give Lender the same rights with respect to access to books and records and related rights as Lender has under this Agreement); provided that Lender hereby consents to the maintenance of records consisting of accounting records supported by documents and transactions by SAP America, Inc. and records consisting of payroll processing information and records by Automatic Data Processing, Inc. in each case so long as Lender has access to such records.

5.   **REPRESENTATIONS, WARRANTIES AND COVENANTS.**

       To induce Lender to enter into this Agreement, Borrower represents, warrants and covenants as follows (it being understood that (i) each such representation and warranty will be deemed remade as of the date on which each Revolving Loan is made and each Credit Accommodation is provided and shall not be affected by any knowledge of, or any investigation by, Lender, (ii) the accuracy of each such representation, warranty and covenant will be a condition to each Revolving Loan and Credit Accommodation and (iii) Indeka shall be entitled to rely independently on each such representation and warranty):

       **5.1   Existence and Authority.**   Borrower is duly organized, validly existing and in good standing under the laws of the State of California. Borrower is qualified and licensed to do business in all jurisdictions in which any failure to do so would have a material adverse effect on Borrower.   The execution, delivery and performance by Borrower of this Agreement and all of the other Loan Documents to which it is a party have been duly and validly authorized, do not violate Borrower's articles or certificate of incorporation, by-laws or other organizational documents, or any law or any agreement or instrument or any court order which is binding upon Borrower or its property, do not constitute grounds for acceleration of any indebtedness or obligation under any agreement or instrument which is binding upon Borrower or its property, and do not require the consent of any Person except as set forth in Section 7(j) of Schedule A to this Agreement. This Agreement and such other Loan Documents have been duly executed and delivered by, and are enforceable against, Borrower, and all other Obligors who have signed them, in accordance with their respective terms.   Sections 7(g) and 7(h) of Schedule A set forth the ownership of Borrower and the names and ownership of Borrower's Subsidiaries as of the date of this Agreement.

       **5.2   Name; Trade Names and Styles.**   The name of Borrower set forth in the heading to this Agreement is its correct and complete legal name as of the date hereof.   Listed in Sections 7(a), 7(b) and 7(c) of Schedule A are all prior names of Borrower and all of Borrower's present and prior trade names.   Borrower shall give Lender at least thirty days' prior written notice before changing its name or doing business under any other name. Borrower has complied with all laws relating to the conduct of business under a fictitious business name.   Borrower represents and warrants that (i) each trade name does not refer to

11

another corporation or other legal entity; (ii) all Accounts invoiced under any such trade names are owned exclusively by Borrower and are subject to the security interest of Lender and the other terms of this Agreement and (iii) all schedules of Accounts, including any sales made or services rendered using any trade name shall show Borrower's name as assignor.

5.3    **Title to Collateral; Permitted Liens.**  Borrower has good and marketable title to the Collateral.  The Collateral now is and will remain free and clear of any and all liens, charges, security interests, encumbrances and adverse claims, except for Permitted Liens. Lender now has, and will continue to have, a first-priority perfected and enforceable security interest in all of the Collateral, subject only to the Permitted Liens, other than Collateral in the possession of Borrower pursuant to Section 3.2 and during the Transition Period only, cash and Deposit Accounts in the possession of the Existing Factors, and Borrower will at all times defend Lender and the Collateral against all claims of others.  Notwithstanding any other provision of this Agreement, Borrower shall not intentionally permit more than $50,000 to be in Deposit Accounts (excluding cash deposited as cash collateral) not in the name of Lender or Greystone Commercial Services; provided that prior to the end of the Transition Period, Borrower may maintain in excess of $50,000 in Deposit Accounts with Existing Factors. None of the Collateral which is Equipment is or will be affixed to any real property in such a manner, or with such intent, as to become a fixture.  Except for leases or subleases as to which Borrower has delivered to Lender a landlord's waiver in form and substance satisfactory to Lender, Borrower is not a lessee or sublessee under any real property lease or sublease pursuant to which the lessor or sublessor may obtain any rights in any of the Collateral, and no such lease or sublease now prohibits, restrains, impairs or conditions, or will prohibit, restrain, impair or condition, Borrower's right to remove any Collateral from the premises.  Except for warehouses as to which Borrower has delivered to Lender a warehouseman's waiver in form and substance satisfactory to Lender, Borrower is not a bailor of any Goods at any warehouse under an arrangement pursuant to which the warehouseman may obtain any rights in any of the Collateral.  Prior to causing or permitting any Collateral to be located upon premises in which any third party has an interest (whether as owner, mortgagee, beneficiary under a deed of trust, lien or otherwise), Borrower shall, whenever requested by Lender, cause each such third party to execute and deliver to Lender, in form and substance acceptable to Lender, such waivers and subordinations as Lender shall specify, so as to ensure that Lender's rights in the Collateral are, and will continue to be, superior to the rights of any such third party.  Borrower will keep in full force and effect, and will comply in all material respects with all the terms of, any lease of real property where any of the Collateral now or in the future may be located.

5.4    **Accounts and Chattel Paper.**  As of each date reported by Borrower, all Accounts which Borrower has reported to Lender as being Eligible Accounts comply in all respects with the criteria for eligibility established by Lender and in effect at such time.  All Accounts and Chattel Paper are genuine and in all respects what they purport to be, arise out of a completed, bona fide and unconditional and non-contingent sale and delivery of goods or rendition of services by Borrower in the ordinary course of its business and in accordance

Greystone Business Credit II LLC          **Loan and Security Agreement**

with the terms and conditions of all purchase orders, contracts or other documents relating thereto, each Account Debtor thereunder had the capacity to contract at the time any contract or other document giving rise to such Accounts and Chattel Paper were executed, and the transactions giving rise to such Accounts and Chattel Paper comply with all applicable laws and governmental rules and regulations.

**5.5 Electronic Chattel Paper.** To the extent that Borrower obtains or maintains any Electronic Chattel Paper, Borrower shall create, store and assign the record or records comprising the Electronic Chattel Paper in such a manner that (i) a single authoritative copy of the record or records exists which is unique, identifiable and except as otherwise provided in clauses (iv), (v) and (vi) below, unalterable, (ii) the authoritative copy identifies Lender as the assignee of the record or records, (iii) the authoritative copy is communicated to and maintained by the Lender or its designated custodian, (iv) copies or revisions that add or change an identified assignee of the authoritative copy can only be made with the participation of Lender, (v) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy and (vi) any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

**5.6 Investment Property.** Borrower will take any and all actions required or requested by Lender, from time to time, to (i) cause Lender to obtain exclusive control of any Investment Property in a manner acceptable to Lender and (ii) obtain from any issuers of Investment Property and such other Persons as Lender shall specify, for the benefit of Lender, written confirmation of Lender's exclusive control over such Investment Property and take such other actions as Lender may request to perfect Lender's security interest in such Investment Property; provided that unless otherwise requested by Lender, Borrower need not take any action to cause Lender to obtain exclusive control of the Investment Property consisting of the equity securities of the Foreign Subsidiaries. For purposes of this Section 5.6, Lender shall have exclusive control of Investment Property if (A) pursuant to Section 3.2, such Investment Property consists of certificated securities and Borrower delivers such certificated securities to Lender (with appropriate endorsements if such certificated securities are in registered form); (B) such Investment Property consists of uncertificated securities and either (x) Borrower delivers such uncertificated securities to Lender or (y) the issuer thereof agrees, pursuant to documentation in form and substance satisfactory to Lender, that it will comply with instructions originated by Lender without further consent by Borrower, and (C) such Investment Property consists of security entitlements and either (x) Lender becomes the entitlement holder thereof or (y) the appropriate securities intermediary agrees, pursuant to documentation in form and substance satisfactory to Lender, that it will comply with entitlement orders originated by Lender without further consent by Borrower.

**5.7 Commercial Tort Claims.** Borrower has no Commercial Tort Claims pending other than those listed on Exhibit A hereto, and Borrower shall promptly notify Lender in writing upon incurring or otherwise obtaining a Commercial Tort Claim after the date hereof

13

against any third party. Such notice shall constitute Borrower's authorization to amend Exhibit A to add such Commercial Tort Claim.

**5.8  State of Organization; Location of Collateral.**    Borrower's Address is Borrower's chief executive office and the location of its books and records. In addition, except as provided in the immediately following sentence, Borrower has places of business only at the locations set forth on Sections 7(d) and 7(e) of Schedule A and Collateral located only at such locations, in transit to or between such locations and Collateral with a fair market value not to exceed $50,000 at any time outside of such locations in the ordinary course of business. Borrower will give Lender at least thirty days' prior written notice before changing Borrower's state of organization, opening any additional place of business, changing its chief executive office or the location of its books and records, or moving any of the Collateral to a location other than Borrower's Address or one of the locations set forth in Sections 7(d) and 7(e) of Schedule A (except as permitted by the preceding sentence), and will execute and deliver all financing statements and other agreements, instruments and documents which Lender shall require as a result thereof.

**5.9  Financial Condition, Statements and Reports.**    All financial statements delivered to Lender by or on behalf of Borrower have been prepared in conformity with GAAP and completely and fairly reflect in all material respects the financial condition of Borrower, at the times and for the periods therein stated, subject only to such adjustments previously disclosed to Lender prior to the date hereof and audit adjustments by a firm of independent certified public accountants of recognized standing (provided that no such adjustments evidence a material adverse change in the operations of Borrower or the Collateral or fraudulent acts). Between the last date covered by any such financial statement provided to Lender and the date hereof (or, with respect to the remaking of this representation in connection with the making of any Revolving Loan or the providing of any Credit Accommodation, the date such Revolving Loan is made or such Credit Accommodation is provided), there has been no material adverse change in the financial condition or business of Borrower. After giving effect to this Agreement, Borrower is able to pay its debts as they come due, and has sufficient capital to carry on its business as now conducted and as proposed to be conducted. All schedules, reports and other information and documentation delivered by Borrower to Lender with respect to the Collateral are, or will be, when delivered, true, correct and complete as of the date delivered or the date specified therein.

**5.10  Tax Returns and Payments; Pension Contributions.**    Borrower has timely filed all tax returns and reports required by applicable law, has timely paid all applicable taxes, assessments, deposits and contributions owing by Borrower and will timely pay all such items in the future as they became due and payable. Borrower may, however, defer payment of any contested taxes; *provided*, that Borrower (i) in good faith contests Borrower's obligation to pay such taxes by appropriate proceedings promptly and diligently instituted and conducted; (ii) notifies Lender in writing of the commencement of, and any material

development in, the proceedings; (iii) posts bonds or takes any other steps required to keep the contested taxes from becoming a Lien upon any of the Collateral and (iv) maintains adequate reserves therefor in conformity with GAAP. Borrower is unaware of any claims or adjustments proposed for any of Borrower's prior tax years that could result in additional taxes becoming due and payable by Borrower. Borrower has paid, and shall continue to pay, all amounts necessary to fund all present and future pension, profit sharing and deferred compensation plans in accordance with their terms, and Borrower has not withdrawn from participation in, permitted partial or complete termination of, or permitted the occurrence of any other event with respect to, any such plan which could result in any liability of Borrower, including any liability to the Pension Benefit Guaranty Corporation or any other governmental agency.

**5.11 Compliance with Laws.** Borrower has complied in all material respects with all provisions of all applicable laws and regulations, including those relating to Borrower's ownership of real or personal property, the conduct and licensing of Borrower's business, the payment and withholding of taxes, ERISA and other employee matters, safety and environmental matters.

**5.12 Litigation.** Section 7(f) of Schedule A discloses all claims, proceedings, litigation or investigations pending or (to the best of Borrower's knowledge) threatened against Borrower. There is no claim, suit, litigation, proceeding or investigation pending or (to the best of Borrower's knowledge) threatened by or against or affecting Borrower in any court or before any governmental agency (or any basis therefor known to Borrower) which may result, either separately or in the aggregate, in any material adverse change in the financial condition or business of Borrower, or in any material impairment in the ability of Borrower to carry on its business in substantially the same manner as it is now being conducted. Borrower will promptly inform Lender in writing of any claim, proceeding, litigation or investigation in the future threatened or instituted by or against Borrower.

**5.13 Use of Proceeds.** All proceeds of all Revolving Loans will be used solely for lawful business purposes.

**5.14 Insurance.** Borrower will at all times carry property, liability and other insurance, with insurers acceptable to Lender, in such form and amounts, and with such deductibles and other provisions, as Lender shall require, and Borrower will provide evidence of such insurance to Lender, so that Lender is satisfied that such insurance is, at all times, in full force and effect. Each property insurance policy shall name Lender as loss payee, at all times after July 1, 2007 each property insurance policy covering Inventory of Borrower shall contain a lender's loss payable endorsement, each liability insurance policy shall name Lender as an additional insured, and each business interruption insurance policy shall be collaterally assigned to Lender, all in form and substance satisfactory to Lender. All policies of insurance shall provide that they may not be cancelled or changed without at least thirty days' prior written notice to Lender, shall contain breach of warranty coverage, and

shall otherwise be in form and substance satisfactory to Lender. Upon receipt of the proceeds of any such insurance, Lender shall apply such proceeds in reduction of the Obligations as Lender shall determine in its sole discretion. Borrower will promptly deliver to Lender copies of all reports made to insurance companies.

**5.15 Financial and Collateral Reports.** Borrower has kept and will keep adequate records and books of account with respect to its business activities and the Collateral in which proper entries are made in accordance with GAAP reflecting all its financial transactions, and will cause to be prepared and furnished to Lender (and to any assignee or participant in the Obligations, which shall include Indeka at all times the Last Out Participation Amount exceeds $0.00) the following (all to be prepared in accordance with GAAP, unless Borrower's certified public accountants concur in any change therein and such change is disclosed to Lender):

(a)    **Collateral Reports.** On or before the twentieth day of each month, an aging of Borrower's Accounts, Chattel Paper and notes receivable, and weekly Inventory reports, all in such form, and together with such additional certificates, schedules and other information with respect to the Collateral or the business of Borrower or any Obligor, as Lender shall request (which shall include without limitation the items set forth in Section 11(b) of Schedule A); *provided,* that Borrower's failure to execute and deliver the same shall not affect or limit Lender's security interests and other rights in any of the Accounts, nor shall Lender's failure to advance or lend against a specific Account affect or limit Lender's security interest and other rights therein. Together with each such schedule, at Lender's reasonable request, Borrower shall furnish Lender with copies (or, at Lender's request, originals) of all contracts, orders, invoices, and other similar documents, and all original shipping instructions, delivery receipts, bills of lading, and other evidence of delivery, for any goods the sale or disposition of which gave rise to such Accounts, and Borrower warrants the genuineness of all of the foregoing. In addition, subject to Section 3.2, Borrower shall deliver to Lender the originals of all Instruments, Chattel Paper, security agreements, guaranties and other documents and property evidencing or securing any Accounts, immediately upon receipt thereof and in the same form as received, with all necessary endorsements. Lender may destroy or otherwise dispose of all documents, schedules and other papers delivered to Lender pursuant to this Agreement (other than originals of Instruments, Chattel Paper, security agreements, guaranties and other documents and property evidencing or securing any Accounts) six months after Lender receives them, unless Borrower requests their return in writing in advance and arranges for their return to Borrower at Borrower's expense.

(b)    **Annual Statements.** Not later than one hundred eighty days after the close of each fiscal year of Borrower, unqualified (except for a qualification for a change in accounting principles with which the accountant concurs) audited financial statements of Borrower and its Subsidiaries as of the end of such year, on a consolidated basis, certified by a firm of independent certified public accountants of recognized standing selected by

**Greystone Business Credit II LLC**                    **Loan and Security Agreement**

Borrower but acceptable to Lender, together with a copy of any management letter issued in connection therewith;

(c) **Interim Statements.** Not later than twenty days after the end of each month hereafter, including the last month of Borrower's fiscal year, unaudited interim financial statements of Borrower and its Subsidiaries as of the end of such month and of the portion of Borrower's fiscal year then elapsed, on a consolidated and consolidating basis, certified by the principal financial officer of Borrower as prepared in accordance with GAAP and fairly presenting the consolidated financial position and results of operations of Borrower and its Subsidiaries for such month and period subject only to changes from audit and year-end adjustments and except that such statements need not contain notes;

(d) **Projections, Etc.** Such business projections, Availability projections, business plans, budgets and cash flow statements for Borrower and its Subsidiaries as Lender shall reasonably request from time to time;

(e) **Shareholder Reports, Etc.** Promptly after the sending or filing thereof, as the case may be, copies of any proxy statements, financial statements or reports which Borrower has made available to its shareholders (in their capacity as shareholder and not as an officer of Borrower) and copies of any regular, periodic and special reports or registration statements which Borrower files with the Securities and Exchange Commission or any governmental authority which may be substituted therefor, or any national securities exchange;

(f) **ERISA Reports.** Upon request by Lender, copies of any annual report to be filed pursuant to the requirements of ERISA in connection with each plan subject thereto; and

(g) **Other Information.** Such other data and information (financial and otherwise) as Lender, from time to time, may reasonably request, bearing upon or related to the Collateral or Borrower's and each of its Subsidiary's financial condition or results of operations.

**5.16 Litigation Cooperation.** Should any third-party suit or proceeding be instituted by or against Lender with respect to any Collateral or in any manner relating to Borrower, Borrower shall, without expense to Lender, make available Borrower and its officers, employees and agents, and Borrower's books and records, without charge, to the extent that Lender may deem them reasonably necessary in order to prosecute or defend any such suit or proceeding.

**5.17 Maintenance of Collateral, Etc.** Borrower will maintain all of its Equipment in good working condition, ordinary wear and tear excepted, and Borrower will not use the Collateral for any unlawful purpose. Borrower will immediately advise Lender in writing of any material loss or damage to the Collateral and of any investigation, action, suit,

Greystone Business Credit II LLC          Loan and Security Agreement

proceeding or claim relating to the Collateral or which may result in an adverse impact upon Borrower's business, assets or financial condition.

**5.18 Notification of Changes.** Borrower will promptly notify Lender in writing of any change in its chief executive officer, chief operating officer, chief financial officer or any director, the opening of any new bank account or other deposit account, or any material adverse change in the business or financial affairs of Borrower or the existence of any circumstance which could reasonably be expected to constitute a Default or Event of Default.

**5.19 Further Assurances.** Borrower agrees, at its expense, to take all actions, and execute or cause to be executed and delivered to Lender all promissory notes, security agreements, agreements with landlords, mortgagees and processors and other bailees, subordination and intercreditor agreements and other agreements, instruments and documents as Lender may reasonably request from time to time, to perfect and maintain Lender's security interests in the Collateral and to fully effectuate the transactions contemplated by this Agreement. To the extent a third party's cooperation is necessary to comply with this Section 5.19, Borrower will use reasonable commercial efforts to obtain such cooperation.

**5.20 Negative Covenants.** Except as set forth in Section 12 of Schedule A, Borrower will not, without Lender's prior written consent, (i) merge or consolidate with another Person, form any new Subsidiary or acquire any interest in any Person; (ii) acquire any assets except in the ordinary course of business and as otherwise permitted by this Agreement and the other Loan Documents; (iii) enter into any transaction outside the ordinary course of business; (iv) sell or transfer any Collateral or other assets, except that Borrower may sell finished goods Inventory in the ordinary course of its business; (v) make any loans to, or investments in, any Affiliate or other Person (including any Subsidiary of Borrower) in the form of money or other assets; (vi) incur any debt outside the ordinary course of business; (vii) guaranty or otherwise become liable with respect to the obligations of another party or entity; (viii) pay or declare any dividends or other distributions on Borrower's stock or other equity interests (except for dividends payable solely in capital stock of Borrower); (ix) redeem, retire, purchase or otherwise acquire, directly or indirectly, any of Borrower's capital stock or other equity interests; (x) make any change in Borrower's capital structure; (xi) dissolve or elect to dissolve; (xii) pay any principal or interest on any indebtedness owing to an Affiliate, (xiii) pay any principal or interest or any Subordinated Indebtedness other than as permitted by the applicable subordination agreement entered into in connection with such Subordinated Indebtedness, (xiv) enter into any transaction with an Affiliate other than on arms-length terms disclosed to Lender in writing; (xv) change the state of Borrower's organization or enter into any transaction which has the effect of changing Borrower's state of organization except as provided for in Section 5.8; or (xvi) agree to do any of the foregoing.

**5.21 Financial Covenants** – Borrower will comply with the financial covenants set forth in Section 6(a) of Schedule A.

Greystone Business Credit II LLC                    Loan and Security Agreement

**5.22 Other Covenants.** Borrower will comply with the additional covenants set forth in Section 11 of Schedule A.

**5.23 Factory Indebtedness.** As of the date hereof, Borrower hereby represents and warrants to Lender that all past due obligations owing by Borrower to any of the following entities as of the date hereof (except those obligations (a) covered by letters of credit, (b) owing to Da Sheng and subject to a payment plan disclosed to Lender prior to the date hereof and (c) not to exceed $250,000 that are presently being reserved for by the Lender pursuant to the ninety day reserve for past due payables) have been assigned on or prior to the date hereof to Global Hero Group Limited, a British Virgin Islands limited liability company: Union Overseas Holdings Limited, Super Trade Overseas Ltd., C.T.N. Footwear Co. Ltd., Da Sheng (BVI) International Holding Limited, Shing Tak Industrial Co. Ltd., Sun Palace Trading Ltd. and Best Health Ltd.

## 6. RELEASE AND INDEMNITY.

**6.1 Release.** Borrower hereby releases Lender and its Affiliates and their respective directors, officers, employees, attorneys and agents and any other Person affiliated with or representing Lender (the *"Released Parties"*) from any and all liability arising from acts or omissions under or pursuant to this Agreement made on or prior to the date hereof, whether based on errors of judgment or mistake of law or fact, except for those arising from gross negligence or willful misconduct. However, in no circumstance will any of the Released Parties be liable for lost profits or other special or consequential damages.

**6.2 Limitation on Liability.**

(a)   Lender shall not be liable for (i) any shortage or discrepancy in, damage to, or loss or destruction of, any goods, the sale or other disposition of which gave rise to an Account; (ii) any error, act, omission, or delay of any kind occurring in the settlement, failure to settle, collection or failure to collect any Account; (iii) settling any Account in good faith for less than the full amount thereof; or (iv) any of Borrower's obligations under any contract or agreement giving rise to an Account; and

(b)   In connection with Credit Accommodations or any underlying transaction, Lender shall not be responsible for the conformity of any goods to the documents presented, the validity or genuineness of any documents, delay, default or fraud by Borrower, shippers and/or any other Person. Borrower agrees that any action taken by Lender with respect to any Credit Accommodation, if taken in good faith, or any action taken by an issuer of any Credit Accommodation, under or in connection with any Credit Accommodation, shall be binding on Borrower and shall not create any resulting liability to Lender. In furtherance thereof, after the occurrence and during the continuance of an Event of Default, Lender shall have the full right and authority to clear and resolve any questions of non-compliance of documents, to give any instructions as to acceptance or rejection of any documents or goods, to execute for Borrower's account any and all applications for steamship or airway

19

guaranties, indemnities or delivery orders, to grant any extensions of the maturity of, time of payment for, or time of presentation of, any drafts, acceptances or documents, and to agree to any amendments, renewals, extensions, modifications, changes or cancellations of any of the terms or conditions of any of the Credit Accommodations or applications and other documentation pertaining thereto.

      **6.3    Indemnity.**  Borrower hereby agrees to indemnify the Released Parties and hold them harmless from and against any and all claims, debts, liabilities, demands, obligations, actions, causes of action, penalties, costs and expenses (including reasonable attorneys' fees), of every nature, character and description, which the Released Parties may sustain or incur based upon or arising out of any of the transactions contemplated by this Agreement or the other Loan Documents or any of the Obligations, including any transactions or occurrences relating to the issuance of any Credit Accommodation, the Collateral relating thereto, any drafts thereunder and any errors or omissions relating thereto (including any loss or claim due to any action or inaction taken by the issuer of any Credit Accommodation) (and for this purpose any charges to Lender by any issuer of Credit Accommodations shall be conclusive as to their appropriateness and may be charged to the Loan Account), or any other matter, cause or thing whatsoever occurred, done, omitted or suffered to be done by Lender relating to Borrower or the Obligations (except any such amounts sustained or incurred as the result of the gross negligence or willful misconduct of the Released Parties).  Notwithstanding any provision in this Agreement to the contrary, the indemnity agreement set forth in this Section shall survive any termination of this Agreement.

**7.    TERM.**

      **7.1    Maturity Date.**  Lender's obligation to make Revolving Loans and to provide Credit Accommodations under this Agreement shall initially continue in effect for a term (the *"Term"*) from the date of this Agreement until the Maturity Date set forth in Section 4 of Schedule A (the *"Maturity Date"*).  This Agreement and the other Loan Documents and Lender's security interests in and Liens upon the Collateral, and all representations, warranties and covenants of Borrower contained herein and therein, shall remain in full force and effect after the Maturity Date until all of the monetary Obligations are indefeasibly paid in full; provided that the Warrant shall survive the payment of the Obligations in full.

      **7.2    Early Termination.**  Lender's obligation to make Revolving Loans and to provide Credit Accommodations under this Agreement may be terminated prior to the Maturity Date as follows:  (i) by Borrower, effective ten business days after written notice of termination is given to Lender or (ii) by Lender at any time after the occurrence of an Event of Default, without notice, effective immediately; *provided,* that if any Affiliate of Borrower is also a party to a financing arrangement with Lender, no such early termination under clause (i) above shall be effective unless such Affiliate simultaneously terminates its financing arrangement with Lender.  If so terminated under this Section 7.2, Borrower shall pay to Lender (i) an early termination fee (the *"Early Termination Fee"*) in the amount set forth in

Section 3(f) of Schedule A plus (ii) all other Obligations hereunder, including any earned but unpaid Servicing Fees and Overadvance Fees. Such fee shall be due and payable on the effective date of termination and thereafter shall bear interest at a rate equal to the highest rate applicable to any of the Obligations. In addition, if Borrower so terminates and repays the Obligations without having provided Lender with at least ten days' prior written notice thereof, an additional amount equal to ten days of interest at the applicable Interest Rates, based on the average outstanding amount of the Obligations for the six month period immediately preceding the date of termination.

7.3    **Payment of Obligations.** On the Maturity Date or on any earlier effective date of termination, Borrower shall pay in full all Obligations, whether or not all or any part of such Obligations are otherwise then due and payable. Without limiting the generality of the foregoing, if, on the Maturity Date or on any earlier effective date of termination, there are any outstanding Credit Accommodations, then on such date Borrower shall provide to Lender cash collateral in an amount equal to 105% of the Credit Accommodation Balance to secure such Obligations (including estimated attorneys' fees and other expenses) relating to said Credit Accommodations or such greater percentage or amount as Lender reasonably deems appropriate, pursuant to a cash pledge agreement in form and substance satisfactory to Lender.

7.4    **Effect of Termination.** No termination shall affect or impair any right or remedy of Lender or relieve Borrower of any of the Obligations until all of the monetary Obligations have been indefeasibly paid in full. Upon indefeasible payment and performance in full of all of the monetary Obligations (and the provision of cash collateral with respect to any Credit Accommodation Balance as required by Section 7.3) and termination of this Agreement, Lender shall promptly deliver to Borrower termination statements, requests for reconveyances and such other documents as may be reasonably required to terminate Lender's security interests in the Collateral.

## 8.    EVENTS OF DEFAULT AND REMEDIES.

8.1    **Events of Default.** The occurrence of any of the following events shall constitute an "*Event of Default*" under this Agreement, and Borrower shall give Lender immediate written notice thereof: (i) if any warranty, representation, statement, report or certificate made or delivered to Lender by Borrower or any of Borrower's officers, employees or agents is untrue or misleading in any material respects (to the extent not otherwise qualified by reference to materiality or a dollar amount) when made or deemed made; (ii) if Borrower fails to pay when due any principal or interest on any Revolving Loan on the date due or any other monetary Obligation within three Business Days after the date due; (iii)(A) if Borrower breaches any covenant or obligation contained in Sections 5.8, 5.10, 5.14, 5.20, 5.21 and 5.22 (except for items (a) and (b) of Section 11 of Schedule A referenced therein) of this Agreement or (B) if Borrower breaches any other covenant or obligation contained in this Agreement or any other Loan Document or fails to perform any other non-monetary

21

Greystone Business Credit II LLC                    Loan and Security Agreement

Obligation and such failure continues for a period of fifteen days after the earlier of (x) the date on which such failure shall first become known to any officer of Borrower or (y) written notice thereof is given to Borrower by Lender; (iv) if any levy, assessment, attachment, seizure, lien, security interest or encumbrance (other than a Permitted Lien) is made or permitted to exist on all or any part of the Collateral with a value in excess of $50,000; (v) if one or more judgments aggregating in excess of $50,000, or any injunction or attachment, is obtained against Borrower or any Obligor which remains outstanding and unstayed for more than thirty days or is enforced; (vi) (A) the occurrence of any default under any financing agreement, security agreement or other agreement, instrument or document executed and delivered by Borrower or any Affiliate of Borrower with, or in favor of, Lender or any Affiliate of Lender which remains uncured for more than the applicable number of days in any cure period set forth in such agreement, (B) the occurrence of any default under any financing agreement or security agreement executed and delivered by Borrower with, or in favor of, any Person other than Lender which remains uncured for more than the applicable number of days in any cure period set forth in such agreement or (C) the occurrence of any default under any agreement, instrument or document (other than a financing agreement or security agreement) comprising a value or obligation in excess of $100,000 executed and delivered by Borrower with, or in favor of, any Person other than Lender and such default continues unwaived or uncured for more than thirty days after such default first occurs, provided that such grace period shall not apply, and an Event of Default shall be deemed to have occurred promptly upon such default, if such default, in Lender's reasonable determination, is incapable of being cured by Borrower during such thirty day period; and provided further that no Event of Default shall be deemed to occur with respect to professional services fees, royalty payments or supplier payments (I) if such payments are made in accordance with past practice and (II) any such royalty payments or supplier payments are made no more than 90 days after the applicable due date thereof; (vii) the dissolution, death, termination of existence in good standing, insolvency or business failure or suspension or cessation of business as usual of Borrower or any Obligor (or of any general partner of Borrower or any Obligor if it is a partnership) or the appointment of a receiver, trustee or custodian for all or any part of the property of, or an assignment for the benefit of creditors by Borrower or any Obligor, or the commencement of any proceeding by Borrower or any Obligor under any reorganization, bankruptcy, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or in the future in effect, or if Borrower makes or sends a notice of a bulk transfer or calls a meeting of its creditors; (viii) the commencement of any proceeding against Borrower or any Obligor under any reorganization, bankruptcy, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or in the future in effect which is not dismissed or discharged within 60 days; (ix) the actual or attempted revocation or termination of, or limitation or denial of liability upon, any guaranty of the Obligations, or any security document securing the Obligations, by any Obligor; (x) if Borrower makes any payment on account of any indebtedness or obligation which has been subordinated to the Obligations (including without limitation the Subordinated Indebtedness) other than as permitted in the

applicable subordination agreement, or if any Person who has subordinated such indebtedness or obligations attempts to limit or terminate its subordination agreement; (xi) if there is any actual or threatened indictment of Borrower or any Obligor under any criminal statute or commencement or threatened commencement of criminal or civil proceedings against Borrower, any Obligor or any of their Affiliates, pursuant to which the potential penalties or remedies sought or available include forfeiture of any property with a value in excess of $50,000 of Borrower or such Obligor; (xii) if there is any change in the chief executive officer of Borrower; (xiii) if an Event of Default occurs under any Loan and Security Agreement between Lender and an Affiliate of Borrower; (xiv) if Lender determines in good faith that the Collateral is insufficient to fully secure the Obligations or that the prospect of payment of performance of the Obligations is impaired; or (xv) the occurrence of any event set forth in Section 10 to Schedule A.

8.2    **Remedies.**  Upon the occurrence and during the continuance of any Default, and at any time thereafter, Lender, at its option, may cease making Revolving Loans or otherwise extending credit to Borrower under this Agreement or any other Loan Document.  Upon the occurrence of and during the continuance of an Event of Default, Lender may exercise from time to time any rights and remedies available to it under the UCC and any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Agreement or in any of the other Loan Documents and all of Lender's rights and remedies shall be cumulative and non-exclusive to the extent permitted by law.  In particular, but not by way of limitation of the foregoing, upon the occurrence of and during the continuance of any Event of Default, and at any time thereafter, Lender, at its option, and without notice or demand of any kind (all of which are hereby expressly waived by Borrower), may do any one or more of the following: (i) cease making Revolving Loans or otherwise extending credit to Borrower under this Agreement or any other Loan Document; (ii) accelerate and declare all or any part of the Obligations to be immediately due, payable and performable, notwithstanding any deferred or installment payments allowed by any instrument evidencing or relating to any of the Obligations; (iii) take possession of any or all of the Collateral (in addition to Collateral of which it already has possession) wherever it may be found, and for that purpose Borrower hereby authorizes Lender, without judicial process, to enter onto any of Borrower's premises without interference to search for, take possession of, keep, store, or remove any of the Collateral, and remain (or cause a custodian to remain) on the premises in exclusive control thereof, without charge for so long as Lender deems it reasonably necessary in order to complete the enforcement of its rights under this Agreement or any other agreement; *provided*, that if Lender seeks to take possession of any of the Collateral by court process, Borrower hereby irrevocably waives (A) any bond and any surety or security relating thereto required by law as an incident to such possession, (B) any demand for possession prior to the commencement of any suit or action to recover possession thereof and (C) any requirement that Lender retain possession of, and not dispose of, any such Collateral until after trial or final judgment; (iv) require Borrower to assemble any or all of the Collateral and make it available to Lender at one or more places designated by Lender which are reasonably convenient to Lender and Borrower, and to remove the Collateral to such

23

locations as Lender may deem advisable; (v) complete the processing, manufacturing or repair of any Collateral prior to a disposition thereof and, for such purpose and for the purpose of removal, Lender shall have the right to use Borrower's premises, vehicles and other Equipment and all other property without charge; (vi) sell, lease or otherwise dispose of any of the Collateral, in its condition at the time Lender obtains possession of it or after further manufacturing, processing or repair, at one or more public or private sales, in lots or in bulk, for cash, exchange or other property, or on credit (a "*Sale*"), and to adjourn any such Sale from time to time without notice other than oral announcement at the time scheduled for Sale (and, in connection therewith, (A) Lender shall have the right to conduct such Sale on Borrower's premises without charge, for such times as Lender deems reasonable, on Lender's premises, or elsewhere, and the Collateral need not be located at the place of Sale; (B) Lender may directly or through any of its Affiliates purchase or lease any of the Collateral at any such public disposition, and if permissible under applicable law, at any private disposition and (C) any Sale of Collateral shall not relieve Borrower of any liability Borrower may have if any Collateral is defective as to title, physical condition or otherwise at the time of sale); (vii) demand payment of and collect any Accounts, Chattel Paper, Instruments and General Intangibles included in the Collateral and, in connection therewith, Borrower irrevocably authorizes Lender to endorse or sign Borrower's name on all collections, receipts, Instruments and other documents, to take possession of and open mail addressed to Borrower and remove therefrom payments made with respect to any item of Collateral or Proceeds thereof and, in Lender's sole discretion, to grant extensions of time to pay, compromise claims and settle Accounts, General Intangibles and the like for less than face value; and (viii) demand and receive possession of any of Borrower's federal and state income tax returns and the books and records utilized in the preparation thereof or relating thereto. Borrower recognizes that if Borrower fails to perform, observe or discharge any of its Obligations under this Agreement or any of the Loan Documents, no remedy at law will provide adequate relief to Lender, and agrees that Lender shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages. Any notification of intended disposition of any of the Collateral required by law will be deemed to be a reasonable authenticated notification of disposition if given at least ten (10) days prior to such disposition and such notice shall (i) describe Lender and Borrower, (ii) describe the Collateral that is the subject of the intended disposition, (iii) state the method of the intended disposition, (iv) state that Borrower is entitled to an accounting of the Obligations and state the charge, if any, for an accounting and (v) state the time and place of any public disposition or the time after which any private sale is to be made. Lender may disclaim any warranties that might arise in connection with the sale, lease or other disposition of the Collateral and has no obligation to provide any warranties at such time. Any Proceeds of any disposition by Lender of any of the Collateral may be applied by Lender to the payment of expenses in connection with the Collateral, including, without limitation, legal expenses and reasonable attorneys' fees, and any balance of such Proceeds may be applied by Lender toward the payment of such of the Obligations, and in such order of application, as Lender may from time to time elect. In addition to the foregoing remedies, upon the

**Greystone Business Credit II LLC**                    **Loan and Security Agreement**

occurrence and during the continuance of any Event of Default resulting from a breach of any of the financial covenants set forth in Section 5.21, Lender may, at its option, upon not less than ten days' prior notice to Borrower, reduce any or all of the Advance Rates set forth in Section 1(b) of Schedule A to the extent Lender, in its sole discretion, deems appropriate. Exercise or partial exercise by Lender of one or more of its rights or remedies shall not be deemed an election or bar Lender from subsequent exercise or partial exercise of any other rights or remedies. The failure or delay of Lender to exercise any rights or remedies shall not operate as a waiver thereof, but all rights and remedies shall continue in full force and effect until all of the Obligations have been fully paid and performed. If any Collateral is sold or leased by Lender on credit terms or for future delivery, the Obligations shall not be reduced as a result thereof until payment is collected by Lender.

**8.3    Application of Proceeds.**    Subject to any application required by law, all Proceeds realized as the result of any Sale shall be applied by Lender to the Obligations in such order as Lender shall determine in its sole discretion. Any surplus shall be paid to Borrower or other persons legally entitled thereto; but Borrower shall remain liable to Lender for any deficiency. If Lender, in its sole discretion, directly or indirectly enters into a deferred payment or other credit transaction with any purchaser at any Sale, Lender shall have the option, exercisable at any time, in its sole discretion, of either reducing the Obligations by the principal amount of the purchase price or deferring the reduction of the Obligations until the actual receipt by Lender of the cash therefor.

## 9.    EFFECTIVE DATE.

The obligations of the Lender to make Revolving Loans on the date hereof shall not become effective until the date on which each of the conditions set forth in Section 13 of Schedule A is satisfied (or waived in writing by Lender).

## 10.    GENERAL PROVISIONS.

**10.1    Notices.**    All notices to be given under this Agreement shall be in writing and shall be given either personally, by reputable private delivery service, by regular first-class mail or certified mail return receipt requested, addressed to Lender or Borrower at the address shown in the heading to this Agreement, or by facsimile to the facsimile number shown in Section 7(i) of Schedule A, or at any other address (or to any other facsimile number) designated in writing by one party to the other party in the manner prescribed in this Section 10.1. All notices shall be deemed to have been given when received or when delivery is refused by the recipient.

**10.2    Severability.**    If any provision of this Agreement, or the application thereof to any party or circumstance, is held to be void or unenforceable by any court of competent jurisdiction, such defect shall not affect the remainder of this Agreement, which shall continue in full force and effect.

**10.3  Integration.**  This Agreement and the other Loan Documents represent the final, entire and complete agreement between Borrower and Lender and supersede all prior and contemporaneous negotiations, oral representations and agreements, all of which are merged and integrated into this Agreement.  THERE ARE NO ORAL UNDERSTANDINGS, REPRESENTATIONS OR AGREEMENTS BETWEEN THE PARTIES THAT ARE NOT SET FORTH IN THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

**10.4  Waivers.**  The failure of Lender at any time or times to require Borrower to strictly comply with any of the provisions of this Agreement or any other Loan Documents shall not waive or diminish any right of Lender later to demand and receive strict compliance therewith.  Any waiver of any default shall not waive or affect any other default, whether prior or subsequent, and whether or not similar.  None of the provisions of this Agreement or any other Loan Document shall be deemed to have been waived by any act or knowledge of Lender or its agents or employees, but only by a specific written waiver signed by an authorized officer of Lender and delivered to Borrower.  Borrower waives demand, protest, notice of protest and notice of default or dishonor, notice of payment and nonpayment, release, compromise, settlement, extension or renewal of any commercial paper, Instrument, Account, General Intangible, Document, Chattel Paper, Investment Property or guaranty at any time held by Lender on which Borrower is or may in any way be liable, and notice of any action taken by Lender, unless expressly required by this Agreement, and notice of acceptance hereof.

**10.5  Amendment.**  This Agreement may not be amended or modified except in a writing executed by Borrower and a duly authorized officer of Lender.

**10.6  Time of Essence.**  Time is of the essence in the performance by Borrower of each and every obligation under this Agreement and the other Loan Documents.

**10.7  U.S. Dollars.**  All advances, charges and fees of Borrower to Lender, all financial and collateral reports, including, without limitation, those financial and collateral reports listed in Section 5.15, and all borrowing base reports shall be in United States dollars and all collections and payments of Borrower to Lender shall be in United States dollars.

**10.8  Attorneys' Fees and Costs.**  Borrower shall reimburse Lender for all reasonable attorneys' and paralegals' fees (including in-house attorneys and paralegals employed by Lender) and all filing, recording, search, title insurance, appraisal, audit, and other costs incurred by Lender, pursuant to, in connection with, or relating to this Agreement, including all reasonable attorneys' fees and costs Lender incurs to prepare and negotiate this Agreement and the other Loan Documents; to obtain legal advice in connection with this Agreement and the other Loan Documents or Borrower or any Obligor; to administer this Agreement and the other Loan Documents (including the cost of periodic financing statement, tax lien and other searches conducted by Lender); to enforce, or seek to enforce, any of its rights; prosecute actions against, or defend actions by, Account Debtors; to commence, intervene in, or defend

any action or proceeding; to enforce and protect, or to seek to enforce and protect, any of its rights and interests in any bankruptcy case of Borrower, including, without limitation, by initiating and prosecuting any motion for relief from the automatic stay and by initiating, prosecuting or defending any other contested matter or adversary proceeding in bankruptcy; to file or prosecute any probate claim, bankruptcy claim, third-party claim, or other claim; to examine, audit, copy, and inspect any of the Collateral or any of Borrower's books and records; to protect, obtain possession of, lease, dispose of, or otherwise enforce Lender's security interests in, the Collateral; and to otherwise represent Lender in any litigation relating to Borrower or any Obligor. If either Lender or Borrower files any lawsuit against the other predicated on a breach of this Agreement, the prevailing party in such action shall be entitled to recover its reasonable costs and attorneys' fees, including reasonable attorneys' fees and costs incurred in the enforcement of, execution upon or defense of any order, decree, award or judgment. All attorneys' fees and costs to which Lender may be entitled pursuant to this Section shall immediately become part of the Obligations, shall be due on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations. Borrower further agrees to reimburse Indeka, as a participant of Lender, for all costs and expenses (including reasonable attorneys' fees) of Indeka (a) incurred on or prior to the date hereof with respect to the negotiation and execution of any agreement, document or instrument related to the Last Out Participation Amount and (b) incurred after the occurrence of and during the continuance of an Event of Default.

   **10.9   Benefit of Agreement; Assignability.** The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, beneficiaries and representatives of Borrower and Lender; *provided,* that Borrower may not assign or transfer any of its rights under this Agreement without the prior written consent of Lender, and any prohibited assignment shall be void. No consent by Lender to any assignment shall release Borrower from its liability for any of the Obligations. Lender shall have the right to assign all or any of its rights and obligations under the Loan Documents, and to sell participating interests therein, to one or more other Persons, and Borrower agrees to execute all agreements, instruments and documents requested by Lender in connection with each such assignment and participation.

   **10.10 Headings; Construction.** Section and subsection headings are used in this Agreement only for convenience and do not affect the meanings of the provisions that they precede.

   **10.11 GOVERNING LAW; CONSENT TO FORUM, ETC.** THIS AGREEMENT HAS BEEN NEGOTIATED, EXECUTED AND DELIVERED, AND SHALL BE DEEMED TO HAVE BEEN MADE, IN NEW YORK COUNTY, NEW YORK, AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. BORROWER HEREBY CONSENTS AND AGREES THAT THE STATE AND FEDERAL COURTS LOCATED IN NEW YORK COUNTY, NEW YORK OR THE STATE IN WHICH ANY OF THE COLLATERAL IS LOCATED

SHALL HAVE NON-EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN BORROWER AND LENDER PERTAINING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENTS OR ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS. BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND WAIVES ANY OBJECTION WHICH BORROWER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. BORROWER ALSO AGREES THAT ANY CLAIM OR DISPUTE BROUGHT BY BORROWER AGAINST LENDER PURSUANT TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR ANY MATTER ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE BROUGHT EXCLUSIVELY IN THE STATE AND FEDERAL COURTS LOCATED IN NEW YORK COUNTY, NEW YORK. BORROWER HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE IN THE MANNER AND SHALL BE DEEMED RECEIVED AS SET FORTH IN SECTION 10.1 FOR NOTICES, TO THE EXTENT PERMITTED BY LAW. NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO AFFECT THE RIGHT OF LENDER TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW, OR TO PRECLUDE THE ENFORCEMENT BY LENDER OF ANY JUDGMENT OR ORDER OBTAINED IN SUCH FORUM OR THE TAKING OF ANY ACTION UNDER THIS AGREEMENT TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION.

10.12 WAIVER OF JURY TRIAL, ETC. BORROWER WAIVES (i) THE RIGHT TO TRIAL BY JURY (WHICH LENDER ALSO WAIVES) IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND ARISING OUT OF OR RELATED TO ANY OF THE LOAN DOCUMENTS, THE OBLIGATIONS OR THE COLLATERAL OR ANY CONDUCT, ACTS OR OMISSIONS OF LENDER OR BORROWER OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS OR AGENTS OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE; (ii) NOTICE PRIOR TO LENDER'S TAKING POSSESSION OR CONTROL OF THE COLLATERAL OR ANY BOND OR SECURITY WHICH MIGHT BE REQUIRED BY ANY COURT PRIOR TO ALLOWING LENDER TO EXERCISE ANY OF LENDER'S REMEDIES AND (iii) THE BENEFIT OF ALL VALUATION, APPRAISEMENT AND EXEMPTION LAWS. BORROWER ACKNOWLEDGES THAT THE FOREGOING WAIVERS ARE A MATERIAL INDUCEMENT TO LENDER'S ENTERING INTO THIS AGREEMENT AND THAT LENDER IS RELYING UPON THE FOREGOING WAIVERS IN ITS FUTURE DEALINGS WITH BORROWER. BORROWER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THE FOREGOING WAIVERS WITH ITS LEGAL COUNSEL AND HAS KNOWINGLY AND VOLUNTARILY WAIVED ITS

**Greystone Business Credit II LLC**                    **Loan and Security Agreement**

JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.