Exhibit A (part II)

Greystone Business Credit II LLC

IN WITNESS WHEREOF, Borrower and Lender have signed this Agreement as of the date first set forth above.

Borrower:

GLOBAL BRAND MARKETING INC.

By _____

Its _____ President

Lender:

GREYSTONE BUSINESS CREDIT II LLC

By _____

Its Authorized Signatory

Signature Page to Loan and Security Agreement

<u>Greystone Business Credit II LLC</u>

IN WITNESS WHEREOF, Borrower and Lender have signed this Agreement as of the date first set forth above.

**Borrower:**                                          **Lender:**

GLOBAL BRAND MARKETING INC.              GREYSTONE BUSINESS CREDIT II LLC

By _____              By _____
    Its _____             Its Authorized Signatory

Signature Page to Loan and Security Agreement

## Schedule A

### Description of Certain Terms

This Schedule is an integral part of the Loan and Security Agreement between Global Brand Marketing Inc. and Greystone Business Credit II LLC (the *"Agreement"*).

1. Loan Limits:

    (a) Maximum Facility Amount:     $25,000,000.

    (b) Advance Rates:

        (i)  Accounts Advance Rate:     80%; *provided,* that Lender may in its sole discretion at its option (A) reduce such advance rate, (B) if the Dilution Percentage exceeds 5%, reduce such advance rate by the number of full or partial percentage points that Dilution exceeds 5% or (C) establish Reserves

        (ii) Inventory Advance Rate:     the lower of 75% of cost or 75% of net orderly liquidation value of Eligible Inventory that is specifically saleable pursuant to any license authorizing the sale of such Inventory; *provided,* that Lender may, in its sole discretion at its option (A) reduce such advance rate or (B) establish Reserves

    (c) Inventory Sublimit:     $6,000,000

    (d) Credit Accommodation Limit:     $9,000,000

    (e) Minimum Loan Amount:     $10,000,000 during the first year of the Term, $6,000,000 during the second year of the Term, $3,000,000 thereafter

(f) Overadvance Amount

At any time of determination, an amount equal to the lesser of (i)(A) the sum of 15% of Eligible Accounts plus (B) 20% of net orderly liquidation value of Eligible Inventory and (ii) the Overadvance Limit; provided that subject to Section 1.1 at any time Borrower may terminate the Overadvance Amount upon five Business Days written notice to Lender but such termination shall not effect Borrower's obligation to pay any earned but unpaid Overadvance Fee

2. Interest Rates on Revolving Loans:

3.0% per annum in excess of the Prime Rate

3. Fees:

(a) Closing Commitment Fee:

$125,000, which amount was earned upon the date of execution of the commitment letter between Lender and Borrower dated October 28, 2006 and has been paid as of such date

(b) Closing Fee:

$375,000

(c) Servicing Fee:

0.15% of the average daily balance of outstanding Revolving Loans (based on no less than the Minimum Loan Amount in Section 1(e) of Schedule A) plus the average daily Credit Accommodation Balance during the immediately prior month or part thereof during the term of the Agreement

(d) Unused Line Fee:

0.50% per annum

(e) Underwriting Fee:

$30,000, which amount was earned upon the date of execution of the term sheet and has been paid as of such date

(f) Early Termination Fee:

3.00% of the Maximum Facility Amount minus the Last Out Participation Amount if terminated during the first year of the Term or 2.00% of the Maximum Facility Amount minus the Last Out Participation Amount if terminated thereafter

(g) Credit Accommodation Fees:

3.00% per annum of the face amount of each open Credit Accommodation

(h) Overadvance Fee

$540,000, payable in monthly installments of $15,000 per month.

(i) Warrants

Lender shall receive on the date hereof equity warrants representing a fully diluted 10% of the Borrower; provided that this amount shall be increased to 16% if the Overadvance Amount is not cancelled by Borrower pursuant to the terms of Section (f) of Schedule A on or before March 4, 2008.

4. Maturity Date:

December 4, 2009

5. Maximum Days:

(a) Maximum days after the original *invoice date* for Eligible Accounts:

90 days

(b) Maximum days after original *invoice due date* for Eligible Accounts:

60 days

6. Financial Covenants:

(a) Financial Covenants

(i) Cumulative Net Income of Borrower and its Subsidiaries in any fiscal year (beginning with the fiscal year ending December 31, 2007), is not less than $500,000;

(ii) Cash Operating Income in any fiscal year (beginning with the fiscal year ending December 31, 2007), is not less than negative $750,000 for any three month rolling period in such year; except for the three month period ending each of October 31, 2007 and November 30, 2007 in which case the Cash Operating Income is not less than negative $900,000;

(iii) Borrower shall be substantially in conformance with the Borrower's projections delivered to Lender on or prior the date hereof, including actual Net Revenue not being less than 85% of projected Net Revenue in any fiscal year (beginning with the fiscal year ending December 31, 2007);

(iv) Borrower shall have cumulative Net Revenue of not less than (A) $8,000,000 for the period beginning on December 1, 2006 and ending on January 5, 2007, (B) $17,000,000 for the period beginning on December 1, 2006 and ending on January 31, 2007, and (C) $28,000,000 for the period beginning on December 1, 2006 and ending on February 28, 2007; and

(v) Borrower shall have achieved EBITDA of not less than $400,000 for the period beginning on December 1, 2006 and ending on February 28, 2007.

(b) Limitation on Purchase Money
Security Interests:                 $200,000

(c) Limitation on Equipment
Leases:                            $200,000

A-4

7. Borrower Information:

    (a) Prior Names of Borrower:       NONE

    (b) Prior Trade Names of
        Borrower:               NONE

    (c) Existing Trade Names of     Global Brand Marketing Inc.;
        Borrower:

                             Owned Trade/Brand Names: Global Feet,
                             Dry-shoD, Nomass, FunFlopps, and
                             Mehandi; Licensed Brand Names: Diesel,
                             XOXO, Mecca, Nautica and Seven For All
                             Mankind.

    (d) Inventory Locations:          P&O Nedlloyd Logistics LLC
                             D/B/A The Gilbert Company (Gilbert West)
                             15710 San Antonio,
                             Chino, CA 91710

(e) Other Locations:

Global Brand Marketing Inc.
6500 Hollister Avenue
Santa Barbara, CA 93117

Global Brand Marketing Inc.
165 Castilian Drive
Goleta, CA 93117

Global Brand Marketing Inc
(NY Showroom)
730 Fifth Avenue, 12th Floor
New York, New York 10019

Global Feet Santa Barbara
930 State Street
Santa Barbara, CA 93101

Global Feet Kids Santa Barbara
939 State Street
Santa Barbara, CA 93101

Global Feet Las Vegas
7400 Las Vegas Blvd South
Suite 240A
Las Vegas, NV 89123

Global Feet Camarillo
740 East Ventura Blvd.
Suite 416
Camarillo, CA 93010

Global Feet Santa Monica
1323 Third Street Promenade
Santa Monica, CA

Global Feet Topanga Plaza
6600 Topanga Canyon Blvd., Store #2046
Canoga Park, CA  91303

(f) Litigation:

Central Sports Inc. vs. Global Brand Marketing Inc. (Case No. 52798/2002, Supreme Court of the State of New York, County of Kings. Filed December 19, 2002).

Central Sports is a Brooklyn based retail business that was not an authorized Diesel account but was selling Diesel Footwear, advertising Diesel Footwear and infringing upon the Diesel trademark at several of its retail locations. GBMI sent a Cease and Desist Letter to Central Sports demanding that they stop selling Diesel product and advertising the Diesel product. Central Sports had previously been an authorized Diesel account but had been terminated because Central Sports stopped purchasing Diesel Footwear from GBMI for a significant amount of time, had certain credit issues and their account lapsed. Central Sports filed a Complaint, Request for Judicial Intervention, Order to Show Cause with Preliminary Injunction and related documentation on December 19, 2002. They claimed that they sustained damages to their business and reputation in an amount not less than $5,000,000.00. GBMI answered the Complaint January 16, 2003, in which it asserted no liability was owed to Central Sports. This case is still pending in state court in Brooklyn after having been remanded by the federal court when Central Sports successfully added a defendant that destroyed diversity jurisdiction back in July, 2004. Central Sports has taken no steps to advance the litigation, and GBMI has in turn also taken no action.

So long as plaintiff takes no action, we have determined with outside counsel that the best course at this time may be to continue to do nothing. Should Central Sports attempt to move the litigation forward, GBMI is prepared to file a motion to dismiss for failure to state a claim. No case schedule has been issued by the court. Insurance does not cover this type of lawsuit.

(g) Ownership of Borrower:

Sudeepto Datta, 100%

(h) Subsidiaries (and ownership thereof):

GBMI Europe B.V.-100% Global Brand Marketing Inc.

Global Brand Marketing India Pvt Ltd- Global Brand Marketing Inc. and one share owned by Sudeepto Datta

Global Brand Marketing Hong Kong Limited- 100% Global Brand Marketing Inc.

(i) Facsimile Numbers:

Borrower:

(805) 562-5620

Lender:

(212) 649-9799

(j) Consents:

None

8.  **[Intentionally Omitted]**

A-8

9. Lender's Bank:

Bank of America
6000 Feldwood Road
College Park, Georgia 30349
ABA: 026009593
Account: 003284737253

10. Additional Events of Default

(a) a Change of Control has occurred

(b) Borrower loses the right to sell or distribute any product or products comprising in excess of $5,000,000 of the Net Revenue of the Borrower over the past 12 months, by way of termination of distribution rights, loss of intellectual property rights to sell such product, or otherwise; provided that the expiration of the rights to distribute Nautica products on December 31, 2007 pursuant to the terms of the Nautica agreements in existence on the date hereof shall not constitute an Event of Default hereunder

11. Other Covenants:

(a) Borrower shall within 30 days after the date hereof enter into an operating agreement with a third party mutually acceptable to Borrower and Lender (or if no Person is agreed upon during such 30 day period, a Person appointed by Lender) that among other things conveys in all respects, authority and responsibility for the implementation or modification of the restructuring plan described on Exhibit B hereto that provides for the identification by February 28, 2007 of specific cost reductions that will reduce existing cash operating expenses in an amount equal to or greater than $3,500,000 on an annualized basis (excluding non-recurring expenses in connection with removal of such costs).

(b) Borrower shall provide Lender on or before the fifteenth day of each month:

(A) schedule of sales made, credits issued and cash received;

(B)(w) perpetual inventory reports, (x) inventory reports by location and

category (including identifying Inventory at locations owned and operated by third parties, inventory held by Borrower on consignment and Inventory of Borrower held by third Persons on consignment), (y) agings of accounts payable (and including information indicating the status of payments to owners and lessors of the leased premises of Borrower and (z) agings of accounts receivable (together with a reconciliation to the previous month's aging and general ledger); and

(C)  upon Lender's request, (x) copies of customer statements, purchase orders, sales invoices and credit memos, remittance advices and reports, and copies of deposit slips and bank statements, (y) copies of shipping and delivery documents and (z) copies of purchase orders, invoices and delivery documents for Inventory and Equipment acquired by Borrower.

(c)  If Borrower's records or reports of the Collateral are prepared or maintained by an accounting service, contractor, shipper or other agent, Borrower hereby irrevocably authorizes such service, contractor, shipper or agent to deliver such records, reports, and related documents to Lender as it may reasonably request and, at any time an Event of Default exists, to follow Lender's instructions with respect to further services at such time.

(d)  No later than 90 days after the close of each calendar year, Borrower will cause to be prepared and deliver to Lender a cash balance sheet of Datta in form and substance satisfactory to the Lender.  No later than April 20th of each calendar year, Borrower will cause to be delivered to Lender the personal income tax returns of Datta; provided that if Datta files an extension with respect to such returns in any calendar year, Borrower shall deliver to Lender (i) copies of such extension filings, including without limitation estimates of income tax liability, no later than April 20th of such year and (ii) copies of the filed income tax return no later than the earlier of five Business Days after the filing thereof and October 20th of such year.

(e)  Upon Lender's request, Borrower shall, at their expense, no more than once in any twelve (12) month period, but at any time or times as Lender may request on or after an Event of Default, deliver or cause to be delivered to Lender a full written appraisal as to the Inventory in form, scope and methodology reasonably acceptable to Lender and by an appraiser acceptable to Lender, addressed to Lender and upon which Lender is expressly permitted to rely.

(f)  Borrower shall promptly provide Lender copies of any material communication delivered in connection with a material distribution or license agreement.

(g)  Borrower shall cause any standby letter of credit issued in connection with the FMI International, LLC warehouse to be terminated and any cash collateral

with respect to such letter of credit to be delivered to Lender on or before March 15, 2007.

(h) Borrower shall delivered to Lender Borrower's audited financial statements dated December 31, 2005 on or prior to February 28, 2007.

12. Exceptions to Negative Covenants

(a) Notwithstanding the provisions of Section 5.20, Borrower may incur Subordinated Debt and make payments with respect to (i) the Datta Subordinated Debt pursuant to the terms of the Datta Subordination Agreement and (ii) the Factory Subordinated Debt pursuant to the terms of the Factory Subordination Agreement.

(b) Notwithstanding the provisions of clause (v) of Section 5.20, so long as no Default or Event of Default exists or would be caused thereby, Borrower may make equity or debt investments in GBMI Europe B.V. not to exceed $375,000 in any fiscal quarter; provided that with respect to any fiscal quarter, amounts available for investments in GBMI Europe B.V. in the immediately prior fiscal quarter that remain unused shall be available for investments in the current fiscal quarter (but not any subsequent fiscal quarter and shall only be available on a last out basis after all investments otherwise permitted for such current fiscal quarter are expended).

(c) Notwithstanding the provisions of clause (viii) of Section 5.20, so long as Borrower is taxable as an S Corporation, subject to the last sentence of this clause (c), Borrower may make Tax Distributions to allow Borrower's shareholders to satisfy estimated tax payment obligations on such income in a timely manner, minus in each case (i) the reasonable estimate of Net Tax Benefit that has not been previously applied to reduce Tax Distributions pursuant to this clause (c) and (ii) less the amount of Net Tax Benefit realized by such shareholders for any previous tax year. If a Default or Event of Default has occurred and is continuing, or would result from such distribution, then Tax Distributions may only be made after Borrower's audited financial statements for the applicable tax year have been provided to Lender

(d) Notwithstanding the provisions of clause (xiv) of Section 5.20, Borrower may pay (i) to Datta aggregate compensation (including without limitation, salary, commissions and bonuses) not to exceed $750,000 plus reimbursements of reasonable expenses directly related to Datta's position as chief executive officer (and not personal expenses) in any calendar year and (ii) directors fees to directors that are not officers of Borrower not to exceed $10,000 in any calendar year.

(e) Notwithstanding the provisions of clause (xiv) of Section 5.20, Borrower may purchase and obtain directors and officers insurance in form and amounts

reasonably acceptable to Lender; it being agreed by Lender that the current amount of the directors and officers insurance of Borrower is acceptable.

(f)    Notwithstanding the provisions of clause (xiv) of Section 5.20, Borrower may (i) reimburse reasonable expenses of Indeka incurred by Indeka as a participant in the Revolving Loans as set forth in this Agreement and (ii) enter into and comply with that certain Investor Rights Agreement dated the date hereof among Borrower, Datta and Indeka.

13    (a)    After giving effect to the funding of the Revolving Loans and the issuance of any Credit Accommodations on the date hereof, Borrower shall have no less than $6,000,000 of (i) Availability plus (ii) cash in the Blocked Account, after giving effect to cash needs on the date hereof (including without limitation past due accounts payable).

(b)    Borrower shall have delivered to Lender satisfactory evidence that each supplier of Borrower to which Borrower owes outstanding past due obligations has assigned such obligations to Global Hero Group Limited, a British Virgin Islands limited company, subordination agreements with each holder of indebtedness of Borrower, licensor agreements with Diesel S.p.A., Diesel KID S.r.l. and Seven for All Mankind, and the agreements, instruments and documents set forth on the closing checklist attached hereto as Exhibit C, in each case in form and substance satisfactory to Lender.

(c)    Since October 31, 2006, there has been (i) no material adverse change in the business, financial or other condition of Borrower, the industry in which Borrower operates, or the Collateral or in the prospects or projections of Borrower and (ii) no litigation commenced which has not been stayed by any court and which if successful, could reasonably be expected to have a material adverse impact on Borrower, its business or ability to repay the Obligations or which challenge the transactions contemplated by this agreement.

(d)    Borrower shall have entered into a proposal letter to engage Greystone Commercial Service as their third party credit and collections service provider within three months of the date hereof, and entered into transition agreements with Century Business Credit Corp.

(e)    Borrower shall have delivered to Lender financial projections in form and substance satisfactory to Lender, which among other things adequately demonstrate sufficient liquidity to finance a profitable operating plan.

(f)    Lender shall have received proceeds from a subordinated, last out participation by Indeka of not less than $3,000,000, on terms and conditions

satisfactory to Lender.

(g) Borrower shall have moved all Collateral from the 350-400 Westmont Drive, San Pedro, California location and provided notice of its termination of the warehouse agreement with FMI International, LLC.

IN WITNESS WHEREOF, Borrower and Lender have signed this Schedule A as of the date set forth in the heading to the Agreement.

Borrower:                                          Lender:

GLOBAL BRAND MARKETING INC.          GREYSTONE BUSINESS CREDIT II
                                                   LLC

By _____                   By _____
   Its_____President_____                        Its Authorized Signatory

Signature Page to Loan and Security Agreement – Schedule A

IN WITNESS WHEREOF, Borrower and Lender have signed this Schedule A as of the date set forth in the heading to the Agreement.

Borrower:

**GLOBAL BRAND MARKETING INC.**

By _____

Its _____

Lender:

**GREYSTONE BUSINESS CREDIT II LLC**

By _____

Its Authorized Signatory

Greystone Business Credit II LLC

## Schedule B

### Definitions

This Schedule is an integral part of the Loan and Security Agreement between GLOBAL BRAND MARKETING INC. ("*Borrower*") and GREYSTONE BUSINESS CREDIT II LLC ("*Lender*").

As used in the Agreement, the following terms have the following meanings:

"*Account*" has the meaning set forth in the UCC.

"*Account Debtor*" has the meaning set forth in the UCC.

"*Account Proceeds*" has the meaning set forth in Section 4.1.

"*Accounts Advance Rate*" means the percentage set forth in Section 1(b)(i) of Schedule A.

"*Advance Rates*" means, collectively, the Accounts Advance Rate and the Inventory Advance Rate.

"*Affiliate*" means, with respect to any Person, a relative, partner, shareholder, member, manager, director, officer, or employee of such Person, any parent or subsidiary of such Person, or any Person controlling, controlled by or under common control with such Person or any other Person affiliated, directly or indirectly, by virtue of family membership, ownership, management or otherwise.

"*Agreement*" and "*this Agreement*" mean the Loan and Security Agreement of which this Schedule B is a part and the Schedules thereto.

"*Availability*" has the meaning set forth in Section 1.1.

"*Bankruptcy Code*" means the United States Bankruptcy Code (11 U.S.C. § 101 et seq.).

"*Blocked Account*" has the meaning set forth in Section 4.1.

"*Borrower*" has the meaning set forth in the heading to the Agreement.

"*Borrower's Address*" has the meaning set forth in the heading to the Agreement.

"*Business Day*" means a day other than a Saturday or Sunday or any other day on which Lender or banks in New York are authorized to close.

"*Cash Operating Income*" means income from operations, reasonably in accordance with GAAP, plus depreciation, minus cash interest expense.

*"Change of Control"* means (i) Datta and Indeka shall cease to own and control collectively at least 70% of the outstanding voting capital stock of Borrower or (ii) Borrower shall cease to, directly or indirectly, own and control 100% of each class of the outstanding equity interests of its Subsidiaries (excluding directors' or other nominal shares in foreign Subsidiaries in accordance with applicable law).

*"Chattel Paper"* has the meaning set forth in the UCC.

*"Closing Commitment Fee"* has the meaning set forth in Section 2.2(a).

*"Closing Fee"* has the meaning set forth in Section 2.2(b).

*"Code"* means the Internal Revenue Code of 1986.

*"Collateral"* means all property and interests in property in or upon which a security interest or other Lien is granted pursuant to this Agreement or the other Loan Documents, including, without limitation, all of the property of Borrower described in Section 3.1.

*"Commercial Tort Claims"* has the meaning set forth in the UCC.

*"Credit Accommodation"* has the meaning set forth in Section 1.1.

*"Credit Accommodation Balance"* means the sum of (i) the aggregate undrawn face amount of all outstanding Credit Accommodations and (ii) all interest, fees and costs due or, in Lender's estimation, likely to become due in connection therewith.

*"Credit Accommodation Fees"* has the meaning set forth in Section 2.2(f).

*"Credit Accommodation Limit"* means the amount set forth in Section 1(d) of Schedule A.

*"Datta"* means Sudeepto Datta, an individual.

*"Datta Subordinated Debt"* means the "Subordinated Debt" as defined in the Datta Subordination Agreement.

*"Datta Subordination Agreement"* means that certain Subordination Agreement between Lender and Datta dated the date hereof, as amended, restated, supplemented or otherwise modified from time to time pursuant to the terms of such agreement.

*"Default"* means any event which with notice or passage of time, or both, would constitute an Event of Default.

*"Default Rate"* has the meaning set forth in Section 2.1.

*"Deposit Account"* has the meaning set forth in the UCC.

"*Diesel*" means Diesel Props S.r.l., an Italian company.

"*Diesel Agreement*" means that certain letter agreement among Borrower, Lender and Diesel with respect to the payment of Diesel invoices, in form and substance satisfactory to Lender (as amended, restated, supplemented or otherwise modified from time to time).

"*Dilution Percentage*" means the gross amount of all returns, allowances, discounts, credits, write-offs and similar items relating to Borrower's Accounts computed as a percentage of Borrower's gross sales, calculated on a ninety (90) day rolling average.

"*Document*" has the meaning set forth in the UCC.

"*Early Termination Fee*" has the meaning set forth in Section 7.2.

"*EBITDA*" shall mean, as of any date of determination, for a specified period ending on such date of determination, an amount equal to: (a) Net Income, plus (b) depreciation, amortization and other non-cash charges (including, but not limited to, imputed interest and deferred compensation) of Borrower for such period (to the extent deducted in the computation of Net Income), all in accordance with GAAP, plus (c) interest expense of Borrower for such period (to the extent deducted in the computation of Net Income), plus (d) charges for federal, state, local and foreign income taxes for such period (to the extent deducted in the computation of Net Income).

"*Electronic Chattel Paper*" has the meaning set forth in the UCC.

"*Eligible Account*" means, at any time of determination, an Account which satisfies the general criteria set forth below and which is otherwise acceptable to Lender (*provided*, that Lender may, in its sole discretion, change the general criteria for acceptability of Eligible Accounts upon at least fifteen days' prior notice to Borrower). An Account shall be deemed to meet the current general criteria if (i) neither the Account Debtor nor any of its Affiliates is an Affiliate, creditor or supplier of Borrower; (ii) it does not remain unpaid more than the earlier to occur of (A) the number of days after the original *invoice date* set forth in Section 5(a) of Schedule A or (B) the number of days after the original *invoice due date* set forth in Section 5(b) of Schedule A; (iii) the Account Debtor or its Affiliates are not past due on other Accounts owing to Borrower comprising more than 35% of all of the Accounts owing to Borrower by such Account Debtor or its Affiliates; (iv) all Accounts owing by the Account Debtor or its Affiliates do not represent more than 30% of all otherwise Eligible Accounts (*provided*, that Accounts which are deemed to be ineligible solely by reason of this clause (iv) shall be considered Eligible Accounts to the extent of the amount thereof which does not exceed 30% of all otherwise Eligible Accounts); (v) no covenant, representation or warranty contained in this Agreement with respect to such Account (including any of the representations set forth in Section 5.4) has been breached; (vi) the Account is not subject to any contra relationship, counterclaim, dispute or set-off (*provided*, that Accounts which are deemed to be ineligible solely by reason of this clause (vi) shall be considered Eligible Accounts to the extent of the amount thereof which is not affected by such contra relationships, counterclaims, disputes or set-offs); (vii) the Account Debtor's chief executive office or principal place of

business is located in the United States or Provinces of Canada which have adopted the Personal Property Security Act or a similar act, unless (A) the sale is fully backed by a letter of credit, guaranty or acceptance acceptable to Lender in its sole discretion, and if backed by a letter of credit, such letter of credit has been issued or confirmed by a bank satisfactory to Lender, is sufficient to cover such Account, and if required by Lender, the original of such letter of credit has been delivered to Lender or Lender's agent and the issuer thereof notified of the assignment of the proceeds of such letter of credit to Lender or (B) such Account is subject to credit insurance payable to Lender issued by an insurer and on terms and in an amount acceptable to Lender; (viii) it is absolutely owing to Borrower and does not arise from a sale on a bill-and-hold, guarantied sale, sale-or-return, sale-on-approval, consignment, retainage or any other repurchase or return basis or consist of progress billings; (ix) Lender shall have verified the Account in a manner satisfactory to Lender; (x) the Account Debtor is not the United States of America or any state or political subdivision (or any department, agency or instrumentality thereof), unless Borrower has complied with the Assignment of Claims Act of 1940 (31 U.S.C. §203 et seq.) or other applicable similar state or local law in a manner satisfactory to Lender; (xi) it is at all times subject to Lender's duly perfected, first priority security interest and to no other Lien that is not a Permitted Lien, and the goods giving rise to such Account (A) were not, at the time of sale, subject to any Lien except Permitted Liens and (B) have been delivered to and accepted by the Account Debtor, or the services giving rise to such Account have been performed by Borrower and accepted by the Account Debtor; (xii) the Account is not evidenced by Chattel Paper or an Instrument of any kind and has not been reduced to judgment; (xiii) the Account Debtor's total indebtedness to Borrower does not exceed the amount of any credit limit established by Borrower or Lender and the Account Debtor is otherwise deemed to be creditworthy by Lender (*provided*, that Accounts which are deemed to be ineligible solely by reason of this clause (xiii) shall be considered Eligible Accounts to the extent the amount of such Accounts does not exceed the lower of such credit limits); (xiv) there are no facts or circumstances existing, or which could reasonably be anticipated to occur, which might result in any material adverse change in the Account Debtor's financial condition or impair or delay the collectibility of all or any portion of such Account; (xv) Lender has been furnished with all documents and other information pertaining to such Account which Lender has requested, or which Borrower is obligated to deliver to Lender, pursuant to this Agreement; (xvi) Borrower has not made an agreement with the Account Debtor to extend the time of payment thereof beyond the time periods set forth in clause (ii) above; and (xvii) no surety or other bond has been posted in respect of the contract under which such Account arose.

"*Eligible Inventory*" means, at any time of determination, Inventory (other than packaging materials and supplies) which satisfies the general criteria set forth below and which is otherwise acceptable to Lender (*provided*, that Lender may, in its sole discretion, change the general criteria for acceptability of Eligible Inventory upon at least fifteen days' prior written notice to Borrower). Inventory shall be deemed to meet the current general criteria if (i) it consists of raw materials or finished goods, or work-in-process that is readily marketable in its current form; (ii) it is in good, new and saleable condition; (iii) it is not slow-moving, obsolete, unmerchantable, returned or repossessed; (iv) it is not in the possession of a processor, consignee or bailee, or located on premises leased or subleased to Borrower, or on premises subject to a mortgage in favor of a Person other than Lender, unless such processor, consignee,

-4-

bailee or mortgagee or the lessor or sublessor of such premises, as the case may be, has executed and delivered all documentation which Lender shall require to evidence the subordination or other limitation or extinguishment of such Person's rights with respect to such Inventory and Lender's right to gain access thereto; (v) it meets all standards imposed by any governmental agency or authority; (vi) it conforms in all respects to any covenants, warranties and representations set forth in the Agreement; (vii) it is at all times subject to Lender's duly perfected, first priority security interest and no other Lien except a Permitted Lien; and (viii) it is situated at an Inventory location listed in Section 7(d) of Schedule A or other location of which Lender has been notified as required by Section 5.8 or it is in transit to the United States and such Inventory is insured in a manner satisfactory to Lender and Lender has possession of all bills of lading and other documents of title with respect thereto in a manner acceptable to Lender in its sole discretion and any other documents or agreements Lender shall require to perfect Lender's Lien on the in transit Inventory.

"*Equipment*" has the meaning set forth in the UCC.

"*ERISA*" means the Employee Retirement Income Security Act of 1974 and all rules, regulations and orders promulgated thereunder.

"*Event of Default*" has the meaning set forth in Section 8.1.

"*Existing Factors*" means Wells Fargo Century, Inc. and The CIT Group/Commercial Services Inc.

"*Factory Subordinated Debt*" means the "Subordinated Debt" as defined in the Factory Subordination Agreement.

"*Factory Subordination Agreement*" means that certain Subordination Agreement between Lender and Global Hero Group Limited, a British Virgin Islands limited company, as amended, restated, supplemented or otherwise modified from time to time pursuant to the terms of such agreement.

"*Fixtures*" has the meaning set forth in the UCC.

"*Foreign Subsidiaries*" means GBMI Europe B.V., Global Brand Marketing India Pvt Ltd and Global Brand Marketing Hong Kong Limited.

"*GAAP*" means generally accepted accounting principles as in effect from time to time, consistently applied.

"*General Intangibles*" has the meaning set forth in the UCC.

"*Goods*" has the meaning set forth in the UCC.

"*Indeka*" shall mean Indeka Capital, Inc., an Ontario corporation.

"*Instrument*" has the meaning set forth in the UCC.

*"Inventory"* has the meaning set forth in the UCC.

*"Inventory Advance Rate"* means the percentage(s) set forth in Section 1(b)(ii) of Schedule A.

*"Inventory Sublimit"* means the amount(s) set forth in Section 1(d) of Schedule A.

*"Investment Property"* has the meaning set forth in the UCC.

*"Last Out Participation Amount"* means the subordinated, last out participation of Indeka in the Revolving Loans on the date hereof in an amount equal to, as of any date of determination, the current principal amount of such participation, to which amount is $3,000,000 on the date hereof.

*"Lender"* has the meaning set forth in the heading to the Agreement.

*"Letter-of-Credit Right"* has the meaning set forth in the UCC.

*"Lien"* means any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on common law, statute or contract, including rights of sellers under conditional sales contracts or title retention agreements and reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases and other title exceptions and encumbrances affecting property. For the purpose of this Agreement, Borrower shall be deemed to be the owner of any property which it has acquired or holds subject to a conditional sale agreement or other arrangement pursuant to which title to the property has been retained by or vested in some other Person for security purposes.

*"Loan Account"* has the meaning set forth in Section 2.4.

*"Loan Documents"* means, collectively, the Agreement and all notes, guaranties, security agreements, certificates, landlord's agreements, Lock Box and Blocked Account agreements and all other agreements, documents and instruments now or hereafter executed or delivered by Borrower or any Obligor in connection with, or to evidence the transactions contemplated by, this Agreement.

*"Loan Limits"* means, collectively, the Availability limits and all other limits on the amount of Revolving Loans and Credit Accommodations set forth in this Agreement.

*"Lock Box"* has the meaning set forth in Section 4.1.

*"Maturity Date"* has the meaning set forth in Section 7.1.

*"Maximum Facility Amount"* means the amount set forth in Section 1(a) of Schedule A.

"*Minimum Loan Amount*" means the amount set forth in Section 1(g) of Schedule A.

"*Net Income*" shall mean, as of any date of determination, as determined in accordance with GAAP, when calculated for a specified period ending on such date of determination, the aggregate of the net income (loss) of Borrower for such period (but excluding to the extent included therein any extraordinary or one-time gains or losses or non-recurring events, including, but not limited to, restructuring charges, unusual severance charges, casualty losses and acquisitions or divestiture related charges and excluding the effect of any change in accounting principles adopted by Borrower after the date hereof shall be excluded). For the purpose of this definition, net income excludes any gain or loss, together with any related provision for taxes for such gain or loss realized upon the sale or other disposition of any assets that are not sold in the ordinary course of business (including, without limitation, dispositions pursuant to sale and leaseback transactions), or of any capital stock of Borrower and any net income realized as a result of changes in accounting principles or the application thereof to Borrower.

"*Net Revenue*" means gross domestic and international revenue minus discounts, returns and allowances with respect thereto.

"*Net Tax Benefit*" means (i) the aggregate amount by which income tax liability of the shareholders of Borrower is reduced for tax years 2006 and thereafter as a result of any S corporation losses of Borrower and its Subsidiaries during tax year 2006 and thereafter, plus (ii) the amount by which (a) the aggregate amount of Tax Distributions made, based on good faith estimates, to such shareholders in such tax year is in excess of (b) the tax obligations owing by such shareholders for income generated by Borrower's and its Subsidiaries' business during such year; *provided, however*, to the extent that the income tax liability for any year is reduced pursuant to clause (i) above, the amount corresponding to such reduction in income tax liability shall not be included as a tax obligation under clause (ii)(b) above.

"*Obligations*" means all present and future Revolving Loans, advances, debts, liabilities, obligations, guaranties, covenants, duties and indebtedness at any time owing by Borrower to Lender, whether evidenced by this Agreement, any other Loan Document or otherwise whether arising from an extension of credit, opening of a Credit Accommodation, guaranty, indemnification or otherwise (including all fees, costs and other amounts which may be owing to issuers of Credit Accommodations and all taxes, duties, freight, insurance, costs and other expenses, costs or amounts payable in connection with Credit Accommodations or the underlying goods), whether direct or indirect (including those acquired by assignment and any participation by Lender in Borrower's indebtedness owing to others), whether absolute or contingent, whether due or to become due, and whether arising before or after the commencement of a proceeding under the Bankruptcy Code or any similar statute, including all interest, charges, expenses, fees, attorney's fees, expert witness fees, audit fees, letter of credit fees, Closing Commitment Fees, Closing Fees, Servicing Fees, Unused Line Fees, Underwriting Fees, amounts owing under Warrant, amounts owing under Credit

Accommodation Fees and any other sums chargeable to Borrower under this Agreement or under any other Loan Document.

"*Obligor*" means any guarantor, endorser, acceptor, surety or other person liable on, or with respect to, the Obligations or who is the owner of any property which is security for the Obligations, other than Borrower.

"*Overadvance Fee*" has the meaning set forth in Section 2.2(g).

"*Overadvance Limit*" means $3,000,000.

"*Permitted Liens*" means: (i) purchase money security interests in specific items of Equipment in an aggregate amount not to exceed the existing principal amount outstanding plus the limit set forth in Section 6(b) of Schedule A; (ii) leases of specific items of Equipment in an aggregate amount not to exceed the existing principal amount outstanding plus the limit set forth in Section 6(c) of Schedule A; (iii) Liens for taxes not yet due and payable; (iv) additional Liens which are fully subordinate to the security interests of Lender and are consented to in writing by Lender; (v) security interests being terminated concurrently with the execution of this Agreement; (vi) Liens of materialmen, mechanics or carriers (but excluding Liens in favor of warehousemen) arising in the ordinary course of business and securing obligations which are not delinquent; (vii) Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clause (i) or (ii) above; *provided*, that any extension, renewal or replacement Lien is limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase; (viii) Liens in favor of customs and revenue authorities which secure payment of customs duties in connection with the importation of goods; (ix) security deposits posted in connection with real property leases or subleases, (x) Liens during the Transition Period in favor of the Existing Factors covering Accounts factored to such Persons prior to the date hereof (and proceeds thereof) securing obligations to such Persons for collection factoring services only and (xi) liens in favor of Bank of the West on cash collateral described in Section 4.2. Lender will have the right to require, as a condition to its consent under clause (iv) above, that the holder of the additional Lien sign an intercreditor agreement in form and substance satisfactory to Lender, in its sole discretion, acknowledging that the Lien is subordinate to the security interests of Lender, and agreeing not to take any action to enforce its subordinate Lien so long as any Obligations remain outstanding, and that Borrower agree that any uncured default in any obligation secured by the subordinate Lien shall also constitute an Event of Default under this Agreement.

"*Person*" means any individual, sole proprietorship, partnership, joint venture, limited liability company, trust, unincorporated organization, association, corporation, government or any agency or political division thereof, or any other entity.

"*Prime Rate*" means, at any given time, the prime rate as quoted in *The Wall Street Journal* as the base rate on corporate loans posted as of such time by at least 75% of the nation's 30 largest banks (which rate is not necessarily the lowest rate offered by such banks).

"*Proceeds*" has the meaning set forth in the UCC.

"*Released Parties*" has the meaning set forth in Section 6.1.

"*Reserves*" has the meaning set forth in Section 1.2.

"*Revolving Loans*" has the meaning set forth in Section 1.1.

"*Sale*" has the meaning set forth in Section 8.2.

"*Servicing Fee*" has the meaning set forth in Section 2.2(c).

"*Subordinated Indebtedness*" means any indebtedness of Borrower the payment of which is subordinated to payment of the Obligations to written satisfaction of the Lender.

"*Subsidiary*" means any corporation or other entity of which a Person owns, directly or indirectly, through one or more intermediaries, more than 50% of the capital stock or other equity interest at the time of determination.

"*Supporting Obligations*" has the meaning set forth in the UCC.

"*Tangible Chattel Paper*" has the meaning set forth in the UCC.

"*Tax Distributions*" means, for any taxable year for which Borrower is treated under the Code as a S corporation for income tax purposes or otherwise similarly disregarded under the Code for income tax purposes, dividends and/or distributions paid by Borrower to its shareholders pursuant to Section 12(b) of Schedule A. Tax Distributions shall be made in an amount not to exceed the product of (i) taxable income related to such shareholders' interest in Borrower multiplied by (ii) the sum of the highest marginal individual federal and state income tax rates in any state in which any shareholder resides or is subject to income tax which were applicable in such taxable year.

"*Term*" has the meaning set forth in Section 7.1.

"*Transition Period*" means the period beginning on the date hereof and ending on the earlier of (a) April 4, 2007 and (b) the date that each of the Factoring Agreement dated July 28, 1999 between Borrower and Wells Fargo Century, Inc. and the Factoring Agreement between Borrower and The CIT Group/Commercial Services Inc. dated January 11, 2002 have been terminated.

"*UCC*" means, at any given time, the Uniform Commercial Code as adopted and in effect at such time in the State of New York.

"*Underwriting Fee*" has the meaning set forth in Section 2.2(e).

"*Unused Line Fee*" has the meaning set forth in Section 2.2(d).

"*Warrant*" has the meaning set forth in Section 2.2(h).

All accounting terms used in this Agreement, unless otherwise indicated, shall have the meanings given to such terms in accordance with GAAP. All other terms contained in this Agreement, unless otherwise indicated, shall have the meanings provided by the UCC, to the extent such terms are defined therein. The term *"including,"* whenever used in this Agreement, shall mean "including but not limited to." The singular form of any term shall include the plural form, and vice versa, when the context so requires. References to Sections, subsections and Schedules are to Sections and subsections of, and Schedules to, this Agreement. All references to agreements and statutes shall include all amendments thereto and successor statutes in the case of statutes.

**Greystone Business Credit II LLC**

IN WITNESS WHEREOF, Borrower and Lender have signed this Schedule B as of the date set forth in the heading to the Agreement.

Borrower:                          Lender:

**GLOBAL BRAND MARKETING INC.**        **GREYSTONE BUSINESS CREDIT II LLC**

By _____         By _____

Its _____President_____          Its Authorized Signatory

Greystone Business Credit II LLC

IN WITNESS WHEREOF, Borrower and Lender have signed this Schedule B as of the date set forth in the heading to the Agreement.

**Borrower:**                                    **Lender:**

GLOBAL BRAND MARKETING INC.                    GREYSTONE BUSINESS CREDIT II LLC

By _____                     By _____
   Its _____                    Its Authorized Signatory

Greystone Business Credit II LLC

Exhibit A

COMMERCIAL TORT CLAIMS

None