Exhibit B

## Affidavit of Sudeepto Datta

1. My name is Sudeepto (Killick) Datta.

2. I am more than 18 years of age and competent to testify on the matters set forth herein.

3. Except were otherwise specified, I have personal knowledge of the matters set forth in this affidavit. To the best of my knowledge, the facts stated herein are true and correct.

4. I am the President and Chief Executive Officer of Titan Apparel, Inc. ("Titan") and Global Brand Marketing, Inc. ("GBMI").

5. From the late 1990s until the end of 2007, GBMI designed, developed, marketed and distributed Diesel-brand shoes in the United States. During that period, I developed a close relationship with many Diesel employees and officers and became familiar with the operations of the Diesel family of companies.

6. Throughout my relationship with Diesel, the relationship between "Diesel Props," "Diesel SpA" and "Diesel Kid" was never meaningful. We always looked at Diesel as a single company.

7. Throughout my relationship with Diesel, it was my understanding all major decisions affecting the Diesel companies and the Diesel brand were made by officers of Diesel SpA, including Renzo Rosso and Marina Tosin. I often worked directly with Diesel SpA officers, some of whom visited GBMI in Santa Barbara. Diesel SpA officers were always closely involved with GBMI's work on the Diesel brand.

8. For example, when Diesel wanted to discuss performance under the Distribution Agreement with GBMI in March 2007, personnel from Diesel SpA were sent to visit GBMI even though the actual contractual relationship was with Diesel Props and Diesel Kid.

9. Luigi Mezzasoma was the Diesel employee that I dealt with most frequently. His immediate superior was Marina Tosin, an officer of Diesel SpA. It is my understanding Mr. Mezzasoma needed her approval on all major decisions, and she had the power to override any decision made by him.



10.    Mr. Mezzasoma told me that Diesel's decision to terminate the relationship with GBMI and file this lawsuit was made by officers of Diesel SpA, including Ms. Tosin.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed this _11th_ day of February, 2008,

_____

Sudeepto (Killick) Datta

Exhibit C

**GREYSTONE BUSINESS CREDIT II LLC**
Carnegie Hall Tower
152 West 57th Street, 60th Floor
New York, New York 10019

November 30, 2006

Mrs. Marina Tosin
Managing Director
Diesel S.p.A.
Via dell'Industria n. 7
Molvena (Vicenza) Italy

Dear Mrs. Tosin:

Notice is hereby given that Greystone Business Credit II LLC ("Greystone") intends to enter into various agreements, instruments and documents (as such agreements, instruments and documents may be amended, modified, restated, otherwise modified, superseded or replaced from time to time, the "Financing Agreements") to make certain financing accommodations for the benefit of Global Brand Marketing, Inc., a California corporation (the "Company"), subject to the completion of certain conditions precedent. It is a condition to the entry into the Financing Agreements by Greystone that this letter agreement is executed by you and returned to Greystone at the address above.

By your signature below, you hereby consent to the Company's entrance into the Financing Agreements and hereby acknowledge and agree that until all of the obligations or liabilities owing to Greystone under the Financing Agreements have been paid in full and the Financing Agreements have been terminated, you shall not: (1) create, assert or possess any security interests, liens, retentions of title or similar rights on the assets of the Company (the "Collateral"), (2) sell, assign, transfer, pledge or give a security interest in any of the Collateral or (3) hinder or otherwise interfere with Greystone's rights and remedies under the Financing Agreements, including the liquidation of the Collateral by Greystone or its agents after a default under the Financing Agreements. Notwithstanding the foregoing, nothing in this letter agreement shall relieve the Company of its obligations under any agreement it has with you or otherwise prevent you from receiving regular payments under any applicable license agreement between you and the Company in absence of a default under the Financing Agreements. By signature below, you hereby represent and warrant that you possess no security interests, liens, retentions of title or similar rights with respect to the Collateral.

In the event that the Financing Agreements are entered into by the Company and Greystone on or prior to December 6, 2006, this letter agreement shall remain in full force and effect for a period of three (3) years from the date of the closing of the Financing Agreements. In the event that the Financing Agreements are not entered into by the Company and Greystone on or prior to December 6, 2006, this letter agreement shall terminate and have no further force or effect as of such date.

573942v1 10/30/2006 7:54:29 PM                                                                          573?4.012

Please acknowledge your agreement to be bound by the foregoing by signing this letter and delivering it to Greystone at the address above.

Sincerely,

GREYSTONE BUSINESS CREDIT II LLC

By_____
Its_____

Accepted and Agreed as of
this ___day of December, 2006:

DIESEL S.p.A.

By_____
Its_____

Signature Page to Licensor Letter

# Exhibit D

**GREYSTONE BUSINESS CREDIT II LLC**
Carnegie Hall Tower
152 West 57th Street, 60th Floor
New York, New York 10019

December 1, 2006

Mr. Germano Ferraro
Managing Director
DIESEL KID S.r.l.
Via Fosse 14
Marostica 36063
Vicenza, Italy

Dear Mr. Ferraro:

Notice is hereby given that Greystone Business Credit II LLC ("Greystone") intends to enter into various agreements, instruments and documents (as such agreements, instruments and documents may be amended, modified, restated, otherwise modified, superseded or replaced from time to time, the "Financing Agreements") to make certain financing accommodations for the benefit of Global Brand Marketing, Inc., a California corporation (the "Company"), subject to the completion of certain conditions precedent. It is a condition to the entry into the Financing Agreements by Greystone that this letter agreement is executed by you and returned to Greystone at the address above.

By your signature below, you hereby consent to the Company's entrance into the Financing Agreements and hereby acknowledge and agree that until all of the obligations or liabilities owing to Greystone under the Financing Agreements have been paid in full and the Financing Agreements have been terminated, you shall not: (1) create, assert or possess any security interests, liens, retentions of title or similar rights on the assets of the Company (the "Collateral"), (2) sell, assign, transfer, pledge or give a security interest in any of the Collateral or (3) hinder or otherwise interfere with Greystone's rights and remedies under the Financing Agreements, including the liquidation of the Collateral by Greystone or its agents after a default under the Financing Agreements. Notwithstanding the foregoing, nothing in this letter agreement shall relieve the Company of its obligations under any agreement it has with you or otherwise prevent you from receiving regular payments under any applicable license agreement between you and the Company in absence of a default under the Financing Agreements. By signature below, you hereby represent and warrant that you possess no security interests, liens, retentions of title or similar rights with respect to the Collateral.

In the event that the Financing Agreements are entered into by the Company and Greystone on or prior to December 6, 2006, this letter agreement shall remain in full force and effect for a period of three (3) years from the date of the closing of the Financing Agreements. In the event that the Financing Agreements are not entered into by the Company and Greystone on or prior to December 6, 2006, this letter agreement shall terminate and have no further force or effect as of such date.

533942-1 10/30/2006 1:54:29 PM

1724.012

Please acknowledge your agreement to be bound by the foregoing by signing this letter and delivering it to Greystone at the address above.

Sincerely,

GREYSTONE BUSINESS CREDIT II LLC

By_____
Its_____

Accepted and Agreed as of
this 4th day of December 2006:

DIESEL KID S.r.L.

By_____
Its   DIESEL KID SRL   CEO

Signature Page to Licensing Letter

Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
DIESEL PROPS S.R.L. and
DIESEL KID S.R.L.,

            Plaintiffs/Counterdefendants,

            against

GREYSTONE BUSINESS CREDIT II LLC and
GLOBAL BRAND MARKETING INC.,

            Defendants/Counterplaintiffs

            -against-

DIESEL S.p.A.

            Third-Party Defendant.
-------------------------------------------------------x

Civil Action No. 1:07 CV 9580 (HB)

**AFFIDAVIT OF
DANIEL P. SHAPIRO**

I, Daniel P. Shapiro, under oath state the following:

1.     I am a partner in the law firm of Goldberg, Kohn in Chicago, Illinois. I am lead litigation counsel in this case for the defendant Greystone Business Credit II L.L.C. ("Greystone").

2.     Beginning on October 26, 2007 before Judge Rakoff, and through November 1, 2007 before this Court, on multiple occasions the plaintiffs in this action sought to obtain emergency injunctive relief to restrain Greystone from liquidating approximately 158,000 pairs of Diesel brand shoes that were Greystone's collateral for its loan to the defendant Global Brand Marketing, Inc. ("Global"). The plaintiffs sought to have the defendants restrained from "seizing, liening, transferring, selling, effecting, taking any action with respect to, distributing, or otherwise disturbing or asserting control over" this collateral.

The plaintiffs failed to obtain this relief and the defendants were permitted to sell these goods in the ordinary course of their business relationships.

       3.     Following this Court's ruling on November 1, 2007, counsel for the plaintiffs, Ira Sacks, contacted me by telephone regarding the preliminary injunction hearing that this Court had scheduled for November 19, 2007.  We had several telephone conversations on this subject. It is my clear recollection of those conversations that because the plaintiffs had not obtained the relief that they had been seeking there was no reason, in Mr. Sacks' view, to proceed with the scheduled preliminary injunction hearing if most of the collateral was going to have been sold by the defendants by that time.  If that was going to be the case, Mr. Sacks expressed his interest in withdrawing the plaintiffs' motion for preliminary injunction in advance of the scheduled hearing date.  Mr. Sacks asked if I could ascertain whether the defendants expected most of the shoes would be sold by November 19, 2007.  Without revealing the specifics of privileged communications between client and counsel, I ascertained and reported to Mr. Sacks that the defendants expected that most of the shoes would be sold before November 19, 2007.  Mr. Sacks' letter to the Court of November 8, 2007 accurately summarizes our conversations:

> In light of the ability of defendants to sell Warehouse Product during the time period prior to the scheduled preliminary injunction hearing, and the likelihood that most of the product will have been sold by the time of the preliminary injunction hearing, plaintiffs hereby withdraw their motion for preliminary injunction.

Exhibit A.

4.    Mr. Sacks' November 8, 2007 letter and my own recollection of our conversations are the same. I was providing Mr. Sacks with an estimation of what was likely. Mr. Sacks never requested an affidavit, supporting documentation or any other detail. This was an informal communication and it was, as far as I was able to determine then, and as best as I know now, an accurate statement of the facts at the time. Ultimately, the sales that were expected fell through. *See* Aff. of Scott Home, which is Ex. G. I did not learn of that fact until Mr. Sacks raised these issues again with me several weeks ago, in early February 2008.

5.    In late November 2007, I learned that I would have to take an unexpected medical leave of about one month to have spinal fusion surgery. I advised Mr. Sacks that I would be on this short medical leave, and my litigation partner, David Chizewer, stepped in to cover in my absence.

6.    I have spoken to Mr. Chizewer about his correspondence with Mr. Sacks. In late November 2007, the defendants planned to conduct a private sale of the collateral, as provided under the UCC. While no notice to the plaintiffs of that sale was required under the UCC, to avoid any unnecessary surprise or feeling of ill will in a circumstance where there was already litigation pending (the plaintiffs continuing damages actions and, eventually, the counterclaims), Mr. Chizewer sent Mr. Sacks an e-mail on November 30, 2007 advising of the sale and of his belief that the sale would not include any Diesel inventory. Again, without disclosing specific attorney-client communications, this was an accurate statement at that time of what was anticipated. Mr. Chizewer's e-mail also says that "if we intend to include the Diesel branded inventory in the private sale, we will

give you advance notice...." Mr. Chizewer did not learn that there were, in fact, Diesel shoes included in the private sale, which took place on December 14, 2007, until after Mr. Sacks raised this issue with me during the first week of February. Not advising Mr. Sacks that Diesel inventory was, ultimately, included in the private sale was neither deliberate nor knowing. As far as I have been able to determine, it was expected that all of the Diesel shoes would be sold. When that sale fell through, that fact did not come to Mr. Chizewer's attention.

7.     I swear under penalties as provided by law that the statements set forth in this instrument are true, to the best of my knowledge, information and belief. I further certify that statements setting forth a lack of knowledge as to certain matters are true to the best of my knowledge, information and belief.

Daniel P. Shapiro

-4-

Exhibit F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

DIESEL PROPS S.R.L. and
DIESEL KID S.R.L.,

        Plaintiffs/Counterdefendants,

        against

GREYSTONE BUSINESS CREDIT II LLC and
GLOBAL BRAND MARKETING INC.,

        Defendants/Counterplaintiffs

        -against-

DIESEL S.p.A.

        Third-Party Defendant.
-----------------------------------------------------------x

Civil Action No. 1:07 CV 9580 (HB)

**AFFIDAVIT OF
DAVID J. CHIZEWER**

I, David J. Chizewer, under oath state the following:

1.    I am a partner in the law firm of Goldberg, Kohn in Chicago, Illinois.

2.    For a brief period in late November and early December 2007, I became involved in the above-captioned case while my partner, Dan Shapiro, was on medical leave.

3.    I understand that a dispute has developed regarding, in part, correspondence between myself and Ira Sacks, counsel for the plaintiffs.

4.    I have discussed that correspondence and other related issues with Mr. Shapiro. Mr. Shapiro's affidavit, which I have reviewed, accurately describes the events in which I was involved.

5.    I swear under penalties as provided by law that the statements set forth in this instrument are true, to the best of my knowledge, information and belief.

_____
David J. Chizewer

Exhibit G

## Affidavit of Scott Home

1. My name is Scott Home.

2. I am more than 18 years of age and competent to testify to the matters described herein.

3. Except where otherwise specified, I have personal knowledge of the facts set forth in this affidavit.

4. I am the Executive Vice-President of Sales for Titan Apparel, Inc. ("Titan"). I held the same position for Global Brand Marketing, Inc. ("GBMI") from late Spring 2007 until December 2007.

5. As Executive Vice-President of Sales for both GBMI and Titan, I worked to sell Diesel-brand shoes, among others, to customers throughout the United States.

6. As of early November, I expected that all or virtually all of the Diesel shoes in GBMI's inventory would be sold by mid-December. My expectations were based upon my experience in this industry and my specific knowledge of the market for Diesel footwear.

7. Our efforts to sell Diesel shoes were hindered by Diesel's actions in the marketplace. I have been told that Diesel contacted many of our accounts and informed them that orders would be filled directly by Diesel, rather than through GBMI. It is my understanding that Diesel asked certain of our customers to cancel their orders with GBMI and place them with Diesel instead. In addition, it is my understanding that Diesel hired two former GBMI sales employees and contacted other former GBMI employees.

8. We also faced challenges because of Diesel's late deliveries of shoes to GBMI for the Fall/Winter 2007 and earlier seasons. It became difficult, and in some cases impossible, to convince customers that any shoes they ordered would be delivered on time.

9. Despite these obstacles, I managed to reach a verbal agreement with a customer, Ross, for the sale of virtually all of the Diesel shoes in our inventory. We expected to complete the sale and ship the shoes in early December 2007.

10. At around the same time of the verbal agreement with Ross, we received an offer from another customer, GenEx, for a large number of the same Diesel shoes that we were prepared to sell to Ross. We decided to pursue the Ross deal instead of the GenEx deal because Ross offered a higher price and because Ross is listed as an approved customer in the Distribution Agreement between GBMI and Diesel.

11. The sale to Ross ultimately fell through, so I had to work to find another buyer for the Diesel shoes. I continued to face substantial challenges in the market but ultimately located buyers for all of the Diesel inventory.

12. There is an order in place for the remaining approximately 100,500 unsold pairs of Diesel shoes in our inventory. I am highly concerned that the delay in filling that order will result in us losing it altogether. The prospective buyer of the shoes expected to be able to market the Diesel shoes at fashion shows occurring this week and next. The delay means that the buyer is losing these marketing opportunities, thus increasing the likelihood that the buyer will cancel the order from Titan altogether. If the sale is not completed by the end of the week, I expect the buyer to cancel the order.

13. If we lose the order, it will be difficult to find another buyer. Even if we are able to find another buyer, we almost certainly will not be able sell the shoes at the same price because the inventory – especially the Fall/Winter 2007 Seasons shoes – continue to age.

14. There is nothing unusual about selling Fall/Winter Season inventory to discount stores and other after-market companies in February of the following year. By February, it is far too late to sell the inventory to major department stores and retail chains. Discount stores and after-market companies are usually the only options.

15. At the present time, the U.S. market for Diesel shoes is terrible. Diesel is not seen as reliable on deliveries, and their designs are not popular, either. At a department store like Nordstrom's, in the past you would find one or two tables full of Diesel footwear for sale, whereas today it would be difficult to find many Diesel shoes in those stores at all.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Signed this 11th day of February, 2008,

_____
Scott Home

Exhibit H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

DIESEL PROPS S.R.L. and
DIESEL KID S.R.L.,

               Plaintiffs/Counterdefendants,            Civil Action No. 1:07 CV 9580 (HB)

               against                           **VERIFICATION OF**
                                              **GUY SMITH**

GREYSTONE BUSINESS CREDIT II LLC and
GLOBAL BRAND MARKETING INC.,

               Defendants/Counterplaintiffs

               -against-

DIESEL S.p.A.

               Third-Party Defendant.
----------------------------------------------------------------x

        I, Guy Smith, under oath state the following:

        1.     I am more than 18 years of age and have personal knowledge of the matters set forth in this affidavit.

        2.     I am Eastern Regional Director, New Business, at Greystone Business Credit II L.L.C. I have held that position at all times relevant to this affidavit.

        2.     I was heavily involved in the negotiation of the lending arrangement between Greystone and Global Brand Marketing, Inc., which closed on or about December 4, 2006.

        3.     It was my understanding and belief at the time that Greystone made the loan to GBMI that Greystone's rights and obligations regarding collateral for that loan were defined and governed entirely by the loan documents between the parties and the provisions of the Uniform Commercial Code. That has always been my understanding, and is my

understanding today. Neither I nor, to my knowledge, anyone else at Greystone ever agreed or would have agreed to have the law of Italy or any other foreign jurisdiction apply to Greystone's rights and obligations.

4.      I am aware that the Diesel parties to this litigation are arguing that certain choice-of-law and "retention-of-title" provisions in Distribution Agreements between them and GBMI should be applied to the disadvantage of Greystone. It was never my understanding or belief that any aspect of these Distribution Agreements, or any other agreement between any Diesel entity and GBMI, would bind or affect Greystone's interests in any manner that would be inconsistent with the loan documents between Greystone and GBMI. Neither I, nor anyone at Greystone to my knowledge, ever agreed, or would have agreed, to that result. In fact, Greystone deliberately put the Diesel entities on notice, through the Non-Interference Agreements signed by Diesel S.p.A. and Diesel Kids S.R.L., that Greystone's rights in its collateral were superior to whatever rights in that property Diesel might have.

5.      Attached to this affidavit is a copy of an "Official Diesel Release" dated October 30, 2007. I received it by email and believe that it originated from Diesel.

6.      I swear under penalties as provided by law that the statements set forth in this instrument are true, to the best of my knowledge, information and belief.

_____
Guy Smith

-2-

Exhibit H(1)

```
 -----Original Message-----
From:      Abel, Katie
Sent: Tuesday, October 30, 2007 12:06 PM Eastern Standard Time
To:    Atmore, Michael
Subject:    Official Diesel Release
```

A FOOTNOTE IN DIESEL HISTORY
Diesel's international footwear distribution to become entirely controlled by
the Group


Diesel Props SRL, a wholly owned subsidiary of the Diesel Group and worldwide
licensee for the production and distribution of men's and women's footwear,
and Diesel Kid SRL, a controlled company of the Diesel Group and  worldwide
licensee of children's footwear, both bearing the "Diesel" trademark, have
terminated for cause their agreement with Global Brand Marketing Inc (GBMI)
for the exclusive distribution of Diesel footwear in the United States, in
alignment with the decision to directly distribute this product category as
in the major countries of the world. Diesel footwear (men's, women's and
children's) US distribution will be integrated into the Diesel US subsidiary,
which is directly owned by the Diesel Group.

The aim of this reorganization is to strategically develop Diesel's footwear
business further, consolidating and leveraging its product positioning and
image worldwide.

The fall/winter 2008 men's, women's and children's footwear sales campaign
will begin on December 4th, 2007 at the Diesel US head offices (located at
770 Lexington Avenue, 9th floor, New York, NY) and it will then continue in
all major countries worldwide.


###



For further information please contact:
Erin Hawker Diesel at 212.929.8412, extension 236, erin_hawker@diesel.com
Patrick Jones at 212.929.8412, extension 235, patrick_jones@diesel.com


*PLEASE NOTE THE US PRESS OFFICE ADDRESS CHANGE EFFECTIVE DECEMBER 6th,
2006:

Erin Hawker
Head of Press and Publicity
Diesel US Press Office
1 Union Square West
Suite 208
New York  NY  10003

212.929.8412, extension 236
212.675.7430 fax
erin_hawker@diesel.com


------ End of Forwarded Message

# .vma 2/22/08 2:46 PM \Normal.dot

# Exhibit I

**From:** Ira S. Sacks [mailto:isacks@dreierllp.com]
**Sent:** Friday, February 15, 2008 10:39 AM
**To:** Shapiro, Dan
**Cc:** Locher, Stephen H.; gsilverstein@leaderberkon.com; Kohn, Richard
**Subject:** RE: Stip

I do not want to do this piecemeal, but we will not challenge the existence of the perfected security interest or the authenticity of the noninterference and tripartite agreements. Indeed, we have already submitted them in connection with the original application.

My best,

Ira

PRIVILEGED AND CONFIDENTIAL

-----Original Message-----
**From:** Shapiro, Dan [mailto:Daniel.Shapiro@goldbergkohn.com]
**Sent:** Friday, February 15, 2008 11:34 AM
**To:** Ira S. Sacks
**Cc:** Locher, Stephen H.; gsilverstein@leaderberkon.com; Kohn, Richard
**Subject:** RE: Stip

Can I assume that you are not going to contest Greystone's perfected security interest? I understand that we have a disagreement on the law as to choice of law and the effect of that interest, which we have discussed extensively, but a part of what I would have to submit would be affidavits with regard to the existence of the perfected security interest itself. Same as to the authenticity of the non interference agreements and the tri partite agreements.

Daniel Shapiro | **GOLDBERG KOHN** | 55 East Monroe, Suite 3300, Chicago, Illinois 60603 | direct 312.201.3917 | direct fax 312.863.7417 | daniel.shapiro@goldbergkohn.com | www.goldbergkohn.com

This e-mail is subject to Goldberg Kohn's terms and conditions regarding e-mail, which are available on our web site or by clicking here.

IRS Circular 230 Disclosure: Unless we have specifically stated to the contrary in writing, any discussion of federal tax issues or submissions in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the United States federal tax laws or (2) promoting, marketing, or recommending to anyone any transaction or matter addressed herein.

**From:** Ira S. Sacks [mailto:isacks@dreierllp.com]
**Sent:** Friday, February 15, 2008 10:28 AM
**To:** Shapiro, Dan
**Cc:** Locher, Stephen H.; gsilverstein@leaderberkon.com
**Subject:** RE: Stip

OK. Thx.

My best,

Ira

PRIVILEGED AND CONFIDENTIAL

-----Original Message-----
**From:** Shapiro, Dan [mailto:Daniel.Shapiro@goldbergkohn.com]
**Sent:** Friday, February 15, 2008 8:59 AM
**To:** Ira S. Sacks
**Cc:** Locher, Stephen H.; gsilverstein@leaderberkon.com
**Subject:** RE: Stip

I will look at this and your e mail, but have a busy day and I may not get back to you on all of it until Monday. I will respond as quickly as I can.

Daniel Shapiro | **GOLDBERG KOHN** | 55 East Monroe, Suite 3300, Chicago, Illinois 60603 | direct 312.201.3917 | direct fax 312.863.7417 | daniel.shapiro@goldbergkohn.com | www.goldbergkohn.com

This e-mail is subject to Goldberg Kohn's terms and conditions regarding e-mail, which are available on our web site or by clicking here.

IRS Circular 230 Disclosure: Unless we have specifically stated to the contrary in writing, any discussion of federal tax issues or submissions in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the United States federal tax laws or (2) promoting, marketing, or recommending to anyone any transaction or matter addressed herein.

**From:** Ira S. Sacks [mailto:isacks@dreierllp.com]
**Sent:** Friday, February 15, 2008 5:13 AM
**To:** Shapiro, Dan
**Cc:** Locher, Stephen H.; gsilverstein@leaderberkon.com
**Subject:** Stip

<<00329714.DOC>>
Here is a proposed stipulation of facts to avoid declarations by you, me and David.

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you

have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

This e-mail message may contain legally privileged and/or confidential information. If you are not the intended recipient(s), or the employee or agent responsible for delivery of this message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please immediately notify the sender and delete this e-mail message from your computer.

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with Treasury Department regulations, we inform you that any U.S. federal tax advice contained in this correspondence (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties that may be imposed under the U.S. Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.