# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DIESEL PROPS S.R.L. and
DIESEL KID S.R.L.,

                Plaintiffs/Counter-Defendants,

                vs.

GREYSTONE BUSINESS CREDIT II LLC
and GLOBAL BRAND MARKETING INC.,

                Defendants/Counter-Plaintiffs

                vs.

DIESEL S.p.A.

                Third-Party Defendant

**GREYSTONE'S OPPOSITION
TO PLAINTIFFS' AND THIRD
PARTY DEFENDANT'S
MOTIONS TO DISMISS**


Civil Action No. 07 CV 9580
(HB)

## TABLE OF CONTENTS

OVERVIEW ............................................................................................................... 1

INTRODUCTION ...................................................................................................... 3

FACTUAL BACKGROUND...................................................................................... 7

ARGUMENT ............................................................................................................ 11

I.   GREYSTONE IS NOT BARRED FROM RAISING ITS COUNTERCLAIMS IN THIS
     FORUM. ........................................................................................................... 11

     A.   Props and Kid Have Waived Their Venue Objections. .........................12
     B.   The Venue Objections Fail Even Without Waiver................................13
          1.   Greystone and SpA Are Not Parties to the Contracts in Which the Forum
               Selection Provisions Are Found. ................................................13
          2.   The Relevant Contractual Language and Sequence of Events Reveals that
               SpA, Props and Kid Agreed to Litigate Claims Against Greystone in New
               York, Whereas Greystone Never Agreed to Litigate in Italy......................14
          3.   Principles of Judicial Economy Also Support the Adjudication of
               Counterclaims in this Forum. ...................................................17

II.  GREYSTONE'S PLEADINGS ARE MORE THAN SUFFICIENT UNDER THE NOTICE
     PLEADING STANDARDS OF THE FEDERAL RULES OF CIVIL PROCEDURE. ...... 18

III. THE UCC GIVES GREYSTONE STANDING TO RAISE CLAIMS ON BEHALF OF
     GBMI, ITS DEBTOR. ......................................................................................... 20

     A.   Section 9-607 of the New York UCC Defeats Diesel's Arguments. .....................20
     B.   The Case Relied Upon Heavily by Diesel Does Not Change the Effect of N.Y.
          UCC § 9-607..........................................................................................22

IV.  EACH COUNTERCLAIM RAISED BY GREYSTONE SURVIVES PLAINTIFFS' AND
     SPA'S OTHER ARGUMENTS IN SUPPORT OF THEIR MOTION TO DISMISS. ........ 25

     A.   Plaintiffs and SpA Have Failed to Establish Any Basis For Dismissing
          Greystone's First Counterclaim/First Third-Party Claim for Breach of the Non-
          Interference Agreements.........................................................................25
          1.   Greystone Has Stated a Claim Against Kid. ...........................25
          2.   Greystone Has Stated a Claim Against Props. ...........................26
          3.   Greystone Has Stated a Claim Against SpA. ............................28
     B.   Plaintiffs and SpA Have Failed to Establish Any Justifiable Basis For Dismissing
          Greystone's Second Counterclaim/Second Third-Party Claim, for Conversion. ..28
     C.   Plaintiffs and SpA Have Failed to Establish Any Justifiable Basis for Dismissing
          Greystone's Third Counterclaim/Third Third-Party Claim, For Tortious
          Interference With Business Relationships, and Fourth Counterclaim/Fourth Third-
          Party Claim, For Tortious Interference With Contracts. ........................30

D.   Plaintiffs and SpA Have Failed to Establish Any Justifiable Basis For Dismissing Greystone's Fifth Counterclaim/Fifth Third-Party Claim, For Unjust Enrichment. ................................................................................................

E.   Plaintiffs Have Failed to Establish Any Justifiable Basis for Dismissing ........................31
Greystone's Sixth and Eighth Counterclaims, For Breach of the Distribution Agreements and Sourcing Agreement. ................................

F.   Plaintiffs and SpA Have Failed to Establish Any Justifiable Basis for Dismissing ........................32
the Seventh Counterclaim/Sixth Third-Party Claim, for Breach of Oral Agreement. ................................

G.   Plaintiffs and SpA Have Failed to Establish Any Justifiable Basis for Dismissing ........................33
the Ninth Counterclaim/Seventh Third-Party Claim, for Fraud. ...........................34

CONCLUSION ................................................................................................ 37

## TABLE OF AUTHORITIES

**Cases**

Atlas Die Casting, Inc. v. Lendino, 49 A.D.2d 917, 374 N.Y.S.2d 35 (N.Y. A.D. 1975) ............................................................................................................26

Automobile Mechanics Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc., 502 F.3d 740 (7th Cir. 2007) ...............................................12

Bank of India v. Weg & Myers, P.C., 257 A.D.2d 183, 191, 691 N.Y.S.2d 439 (1st Dept. 1999) ......................................................................................................32

Bell Atlantic v. Twombly, 127 S.Ct. 1955 (2007) ...........................................18, 19

Capital Nat'l Bank of New York v. McDonald's Corp., 625 F. Supp. 874 (S.D. N.Y. 1986) .....................................................................................................22, 23, 24

Caspian Invs., Ltd. v. Vicom Holdings, Ltd., 770 F. Supp. 880 (S.D. N.Y. 1991) ..........13, 17

Chase Manhattan Bank, N.A. v. Perla, 65 A.D.2d 207, 210, 411 N.Y.S.2d 66 (N.Y. S.Ct. 1978) ......................................................................................................36

Cohen v. Koenig, 25 F.3d 1168 (2d Cir. 1994) ......................................................35

Community Bank v. Newmark & Lewis, Inc., 534 F. Supp. 456 (E.D. N.Y. 1982) ..........22, 24

Computech Int'l, Inc. v. Compaq Computer Corp., 2004 WL 1126320, *8 (S.D.N.Y. May 21, 2004) .....................................................................................................35

Conley v. Gibson, 78 S.Ct. 99, 103, 355 U.S. 41 (1957) .......................................18

Decca Records v. Republic Recording Co., 253 F.2d 360 (6th Cir. 1956) ............15

Diversa-Graphics, Inc. v. Management & Tech. Servs. Co., 561 F.2d 725 (8th Cir. 1977) ...........................................................................................................24

Erickson v. Pardus, 127 S.Ct. 2197 (2007) ...........................................................19

General Elec. Co. v. Marvel Rare Metals Co., 287 U.S. 430, 435, 53 S.Ct. 202 (1932) ..12, 13

G-I Holdings, Inc. v. Baron & Budd, 238 F. Supp. 2d 521 (S.D. N.Y. 2001) .......32

Hugo Boss Fashions, Inc. v. Sam's European Tailoring, Inc., 293 A.D.2d 296, 742 N.Y.S.2d 1 (A.D. 1st Dept. 2002) ...................................................................14

In re Mid-West Metal Products, Inc., 13 B.R. 562 (Bankr. Kan. 1981) .................27

Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) ............................................19

Jockey Intern., Inc. v. M/V "Leverkusen Express", 217 F. Supp. 2d 447 (S.D. N.Y. 2002) ................................................................................................................12

Kinley Corp. v. Ancira, 859 F. Supp. 652 (W.D. N.Y. 1994) ...............................33

L-3 Communications Corp. v. Channel Technologies, Inc., 291 A.D.2d 276, 737 N.Y.S.2d 366, 367 (1st Dept. 2002) ...............................................................14

Lesnik v. Public Indus. Corp., 144 F.2d 968, (2d Cir. 1944) ...........................12, 13

Licensed Practical Nurses, Technicians and Health Care Workers of New York, Inc. v. Ulysses Cruises, Inc., 131 F. Supp. 2d 393 (S.D. N.Y. 2000)............................13

Maxus Leasing Group, Inc. v. Kobelco America, Inc., 2007 WL 655779 at * 5 (W.D. N.Y. 2007) ..................................................................................................31

Messina v. Mazzeo, 854 F. Supp. 116, (E.D.N.Y. 1994) ......................................19

Mylan Pharms., Inc. v. American Safety Razor Co., 265 F. Supp. 2d 635 (N.D. W.Va. 2002) ....................................................................................................18

New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG, 121 F.3d 24 (2d Cir. 1997) .............................................................................................................12, 16

Nippon Fire & Marine Ins. Co. v. M/V Spring Wave, 92 F. Supp. 2d 574 (E.D. La. 2000) ....................................................................................................17

O'Hara & Shaver, Inc. v. Empire Bituminous Products, Inc., 323 N.Y.S.2d 190 (N.Y. Co. Ct. 1971)....................................................................................................23

Palmer v. Bd. of Educ. of Cmty. Unit School Dist. 201-U, 46 F.3d 682 (7th Cir. 1995)19, 28, 29

Parker Roofing Co. v. Pacific First Fed. Sav. Bank, 59 Wash. App. 151, 796 P.2d 732, 735 (Wash. App. 1990).................................................................................24

Pioneer Comm. Funding Corp. v. United Airlines, Inc., 122 B.R. 871 (S.D. N.Y. 1991) ..........................................................................................................31

Robinson v. Kamens, 664 F. Supp. 118 (S.D. N.Y. 1987).....................................22

Sealord Marine Co., Ltd. v. American Bureau of Shippins, 220 F. Supp. 2d 260 (S.D. N.Y. 2002) ........................................................................................................13

Securities Investor Protection Corp. v. Stratton Oakmont, Inc., 234 B.R. 293 (Bankr. S.D. N.Y. 1999) ....................................................................................................27

Swierkiewicz v. Sorema N.A., 122 S.Ct. 992, 998, 534 U.S. 506 (2002)..............................18

Taylor Inv. Corp. v. Weil, 169 F. Supp. 2d 1046 (D. Minn. 2001).........................................17

TMC Co. Ltd, 2002 WL 1880722 at *1 ................................................................16

TMC Co. Ltd. v. M/V Mosel Bridge, 2002 WL 1880722 at *1 (S.D. N.Y. 2002) .................15

Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., 63 N.Y.2d 396, 472 N.E.2d 315 (1984) ....................................................................................................27

Weil, 169 F. Supp. 2d at 1061 ........................................................................17, 18

**Statutes**

N.Y. UCC § 9-102 (McKinney's 2008)....................................................22, 23, 30

N.Y. UCC § 9-106 (McKinney's 2008)....................................................................22

N.Y. UCC § 9-204(a) (McKinney's 2008) .........................................................23, 24

N.Y. UCC § 9-607 (McKinney's 2008).............................................................passim

N.Y. UCC § 9-608 (McKinney's 2008).......................................................................24

**Rules**

Fed. R. Civ. P. 8(a) ...............................................................................................passim

Fed. R. Civ. P. 8(d)......................................................................................................32

Fed. R. Civ. P. 9.....................................................................................................34, 35

Fed. R. Civ. P. 12(b)(3) ...............................................................................................12

Fed. R. Civ. P. 12(b)(6) ...............................................................................................19

**Treatises**

6 Wright, Miller & Kane, Federal Practice and Procedure, § 1424 (2007)............................12

Clark, Barkley and Barbara Clark, The Law of Secured Transactions Under The
    Uniform Commercial Code, ¶ 1.03[2] (2007) .........................................................22, 23, 24

5B Charles A. Wright and Arthur R. Miller, Federal Practice & Procedure, § 1352 at
    318-19 (3d Ed. 2004)..................................................................................................12

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DIESEL PROPS S.R.L. and
DIESEL KID S.R.L.,

        Plaintiffs/Counter-Defendants,

        vs.

GREYSTONE BUSINESS CREDIT II LLC
and GLOBAL BRAND MARKETING INC.,

        Defendants/Counter-Plaintiffs

        vs.

DIESEL S.p.A.

        Third-Party Defendant

**GREYSTONE'S OPPOSITION
TO PLAINTIFFS' AND THIRD
PARTY DEFENDANT'S
MOTIONS TO DISMISS**

Civil Action No. 07 CV 9580
(HB)

Defendant/counter-plaintiff Greystone Business Credit II, L.L.C. ("Greystone"), by its undersigned counsel, respectfully submits this Opposition to Plaintiffs' and Third-Party Defendant's Motions to Dismiss Counterclaims and Third-Party Claims of Greystone Business Credit II, LLC (collectively, the "Motions to Dismiss")[1], and states as follows:

### OVERVIEW

Greystone has pled nine counterclaims against Diesel Props ("Props"), eight counterclaims against Diesel Kid ("Kid"), and seven third-party claims against Diesel SpA ("SpA," and collectively with Props and Kid, "Diesel" or the "Diesel Entities"). The Diesel Entities have moved to dismiss all of them on the basis of a wide range of arguments regarding forum selection provisions, pleading standards, standing, and various other matters. Some of the

---

[1] Plaintiffs and SpA submitted separate Motions to Dismiss and memoranda of law. For the Court's convenience, and given the significant overlap in the relevant legal and factual issues, Greystone is submitting a single responsive brief to the two separate motions.

Diesel Entities' arguments appear to apply broadly to all of the counterclaims and third-party claims, while others are specific to particular counterclaims and third-party claims.

Greystone will respond in kind, first by addressing Diesel's general arguments in support of dismissal, <u>see</u> pp. 11-25, and later by providing a more narrowly-tailored discussion of the specific arguments against particular counterclaims and third-party claims, <u>id.</u> at pp. 25-36. For the Court's convenience, the following summary identifies the relevant pages for the discussion of each Counterclaim and Third-Party Claim:

- Pages 11-20 and 25-28 address Diesel's arguments in support of dismissal of Greystone's First Counterclaim/First Third-Party Claim.

- Pages 11-20 and 28-29 address Diesel's arguments in support of dismissal of Greystone's Second Counterclaim/Second Third-Party Claim.

- Pages 11-20 and 30 address Diesel's arguments in support of dismissal of Greystone's Third Counterclaim/Third Third-Party Claim.

- Pages 11-20 and 30 address Diesel's arguments in support of dismissal of Greystone's Fourth Counterclaim/Fourth Third-Party Claim.

- Pages 11-20 and 31-32 address Diesel's arguments in support of dismissal of Greystone's Fifth Counterclaim/Fifth Third-Party Claim.

- Pages 11-25 and 32-33 address Diesel's arguments in support of dismissal of Greystone's Sixth Counterclaim.

- Pages 11-25 and 33-34 address Diesel's arguments in support of dismissal of Greystone's Seventh Counterclaim/Sixth Third-Party Claim.

- Pages 11-25 and 32-33 address Diesel's arguments in support of dismissal of Greystone's Eighth Counterclaim.

- Pages 11-25 and 34-36 address Diesel's arguments in support of dismissal of Greystone's Ninth Counterclaim/Seventh Third-Party Claim.

## INTRODUCTION

Although the claims and counterclaims in this case arise out of a maze of contracts and relationships, the underlying issues are straightforward. For approximately ten years, Defendant Global Brand Marketing, Inc. ("GBMI") had a contractual relationship with various "Diesel" entities to design, develop, market and distribute Diesel-branded footwear in the United States. GBMI's most recent work has been governed by Distribution Agreements with Props (for the adult product line) and Kid (for the children's product line), as well as a Sourcing Agreement with Props. GBMI has had, at other times, a licensor relationship with SpA, the parent of Props and Kid.

In late October 2007, Props and Kid sued GBMI for more than $16 million (later amended to more than $20 million) that they claim is due and owing for shoes shipped to GBMI under the Distribution Agreements. Greystone is not a party to those Distribution Agreements. It is GBMI's lender. Nonetheless, perhaps believing that GBMI is judgment-proof, Props and Kid also sued Greystone on the erroneous theory that a three-way payment mechanism put in place by Greystone, GBMI and Diesel can somehow be converted into a guarantee by Greystone of GBMI's payment obligations. Props and Kid also raise conversion claims and seek injunctive relief against Greystone and GBMI relating to the disposition of certain shoes that are part of Greystone's collateral.

Greystone has no liability to Props or Kid for any debts owed by GBMI and acted well within its rights as senior secured creditor with respect to the collateral. Indeed, as between Greystone and Diesel, *Greystone* is the party that has suffered redressable harm because the Diesel Entities have unlawfully interfered with its status as senior secured creditor with a perfected security interest in all of GBMI's assets. This interference violates not only Article 9 of the Uniform Commercial Code ("UCC"), but also written agreements executed by SpA and

-3-

Kid – and binding on Props – promising not to interfere with Greystone's collection and disposition of its collateral. Greystone has thus raised four direct counterclaims and third-party claims seeking damages from Props, Kid and SpA.

Greystone also has raised five counterclaims and third-party claims arising out rights belonging in the first instance to GBMI. These claims seek damages for, *inter alia*, late and non-conforming deliveries by Props and Kid under the Distribution Agreement that destroyed GBMI's business, as well as more recent efforts by Props, Kid and SpA to take GBMI's customers and employees. Greystone has standing to pursue these claims under a UCC provision giving a secured creditor the right to enforce obligations owed to its borrower by third-parties.

Props, Kid and SpA have filed parallel Motions to Dismiss seeking the dismissal of <u>all</u> of Greystone's counterclaims and third-party claims. Their arguments in support of dismissal vary widely, but the underlying theme is narrow (and outrageous): they believe that Props and Kid should be permitted to bring more than $20 million in claims against Greystone in this forum but that Greystone should be precluded from bringing counterclaims arising out of the very same transactions and events. Their arguments fail.

<u>First</u>, Diesel argues that all of the Counterclaims and Third-Party claims must be dismissed on the basis of forum selection provisions in the Distribution Agreements and Sourcing Agreement between Props, Kid and GBMI. This argument fails for numerous reasons, including: (1) Props and Kid have waived the right to raise venue objections by asserting claims in this forum, including claims which themselves arise out of the Distribution Agreement; (2) Greystone is not a party to the Distribution Agreements or Sourcing Agreement and never agreed to be bound by the forum selection provision contained therein; (3) Only two of Greystone's Counterclaims – and none of its Third-Party Claims – even arise out of the Distribution

Agreements and Sourcing Agreement; (4) the parties effectively amended the Italian choice-of-forum provision when they agreed in a subsequent contract to litigate claims in New York; and (5) principles of judicial economy require the non-enforcement of the forum selection provisions on the few claims to which those provisions actually may apply.

Greystone's First Counterclaim provides a stark example of the absurdity of Diesel's position regarding the forum selection provisions. Props and Kid have pled a conversion claim against Greystone based on Greystone's collection and liquidation of approximately 164,000 pairs of shoes that were shipped to GBMI under the Distribution Agreement. Greystone's First Counterclaim alleges, in part, that the mere act of bringing the conversion claim violates Diesel's express, written agreement not to interfere with Greystone's collection and liquidation of its collateral. The two sides have thus raised competing claims involving the very same property, yet Diesel argues that its conversion claim should be allowed proceed in this forum while Greystone's First Counterclaim/First Third-Party Claim should be dismissed and sent to Italy. Diesel persists with this argument even though Greystone is not a party to the Distribution Agreements; Greystone's claim to the property arises out of a *different* set of contracts than the Distribution Agreements; the underlying issue is one of U.S. contract and secured transactions law; and the only contracts signed by Greystone – including ones in which Props and Kid are also signatories – contain forum selection provisions identifying *New York* as the forum for disputes. Moreover, Diesel's own conversion claims "arise out of" the Distribution Agreements and thus, if Diesel's arguments prevail, its *own* claims also would have to be dismissed and re-filed in Italy. Under these circumstances, and as discussed more fully below, the law provides absolutely no support for Diesel's position.

Second, SpA argues from the mistaken premise that it can be liable only under a "piercing the corporate veil" theory when, in fact, Greystone's claims arise out of actions

committed by SpA directly and in connection with contracts to which SpA itself is a party. Piercing theories are irrelevant.

Third, Diesel challenges Greystone's standing to raise claims on behalf of GBMI but fails to cite N.Y. UCC § 9-607(a), which expressly authorizes a secured party like Greystone to enforce the rights of its borrower against third-parties following a default. Official Comment 3 to § 9-607 makes clear that the secured party's rights "include the right to enforce claims that the debtor may enjoy against others." Further, New York law grants standing to both a secured party and its debtor in the context of claims that are subject to a security agreement. Thus, Diesel's standing arguments are entirely without merit.

Fourth, Diesel's attempt to impose a heightened pleading requirement on Greystone also is unavailing. The Federal Rules of Civil Procedure impose no obligation on Greystone to specifically identify which of Props, Kid and SpA took particular actions, provided that Greystone can allege in good faith (which it has) that actions were taken by at least *one* of those entities and in such a manner that the technical distinction between them was not apparent.

Fifth, Diesel's various other arguments in support of dismissal also fail, for reasons discussed fully below.

Ultimately, the Diesel Entities must accept this litigation as a two-way street. They cannot sue Greystone and GBMI for millions of dollars in connection with the performance of various contracts but then expect to be insulated from liability for their own wrongdoing under the same and related contracts. Instead, for the reasons set out more fully below, the Motions to Dismiss should be denied in full.

## FACTUAL BACKGROUND

Greystone is an asset-based lender with its principal place of business in New York. Answer, Counterclaims and Third-Party Complaint (hereinafter, the "Counterclaims") at ¶ 6. In 2006, Greystone began negotiating a financing arrangement with GBMI. Id. at ¶ 67. GBMI indicated to Greystone that it sought the financing arrangement because it was in the midst of financial problems and needed substantial infusions of cash and revolving loans in order to continue its business and avoid bankruptcy. Id. Greystone and GBMI ultimately entered a Loan and Security Agreement (the "Financing Agreement") dated December 4, 2006, in which Greystone agreed to make revolving loans and other credit accommodations to GBMI. Id. at ¶ 67. As part of the Financing Agreement, Greystone received a collateral assignment of a continuing security interest in virtually all of GBMI's assets, then existing or after acquired, including, *inter alia*, inventory, contract rights, rights to indemnification, goodwill and other general intangibles. Id. at ¶¶ 67, 69.

As of December 2006, the majority of GBMI's business revolved around Diesel-branded footwear. Id. at ¶ 70. For almost ten years, GBMI had worked to build the popularity of the Diesel brand in the United States footwear market, first as a licensee of SpA and later as a distributor for Props and Kid. Id. at ¶ 61. GBMI's efforts helped the Diesel brand become popular in the United States and, upon information and belief, produced substantial financial benefits to SpA, Props and Kid. Id. at ¶ 62.

Greystone knew that GBMI's business depended heavily on the Diesel relationship and therefore sought to ensure that the Diesel Entities consented to, and would not interfere with, Greystone's role as senior secured creditor. Id. at ¶ 70. SpA and Kid ultimately signed Non-Interference Agreements with Greystone in which they promised, among other things, not to "hinder or otherwise interfere with Greystone's rights and remedies under the Financing

Agreements, including the liquidation of the Collateral by Greystone or its agents after a default under the Financing Agreements." Id. at ¶ 73.  Greystone would not have entered the Financing Agreement without the execution of the Non-Interference Agreements. Id. at ¶ 74; see also Non-Interference Agreements at p. 1 ("It is a condition to the entry of the Financing Agreements by Greystone that this letter agreement is executed by you. . . .").    The Non-Interference Agreements are binding on SpA, Props and Kid alike. Id. at ¶ 143.

As of December 2006, the operative contracts between GBMI and the Diesel Entities were two Distribution Agreements between GBMI and Props and Kid, respectively, and a Sourcing Agreement between GBMI and Props.  Id. at ¶¶ 63, 65.    Under the Distribution Agreements, GBMI would purchase footwear from Props and Kid and then resell the footwear to its own customers in the United States. Id. at ¶ 63.  GBMI would make money under the Distribution Agreements by re-selling the inventory at a higher price than it paid for it. Id. at ¶ 64. Due to the seasonality of the business, GBMI's ability to make money depended heavily on accurate and timely shipping of footwear by Props and Kid. Id. at ¶ 64.

On the same date that Greystone and GBMI entered the Financing Agreement, they also entered three-way letter agreements (the "Triparty Agreements," or "TPAs") with Props and Kid. Id. at ¶ 76.    The TPAs established certain conditions under which the proceeds of GBMI's revolving loans would be paid directly to Props or Kid. Id. at ¶ 78. The terms of the TPAs were intended primarily to protect Greystone in its status as senior secured creditor, but certain provisions, if followed, also would have increased the likelihood that Props and Kid would be paid for shipments. Id. at ¶¶ 79, 80.  Props and Kid chose not to exercise those protective rights. Id. at ¶ 80.    They knew at all times that they were unsecured creditors of GBMI and that Greystone was the senior secured creditor. Id. at ¶ 81.  Greystone did not at any time intend or agree to act as a guarantor for GBMI's debts under the Distribution Agreements. Id. at ¶¶ 18, 79.

In the first weeks and months after the execution of the TPAs and Non-Interference Agreements, virtually all of the deliveries made by Props and Kid pursuant to the Distribution Agreements were late and non-conforming. Id. at ¶¶ 91, 92, 94. These late and non-conforming deliveries prevented GBMI from filling the orders of its customers, thus leading to the cancellation or renegotiation (at reduced prices) of those orders. Id. at ¶¶ 91, 92. GBMI also lost the opportunity for "sell-throughs" that occur when a style of shoe becomes popular, sells out of stores, and has to be re-ordered from GBMI. Id. at ¶ 93. Ultimately, GBMI went into default under the Financing Agreement with Greystone because it did not generate the revenue that would have been generated had Props and Kid made on-time and conforming deliveries. Id. at ¶¶ 96, 98.

Props and Kid acknowledged that they were at fault for the late and non-conforming deliveries and stated that they were committed to improving their performance. Id. at ¶¶ 99, 100. The deliveries did not substantially improve, however, and GBMI could not recover from the hole it had been placed in by Props and Kid. Id. at ¶¶ 103, 141. Ironically, in October 2007, Props and Kid purported to terminate the Distribution Agreements on account of non-payment of invoices even though it was Props and Kid that had caused the problems in the first place. Id. at ¶¶ 109, 111.

In addition to breaching the Distribution Agreements with GBMI, Props, Kid and SpA also began substantially interfering with Greystone's collection and liquidation of its collateral in October 2007. Props and Kid – acting at the direction of SpA – filed the instant lawsuit seeking control over more than 160,000 pairs of shoes in a warehouse located in Chino, California. Id. at ¶¶ 60, 116. They took control of more than 50,000 pairs of shoes in customs in Long Beach, California. Id. at ¶ 121. They contacted GBMI's customers and tried to convince them to cancel their orders with GBMI and have the orders filled by Diesel instead. Id. at ¶ 130. They refused

-9-

to ship shoes that they knew were necessary to fill orders placed by GBMI's customers. Id. They successfully solicited former GBMI employees for employment despite a provision of the Sourcing Agreement prohibiting them from doing so. Id. at ¶ 138. They refused to pay GBMI commissions due and owing under the Sourcing Agreement. Id. at ¶ 136. In short, after devastating GBMI's business, Diesel proceeded to make sure that Greystone would not come out whole, either.

Greystone has raised four direct claims against the Diesel Entities arising out of this misconduct, including the following:

- First Counterclaim/First Third-Party Claim for breach of the Non-Interference Agreements against SpA, Props and Kid;

- Second Counterclaim/Second Third-Party Claim for conversion against SpA, Props and Kid;

- Fifth Counterclaim/Fifth Third-Party Claim for unjust enrichment against SpA, Props and Kid; and

- Ninth Counterclaim/Seventh Third-Party Claim for fraud against SpA, Props and Kid.

In addition, Greystone has raised the following five claims against the Diesel Entities arising out of rights possessed by GBMI and collaterally assigned to Greystone under the Financing Agreement:

- Third Counterclaim/Third Third-Party Claim for tortious interference with business relationships against SpA, Props and Kid;

- Fourth Counterclaim/Fourth Third-Party Claim for tortious interference with contractual relationships against SpA, Props and Kid;

- Sixth Counterclaim for breach of the Distribution Agreements against Props and Kid;

- Seventh Counterclaim/Sixth Third-Party Claim for breach of an oral agreement against SpA, Props and Kid; and

- Eighth Counterclaim for breach of the Sourcing Agreement against Props.[2]

## ARGUMENT

## I.   GREYSTONE IS NOT BARRED FROM RAISING ITS COUNTERCLAIMS IN THIS FORUM.

Although Props and Kid have raised claims against Greystone seeking more than $20 million in damages, they and SpA ask this Court to shield them from Greystone's counterclaims and third-party claims arising out of the same events and transactions. Their argument rests, first, on forum selection provisions in certain contracts between Props, Kid and GBMI – **but not Greystone** – in which Italy is identified as the forum for the resolving disputes. Props, Kid and GBMI assert that these forum selection provisions require the dismissal of all of Greystone's Counterclaims and Third-Party Claims, including those claims arising out of completely separate contracts.

These arguments fail for numerous reasons, including: (1) Props and Kid have waived the right to raise venue objections; (2) by their own logic, Props' and Kid's own claims "arise out of" the Distribution Agreements and would have to be dismissed, too, if their arguments are accepted; (3) Greystone and SpA are not parties to the contracts in which the forum selection provisions are found; (4) the parties effectively modified the forum selection provisions when they entered the TPAs, which contain a forum selection provision identifying *New York* as the forum for disputes; and (5) principles of judicial economy counsel against enforcement of the forum selection provisions on the few claims to which they may actually apply.

---

[2] In addition, Greystone's Ninth Counterclaim, for fraud, is raised both on its own behalf and as assignee of GBMI's rights.

###### A.    Props and Kid Have Waived Their Venue Objections.

Props' and Kid's venue objections fail at the threshold because they waived those objections by choosing to file claims against Greystone and GBMI in this Court. In General Elec. Co. v. Marvel Rare Metals Co., 287 U.S. 430, 435, 53 S.Ct. 202, 204 (1932), the Supreme Court held that a plaintiff who brings a claim in a particular forum waives any venue objections it might otherwise have against the defendant's counterclaims. The Second Circuit has acknowledged that the holding in Marvel applies to both compulsory and permissive counterclaims. Lesnik v. Public Indus. Corp., 144 F.2d 968, 977 (2d Cir. 1944). "Plaintiff, having chosen the forum in which to bring suit, is in no position to urge that a counterclaim cannot be entertained merely because, if prosecuted as an original action, it would have to be brought in another district." 6 Wright, Miller & Kane, Federal Practice and Procedure, § 1424 (2007). Thus, this Court should not even consider Plaintiffs' venue objections.

There is nothing in Lesnik or Marvel to suggest that the existence of a forum selection provision would change the analysis. Indeed, although the Second Circuit has not definitively decided which provision of Fed. R. Civ. P. 12(b) should be used for analyzing a motion to dismiss on the basis of a forum selection provision, see New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG, 121 F.3d 24, 29 (2d Cir. 1997), many courts in this circuit have treated such a motion as one to dismiss for improper venue pursuant to Rule 12(b)(3), see, e.g., Jockey Intern., Inc. v. M/V "Leverkusen Express", 217 F. Supp. 2d 447, 450 (S.D.N.Y. 2002). So, too, have the majority of courts of appeal that have decided the issue. See Automobile Mechanics Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc., 502 F.3d 740, 746 (7th Cir. 2007) (quoting 5B Charles A. Wright and Arthur R. Miller, Federal Practice & Procedure, § 1352 at 318-19 (3d Ed. 2004) for the statement that "most of the decided cases use [Rule 12(b)(3)] as the basis" for addressing a motion to enforce a forum selection provision). Under this majority

approach, Lesnik and Marvel compel the conclusion that Props and Kid have waived their right to seek enforcement of the forum selection provisions.

A finding of waiver is particularly appropriate because the affirmative claims of Props and Kid arise out of the very Distribution Agreements in which the relevant forum selection provision is found. Props and Kid even cite heavily to the Distribution Agreements in their Amended Complaint, see Amended Complaint at ¶¶ 12, 18, 27, 29, and rely exclusively on a retention-of-title provision contained therein to support their conversion claim, see id. at ¶ 18.[3] Props and Kid cannot, on the one hand, bring affirmative claims arising directly out of the Distribution Agreements and then, on the other, argue for the dismissal of Greystone's and GBMI's claims that relate only tangentially to those same agreements. See Licensed Practical Nurses, Technicians and Health Care Workers of New York, Inc. v. Ulysses Cruises, Inc., 131 F. Supp. 2d 393, 410 (S.D.N.Y. 2000) ("By bringing suit in New York in violation of the forum selection clause, plaintiff undoubtedly has waived any right to insist on its enforcement."); cf. Caspian Invs., Ltd. v. Vicom Holdings, Ltd., 770 F. Supp. 880, 885 n.5 (S.D.N.Y. 1991) (stating that a party "appears to have waived the forum selection clause" by raising a claim in a different forum).

### B.    The Venue Objections Fail Even Without Waiver.

####     1.    Greystone and SpA Are Not Parties to the Contracts in Which the Forum Selection Provisions Are Found.

The venue objections would fail even without waiver because Greystone is not a party to the contracts that contain the forum selection provisions relied upon by SpA, Props and Kid. See Sealord Marine Co., Ltd. v. American Bureau of Shippins, 220 F. Supp. 2d 260, 270 (S.D.N.Y. 2002) (declining to enforce forum selection provision against third-party); L-3 Communications

Corp. v. Channel Technologies, Inc., 291 A.D.2d 276, 277, 737 N.Y.S.2d 366, 367 (App. Div. 2002) (same). Instead, the only agreements executed by Greystone either contain a provision identifying *New York* as the forum for resolving disputes, see TPAs at p. 3; Financing Agreement at §10.11, or else contain no forum selection provision but expressly reference the Financing Agreement, see Non-Interference Agreements at 1. Thus, Greystone clearly did not consent to Italy as the forum for resolution of *its* disputes, especially with respect to its direct claims against SpA, Props and Kid.[4]   See Hugo Boss Fashions, Inc. v. Sam's European Tailoring, Inc., 293 A.D.2d 296, 297, 742 N.Y.S.2d 1 (App. Div. 2002) (declining to enforce forum selection provision where evidence showed that party against whom enforcement was sought did not agree to that provision).

Similarly, SpA is not a party to the Distribution Agreements or Sourcing Agreement, nor are any claims under those contracts brought against SpA. See Counterclaims at Sixth and Eighth Counterclaims (raising Distribution Agreement and Sourcing Agreement claims against Kid and Props only). Thus, what SpA is asking this Court to do – apply a forum selection provision to claims in which *neither side* is a party to the contract containing that provision – is nothing short of remarkable. All seven Third-Party Claims against SpA should be permitted to proceed in this forum.

 2. The Relevant Contractual Language and Sequence of Events Reveals that SpA, Props and Kid Agreed to Litigate Claims Against Greystone in New York, Whereas Greystone Never Agreed to Litigate in Italy.

Even the claims brought on behalf of GBMI against Props and Kid (i.e., the Third, Fourth, Sixth, Seventh and Eighth Counterclaims) are not subject to the forum selection

---

[3] Indeed, as this Court undoubtedly recalls, the parties recently engaged in extensive briefing and motion practice regarding the effect of certain provisions of the Distribution Agreements. See generally Docket Entries 54-76. Diesel cannot seriously suggest that its own claims do not arise out of the Distribution Agreements.
[4] The direct include the First, Second, Fifth and Ninth Counterclaims, and First, Second, Third and Ninth Third-Party Claims.

provisions in the Distribution Agreements and Sourcing Agreement.  The Distribution Agreements and Sourcing Agreement were executed prior to the TPAs, which state that "the parties [including Greystone, Props, Kid and GBMI] submit to the jurisdiction of the state and federal courts located in New York County, New York for the resolution of disputes."  Id. at p. 3.  The word "disputes" is not qualified in the TPAs, thus indicating the parties' intention to make that provision as far-reaching as possible.  The TPAs thus effectively amended the forum selection provisions in the Distribution Agreements so that all disputes involving Greystone, GBMI and the Diesel Entities would be litigated in New York.  See TMC Co. Ltd. v. M/V Mosel Bridge, 2002 WL 1880722 at *1 (S.D.N.Y. Aug. 15, 2002) (finding that forum selection provision in later contract between parties superceded inconsistent forum selection provision in earlier contract) (quoting Decca Records v. Republic Recording Co., 235 F.2d 360, 363 (6th Cir. 1956) ("A second contract of a later date than an earlier contract containing the same subject matter, but containing terms inconsistent with the former contract, will supersede the former contract even though there is no express agreement that the new contract shall have that effect.")).

This intention is reinforced by the Non-Interference Agreements, which state, in relevant part, that SpA and Kid "hereby consent to [GBMI]'s entrance into the Financing Agreements [and agree not to] (3) hinder or otherwise interfere with Greystone's rights and remedies under the Financing Agreements."  Because the Financing Agreements contain a New York forum selection provision, SpA and Kid were effectively agreeing not to interfere with Greystone's use of this forum for the enforcement of its and GBMI's rights—including contract rights and rights to indemnification against Props, Kid and SpA.

SpA, Kid and Props weakly attempt to flip the facts by arguing that "there can be no question that Greystone was aware of the [Distribution and Sourcing] agreements at the time it

-15-

executed the Non-Interference Agreements," and therefore that Greystone effectively consented to Italy as the forum for resolving disputes. See Plaintiffs' Motion to Dismiss at 10. This position is directly contradicted as a matter of law by TMC Co. Ltd, 2002 WL 1880722 at *1. It also fails as a matter of fact because neither Greystone nor SpA ever signed an agreement identifying Italy as the forum for disputes, whereas Props and Kid both signed agreements identifying New York as the forum for disputes. See TPAs. Thus, Diesel's position fails on both the law and the facts.

In any event, the question of what Greystone knew or did not know at the time it entered the Non-Interference Agreements is a question of fact. At this stage in the litigation, it is well-established that the Court must resolve all factual questions in favor of the (counter)plaintiff, including disputed facts surrounding the appropriate application of a forum selection provision. See New Moon, 121 F.3d at 29 ("[A] party seeking to avoid enforcement of such a [forum selection] clause is also entitled to have the facts viewed in the light most favorable to it, and no disputed fact should be resolved against that party until it has had an opportunity to be heard."). Thus, even if there were a shred of plausibility in the Diesel Entities' version of the facts, Greystone's (and GBMI's) counterclaims still would survive a motion to dismiss.

Finally, there is a telling flaw in the way that Props, Kid and SpA purport to use the forum selection provisions in the Distribution Agreements and Sourcing Agreement. They argue that the language of the forum selection provisions is broad and therefore even tort claims, fraud claims, and contract claims arising out of *separate* agreements are governed by the forum selection provisions. See Plaintiffs' Motion to Dismiss at 10. Under this interpretation, however, even Props' and Kid's *own* claims against Greystone would be subject to the forum selection provision in the Distribution Agreement; yet, those claims were raised in this forum. The reason Props and Kid raised their claims here is obvious: once Greystone entered the picture, the parties

-16-

intended and agreed for resolution of disputes in New York courts.  It is disingenuous for Props and Kid to now turn their backs on that intent.

         3.    <u>Principles of Judicial Economy Also Support the Adjudication of Counterclaims in this Forum.</u>

In addition to the reasons stated above, there are indisputable practical reasons for allowing Greystone and GBMI to pursue their counterclaims in this forum.  The litigation involving GBMI's alleged non-payment of invoices, Greystone's liability or non-liability for the same, and the ownership of the shoes in Chino, California, will proceed in this forum whether Greystone's counterclaims are dismissed or not.  Thus, the vast majority of the issues raised in the counterclaims will be litigated here as affirmative defenses, at the very least, under any circumstances.  Greystone and GBMI will argue, for example, that the damages caused by Diesel's late and nonconforming deliveries must offset any unpaid invoices under the Distribution Agreements and TPAs.  <u>See</u> Answer at ¶ 52 ("Plaintiffs' claims are subject to offset as a result of their breaches of the Distribution Agreements and other contracts with GBMI and Greystone.").  It would make no sense to have this and other issues litigated in two separate courts at the same time.  <u>See</u> <u>Taylor Inv. Corp. v. Weil</u>, 169 F. Supp. 2d 1046, 1061 (D. Minn. 2001) (declining to enforce forum selection provision where adjudication in a different district would waste parties' and court's resources); <u>Nippon Fire & Marine Ins. Co. v. M/V Spring Wave</u>, 92 F. Supp. 2d 574, 577 (E.D. La. 2000) (declining to enforce forum selection provision where the issues would be litigated before court either way).

Courts in the Second Circuit and elsewhere have recognized that an exception arises to the enforcement of forum selection provisions when principles of judicial economy so warrant. <u>Caspian</u>, 770 F. Supp. at 885 n.5.  Where, as here, the forum selection provisions apply, at most, only to a small subset of the overall claims in the case, the consideration of principles of judicial

economy seems especially appropriate. Mylan Pharms., Inc. v. American Safety Razor Co., 265 F. Supp. 2d 635, 639 (N.D.W.Va. 2002) (declining to enforce forum selection clause that affected only a cross-claim where the effect would be parallel litigation between the same parties). Weil, 169 F. Supp. 2d at 1061 (holding that enforcement of forum selection provision would be "unreasonable and unjust" where clause would dismiss only a portion of the pending lawsuit). Thus, principles of judicial economy also support denial of the Motions to Dismiss.

## II.    GREYSTONE'S PLEADINGS ARE MORE THAN SUFFICIENT UNDER THE NOTICE PLEADING STANDARDS OF THE FEDERAL RULES OF CIVIL PROCEDURE.

Greystone's Counterclaims go into considerable detail to describe the actions of SpA, Props, and Kid that give rise to the counterclaims and third party claims. Indeed, Greystone included more than one hundred paragraphs of factual allegations in its Counterclaims. These paragraphs carefully describe Greystone and GBMI's history with the Diesel Entities, the Diesel Entities' contractual obligations to Greystone and GBMI, and the actions that constitute breaches of contract and tortious conduct. With these detailed factual allegations, Greystone has far exceeded its obligation under Rule 8(a) of the Federal Rules of Civil Procedure. See Swierkiewicz v. Sorema N.A., 122 S.Ct. 992, 998, 534 U.S. 506, 512 (2002) ("[A] statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests'") (quoting Conley v. Gibson, 78 S.Ct. 99, 103, 355 U.S. 41, 47 (1957)).

Nonetheless, in an argument that is apparently intended to apply to all of Greystone's Counterclaims and Third-Party Claims, the Diesel Entities contend that Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007), requires Greystone to specify which of the alleged actions was taken by which of the Diesel Entities. See Plaintiffs' Motion to Dismiss at 12. They do not identify any particular language from Twombly creating such a pleading obligation, nor

do they cite any other precedent for the point.    Thus, it seems to represent their novel interpretation of Twombly, and nothing more.  This novel argument fails.

Just two weeks after deciding Twombly, the Supreme Court reiterated the routine and unremarkable proposition that Rule 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'  *Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.*'"  Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007) (emphasis added); see also Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (holding that Twombly did not create a universal standard of heightened fact pleading).  Thus, Diesel's attempt to interpret Twombley as creating some new and heightened pleading standard is unavailing.  Under the notice pleading standard, Greystone's hundreds of factual allegations certainly satisfy the "fair notice" and "plausibility" requirements.

"The Federal Rules, as illustrated by Rule 8(a), do not require that plaintiff set out a defendant's precise role in the injurious conduct."  Messina v. Mazzeo, 854 F. Supp. 116, 126 (E.D.N.Y. 1994).  In Messina, the Court denied defendants' motion to dismiss where plaintiff made allegations of excessive force against several police officers who were defined collectively in the complaint as "defendant Police Officers."  Id. at 125-26.  The Court emphasized that defendants had been "put on notice as to the nature of the allegations against them," and therefore plaintiff had satisfied the notice-pleading standard.  Id. at 126.  Like the defendants in Messina, Props, Kid and SpA clearly have been "put on notice."

The Federal Rules require nothing more.  Indeed, "[i]f the complaint cannot survive a motion under Rule 12(b)(6) until each person's role is known . . . it may be impossible as a practical matter to obtain complete relief."  Palmer v. Bd. of Educ. of Cmty. Unit School Dist. 201-U, 46 F.3d 682, 688 (7th Cir. 1995) (holding that plaintiff's complaint satisfied Fed. Civ.

P. 8(a) where the plaintiff grouped nine defendants together for purposes of the allegations). This is especially true when, as here, the (counter)defendants are related companies operating under a single "Diesel" banner, and the technical distinction between them was often not observed in day-to-day dealings.  For example, it is simply impossible for Greystone to know without the benefit of discovery which particular Diesel entity was acting when a representative of "Diesel" (generically) arranged to obtain control over certain shoes in Long Beach, California, that were subject to Greystone's senior perfected security interest.  See Counterclaims at ¶ 126. The Diesel Entities are thus asking this Court to impose a pleading standard that does not exist.

Separately, SpA alleges that Greystone has not adequately set forth the elements for piercing the corporate veil.  This argument is a red herring, as Greystone has not raised a veil piercing argument against SpA.  SpA personally entered the Non-Interference Agreement with Greystone and personally breached that contract and committed other torts against Greystone and GBMI.  Greystone seeks to hold SpA directly accountable for its actions without resort to piercing theories.

## III.   THE UCC GIVES GREYSTONE STANDING TO RAISE CLAIMS ON BEHALF OF GBMI, ITS DEBTOR.

### A.      Section 9-607 of the New York UCC Defeats Diesel's Arguments.

The Diesel Entities offer a variety of arguments for why, in their view, Greystone does not have standing to assert claims on behalf of GBMI.  See generally Plaintiffs' Motion to Dismiss at 17-21.  Those arguments collapse in the face of UCC § 9-607(a), which states:

> [A]fter default, a secured party: . . . (3) may enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor or other person obligated on the collateral.

New York U.C.C. § 9-607(a)(3) (McKinney's 2008).  Official Comment No. 3 states further:

> The scope of this section is broader than that of former Section 9-502.  It applies not only to collections from account debtors and obligors on instruments but also to enforcement more generally against all persons obligated on collateral.  It explicitly provides for the secured party's enforcement of the debtor's rights in respect of the account debtor's (and other third parties') obligations and for the secured party's enforcement of supporting obligations with respect to those obligations. . . . *The rights of a secured party under subsection (a) include the right to enforce claims that the debtor may enjoy against others.*  For example, the claims might include a breach-of-warranty claim arising out of a defect in equipment that is collateral or a secured party's action for an injunction against infringement of a patent that is collateral.

(emphasis added).

The counterclaims and third-party claims brought by Greystone on behalf of GBMI fit well within this provision and are analogous to the breach of warranty and patent infringement claims described in the Official Comment.  Greystone's right to bring the Third and Fourth Counterclaims/Third-Party Claims, for tortious interference, arises out of its security interest in GBMI's goodwill, contract rights and commercial tort claims.  The right to bring the Sixth, Seventh, and Eighth Counterclaims/Sixth Third-Party Claim, for breach of the Distribution Agreements, oral agreement, and Sourcing Agreement, arises out of Greystone's security interest in GBMI's contract rights and rights to indemnification.  Finally, the right to bring the Ninth Counterclaim/Seventh Third-Party Claim, for fraud, arises out of Greystone's security interest in GBMI's general intangibles, including goodwill.  Like the breach of warranty and patent infringement claims, these Counterclaims/Third-Party Claims seek to remedy harm caused by Diesel to some component of Greystone's collateral.

Section 9-607 also defeats the Diesel Entities' overarching argument that Greystone is only a "collateral" assignee and cannot bring claims belonging to GBMI.  See Plaintiffs' Motion to Dismiss at 17-18.  Official Comment No. 6 disposes of this argument in short order, stating:

"[i]t is not necessary for a secured party first to become the owner of the collateral pursuant to a disposition or acceptance." See also Community Bank v. Newmark & Lewis, Inc., 534 F. Supp. 456, 460 (E.D.N.Y. 1982) (rejecting defendant's argument that secured creditor lacked standing because no "formal" assignment had taken place). Indeed, "[u]nder New York law, where there has been a partial assignment, such as an assignment for collection, the assignor and assignee each retain an interest in the claim and are both real parties in interest." Robinson v. Kamens, 664 F. Supp. 118, 120 (S.D.N.Y. 1987).

**B.    The Case Relied Upon Heavily by Diesel Does Not Change the Effect of N.Y. UCC § 9-607.**

The revision of § 9-607 and other changes to the UCC demonstrate that the holding of Capital Nat'l Bank of New York v. McDonald's Corp., 625 F. Supp. 874 (S.D.N.Y. 1986) has no continuing viability.[5] Plaintiffs and SpA cite Capital for the proposition that a chose in action must be "sufficiently choate" in order to be assigned as part of a security interest in "general intangibles." See id. at 879. That aspect of the holding in Capital was based, however, entirely on a statement in the Official Comment to N.Y. UCC § 9-106 (now § 9-102) that no longer exists. At the time Capital was decided, the Official Comment to then-§ 9-106 stated that "general intangibles" are "miscellaneous contractual rights and other personal property **which are used or may become customarily used as commercial security**" (emphasis added). Relying solely on the bolded language, the court held that causes of action not in existence at the time a security interest is created are not "*customarily* used as commercial security" (emphasis in original), and therefore were not assigned to the secured party under the loan agreement. Capital, 625 F. Supp. at 879.

---

[5] The holding in Capital was dubious even at the time it was decided. A leading commentator on the UCC describes it as "off base" and inconsistent with the intent and purpose of UCC Article 9. See Clark, Barkley and Barbara Clark, The Law of Secured Transactions Under The Uniform Commercial Code, ¶ 1.03[2] (2007).

The Official Comment to § 9-102 no longer limits the definition of "general intangibles" to contractual rights and other personal property "which are used or may become customarily used as commercial security." Instead, Official Comment 5.B now broadly states that "'[g]eneral intangible' is the residual category of personal property, including things in action, that is not included in the other defined types of collateral." The removal of the language on which the Capital court exclusively relied demonstrates that the holding of that case is no longer viable under the Revised UCC. See Clark, Barkley and Barbara Clark, The Law of Secured Transactions Under The Uniform Commercial Code, ¶ 1.03[2] (2007) ("There is no justification for excluding future lawsuits as collateral, given the broad catch-all definition of general intangibles in [UCC § 9-102].").

This conclusion is reinforced by N.Y. UCC § 9-204(a), which states that "a security agreement may create or provide for a security interest in after-acquired collateral." According to Official Comment No. 2, "[s]ubsection (a) makes clear that a security interest arising by virtue of an after-acquired property clause is no less valid than a security interest in collateral in which the debtor has rights at the time value is given." See also O'Hara & Shaver, Inc. v. Empire Bituminous Products, Inc., 323 N.Y.S.2d 190, 192 (Co. Ct. 1971) ("It is now well settled law that under s 9-108 and s 9-204 the secured party has a continuing security interest in the present AND FUTURE inventory of his debtor and that his lien prevails over a subsequent judgment creditor who levied prior to the secured party taking possession of the collateral.") (emphasis in original). In the instant case, Greystone is exercising its security interest over after-acquired "general intangibles" – i.e., causes of action. See Financing Agreement at ¶ 3.1 (granting Greystone a security interest in property "now or hereafter owned, existing, acquired or arising"). The application of Capital urged by the Plaintiffs and SpA would deprive Greystone of this security interest and effectively read § 9-204(a) out of the UCC altogether. Surely this is not the proper

result. See Clark, The Law of Secured Transactions, ¶ 1.03[2] ("[I]t is in the very nature of general intangibles that they may not be identifiable at the time of the assignment. Most courts allow the security interest to attach to the after-acquired property even in the absence of a specific intent."); see also Community Bank, 534 F. Supp. at 460 (holding that secured party had right to enforce payment on after-acquired invoices).

Because the interpretation of Capital urged by Plaintiffs and SpA is based entirely on language no longer found in the Official Comment to the UCC, would require this Court to read § 9-204(a) out of the UCC, and would violate the clear intention of § 9-607 to broaden the scope of rights of secured creditors, it should be rejected. See Parker Roofing Co. v. Pacific First Fed. Sav. Bank, 59 Wash. App. 151, 157, 796 P.2d 732, 735 (Wash. App. 1990) (refusing to follow the holding of Capital and describing it as "an example of the reasoning the U.C.C. after-acquired property provisions rejected").

The Diesel Entities also cite Capital for the proposition that Greystone may only raise claims as assignee of GBMI to the extent of GBMI's outstanding liability on the Financing Agreement. This may very well be so, but it is not a reason to dismiss the case, nor does Capital suggest otherwise. 625 F.Supp. at 879. Instead, at most, this point affects the distribution of the proceeds once the case is finished – an issue already addressed by the UCC. See N.Y. UCC § 9-608 (governing application of proceeds).

Similarly, dismissal is not appropriate simply because Greystone and GBMI raise the same claims. It is certainly plausible that Greystone and GBMI would recover more than enough to satisfy GBMI's outstanding debt under the Financing Agreement, thus potentially entitling GBMI to the surplus. See Diversa-Graphics, Inc. v. Management & Tech. Servs. Co., 561 F.2d 725, 727 (8th Cir. 1977) (applying New York law) (holding that a secured creditor and a borrower each have standing to assert choses in action collaterally assigned as security under a

loan agreement). Given the plausibility of this outcome, there is no basis for dismissal at this stage of the case.

## IV. EACH COUNTERCLAIM RAISED BY GREYSTONE SURVIVES PLAINTIFFS' AND SPA'S OTHER ARGUMENTS IN SUPPORT OF THEIR MOTION TO DISMISS.

### A. Plaintiffs and SpA Have Failed to Establish Any Basis For Dismissing Greystone's First Counterclaim/First Third-Party Claim for Breach of the Non-Interference Agreements.

Greystone's First Counterclaim/First Third-Party Claim seeks damages against Props, Kid and SpA for breach of the Non-Interference Agreements, in which SpA and Kid promised, *inter alia*, not to "hinder or otherwise interfere with Greystone's rights and remedies under the Financing Agreements, including the liquidation of the Collateral by Greystone or its agents after a default under the Financing Agreements." See Non-Interference Agreements at p.1. Greystone alleges that Props, Kid and SpA have breached the Non-Interference Agreements by filing this action, interfering with Greystone's collection and disposition of its collateral, breaching various agreements between GBMI and Props or Kid, interfering with GBMI's contractual and business relationships, and soliciting GBMI's employees. See Counterclaims at ¶ 146.

Greystone clearly has standing to raise this claim because it arises out of contracts to which Greystone itself is a party and seeks a remedy for harm suffered by Greystone personally. Moreover, as discussed more fully above, the Diesel Entities' attempt to apply the forum selection provision in the Distribution Agreements is unavailing because: (1) this claim arises out of a wholly separate contract; and (2) Greystone is not a party to the Distribution Agreements anyway and did not agree to be bound by their terms.

### 1. Greystone Has Stated a Claim Against Kid.

Contrary to Kid's assertion, Greystone has stated plenty of "allegations of actionable wrong by Kid" in connection with the First Counterclaim. Motion to Dismiss at 14. Paragraph

119 of Greystone's Counterclaims provides a particularly compelling example. It states that "[t]he Diesel Entities [defined to include Kid] have interfered and continue to interfere with Greystone's rights in the Gilbert West Shoes *through the filing and prosecution of this action*, including the request for temporary and permanent injunctive relief" (emphasis added). Plaintiffs cannot seriously suggest that Kid – whose name is on pleadings, motions and other papers – did not participate in "the filing and prosecution of this action."

This example alone is sufficient to sustain Greystone's First Counterclaim against Kid. When combined with all the other allegations against the "Diesel Entities," the sufficiency of the pleading is overwhelming. This Court should therefore deny Plaintiffs' motion as to Greystone's First Counterclaim against Kid.

> 2.     Greystone Has Stated a Claim Against Props.

Plaintiffs argue that Props did not sign the Non-Interference Agreement and therefore is not bound by its terms. Greystone's counterclaims allege, however, that "the letter signed by Props' parent, Spa, also is binding on Props, and that Spa cannot circumvent its obligations by acting through one of its subsidiaries." Answer at ¶ 15. Greystone has further alleged that "[t]he purpose of the Non-Interference Agreements was to ensure that the Diesel Entities [defined to include Props] would not interfere with Greystone's rights as senior secured creditor to GBMI" and that "Greystone would not have entered the Financing Agreement without the agreement of the Diesel Entities not to interfere with Greystone's collateral or its liquidation of the collateral in the event of [default]." Id. at ¶ 74.

Greystone thus has alleged that the parties *intended* for Props to be bound by the Non-Interference Agreement. This is sufficient to survive a motion to dismiss. See Atlas Die Casting, Inc. v. Lendino, 49 A.D.2d 917, 374 N.Y.S.2d 35 (App. Div. 1975) (holding that the question of who is bound by a contract is a question of fact); In re Mid-West Metal Products,

Inc., 13 B.R. 562 (Bankr. Kan. 1981) (binding subsidiary to contract that contained only parent's name where parties intended for subsidiary to be bound). Indeed, the language of the Non-Interference Agreements demonstrates the parties' intention to bind Props. They state, in relevant part, that SpA will not "create, assert or possess any . . . retentions of title or similar rights on the assets of [GBMI]." SpA possesses no retention-of-title rights against GBMI and was not in an ongoing contractual relationship with GBMI. Thus, this provision clearly must have been referring to retention-of-title rights held by SpA's wholly-owned subsidiary, Props. Any other interpretation would render the entire provision meaningless. See Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., 63 N.Y.2d 396, 403, 472 N.E.2d 315, 318 (1984) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless.").

Moreover, although Greystone need not pierce the corporate veil in order to establish liability against Props, Greystone's allegations are sufficient to support a veil-piercing theory.[6] Greystone alleges that SpA "supervised and directed the actions of Diesel Props and Diesel Kid" at all relevant times, see Counterclaims at ¶ 60, and is attempting to use Props to circumvent contractual restrictions on SpA itself, see id. at 15. If proven, such allegations could plausibly give rise to liability against Props on an alter ego or instrumentality theory. See Securities Investor Protection Corp. v. Stratton Oakmont, Inc., 234 B.R. 293, 323 (Bankr. S.D.N.Y. 1999) (recognizing that New York law allows for reverse piercing of the corporate veil and stating that in the reverse-piercing context, "the domination requirement of the traditional [piercing] test needs to be relaxed in favor of finding a control relationship between the parent and subsidiary"). Indeed, Greystone has effectively alleged, and need only establish, that SpA exercised control

---

[6] Technically, it would be "reverse" veil-piercing because it would involve holding a subsidiary liable for the obligations and actions of its parent.

over Props with respect to the transactions at issue so as to perpetrate fraud or wrong against Greystone. Id.; Counterclaims at ¶¶ 15, 60. Thus, for multiple reasons, Greystone has stated a cause of action against Props under the Non-Interference Agreement.

3.     Greystone Has Stated a Claim Against SpA.

SpA asserts that "none of the factual allegations asserted in support of this [first] claim relate to conduct alleged to have been taken by SpA." SpA's Motion to Dismiss at 22. This assertion is patently false. Greystone alleges that SpA "supervised and directed the actions of Diesel Props and Diesel Kid" at all relevant times, Counterclaims at ¶ 60, and that SpA is attempting to use Props to circumvent contractual restrictions on SpA itself, id. at 15. Greystone further alleges a multitude of actions taken by the "Diesel Entities," a term defined to include SpA. Thus, Greystone has clearly satisfied the pleading requirements of Fed. R. Civ. P. 8(a) for stating a claim against SpA under the Non-Interference Agreements. See Palmer, 46 F.3d at 688.

**B.     Plaintiffs and SpA Have Failed to Establish Any Justifiable Basis For Dismissing Greystone's Second Counterclaim/Second Third-Party Claim, for Conversion.**

Greystone's Second Counterclaim/Second Third-Party Claim is a conversion claim arising out of the Diesel Entities' assertion of control over shoes in which Greystone, as senior secured creditor, had priority. With the exception of the forum selection argument, addressed above, Props does not even attempt to argue that the conversion claim against it should be dismissed.

Kid and SpA raise essentially the same argument in support of dismissal: that the Counterclaims do not specifically allege any wrongdoing by either of those parties individually, but rather lump all three Diesel companies together under the term, "Diesel Entities." As discussed above, however, there is nothing improper about Greystone's allegations, given that SpA, Kid and Props are related companies operating under a single "Diesel" banner. Indeed,

-28-

Greystone knows only that someone representing "Diesel" presented bills of lading to the customs agent in late October 2007 and induced the agent to release the shoes. Requiring Greystone to identify the correct Diesel entity (or entities, since a person could certainly act on behalf of more than one) at this stage of the case would turn the litigation process on its head. See Palmer, 486 F.3d at 688. The Federal Rules do not impose such a severe pleading burden on a (counter)plaintiff. Id.

SpA raises a number of additional fallacious arguments in support of its motion to dismiss the Second Third-Party Claim. SpA asserts, for example, that "it is clear from the documents referred to in Greystone's and GBMI's pleadings . . . that Mezzasoma was Managing Director of Props and had no relationship with Kid and SpA." SpA's Motion to Dismiss at 12 (emphasis in original). Greystone concedes no such thing, nor is such a conclusion "clear" from the referenced documents. Instead, Greystone believes, and it is certainly plausible to conclude from the pleadings, that Mezzasoma was acting on behalf of more than one of the Diesel Entities at the time of the relevant events. Greystone should at the very least have the opportunity to take discovery on this factual issue.

Similarly, SpA asserts that "Greystone and GBMI do not identify any representatives of SpA that were responsible for the alleged conversion of the Long Beach Shoes . . . ." SpA's Motion to Dismiss at 12. This is both wrong – the phrase "Diesel Entities" is defined to include SpA, and SpA is further alleged to have "supervised and directed the actions of Diesel Props and Diesel Kid" – and irrelevant. Rule 8(a), does *not* place such an onerous pleading obligation on a (counter)plaintiff. It is enough that SpA has been given "fair notice" of the claims against it.

-29-

**C.** **Plaintiffs and SpA Have Failed to Establish Any Justifiable Basis for Dismissing Greystone's Third Counterclaim/Third Third-Party Claim, For Tortious Interference With Business Relationships, and Fourth Counterclaim/Fourth Third-Party Claim, For Tortious Interference With Contracts.**

The Third and Fourth Counterclaims, for tortious interference with business relationships and tortious interference with contracts, provide perfect examples of the application of Revised N.Y. UCC § 9-607. Greystone holds a security interest in, among other things, GBMI's goodwill and contract rights. Greystone has alleged, as collateral assignee under the Financing Agreement, that the actions of the Diesel Entities have injured or destroyed that goodwill and those contract rights. See Counterclaims at ¶¶ 155, 159. This is exactly what § 9-607(a) permits secured creditors to do, as evidenced by the close parallel between these tortious interference claims and the patent infringement and warranty claims used as examples in the Official Comment to § 9-607(a). Thus, Greystone clearly has standing to bring claims against the Diesel Entities for tortious interference with business relationships and tortious interference with contracts.

In addition, the tortious interference claims may be "commercial tort claims," which are specifically contemplated by the UCC. See N.Y. UCC § 9-102(a)(13). Plaintiffs and SpA argue that the tort claims were not "sufficiently choate" at the time the security interest was created, and thus were not assigned. This argument is based, however, on a case that is no longer viable in light of revisions to the UCC. See supra, Section III. Moreover, Greystone amended its Financing Agreement with GBMI to include specific reference to the commercial tort claims at issue in this case. Thus, Greystone has a security interest in those tort claims and the right to pursue them. See § 9-607(a).

> **D.    Plaintiffs and SpA Have Failed to Establish Any Justifiable Basis For Dismissing Greystone's Fifth Counterclaim/Fifth Third-Party Claim, For Unjust Enrichment.**

Because Greystone's Fifth Counterclaim is raised on its own behalf, Plaintiffs and SpA do not ask for dismissal on account of standing. They do, however, argue that the claim should be dismissed because Greystone has alleged the existence of written contracts – in particular, the Distribution Agreements and Sourcing Agreement – governing the same conduct.

This argument misunderstands the nature of the Fifth Counterclaim and the triangular relationship between Diesel, GBMI and Greystone. The Distribution Agreement and Sourcing Agreement claims are raised by Greystone for injuries suffered directly by GBMI. The unjust enrichment claim, by contrast, is for injuries suffered directly by *Greystone*. Thus, it is plausible that a set of facts would be proven in which Props and Kid avoid liability as against GBMI (perhaps because they possess some offset right), but are nonetheless unjustly enriched as against Greystone because they have denied Greystone its rights as senior secured creditor. See, e.g., Pioneer Comm. Funding Corp. v. United Airlines, Inc., 122 B.R. 871, 881-84 (S.D.N.Y. 1991) (describing circumstances in which a third-party may possess offset rights against the borrower but not against the secured lender); see also Maxus Leasing Group, Inc. v. Kobelco America, Inc., 2007 WL 655779 at * 5 (W.D.N.Y. 2007) (denying motion to dismiss unjust enrichment claim where existence of governing contract was a disputed issue).

The Diesel Entities' appropriation of GBMI's $16 million worth of Fall/Winter 2008 orders provides just one of many examples. Props and Kid may argue that the appropriation of those orders does not give rise to damages to GBMI because such damages have to be offset against unpaid invoices under the Distribution Agreements. Props and Kid may not, however, have any similar offset right against Greystone, the party with a senior perfected security interest in GBMI's contract rights, customer lists and goodwill. See Pioneer, 122 B.R. at 881-84. Thus,

even if Props and Kid can establish that they have no liability to GBMI, their actions still may interfere with Greystone's collateral in such a way as to give rise to direct liability to Greystone.

It is no defense for Props and Kid to argue that there is overlap between this counterclaim and Greystone's First Counterclaim, for breach of the Non-Interference Agreements.  Both Props and Kid have argued for a limited interpretation of the Non-Interference Agreements that, if accepted, might preclude Greystone from recovering thereunder for Diesel's appropriation of the benefits of GBMI's work.  That does not mean that Props and Kid have no liability; indeed, even without the Non-Interference Agreements, the law contemplates recovery by a secured party when a third-party wrongfully takes control of property over which the secured party has senior position.  See Bank of India v. Weg & Myers, P.C., 257 A.D.2d 183, 191, 691 N.Y.S.2d 439, 445 (1st Dept. 1999) ("The secured party's right to possession of the collateral upon default may be asserted against a third party in possession, which may not properly refuse upon the secured party's request for delivery.").  Greystone is thus asserting its unjust enrichment claim in the alternative, and is well within its rights to do so.  See Fed. R. Civ. P. 8(d); G-I Holdings, Inc. v. Baron & Budd, 238 F. Supp. 2d 521 (S.D. N.Y. 2001) (permitting claims in the alternative where the failure of one claim would not necessarily mean that the other had failed, too).

> **E.    Plaintiffs Have Failed to Establish Any Justifiable Basis For Dismissing Greystone's Sixth and Eighth Counterclaims, For Breach of the Distribution Agreements and Sourcing Agreement.**

The only arguments advanced by Props and Kid in support of dismissal of the Sixth Counterclaim and Eighth Counterclaims, for breach of the Distribution Agreements and Sourcing Agreements. are standing and venue objections.  As discussed more fully above, those arguments fail because: (1) Greystone has standing under UCC § 9-607(a); (2) the forum selection provision in the Distribution Agreements was amended by the forum selection provision in the TPAs; (3) Props and Kid have waived the right to raise the forum selection provision as a defense,

-32-

especially where their own claims arise out of the Distribution Agreements; and (4) principles of judicial economy weigh against the enforcement of the forum selection provision in the Distribution Agreements or Sourcing Agreement.

### F.    Plaintiffs and SpA Have Failed to Establish Any Justifiable Basis for Dismissing the Seventh Counterclaim/Sixth Third-Party Claim, for Breach of Oral Agreement.

Greystone's Seventh Counterclaim/Sixth Third-Party Claim arises out of an oral promise made by Luigi Mezzasoma, on behalf of the Diesel Entities, to release shoes sitting in customs in Long Beach, California, to GBMI so that GBMI could use them to fulfill customer orders. Other than the venue and standing arguments discussed above, the only arguments made by the Diesel Entities in support of dismissal of the Seventh Counterclaim/Sixth Third-Party Claim are that: (1) the Distribution Agreements prohibit oral modification; (2) no consideration is alleged; and (3) Mezzasoma acted only on behalf of Props.

The first argument fails because Props and Kid purport to have terminated the Distribution Agreements as of the very date of the promise made by Mezzasoma. See Amended Complaint at ¶ 26; Answer at ¶¶ 26, 111. Thus, any prohibition on oral modifications contained in those Agreements would have no effect on this particular oral promise.

The second argument fails because Greystone alleges in ¶ 121 of its Counterclaims that "GBMI paid customs and demurrage charges for [the Long Beach Shoes], with funds provided by Greystone." This payment is more than enough by way of consideration to permit a claim for breach of contract to proceed. Kinley Corp. v. Ancira, 859 F. Supp. 652, 657 (W.D.N.Y. 1994) ("A benefit to a promisor or a detriment to the promisee is sufficient consideration for a contract.").

The third argument is purely factual and not appropriate for resolution on a motion to dismiss. Greystone flatly denies the Diesel Entities' assertion that "it is clear from the documents

referred to in Greystone's pleading that Mezzasoma acted on behalf of Props and that other individuals acted on behalf of Kid and SpA." Plaintiffs' Motion to Dismiss at 23. Greystone expects the evidence to show that Mezzasoma acted at the direction of SpA, see Counterclaims at ¶ 60, and, at least at certain times, on behalf of all three Diesel Entities, id. at ¶ 173. Kid cannot close off such a theory prior to discovery even being taken.

### G.  Plaintiffs and SpA Have Failed to Establish Any Justifiable Basis for Dismissing the Ninth Counterclaim/Seventh Third-Party Claim, for Fraud.

The Diesel Entities correctly observe that Greystone's Ninth Counterclaim seeks damages for fraud perpetrated against both Greystone and GBMI, and for which Greystone and GBMI suffered separate injuries. Greystone alleges that Diesel fraudulently induced it to forebear under the Financing Agreement instead of foreclosing on its collateral, thus allowing GBMI to continue obtaining orders and developing customer relationships that Diesel would ultimately appropriate as its own. See Counterclaims at ¶¶ 100, 186. Greystone suffered because it ended up losing money on the loan that would not have been lost had it foreclosed sooner. Id. at 186. GBMI suffered because it invested millions of dollars to continue developing and marketing Diesel-branded shoes, only to have the Diesel Entities swoop in and steal the orders and customer relationships for themselves. See id. at ¶¶ 54, 113, 186.

Greystone addresses, above, the standing and venue objections to the Ninth Counterclaim. The Diesel Entities other arguments are that Greystone: (1) has not satisfied the heightened pleading requirement of Rule 9(b); (2) has asserted only statements of intention or opinion; (3) is simply restating its contract claims under the guise of "fraud"; (4) cannot establish reasonable reliance on the representations; and (5) has not alleged any fraud committed specifically by Kid.

The first argument fails because Greystone's allegations are sufficiently specific to satisfy Rule 9. Paragraph 99, in particular, alleges the name of the speaker (Mezzasoma), time and place ("an email dated January 25, 2007"), and content (statements regarding the Diesel Entities' culpability for late and non-conforming deliveries and commitment to improve performance in the future) of a fraudulent statement. Similarly, paragraph 123 alleges the speaker (Mezzasoma), time and place (on or about October 4, 2007, to GBMI's Chief Executive Officer, Sudeepto Datta), and content (the Diesel Entities' willingness to deliver bills of lading) of a different fraudulent statement. Parts of the fraudulent scheme also are specifically alleged in paragraphs 109 (describing a letter dated September 4, 2007) and 111 (describing a letter dated October 17, 2007), and more generally throughout the remainder of the pleading. These allegations are sufficient under Rule 9. See Cohen v. Koenig, 25 F.3d 1168, 1173 (2d Cir. 1994) (holding that plaintiffs satisfied Rule 9(b) where they alleged who made the false statements and when and where the statements were made).

Diesel's second and third arguments fail because Greystone has alleged more than mere statements of opinion or intention, and more than mere breach of contract claims. The January 25, 2007, email, for example, contains statements of fact regarding the Diesel Entities' admission of culpability for late deliveries, ability to improve those deliveries, and willingness to help GBMI overcome the financial consequences. See Counterclaims at ¶¶ 99, 185. If Greystone proves that the Diesel Entities in fact knew that they did not have the ability to deliver shoes on time, or that they were not actually willing to help GBMI overcome the financial consequences of the late and non-conforming deliveries, then Greystone will have proven the misrepresentation element of a fraud claim. Cohen, 25 F.3d at 1172 ("[A] relatively concrete representation as to a company's future performance, if made at a time when the speaker knows that the represented level of performance cannot be achieved, may ground a claim of fraud."); Computech Int'l, Inc.

-35-

v. Compaq Computer Corp., 2004 WL 1126320, *8 (S.D.N.Y. May 21, 2004) ("[A] failure to perform promised future acts can serve as the basis for a fraud claim where a party establishes that there was an intent not to perform existing at the time that the promise was made."). Moreover, Greystone alleges that the specified representations, among others, were made with the intent to induce Greystone to continue lending to GBMI. Id. at ¶ 186. There is no contract between Greystone and the Diesel Entities regarding Greystone's continuation as a lender. Thus, the fraud claims do not simply restate the contract claims, but rather allege a new and separate harm.

Fourth, it is surely plausible, at the very least, that Greystone will establish reasonable reliance on the allegedly fraudulent statements regarding, *inter alia*, the Diesel Entities' ability to ship shoes in a timely manner and willingness to continue working with BGMI. Greystone, as a secured lender based in New York, was in no position to evaluate the truth or falsity of the statements by Mezzasoma about the Diesel Entities' capabilities and intentions, given that the three Diesel companies are based in Italy and the shipments originated in a Diesel factory and warehouse in China. Moreover, the fact that earlier shipments had been late did not necessarily mean that the Diesel Entities lacked the *ability* to ship shoes on time.

Finally, Kid argues (again) that it is not alleged to have taken any action. This argument depends, however, on a factual determination that cannot be made at this stage of the case. Greystone has alleged, and continues to believe, that Mezzasoma was acting on behalf of all three Diesel Entities, and not just Diesel Props. Greystone should be given the opportunity to conduct discovery before any factual determinations are made.

## CONCLUSION

For the reasons set forth above, Greystone respectfully requests that this Court issue an

order denying in full the Motions to Dismiss of SpA, Props and Kid.

Dated: New York, New York
       March 4, 2008

                                        MOSES & SINGER, LLP

                                        By:   /s/ Danielle S. Friedberg
                                              Mark N. Parry
                                              Danielle S. Friedberg
                                              405 Lexington Avenue
                                              New York, NY 10174
                                              (212) 554-7800
                                              *Attorneys for*
                                              *Defendant/Counter-Plaintiff*
                                              *Greystone Business Credit II,*
                                              *LLC*

                                        Of Counsel:

                                         Daniel P. Shapiro
                                         Stephen H. Locher
                                         GOLDBERG KOHN BELL
                                          BLACK ROSENBLOOM &
                                         MORITZ, LTD.
                                         55 East Monroe Street
                                         Suite 3300
                                         Chicago, Illinois  60603
                                         (312) 201-4000