UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
DIESEL PROPS S.R.L. and
DIESEL KID S.R.L.,

                Plaintiffs/Counter-Defendants,

                -against-

GREYSTONE BUSINESS CREDIT II LLC
and GLOBAL BRAND MARKETING INC.,

                Defendants/Counter-Plaintiffs

                -against-

DIESEL S.p.A.

                Third-Party Defendant.
-------------------------------------------------------------------x

Civil Action No. 07CV9580 (HB)

**DECLARATION OF IRA S. SACKS**

      IRA S. SACKS, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

      1. I am a partner in Dreier LLP, counsel to Diesel Props S.r.l. ("Props") and Diesel Kid S.r.l. ("Kid") in the above captioned action. I submit this declaration in support of the motions of Props and Kid to dismiss the counterclaims asserted by Defendant Greystone Business Credit II, L.L.C. ("Greystone") and Global Brand Marketing, Inc. ("GBMI") and the motion of Diesel S.p.A. ("SpA") to dismiss the third party claims asserted against it by Greystone and GBMI. The purpose of this declaration is to summarize for the Court's convenience certain dispositive facts previously set forth in the moving papers.

      2. As explained more fully in the motions to dismiss, (i) in 2001 and 2002, Props and SpA each entered into a license agreement (collectively, the "License

Agreements") with GBMI whereby GBMI would make and sell Diesel branded shoes in numerous areas of the world. *See* Second Amended Complaint, ¶¶ 9, 10.

3. In November 2005 Props and Kid entered into distribution agreements with GBMI whereby GBMI would distribute Diesel branded shoes in the United States (collectively, the "Distribution Agreements"). *See* Ex. B.[1]

4. The Distribution Agreements provide that the exclusive forum for resolution of claims is Milan, Italy and provide, in relevant part:

> 21.2   For any dispute between the Parties and **arising out of or connected with** this Agreement regarding in particular, but without prejudice to the generality of the foregoing, its conclusion, execution, validity, breach, termination, and determination of damages, which cannot be settled amicably, **the exclusive competent jurisdiction** shall be the Court of Milan, Italy.

*See* Ex. B.

5. Paragraph 5.4 of the Distribution Agreements provided, *inter alia*, that title did not pass to GBMI for any Diesel product delivered to GBMI unless and until Diesel received payment in full for the goods (the "Passage of Title Provision"). *See* Ex. B, ¶ 5.4.

6. Furthermore, Paragraph 12.3 of the Distribution Agreements, as amended by the parties effective October 27, 2006, provided that upon termination by either party, GBMI, upon demand by Diesel, was obligated to immediately sell Diesel branded product back to Diesel (the "Buyback Provision"):

> 12.3 . . . The Company, or its representatives, will have the right to purchase totally or partially, the stock inventory at the following conditions: (a) any Product in new condition which the Company

---

[1]   Reference herein to "Ex. __" refer to the Exhibit Binder, previously submitted under seal in support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction in October 26, 2007, and relied upon in connection with Plaintiffs' Motion to Dismiss.

> continues to produce will be purchased at the original cost price that the Distributor paid for such Product to the Company.

*See* Ex. E.[2]

7. In addition, Paragraph 13 of the Distribution Agreements provides:

> …Should the Company start a legal action against the Distributor and/or its affiliates due to breaches or failures of the Distributor and/or its affiliates which have led to the termination of the Agreement pursuant to the provisions of Article 11 hereof, the Distributor and/or its affiliates shall be entitled to defend themselves by counterclaiming exclusively with regard and to the extent of the specific claims brought by the Company and/or its affiliates and not for any other kind of indemnity.

8. On November 4, 2005, GBMI and Props also entered into the Diesel Adult Footwear Developing, Sourcing and Buying Agreement ("Sourcing Agreement"). *See* Exhibit A to the Declaration of Ira S. Sacks dated January 22, 2008 (the "Sacks Decl."). The Sourcing Agreement provides that the exclusive forum for claims is Milan, Italy:

> Any Dispute that may arise or should be associated with this Agreement, concerning in particular, but not limited to, its termination, execution, validity, default, withdrawal and damages assessment, shall be submitted to the exclusive jurisdiction of the Court of Milan, Italy.

*See id.* at ¶ 24.

9. GBMI was in severe default of its royalty obligations under the License Agreements as of December 31, 2006. At that time, GBMI owed SpA and Kid over $11.2 million in back royalties and advertising contributions, excluding interest. That amount remains unpaid and interest continues to accrue. *See* Second Amended Complaint, ¶ 11. As a result of GBMI's severe, continued financial difficulties, GBMI

---

[2] After termination of the Distribution Agreements, Diesel exercised its rights under the Buyback Provision and demanded return of any remaining inventory, but GBMI failed to comply with this demand. *See* Ex. L.

negotiated a loan and security agreement with Greystone (the "Loan Agreement"). *See* Ex. C.

11. Greystone entered into the Loan Agreement with full knowledge that the Distribution Agreements contained a forum selection clause designating Italy as the sole forum for resolution of disputes "arising under or connected with" the Distribution Agreement. In connection with GBMI's and Greystone's execution of the Loan Agreement, Props, Kid and SpA, and GBMI and Greystone engaged in extensive negotiations, as evidenced by several letter agreements. *See* Exs. E, F. During these negotiations, Greystone was fully aware of the various terms of the Distribution Agreements, because these negotiations included the discussion of amendments to the Distribution Agreements.

11. In a December 2, 2006 letter (the "December 2 letter") from Diesel SpA, Props and Kid to **Greystone** and GBMI, (i) Props and Kid confirmed their willingness to agree to tripartite agreements ("TPA") with GBMI and Greystone **required by Greystone**, and (ii) SpA and Kid confirmed their willingness to sign the "Consent of Licensor" to the Loan Agreement **required by Greystone** (the so-called "Non-Interference Agreements") "**only and exclusively**" on a list of specific conditions, including certain amendments to the Distribution Agreement. *See* Ex. E (emphasis added).

12. The December 2 letter explicitly stated that "should the condition mentioned hereinabove not [occur] the present commitments by Diesel, Diesel Props and Diesel Kid will cease to have any effect and will not be considered legally binding." *See* Ex. E. Thus, (i) the Loan Agreement would not have closed, (ii) the TPAs between

Diesel, GBMI and Greystone (Ex. F), would never have been executed and (iii) the Non-Interference Agreements (Ex. D) would not have been signed <u>unless Greystone and GBMI agreed to the amendments to the Distribution Agreements between Diesel and GBMI</u>. GBMI accepted the terms of the December 2 letter by letter dated December 7, 2006 (*see* Ex. E) and Greystone accepted the terms of the December 2 letter by accepting Kid's and SpA's agreement to the Non-Interference Agreements and Props' and Kid's agreement to the TPAs.

13. Two TPAs were executed among (i) Props or Kid, (ii) GBMI and (iii) Greystone. *See* Ex. F. The <u>Distribution Agreements</u> are <u>expressly referenced</u> in the first paragraph of the TPAs and <u>the rights of Props and Kid under the Distribution Agreements were expressly preserved</u> by the TPA:

> This letter agreement is not in any way intended to limit any of Supplier [Kid and/or Props] Obligations of Borrower [GBMI] to Supplier, and shall in all respects be cumulative thereto.

*See* Ex. F.

14. <u>As a signatory to the TPAs, Greystone was fully aware of the provisions of the Distribution Agreements</u>, including the mandatory forum selection clause (¶ 21.2), the Passage of Title Provision (¶ 5.4), and the Buyback Provision (¶ 12.3).

15. Thus, it is clear that Greystone had full knowledge of the provisions of the Distribution Agreements when it entered into the business relationship with GBMI and the Plaintiffs.

16. The TPAs were executed effective December 4, 2006. *See* Ex. F. The TPAs provided a procedure pursuant to which Props and Kid would be able to present invoices to Greystone, ship product to GBMI and be assured by Greystone that Greystone

5

would pay Props or Kid for such product within <u>two business days</u>. *See* Second Amended Complaint, ¶ 16; GBMI's Answer to the Amended Complaint dated January 9, 2008, ¶ 17.

17. Pursuant to the TPAs, Props and Kid sent invoices to Greystone commencing in January 2007, through and including September 3, 2007. *See* Second Amended Complaint, ¶ 21.

18. The TPAs provided that GBMI would send copies of purchase orders for Diesel product to Props or Kid and Greystone. Props or Kid would then send a Diesel Invoice to GBMI and Greystone for the ordered goods. Props or Kid sent with every shipment an inquiry as to the availability of money. Upon request, Greystone would confirm to Props or Kid that the proposed customer was a *bona fide* customer and that there was availability for revolving loans under the Loan Agreement to pay for the goods. Relying on such availability, Props or Kid would then ship the product to GBMI. When GBMI invoiced the retailer for the products ordered, it would send a copy of the Customer Invoice to Props or Kid and Greystone, and Greystone was required to pay Props or Kid the proceeds of a revolving loan in an amount equal to the corresponding Diesel Invoice within two business days. Greystone also <u>unconditionally</u> agreed to provide Props or Kid with written notice of any request for a revolving loan for a Diesel Invoice that was not permitted to be made pursuant to the terms of the Loan Agreement. *See* Ex. F.

19. Although the procedure under the TPA expressly was designed to protect **Diesel**, and ensure that Diesel received money for the goods it shipped to GBMI, the system failed. Diesel shipped shoes and billed GBMI $28 million; it was only paid $8

million by Greystone and GBMI.  *See* Second Amended Complaint, ¶ 22.  GBMI and Greystone got the full benefit of their bargains with Diesel: GBMI sold all of the shoes, except for the 160,000 left at the start of this lawsuit (*Id*. at ¶ 21); and Greystone received the exact benefit they bargained for under the TPA – the money that GBMI received from its customers went straight into a lockbox for Greystone.  *See* Ex. C, ¶ 4.1.  Only Diesel did not receive the benefit of its bargain.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated:  March 25, 2008
       New York, New York

                                            /s/ Ira S. Sacks
                                            Ira S. Sacks