UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIESEL PROPS S.R.L. and
DIESEL KID S.R.L.,

                Plaintiffs/Counter-Defendants,

        v.

GREYSTONE BUSINESS CREDIT II LLC
and GLOBAL BRAND MARKETING INC.,

            Defendants/Counter-Plaintiffs

        v.

DIESEL S.p.A.

           Third-Party Defendant

**ANSWER, COUNTERCLAIMS
AND THIRD-PARTY
COMPLAINT**

Civil Action No. 07 CV 9580 (HB)

---

       Defendant Greystone Business Credit II, L.L.C. ("Greystone"), by its undersigned counsel, respectfully submits this Answer to the Second Amended Complaint (the "Second Amended Complaint") of Plaintiffs Diesel Props S.R.L. and Diesel Kid S.R.L. (collectively, "Plaintiffs"), and states as follows:

       1.      Paragraph 1 contains a characterization of Plaintiffs' Second Amended Complaint, to which no response is required. To the extent a response is required, Greystone admits that Plaintiffs purport to raise claims under breach of contract, unjust enrichment, conversion, account stated, breach of contract, and fraud theories. Greystone further admits that Plaintiffs' Second Amended Complaint appears to request injunctive relief and damages. Greystone denies that Plaintiffs are entitled to any of the relief they have requested. Except as specifically admitted herein, Greystone denies the allegations of this paragraph.

       2.      Greystone admits the allegations of Paragraph 2.

3.      Greystone admits that Props is an Italian corporation involved in the sale of men's and women's footwear bearing the Diesel trademarks.  Greystone lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations of Paragraph 3 and therefore denies those allegations.

4.      Greystone admits that Kid is an Italian corporation involved in the sale of children's footwear bearing the Diesel trademarks.  Greystone lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations of Paragraph 4 and therefore denies those allegations.

5.      Greystone admits that Spa is an Italian corporation involved in the ownership and licensing of the Diesel trademarks.  Greystone lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations of Paragraph 5 and therefore denies those allegations.

6.      Greystone states that its correct legal name is "Greystone Business Credit II, L.L.C.," not "Greystone Business Credit II LLC."  Greystone admits the remaining allegations of Paragraph 6.

7.      Greystone admits, upon information and belief, the allegations of Paragraph 7.

8.      Greystone admits the allegation of Paragraph 8 that Spa, Props and Kid are involved in the licensing, manufacture, distribution and/or sale of Diesel branded clothing, footwear, accessories and other items worldwide.  Greystone further admits that Spa has held itself out as the owner of trademarks in the United States and elsewhere using the Diesel name, and that Spa has held itself out as having licensed those trademarks from time to time to Props and Kid. Greystone lacks sufficient knowledge and information to form a belief as to the truth of the allegation that those trademarks are "numerous" or "valuable" and therefore denies that

-2-

allegation. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 8.

9.    Greystone admits that Spa and GBMI purported to have entered a license agreement for GBMI to make and sell Diesel branded adult shoes in numerous areas of the world. Greystone further admits that the purported agreement contains a provision stating that it expires on December 31, 2006. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 9.

10.    Greystone admits that Kid and GBMI purported to have entered a license agreement for GBMI to make and sell Diesel branded adult shoes in numerous areas of the world. Greystone further admits that the purported agreement contains a provision stating that it expires on December 31, 2006. Except as specifically admitted herein, Greystone denies the allegations of this Paragraph 10.

11.    Greystone admits that the purported license agreements contain a provision indicating that they are governed by Italian law and that the exclusive forum for resolution of disputes is Milan, Italy. Greystone lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in Paragraph 11 and therefore denies those allegations.

12.    Greystone admits the allegation of Paragraph 12 that GBMI, Props and Kid are parties to distribution agreements dated November 4, 2005. Greystone further admits that each of those agreements contains a provision stating the term of the agreement is "from May 1, 2006 with the Spring Summer 2007 Seasonal Collection, through December 31, 2008 with the Fall/Winter 2008 Seasonal Collection deliveries for a total of four (4) seasons, unless terminated earlier pursuant to article 11 of this Agreement." Greystone states that, upon information and belief, the terms of those agreements were extended by one year to include the

-3-

Spring/Summer 2009 and Fall/Winter 2009 seasons. Except as specifically admitted herein, Greystone denies the allegations in Paragraph 12.

13.    Greystone admits that GBMI held itself out as being in financial difficulty in late 2006. Greystone further admits that GBMI negotiated a loan and security agreement with Greystone, which was effective December 4, 2006. Greystone further admits that the Loan Agreement is governed by New York law and provides for jurisdiction in the state and federal courts in New York County, New York, to hear and determine any claims or disputes pertaining to the Loan Agreement or any matter arising out of or related to the Loan Agreement. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 13.

14.    Greystone admits that the Loan Agreement provided for revolving loans of up to $25 million to GBMI, subject to the terms and conditions stated therein. Greystone further admits that ¶ 1.6 of the Loan Agreement contained GBMI's authorization to Greystone to wire the proceeds of revolving loans to Diesel pursuant to the agreement between GBMI, Greystone and Diesel. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 14.

15.    Greystone admits that Spa and Kid consented to GBMI's entry into the Loan Agreement and agreed not to assert security interests, liens, retentions of title or similar rights in assets of GBMI until Greystone was paid in full under the Loan Agreement. Greystone denies the allegation that "no such letter was requested from – or signed by – Props." Greystone states that the letter signed by Props' parent, Spa, also is binding on Props, and that Spa cannot circumvent its obligations by acting through one of its subsidiaries. Greystone further denies the allegation that "no such letter was requested from Kid under the Distribution Agreement." Greystone states that the letter signed by Kid is not limited in scope to the license agreement and that Kid's obligation not to interfere with Greystone's collateral is equally applicable to claims

-4-

that Kid might have under the Distribution Agreement. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 15.

16.     Greystone admits that it has seen certain letters dated December 7, 2006 and December 2, 2006, purporting to contain an agreement between GBMI and Kid, Props and Spa to amend the Distribution Agreements, for the payment of royalties, and various other matters. Greystone denies that it was a party to those purported agreements and further denies that those agreements impose any obligations on Greystone. Greystone further denies that Kid and Props conditioned their assent to the Loan Agreement on strict adherence to the payment provisions in a tripartite agreement between GBMI, Greystone and Props/Kid. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 16.

17.     Greystone admits that tripartite agreements involving Kid and Props were executed effective December 4, 2006. Greystone admits that each of those agreements imposed certain requirements upon GBMI and Props/Kid for the delivery of purchase orders and invoices to each other and Greystone. Greystone further admits that if those requirements were fully satisfied with respect to a particular order of goods from Diesel, and subject to the terms and conditions of the Loan Agreement between Greystone and GBMI, Greystone would make a revolving loan to GBMI with respect to those goods by wiring funds directly to Props or Kid. Greystone further admits that the tripartite agreements allowed Props/Kid to request notice regarding availability under the Loan Agreement. Greystone denies that Props/Kid relied upon the notice provided by Greystone in deciding whether to ship products. Greystone states that Props and Kid shipped products to GBMI whether or not they had been notified of default under the Loan Agreement. Greystone further denies that it had any obligation to confirm to Props/Kid that the proposed customer was a *bona fide* customer. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 17.

18.    Greystone admits that a portion of the TPA procedure was intended, in part, to increase the likelihood that Props and Kid were paid for shipments. Greystone denies that the procedure was intended to "insure" that Props and Kid were paid for shipments. Greystone states further that Props and Kid did not follow or require adherence to the portion of the TPA that was intended, in part, to increase the likelihood that they were paid for shipments. Greystone states further that the TPA procedure also was intended to protect Greystone's status as senior secured creditor to GBMI. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 18.

19.    Greystone admits the allegations of Paragraph 19.

20.    The allegation of Paragraph 20 that the TPA procedure was "streamlined slightly in March 2007" is vague, ambiguous and not capable of reasonable ascertainment. Greystone therefore denies that allegation.

21.    Greystone admits that Props and Kid sent certain invoices to Greystone commencing in January 2007. Greystone denies that those invoices were submitted in accordance with the terms of the TPA, denies that any amounts are "due" under the TPA, denies that it owes any money to Props/Kid, and denies the remaining allegations of Paragraph 21.

22.    Greystone admits that Props and Kid requested notice on occasions from Greystone as to whether (i) there was availability under the Loan Agreement for revolving loans to pay the invoice, (ii) GBMI was otherwise prevented from requesting such revolving loans, or (iii) GBMI was not in compliance with, or was in default of, any of the covenants and/or warranties of the Loan Agreement. Greystone further admits that it provided written notice to Diesel in January and August regarding GBMI's default under the Loan Agreements. Greystone further admits that it made revolving loans in the amount of at least $7.6 million to GBMI after

-6-

January 29, 2007, in the form of payments to Diesel. Greystone denies that it "sat mute." Except as specifically admitted herein, Greystone denies the allegations of Paragraph 22.

23.    Greystone admits that it did not object to any of the invoices or the amount of the invoices which were submitted by Diesel. Greystone denies that it was in a position to evaluate the accuracy of the invoices or the amount of the invoices. Greystone states that it lacks information and knowledge sufficient to form a belief as to the accuracy of the invoices or the amount of the invoices and therefore denies same. Greystone further states that the invoices submitted by Diesel, even if accurate, must be offset by the amount of damages caused by Diesel to GBMI. Greystone lacks knowledge and information sufficient to form a belief as to the truth of the allegations regarding GBMI, and therefore denies them.

24.    Greystone admits that it received correspondence from Props dated June 1, 2007, in which Props made inquiries regarding the payment of Diesel invoices. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 24.

25.    Greystone admits that it received correspondence from Props and Kid dated September 4, 2007, in which Props and Kid purported to notify Greystone that it had defaulted under the TPA and had thirty (30) days to cure the defaults. Greystone denies that it had, in fact, defaulted under the TPA and therefore denies that there was anything to cure. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 25.

26.    Greystone admits that it has seen correspondence from Props and Kid dated September 4, 2007, in which Props and Kid purported to notify GBMI that it had defaulted under the Distribution Agreements and had thirty (30) days to cure those purported defaults. Greystone denies that GBMI had, in fact, defaulted under the Distribution Agreements and therefore denies that there was anything to cure. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 26.

27.    Greystone admits that it has seen correspondence from Props and Kid dated October 17, 2007, in which Props and Kid purported to notify GBMI that the Distribution Agreements were terminated effective October 4, 2007, GBMI was in default under the purported letter agreements, and GBMI was required to make immediate payment of all overdue royalties and advertising contributions. Greystone further admits that in or around October 2007, Props advised GBMI that it was terminating the Sourcing Agreement. Greystone denies that Props and Kid could retroactively terminate the Distribution Agreements and further denies that GBMI was in default under the various agreements between the parties. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 27.

28.    Greystone admits that it has seen letters dated October 17, 2007, in which Props and Kid made the demands described in Paragraph 28. Greystone denies that Props and Kid had the right to make the demands described in this paragraph. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 28.

29.    Greystone admits that, upon information and belief, GBMI gave Props and Kid an accounting of the Diesel-branded shoes in the warehouse in Chino, California. Greystone denies that GBMI had any obligations as a result of the October 17, 2007 letters. Greystone lacks sufficient knowledge and information as to which shoes are included in the 158,927 pairs referenced in Paragraph 29 and therefore denies all allegations relating to payment or non-payment for those shoes. Greystone further denies that it or GBMI has any obligation to pay for the 158,927 pairs of shoes. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 29.

30.    Greystone admits that Mr. Datta was the President of GBMI. Greystone lacks information and knowledge sufficient to form a belief as to the truth of the allegations

regarding conversations and communications between Mr. Datta and Mr. Mezzasoma and therefore denies the remaining allegations of Paragraph 30.

31.    Greystone denies the allegations of Paragraph 31. Greystone states that ¶ 5.4 of the Distribution Agreements, at most, provides Prop and Kid only with a reservation of an unperfected security interest in the Warehouse Product. Greystone states that its own rights to the Warehouse Product are senior to the reservation of a security interest and any other rights that Props and Kid might possess with respect to the Warehouse Product.

32.    Greystone denies the allegations of Paragraph 32.

33.    Greystone admits that customers expect prompt delivery of the goods that they have ordered, and that they require a level of comfort and certainty that they can rely upon the supplier or distributor with whom they are dealing. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 33.

34.    Greystone admits that on October 26, 2007, Props and Kid instituted this action and sought a temporary restraining order (TRO) and preliminary injunction. Greystone further states that the relief requested was not granted. Greystone denies the existence of irreparable harm. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 34.

35.    Greystone admits that on October 29, 2007, Judge Rakoff, sitting as emergency judge, entered a TRO. Greystone further admits that Plaintiffs have quoted language from Judge Rakoff's order. Greystone states that Plaintiffs' allegations suggesting the basis of Judge Rakoff's ruling are simply speculation. Greystone lacks sufficient knowledge and information to form a belief as to the truth of these allegations, contained in the second sentence of Paragraph 35, and therefore denies them. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 35.

36.     Greystone states that Judge Baer's November 1, 2007 order speaks for itself. Greystone admits that a preliminary injunction hearing was scheduled for November 19, 2007. Greystone states that the allegations contained in the second sentence of Paragraph 36 constitute Plaintiffs' characterization of the TRO, and Greystone denies these allegations. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 36.

37.     Greystone denies the allegations of Paragraph 37.

38.     Greystone denies the allegations contained in the first sentence of Paragraph 38. Greystone admits that Plaintiffs wrote a letter to the Court. Greystone further admits that Plaintiffs have quoted a portion of the language from their letter. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 38.

39.     Greystone denies that the Notice of Private Sale stated that Greystone Business Credit II, L.L.C. would be conducting the Private Sale.  Greystone admits the remaining allegations of Paragraph 39.

40.     Greystone admits the allegations of Paragraph 40.

41.     Greystone denies the allegations of Paragraph 41.

42.     Greystone admits that Plaintiffs have quoted a portion of Mr. Sacks' November 28, 2007 e-mail. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 42.

43.     Greystone lacks sufficient knowledge and information to form a belief as to the truth of the allegations of Paragraph 43, and therefore denies them

44.     Greystone admits the allegations contained in the first sentence of Paragraph 44.  Greystone further admits that Plaintiffs have quoted a portion of David Chizewer's November 30, 2007 e-mail. Greystone denies that any portion of Mr. Chizewer's e-

mail constitutes an agreement. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 44.

45.    Greystone admits that it did not give notice that Diesel branded inventory was to be included in the Private Sale. Greystone denies that any legal obligation to give such notice existed. Greystone further denies the existence of an agreement. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 45.

46.    Greystone denies the existence of an agreement. Greystone lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations of Paragraph 46, and therefore denies them.

47.    Greystone admits that a private sale was conducted on December 14, 2007, in which GBMI's assets were sold to Titan Apparel, Inc. Greystone further admits that it entered a Loan and Security Agreement with Titan Apparel, Inc., pursuant to which Greystone obtained a security interest in all of Titan's assets, including Titan's inventory. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 47.

48.    Greystone denies the allegations of Paragraph 48.

49.    Greystone admits that Mr. Sacks sent an e-mail to Mr. Shapiro and others on January 31, 2008. Further answering, Greystone admits that in response to an inquiry by Mr. Sacks, in early February Mr. Shapiro advised Mr. Sacks by telephone that approximately 101,000 pairs of shoes were being sold by the then current owner to a purchaser. Except as specifically admitted herein, Greystone denies the allegations of Paragraph 49.

50.    Greystone denies the allegations of Paragraph 50.

51.    Greystone denies the allegations of Paragraph 51.

52.    Greystone denies the allegations contained in the first sentence of Paragraph 52. Greystone lacks sufficient knowledge and information to form a belief as to the

truth of the allegations contained in the second sentence of Paragraph 52, and therefore denies them.

53.    Greystone denies the allegations of Paragraph 53.

54.    Greystone lacks sufficient knowledge and information to form a belief as to the truth of the allegations of Paragraph 54, and therefore denies them.

55.    Greystone repeats and realleges its answers to the allegations of paragraphs 1 through 54 as if fully set forth herein.

56.    Greystone denies the allegations of Paragraph 56.

57.    Greystone denies the allegations of Paragraph 57.

58.    Greystone denies the allegations of Paragraph 58.

59.    Greystone repeats and realleges its answers to the allegations of paragraphs 1 through 58 as if fully set forth herein.

60.    Greystone denies the allegations of Paragraph 60.

61.    Greystone denies the allegations of Paragraph 61.

62.    Greystone repeats and realleges its answers to the allegations of paragraphs 1 through 61 as if fully set forth herein.

63.    Greystone denies the allegations of Paragraph 63.

64.    Greystone denies the allegations of Paragraph 64.

65.    Greystone denies the allegations of Paragraph 65.

66.    Greystone repeats and realleges its answers to the allegations of paragraphs 1 through 65 as if fully set forth herein.

67.    Greystone admits that it received certain invoices with respect to certain Diesel footwear.  Greystone denies that it had an obligation to pay for such invoices. Greystone further denies that it was in a position to evaluate the accuracy of the invoices or the

amount of the invoices. Greystone states that it lacks information and knowledge sufficient to form a belief as to the accuracy of the invoices or the amount of the invoices and therefore denies same. Greystone further states that the invoices submitted by Diesel, even if accurate, must be offset by the amount of damages caused by Diesel to GBMI. Greystone lacks knowledge and information sufficient to form a belief as to the truth of the allegations regarding GBMI, and therefore denies them.

68.    Greystone denies the allegations of Paragraph 68.

69.    Greystone repeats and realleges its answers to the allegations of paragraphs 1 through 68 as if fully set forth herein.

70.    Greystone denies the allegations of Paragraph 70.

71.    Greystone admits that it never contacted Plaintiffs regarding the Private Sale. Greystone denies that it had any legal obligation to contact Plaintiff regarding the Private Sale. Greystone further denies the allegations contained in the second sentence of Paragraph 71.

72.    Greystone denies the allegations of Paragraph 72.

73.    Greystone states that the allegations of Paragraph 73 do not require an answer.

74.    Greystone repeats and realleges its answers to the allegations of paragraphs 1 through 73 as if fully set forth herein.

75.    Greystone denies the allegations of Paragraph 75.

76.    Greystone denies the allegations of Paragraph 76.

77.    Greystone denies the allegations of Paragraph 77.

78.    Greystone denies the allegations of the first sentence of Paragraph 78. Greystone further states that the allegations of the second sentence of Paragraph 78 do not require an answer.

## FIRST AFFIRMATIVE DEFENSE

79.     The Second Amended Complaint, and all counts therein, fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

80.     Plaintiffs have failed to join necessary parties in this action including, but not necessarily limited to, Diesel SpA.

## THIRD AFFIRMATIVE DEFENSE

81.     Plaintiffs' claims are barred by the doctrines of waiver, estoppel and/or laches.  As set out more fully below in Greystone's counterclaims and third-party claims, Plaintiffs consistently declined to require GBMI's adherence to the terms of the TPA and instead developed a course of dealing with GBMI outside of the terms of that agreement.  Having chosen not to follow the TPA, Plaintiffs cannot seek to enforce the provisions of that agreement, if any, that work to their benefit.  Furthermore, Plaintiffs cannot seek relief against Greystone because Plaintiffs took actions toward GBMI that Greystone relied upon in deciding not to foreclose on its collateral until October 2007.  Additionally, Plaintiffs' conduct prevented the anticipated sale of Diesel branded shoes before the Private Sale occurred.

## FOURTH AFFIRMATIVE DEFENSE

82.     Plaintiffs' claims are barred by the doctrine of unclean hands.  As set out more fully below in Greystone's counterclaims and third-party claims, Plaintiffs have asserted and attempted to assert control over Greystone's collateral despite having made promises not to do so, and despite lacking a valid ownership interest in that collateral.  Plaintiffs also have violated their agreements with GBMI by making late, incomplete, and other non-compliant deliveries of products ordered by GBMI; failing to pay amounts due to GBMI; and soliciting

GBMI's employees. Plaintiffs also have tortiously interfered with GBMI's contracts and business relationships with its customers.

### FIFTH AFFIRMATIVE DEFENSE

83.     Plaintiffs' claims are barred by applicable statutes of limitations.

### SIXTH AFFIRMATIVE DEFENSE

84.     As set out more fully below in Greystone's counterclaims and third-party claims, Plaintiffs' contract claims are barred because they breached provisions of the relevant agreements between the parties prior to the time of the breaches allegedly committed by Greystone and/or GBMI, thus excusing Greystone and GBMI from any obligations thereunder.

### SEVENTH AFFIRMATIVE DEFENSE

85.     As set out more fully below in Greystone's counterclaims and third-party claims, Plaintiffs' contract claims are barred because of the failure of conditions precedent, including but not limited to the failure of Plaintiffs and GBMI to satisfy the requirements of the TPA regarding the timing and delivery of purchase orders and customer invoices; the failure of the invoices provided by Plaintiffs and GBMI to match each other; and the default of GBMI under the loan agreement between itself and Greystone.

### EIGHTH AFFIRMATIVE DEFENSE

86.     Plaintiffs' claims are barred because certain provisions of the Distribution Agreements upon which they rely, including but not limited to, the retention of title provisions, are unenforceable or enforceable only to a limited extent. The retention of title provisions, at most, give Plaintiffs only an unperfected security interest in the goods to which they claim to retain title.

## NINTH AFFIRMATIVE DEFENSE

87.     As set out more fully below in Greystone's counterclaims and third-party claims, Plaintiffs' claims are subject to offset as a result of their breaches of the Distribution Agreements and other contracts with GBMI and Greystone.

## TENTH AFFIRMATIVE DEFENSE

88.     Plaintiffs have failed to state a claim for fraud. Plaintiffs' fraud claim is based on an assertion of future performance, which alone cannot form the basis of a fraud claim, and Plaintiffs have not alleged that Greystone knew these assertions were false at the time they were made. Moreover, Plaintiffs have not alleged that any purported misrepresentations were material. Nor have Plaintiffs properly alleged injury based on these misrepresentations; Plaintiffs' statements that customers would refuse to deal with Plaintiffs are speculative and lack any factual basis. Finally, Plaintiffs' claim lacks the element of reasonable reliance because it was unreasonable for Plaintiffs to predicate their 2008 sale efforts on informal conversations with opposing counsel made during the course of litigation.

## ELEVENTH AFFIRMATIVE DEFENSE

89.     Plaintiffs have failed to state a claim for breach of oral agreement. Plaintiffs have not properly alleged the existence of a binding obligation. Nor have Plaintiffs alleged any mutuality of obligation.

## TWELFTH AFFIRMATIVE DEFENSE

90.     Plaintiffs' conduct prevented the anticipated sale of Diesel branded shoes before the Private Sale occurred. Plaintiffs therefore are estopped from seeking relief based on theories of breach of oral agreement and fraud on the grounds that Diesel branded shoes were sold during the Private Sale.

-16-

## COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Defendant Greystone Business Credit II, L.L.C., and for its Counterclaims against Plaintiffs and Third-Party Complaint against Diesel SpA, states as follows:

### Introduction

91.    These counterclaims and third-party claims arise out of breaches of contract, torts and fraud committed by Diesel SpA and two of its subsidiaries, Diesel Kid S.R.L. ("Diesel Kid") and Diesel Props S.R.L. ("Diesel Props" and, collectively with Diesel Kid and Diesel SpA, the "Diesel Entities") in connection with a business relationship and series of agreements between them, Global Brand Marketing, Inc. ("GBMI"), and GBMI's secured lender, Greystone Business Credit II, L.L.C. ("Greystone").

92.    Beginning in December 2006, the Diesel Entities committed various breaches of their contracts with GBMI, thus forcing GBMI into default under its lending agreement with Greystone.  The Diesel Entities initially admitted fault for their breaches and promised to help GBMI overcome the devastating financial consequences, but later turned their back on GBMI, tried to terminate the parties' contracts, attempted to steal GBMI's orders, customers and employees, and refused to ship or release certain products for which GBMI had open customer orders waiting to be fulfilled.  The Diesel Entities also harmed Greystone by interfering and attempting to interfere with Greystone's collateral, despite having expressly promised not to do so.  The Diesel Entities have thus caused tremendous financial damage to both GBMI and Greystone, for which Greystone seeks relief in its own right and as assignee of GBMI's rights pursuant to its security interest in GBMI's assets.

### Jurisdiction and Venue

93.    Jurisdiction is proper over Greystone's counterclaims and third-party claims pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value

of $75,000, exclusive of interest and costs, and is between a citizen of the United States and citizens of a foreign country.

94.    Venue is proper pursuant to 28 U.S.C. § 1391.  The contracts involving Greystone and the Diesel Entities were negotiated substantially in New York, executed by Greystone in New York, and, in two instances, contain a forum selection provision identifying the state and federal courts of New York County, New York, as the forum for the resolution of disputes.

### Parties

95.    Counter-plaintiff Greystone is a Delaware limited liability company with its principal place of business in New York.

96.    Counter-defendant Diesel Props is an Italian corporation with its principal place of business in Italy.

97.    Counter-defendant Diesel Kid is an Italian corporation with its principal place of business in Italy.

98.    Third-party defendant Diesel SpA is an Italian corporation with its principal place of business in Italy.  Diesel SpA is the parent entity to Diesel Props and Diesel Kid.  At all times relevant to these counterclaims and third-party claims, Diesel SpA supervised and directed the actions of Diesel Props and Diesel Kid.

### Facts

**I.    History of the GBMI-Diesel Relationship**

99.    The Diesel Entities are involved in the sale of Diesel-branded shoes, clothing and other product lines throughout the world.  The Diesel Entities are based in Italy and did not have a meaningful presence in the market for footwear in the United States until entering

-18-

a business relationship with GBMI nearly ten years ago. Since that time, GBMI has acted as licensee, and later distributor, of Diesel-branded products in the United States.

100. Since the inception of their relationship, GBMI has provided design, development and marketing strategies for Diesel-branded products in the United States. GBMI also has generated orders for Diesel-branded products through GBMI's own sales efforts. Those strategies and efforts caused the Diesel brand to become popular in the United States and, upon information and belief, produced substantial financial benefits to the Diesel Entities.

101. In November 2005, GBMI entered Distribution Agreements with Diesel Props and Diesel Kids. Under the Distribution Agreements, GBMI was appointed as exclusive authorized importer and distributor of Diesel-branded footwear in the United States and its possessions and territories. In essence, GBMI would buy footwear from the Diesel Entities, who would ship it to the United States. GBMI would then re-sell the footwear to GBMI's own customers, with whom GBMI had developed relationships through its own efforts.

102. GBMI would make money under the Distribution Agreements by re-selling the footwear at a higher price than it paid to the Diesel Entities. Due to the seasonality of the business, GBMI's ability to make money directly depended on accurate and timely shipping of products by the Diesel Entities.

103. In November 2005, GBMI also entered a Diesel Adult Footwear Developing, Sourcing and Buying Agreement (the "Sourcing Agreement") with Diesel Props. Pursuant to the Sourcing Agreement, GBMI agreed to act as developing, sourcing and buying agent in Asia and elsewhere for Diesel Props and its affiliates. GBMI's responsibilities included, *inter alia*, designing shoes, preparing samples, working with factories in Asia to arrange the manufacture of the shoes, negotiating terms with those factories, and placing orders on behalf of the Diesel Entities. In exchange, Diesel Props agreed to pay commissions to GBMI in an amount

equal to eight percent (8%) of the FOB port-of-shipment prices for the orders that GBMI placed with manufacturers on behalf of the Diesel Entities.

104.    The Sourcing Agreement and Distribution Agreements were a reflection of GBMI's success in building the Diesel brand in the United States. Prior to September 2007, the Diesel Entities repeatedly assured GBMI that they wanted the relationship to continue throughout 2008 and beyond. These assurances were of critical importance to GBMI and Greystone because the structure of the GBMI-Diesel relationship required GBMI to front millions of dollars to design, develop and market Diesel-branded footwear for subsequent seasons. GBMI would not recoup those costs until the season arrived many months later and GBMI finally completed its sales to its customers.

## II.    Greystone's Role in the GBMI-Diesel Relationship

105.    Greystone was introduced to the GBMI-Diesel relationship in 2006 when Greystone began negotiating a financing arrangement with GBMI. GBMI indicated to Greystone that it sought the financing arrangement because it was in the midst of financial problems and needed substantial infusions of cash and revolving loans in order to continue its business operations and avoid bankruptcy. Greystone and GBMI ultimately entered a Loan and Security Agreement (the "Financing Agreement") on December 4, 2006.

106.    The Financing Agreement called for Greystone to make revolving loans and other credit accommodations to GBMI up to a maximum of $25 million and pursuant to conditions stated therein. In February 2007, the maximum was increased to $27 million.

107.    To secure the full payment and performance of its obligations, GBMI collaterally assigned and granted Greystone a continuing security interest in virtually all of GBMI's assets, then existing or thereafter acquired, including: (i) all accounts; (ii) all chattel paper, instruments, documents and general intangibles (including, *inter alia*, all goodwill,

customer lists, guarantee claims, contracts rights, payment intangibles and rights to indemnification; (iii) all inventory; (iv) all goods; (vi) all deposit accounts, bank accounts, deposits and cash; (vii) all letter-of-credit rights; (viii) commercial tort claims; (ix) all supporting obligations; (x) any other property of GBMI then or thereafter in the possession, custody or control of Greystone; and (xi) all additions and accessions to, substitutions for, and replacements, products and proceeds of the foregoing property, including, *inter alia*, all of GBMI's books and records relating to any of the foregoing and to GBMI's business.

108.    Greystone knew that a substantial portion of GBMI's business arose out of GBMI's relationship with the Diesel Entities. Therefore, prior to entering into the Financing Agreement, Greystone sought to ensure that the Diesel Entities consented to, and would not interfere with, Greystone's role as senior secured lender to GBMI.

109.    The Diesel Entities, in turn, knew that Greystone's provision of financing to GBMI was necessary to the continuation of GBMI's role as distributor of Diesel-branded products in the United States. The Diesel Entities therefore welcomed Greystone's involvement and executed several letter agreements and other documents acknowledging Greystone's position as senior secured lender to GBMI and agreeing not to interfere with Greystone's rights and remedies under the Financing Agreement.

110.    Prior to entering the Financing Agreement, Greystone also searched public records and found no record of any security interest claimed by any of the Diesel Entities in any of GBMI's property.

**A.    The Non-Interference Agreements.**

111.    In letter agreements dated November 30, 2006, and December 1, 2006 (collectively, the "Non-Interference Agreements"), Diesel SpA and Diesel Kid, respectively, formally consented to GBMI's entering into the Financing Agreement and acknowledged and

-21-

agreed that until all of the liabilities owing to Greystone under the Financing Agreement were paid in full and the Financing Agreement had been terminated, Diesel SpA or Diesel Kid would not: (1) create, assert or possess any security interests, liens, retentions of title, or similar rights on the assets of GBMI (the "Collateral"); (2) sell, assign, transfer, pledge or give a security interest in any of the Collateral; or (3) hinder or otherwise interfere with Greystone's rights and remedies under the Financing Agreements, including the liquidation of the Collateral by Greystone or its agents after a default under the Financing Agreements.

112.    The purpose of the Non-Interference Agreements was to ensure that the Diesel Entities would not interfere with Greystone's rights as senior secured creditor to GBMI. Greystone would not have entered the Financing Agreement without the agreement of the Diesel Entities not to interfere with Greystone's collateral or its liquidation of the collateral in the event that GBMI defaulted under the Financing Agreement.

113.    A substantial portion of the negotiation of the Non-Interference Agreements took place in New York and elsewhere in the United States.  Greystone executed the Non-Interference Agreements in New York.

**B.    The Tripartite Agreements.**

114.    On December 4, 2006, Diesel Props entered a letter agreement with Greystone and GBMI setting out certain circumstances in which Greystone's revolving loans to GBMI would be paid directly to Diesel Props. On the same date, Diesel Kid entered an identical letter agreement with Greystone and GBMI. (Collectively, the two agreements will be referred to as the "Tripartite Agreements," or "TPAs"). The TPAs were expressly subject to the terms and conditions of the Financing Agreement.  If, for example, GBMI was in default under the Loan Agreement, Greystone had no obligation to wire funds to GBMI or the Diesel Entities.

115.    The TPAs were substantially negotiated in the United States, and, in particular, New York.  Greystone executed the TPAs in New York.  The TPAs contained a forum selection provision identifying the state and federal courts of New York as the forum for the resolution of disputes.

116.    The TPAs obligated Greystone to make payments (*i.e.*, the proceeds of revolving loans made by Greystone to GBMI under the Financing Agreement) directly to Diesel Props or Diesel Kid only upon the occurrence of several conditions precedent, all of which were designed to protect Greystone in its position as senior secured lender.  The conditions precedent included, *inter alia*, the following:  First, GBMI had to obtain a purchase order from one of its customers, deliver a copy of it to Greystone, and place a corresponding order with Diesel Props or Diesel Kid.  Second, Diesel Props or Diesel Kid had to provide Greystone with a copy of its invoice for the order that had been placed by GBMI.  Third, after GBMI received the shipment from Diesel Props or Diesel Kid and made the delivery to the customer, GBMI had to provide Greystone with a copy of its customer invoice.  Fourth, the shoes described in the customer invoice provided by GBMI had to match the shoes described in the invoice previously provided by Diesel Props or Diesel Kid.  Fifth, the loan had to be permitted under the terms and conditions of the Financing Agreement; meaning, *inter alia*, that GBMI had to have sufficient availability under the Financing Agreement and could not be in default of that Agreement.  Only if all of these conditions were satisfied did Greystone have an obligation to transmit funds to Diesel Props or Diesel Kid.

117.    The purpose of the requirements was to ensure that Greystone was adequately protected at all times.  The requirements ensured, in particular, that Greystone would not make a payment to one of the Diesel Entities for a particular order until an eligible GBMI account receivable existed with respect to that order.  Greystone did not, under any

-23-

circumstances, have an obligation to transmit funds to the Diesel Entities simply because one of the Diesel Entities had shipped shoes to GBMI.

118.    There were also aspects of the TPA procedure that were intended, in part, to provide protection to the Diesel Entities. The Diesel Entities could have declined to ship orders to GBMI for shoes that were not backed by purchase orders from GBMI's customers. The Diesel Entities also could have declined to ship orders following their receipt of notice of GBMI's default under the Financing Agreement. The Diesel Entities chose not to exercise these protective rights.

119.    The Diesel Entities knew at all times that they were unsecured creditors of GBMI and that Greystone was the senior secured creditor. The Diesel Entities acknowledged that their interests would be subordinate to Greystone's if the liquidation of GBMI's assets ever became necessary.

120.    Although the TPAs prohibited GBMI from placing an order with the Diesel Entities until and unless GBMI obtained and delivered a copy of a purchase order from a *bona fide* customer, the Diesel Entities frequently shipped shoes whenever orders were placed by GBMI and without regard to whether a corresponding purchase order existed. GBMI and the Diesel Entities agreed that any orders that were shipped by the Diesel Entities before GBMI had obtained a purchase order would not be subject to the TPAs. Instead, GBMI and the Diesel Entities entered a side agreement to govern these situations.

121.    Under the side agreement, if GBMI placed an order with one of the Diesel Entities despite not having a purchase order in place from a customer, GBMI was required to provide a Letter of Credit drawable 60 days from invoice date issued by a primary bank at the moment of order placement. The Diesel Entities ultimately did not require GBMI's adherence to this provision, either.

-24-

122.    Greystone was not a party to the side agreement between the Diesel Entities and GBMI and had no obligations thereunder. Orders that were placed under the side agreement were, by definition, not subject to the TPAs.

III.    **The Diesel Entities' Late Deliveries and Other Breaches of the Distribution Agreements.**

A.    **Late Deliveries and Other Breaches in December 2006 and early 2007.**

123.    Diesel-branded footwear is manufactured in factories in China and elsewhere in Asia. The Diesel Entities own a warehouse in China, called "SNATT," and would ship shoes by boat from that facility to GBMI in the United States. At all times relevant to these counterclaims and third-party claims, the Diesel Entities were responsible for ensuring that Diesel-branded footwear was shipped on time to GBMI in the United States and with proper labeling and bar-coding.

124.    At the time of the execution of the Financing Agreements, TPAs and Non-Interference Agreements, GBMI had purchase orders from its customers for, collectively, over 540,000 pairs of Diesel branded shoes for the Spring/Summer 2007 season with a total sales value of more than $24.2 million. Greystone relied on the existence of those orders, and the expected revenue, in deciding to enter the Financing Agreements and TPAs.

125.    GBMI continued taking additional purchase orders for Spring/Summer 2007 shoes in the weeks following the execution of the Financing Agreements, TPAs and Non-Interference Agreements.

126.    The Diesel Entities allowed GBMI to order more shoes for the Spring/Summer 2007 season than the number of shoes for which GBMI had customer purchase orders in place. The Diesel Entities wanted to maximize sales and knew that adherence to the TPAs would have a limiting effect on sales. GBMI and the Diesel Entities also wanted to be

prepared for "sell-through" opportunities, in which retail stores would sell out of their stock of Diesel-branded footwear and come back to GBMI with additional orders. GBMI and the Diesel Entities wanted to ensure that GBMI had enough shoes in its inventory to fill "sell-through" orders promptly.

127.    GBMI's customers expected and needed to have their purchase orders fulfilled by a date certain in order to ensure that in-season shoes were available for display and sale to consumers.    The purchase orders that GBMI took from its customers for the Spring/Summer 2007 season therefore contained "cancel dates." If GBMI did not make full delivery of the ordered shoes on or before the cancel date, the customer had no obligation to accept the order. The Diesel Entities knew or should have known that the purchase orders from GBMI's customers would contain such cancel dates.

128.    GBMI placed its orders with the Diesel Entities for Spring/Summer 2007 season shoes early enough that there should have been sufficient time for the shoes to be shipped to GBMI and for GBMI to deliver the shoes to its customers prior to the cancel dates. At the time the orders were placed, however, the Diesel Entities knew or should have known that circumstances were present that would prevent them from shipping the shoes in time for GBMI to meet the cancel dates. The Diesel Entities did not disclose this knowledge to GBMI. Instead, they represented to GBMI that deliveries would be completed on time.

129.    The deliveries to GBMI were, in fact, late, thus causing GBMI to miss the cancel date on many of its customer orders. Many of those customers refused to accept the orders once they finally did arrive or insisted on receiving a substantial discount from the original sales price. With respect to the customers that refused to accept the orders at all, GBMI ended up either not selling the shoes or selling them at a substantial loss to discount outlets and other second-tier customers.

-26-

130.    Other orders were filled only partially by the cancel date, thus again allowing GBMI's customers to refuse to accept or pay for them. Many GBMI customers did, in fact, refuse to accept the orders once they did finally arrive, while others insisted on receiving a substantial discount from the original sales price. With respect to the customers that refused to accept the orders at all, GBMI ended up either not selling the shoes or selling them at a substantial loss.

131.    The Diesel Entities' late delivery also prevented GBMI from realizing full value of the shoes for which customer orders were not already in place. GBMI's customers had no desire to pay full price, or anything close to it, for shoes that were already out of season. Moreover, there was no opportunity for "sell-through" because the shoes had not been delivered on time in the first place. GBMI ended up either not selling the shoes or selling them at a substantial loss.

132.    Finally, the Diesel Entities also failed to ensure that proper bar-coding and labeling were placed on the shoes that were shipped. Without proper bar-coding and labeling, the shoes were undeliverable to GBMI's customers. Thus, again, the Diesel Entities caused GBMI to miss delivery dates and lose purchase orders. GBMI ended up either not selling the shoes at all or selling them at a substantial loss.

133.    The late deliveries by the Diesel Entities constitute a breach of Sections 5.1, 5.4 and 18.2 of the Distribution Agreements, as well as the Diesel Entities' implied obligation to ship within a reasonable time. The improper bar-coding and labeling constitutes a breach of Sections 5.5 and 18.2 of the Distribution Agreements, as well as the implied warranty of merchantability.

134.    GBMI lost more than $25 million in revenue on Spring/Summer 2007 shoes as a result of the breaches of the Distribution Agreements by the Diesel Entities. This

amount represents the difference between the revenue that GBMI actually received and the revenue it would have received had the shoes been delivered on time and with proper bar-coding/labeling. GBMI is entitled to indemnity from the Diesel Entities for these losses.

135.    Pursuant to the terms of the Financing Agreement, and as a result of GBMI's default thereunder, Greystone is the assignee of GBMI's rights under the Distribution Agreements, including GBMI's contract rights and rights to indemnification. The Diesel Entities acknowledged and consented to the assignment by executing the Non-Interference Agreements and TPAs.

**B.    GBMI's Default under the Financing Agreement in January 2007.**

136.    As a direct result of the breaches of the Distribution Agreements by the Diesel Entities, GBMI went into default under its Financing Agreement with Greystone just weeks after that Agreement was executed. On January 29, 2007, Greystone provided notice of the default to the Diesel Entities. Luigi Mezzasoma ("Mezzasoma"), a senior-level employee for the Diesel Entities, informed Greystone that the Diesel Entities were aware of GBMI's default and that further notices of default were unnecessary.

137.    In an email dated January 25, 2007, as well as subsequent conversations, the Diesel Entities acknowledged that they were at fault for the late and non-compliant deliveries. Mezzasoma informed GBMI that the Diesel Entities would strive to improve their performance and help GBMI overcome the negative impact on GBMI's business. He encouraged GBMI to collect orders for the Fall/Winter 2007 season and inform the customers that "Diesel is back."

138.    In light of the Diesel Entities' acknowledgement that they were at fault for the late and non-compliant deliveries, and their commitment to improve their performance, Greystone chose not to foreclose on its collateral following GBMI's default under the Financing

Agreement in January 2007. Instead, Greystone increased GBMI's revolving loan limit by $2 million to help accommodate GBMI's losses. During this time, Greystone continued to comply with its obligations under the various agreements between the parties.

139. Meanwhile, GBMI continued trying to find buyers for the Spring/Summer 2007 season shoes that had been shipped late and without proper bar-coding and labeling by the Diesel Entities. GBMI continued to lose money on the sales. GBMI also continued designing shoes, marketing them, and soliciting orders for the Fall/Winter 2007 season and beyond.

### C.   Diesel's Continuing Delays and Other Course of Performance Issues in the Spring and Summer of 2007.

140. Despite the delivery problems for the Spring/Summer 2007 season shoes, the Diesel Entities informed GBMI that deliveries would be much better for the Fall/Winter 2007 season. The Diesel Entities even represented that the Fall/Winter 2007 season shoes would begin reaching GBMI in April 2007 – one month earlier than expected.

141. Contrary to the Diesel Entities' representations, the first Fall/Winter 2007 season shoes did not reach GBMI until the end of May 2007. As a result, GBMI fell far short of its revenue expectations for May.

142. On June 1, 2007, Mezzasoma sent a letter to GBMI and Greystone claiming that Diesel Props was "suffering 5 weeks period of delays from the date the Customer Invoice is issued till the date when the (sic.) we receive the payment." The letter demanded that Greystone make all payments then due and owing by June 4, 2007. Greystone, however, already had made all the payments it was obligated to make under the TPAs. Any shoes that the Diesel Entities had not been paid for were shoes that the Diesel Entities chose to ship even though an order had not been placed by a GBMI customer. Such orders were not subject to the TPAs.

143.    Even if any of the orders had been subject to the TPAs, Greystone still would have no obligation to pay until and unless, *inter alia*: (1) GBMI submitted a copy of the invoice from its customer; (2) the GBMI invoice could be matched with the Diesel invoice; and (3) there was sufficient availability and a lack of default under the Financing Agreements. These conditions were not satisfied. Moreover, the Diesel Entities knew and acknowledged that Greystone's rights to payment were senior to their own.

144.    Notwithstanding the June 1, 2007, letter, the Diesel Entities continued taking orders from GBMI and shipping shoes to GBMI for the Fall/Winter 2007 season. Mezzasoma, in particular, represented to GBMI that the Diesel Entities would continue shipping shoes to GBMI and that GBMI should continue soliciting orders.

145.    On or around July 18, 2007, GBMI was instructed by Greystone to again notify the Diesel Entities of GBMI's default under the Financing Agreement. GBMI did so. Greystone provided written confirmation to Diesel of GBMI's default on August 2, 2007.

146.    Despite again receiving notice of the default, the Diesel Entities continued taking orders from and shipping shoes to GBMI. Mezzasoma consistently informed GBMI that the Diesel Entities intended to work with GBMI throughout the Fall/Winter 2007 season and beyond. GBMI relied on Mezzasoma's representations, as well as the parties' overall course of dealing, in continuing to take orders from its customers and place corresponding orders with the Diesel Entities for the Fall/Winter 2007 season and in continuing to perform development, design and marketing responsibilities with respect to the Spring/Summer 2008 and Fall/Winter 2008 seasons.

**D.    The Diesel Entities' Purported Termination of the Distribution Agreements and Sourcing Agreement.**

147.    On or about September 4, 2007, Diesel Props and Diesel Kid sent purported notices of default to GBMI under the Distribution Agreement. On or about the same date, Diesel Props and Diesel Kid sent purported notices of default to GBMI and Greystone under the TPAs.

148.    Despite those notices, Diesel shoes continued to arrive in the United States after September 4, 2007. Mezzasoma represented to GBMI that the Diesel Entities would permit GBMI to obtain and deliver the shoes that arrived in the United States after September 4, 2007.

149.    On October 17, 2007, the Diesel Entities sent a letter claiming that the Distribution Agreements were terminated effective October 4, 2007. Several weeks later, they sent a purported notice of termination of the Sourcing Agreement.

150.    The Diesel Entities did not have the right to terminate the Distribution Agreements or Sourcing Agreement.

**E.    The Effect of the Diesel Entities' Wrongful Termination on GBMI's Ability to Recoup Costs for the Spring/Summer 2008 and Fall/Winter 2008 Seasons.**

151.    By the time of the purported terminations of the Distribution Agreements and Sourcing Agreement, GBMI already had invested millions of dollars to develop and market Diesel-branded products for the Spring/Summer 2008 and Fall/Winter 2008 seasons. GBMI had designed shoes, prepared samples, attended trade shows, provided other marketing functions, and solicited orders for Diesel-branded products for those seasons. GBMI had dozens of employees performing those responsibilities.

152.    Under the parties' contracts and course of dealing, GBMI expected to recoup those costs in two ways: (1) the 8% commission under the Sourcing Agreement; and (2) its profit margins on sales under the Distribution Agreements. As of October 17, 2007, GBMI

already had booked $16 million in orders for Diesel-branded products for the Spring/Summer 2008 season.

153.    By purporting to terminate the Sourcing Agreement and Distribution Agreements, the Diesel Entities have deprived GBMI of the ability to recoup the millions of dollars of costs that it incurred in building the Diesel brand for the Spring/Summer 2008 and Fall/Winter 2008 seasons.  The Diesel Entities are attempting to appropriate the benefits of GBMI's work for themselves without incurring any of the costs.

IV.    **Diesel's Interference With Greystone's Collateral In October/November 2007.**

    A.    **The Gilbert West Shoes.**

154.    In August and early September 2007, GBMI received shipments totaling more than 160,000 pairs of Fall/Winter 2007 shoes from Diesel.  GBMI moved those shoes to a Gilbert Company warehouse in Chino, California.  GBMI already had thousands of pairs of Diesel-branded shoes from earlier seasons in that warehouse (collectively, the Diesel-branded shoes in the warehouse in Chino as of October 26, 2007, will be referred to as the "Gilbert West Shoes")

155.    Pursuant to Section 5.4 of the Distribution Agreements, GBMI became the owner of the Gilbert West Shoes the moment those shoes were placed on the boat from the Diesel factories in Asia.  The Diesel Entities have claimed an ownership interest in a substantial portion of the Gilbert West Shoes as a result of a retention-of-title provision in the Distribution Agreements; however, under the Uniform Commercial Code, which applies to this issue, the retention-of-title provision, if it applies at all, serves only to give the Diesel Entities a reservation of an unperfected security interest in the shoes.  The Diesel Entities have never taken any steps to perfect their security interest by filing a Uniform Commercial Code financing statement or otherwise.

-32-

156.    Greystone's perfected security interest in the Gilbert West Shoes is senior to Diesel's reservation of an unperfected security interest.  Accordingly, and as a result of GBMI's default under the Financing Agreement, Greystone has the right to enforce its security interest in accordance with the Financing Agreement, the Uniform Commercial Code, and other applicable law.  Greystone's rights include, among other things, the right to take possession and control of the Gilbert West Shoes.

157.    The Diesel Entities have interfered and continue to interfere with Greystone's rights in the Gilbert West Shoes through the filing and prosecution of this action, including the request for temporary and permanent injunctive relief.  The Diesel Entities also have interfered with Greystone's rights in the Gilbert West Shoes by making late deliveries, soliciting GBMI's customers to cancel their orders with GBMI, soliciting GBMI's employees, and falsely informing the market that GBMI is out of business.  Each of these actions constitutes a breach of the Non-Interference Agreements.

158.    As a result of the breach by the Diesel Entities, Greystone has incurred and continues to incur attorneys' fees and costs associated with defending this matter.  Greystone also has suffered from a significant diminution of value of its collateral.

**B.    The Long Beach Shoes.**

159.    Between September 20, 2007 and October 15, 2007, several more Diesel shipments totaling more than 50,000 pairs of shoes (the "Long Beach Shoes") arrived at a port in Long Beach, California.  The United States Customs and Border Protection documents, prepared by or at the direction of Diesel, identified GBMI as consignee and importer of record of the Long Beach Shoes.  GBMI paid customs and demurrage charges for them, with funds provided by Greystone.  GBMI had a customer, Genesco, with open purchase orders for the Long Beach Shoes, and these shoes were specifically imported for delivery to Genesco.

-33-

160.    The Diesel Entities refused to tender the bills of lading for the Long Beach Shoes to GBMI, thus preventing GBMI from obtaining possession of the shoes and delivering them to Genesco.

161.    On or about October 4, 2007, Mezzasoma represented to GBMI's Chief Executive Officer, Sudeepto Datta, that the Diesel Entities would deliver the bills of lading to GBMI and thus allow GBMI to obtain the Long Beach Shoes and deliver them to Genesco. The Diesel Entities did not, however, tender the bills of lading to GBMI, nor, upon information and belief, did they ever have an intention to do so.

162.    Pursuant to Section 5.4 of the Distribution Agreements, GBMI became the owner of the Long Beach Shoes the moment those shoes were placed on the boat from the Diesel factories in Asia.  The Diesel Entities have claimed an ownership interest in the Long Beach Shoes as a result of a retention-of-title provision in the Distribution Agreements; however, under the Uniform Commercial Code, which applies to this issue, the retention-of-title provision, if it applies at all, serves only to give the Diesel Entities a reservation of an unperfected security interest in the shoes.

163.    Greystone's perfected security interest in the Long Beach Shoes is senior to Diesel's reservation of an unperfected security interest.  Accordingly, and as a result of GBMI's default under the Financing Agreement, Greystone has the right to enforce its security interest in accordance with the Financing Agreement, the Uniform Commercial Code, and other applicable law.  Greystone's rights include, among other things, the right to take possession and control of the Long Beach Shoes.

164.    In direct violation of Greystone's rights as senior secured creditor and under the Non-Interference Agreements, the Diesel Entities presented the bills of lading to the

customs agent in late October 2007 and induced the agent to release the Long Beach Shoes to them. The Diesel Entities also attempted to convince Genesco to cancel its orders with GBMI.

165.    The actions of the Diesel Entities constitute conversion, breach of the Non-Interference Agreement, breach of the Distribution Agreement, and tortious interference with contractual relationships.    Greystone has suffered damages equal to the amount that Greystone would have realized for the Long Beach Shoes had the Diesel Entities not taken them.

### C.    GBMI's Goodwill, Customer Relationships and Customer Orders.

166.    GBMI has cultivated strong relationships with many customers and developed a substantial amount of goodwill for itself and the Diesel Entities during the past ten years. GBMI's goodwill and customer relationships are part of Greystone's collateral under the Financing Agreement.

167.    GBMI took many customer orders for Diesel branded shoes for the Fall/Winter 2007 and Spring/Summer 2008 seasons. Those orders were to be filled in the fall and winter months of 2007 and 2008. Those orders and corresponding proceeds are part of Greystone's collateral under the Financing Agreements.

168.    Beginning in October 2007, the Diesel Entities contacted GBMI's customers – including Genesco, Van Maur, Shoe Mania, and others – and tried to convince them to cancel their orders with GBMI and have those orders filled by the Diesel Entities instead. The Diesel Entities also refused to release the Long Beach Shoes and ship certain other shoes to GBMI that the Diesel Entities knew were necessary to fill GBMI's customer orders.    Upon information and belief, the Diesel Entities also informed GBMI's customers that GBMI was out of business and would not be able to fill their orders.

169.    As a direct result of the Diesel Entities' actions, many of GBMI's customers cancelled their orders with GBMI. Upon information and belief, some of those orders

were placed with the Diesel Entities instead. The Diesel Entities' actions also resulted in GBMI being unable to find buyers for the shoes in its inventory that were not already subject to orders.

170.    GBMI also will now be unable to fulfill the $16 million in customer orders that it already had booked for the Spring/Summer 2008 season. Upon information and belief, the Diesel Entities intend to take those orders for themselves even though it was GBMI that incurred millions of dollars of costs to design the shoes, prepare samples, market them, and solicit the orders.

171.    The actions of the Diesel Entities have shattered GBMI's goodwill, customer relationships, and customer contracts, thus substantially diminishing the value of Greystone's collateral.

172.    The Diesel Entities' interference with the goodwill, relationships and orders between GBMI and its customers constitutes a breach of the Non-Interference Agreements. The Diesel Entities also have commercial tort and contractual liability to GBMI, in which Greystone has a senior perfected security interest.

**D.    GBMI's Rights Under the Sourcing Agreement.**

173.    GBMI continued to perform its responsibilities under the Sourcing Agreement throughout the Summer and Fall of 2007. GBMI's efforts resulted in the placement of tens of millions of dollars of orders with manufacturers in Asia on behalf of the Diesel Entities. GBMI is entitled to an eight percent (8%) commission for those orders, or more than $1 million. GBMI also successfully designed special sample shoes for customers, including Genesco, on behalf of the Diesel Entities for the Spring/Summer 2008 season.

174.    Diesel Props has breached the Sourcing Agreement by terminating it without justification and failing to pay commissions to GBMI. Diesel Props also has attempted to obtain the Genesco samples for itself.

-36-

175.   The commissions under the Sourcing Agreement are part of Greystone's collateral under the Financing Agreements.

176.   The Diesel Entities also have breached Section 14(d) of the Sourcing Agreement, which prohibits them from retaining the services of "any person who was an employee of GBMI at any time during the term of this Agreement or during the one (1) year period following termination of this Agreement."   The Diesel Entities have breached this provision by soliciting multiple former GBMI employees as part of their effort to steal GBMI's contracts and business relationships.

177.   GBMI's rights under Section 14(d) are part of Greystone's collateral pursuant to the Financing Agreement.   The breach of Section 14(d) by the Diesel Entities thus interferes with Greystone's collateral and liquidation of that collateral.

178.   Pursuant to the Financing Agreement, and as a result of GBMI's default thereunder, Greystone is assignee of GBMI's rights under the Sourcing Agreement.   The Diesel Entities acknowledged and consented to the assignment by virtue of their execution of the Non-Interference Agreements and TPAs.

## V.     The Effects of the Diesel Entities' Breaches and Other Misconduct.

179.   As a direct and proximate result of their breaches of contract, torts and fraud, the Diesel Entities have devastated GBMI's business and forced GBMI into default of its Financing Agreement with Greystone.   The Diesel Entities also have interfered with Greystone's collateral, thus preventing Greystone from realizing the full value of that collateral.   The Diesel Entities are liable to Greystone and GBMI for their actions.

## FIRST COUNTERCLAIM / FIRST THIRD-PARTY CAUSE OF ACTION

### BREACH OF NON-INTERFERENCE AGREEMENT
### AGAINST DIESEL SpA, DIESEL PROPS AND DIESEL KID

180.    Greystone repeats and restates the allegations of Paragraphs 1-141 as if fully set forth herein.

181.    The Non-Interference Agreement between Diesel SpA and Greystone is a valid and enforceable agreement that is also binding on Diesel SpA's subsidiary, Diesel Props.

182.    The Non-Interference Agreement between Diesel Kid and Greystone is a valid and enforceable agreement.

183.    Greystone has performed all of its obligations, including all conditions precedent, under the Non-Interference Agreements.

184.    Diesel SpA, Diesel Props, and Diesel Kid have breached the Non-Interference Agreements by, *inter alia*: (a) interfering with Greystone's ability to liquidate the Gilbert West Shoes; (b) asserting control over the Long Beach Shoes; (c) breaching the Distribution Agreements; (d) interfering with GBMI's contractual relationships; (e) interfering with GBMI's business relationships; (f) soliciting GBMI's employees; (g) breaching oral agreements with GBMI; (h) preventing GBMI from recouping the costs it incurred to develop and sell products for the Spring/Summer 2008 and Fall/Winter 2008 seasons, including the $16 million in orders that GBMI already had obtained; and (h) failing to make payments due and owing to GBMI under the Sourcing Agreement.

185.    The Diesel Entities' breaches of the Non-Interference Agreements have proximately caused damage to Greystone in an amount to be determined at trial, presently estimated to exceed $30 million.

## SECOND COUNTERCLAIM / SECOND THIRD-PARTY CAUSE OF ACTION

### CONVERSION AGAINST DIESEL SPA, DIESEL PROPS AND DIESEL KID

186.    Greystone repeats and restates the allegations of Paragraphs 1-147 as if fully set forth herein.

187.    Greystone had and continues to have the right to possession and control of the Long Beach Shoes as a result of its senior security interest in those goods.

188.    The Diesel Entities interfered with Greystone's right to possession and control of the Long Beach Shoes by taking possession of those shoes for themselves.

189.    As a proximate result of the Diesel Entities' wrongful conduct, Greystone has suffered damages equal to the fair market value of the Long Beach Shoes, presently estimated to exceed $2 million.

## THIRD COUNTERCLAIM / THIRD THIRD-PARTY CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS AGAINST DIESEL SpA, DIESEL PROPS AND DIESEL KID

190.    Greystone repeats and restates the allegations of Paragraphs 1-151 as if fully set forth herein.

191.    GBMI had and continues to have business relationships with retail stores, department stores, discount outlets, and other businesses throughout the United States.

192.    The Diesel Entities tortiously interfered with those relationships through the use of dishonest, unfair or improper means.

193.    The actions of the Diesel Entities injured and, in some instances, ruined GBMI's relationships with those customers, thus proximately causing damage to GBMI.

194.    Greystone, as assignee of GBMI's rights, seeks damages in an amount to be proven at trial, presently estimated to exceed $30 million.

## FOURTH COUNTERCLAIM / FOURTH THIRD-PARTY CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS AGAINST DIESEL SpA, DIESEL PROPS AND DIESEL KID

195.    Greystone repeats and restates the allegations of Paragraphs 1-156 as if fully set forth herein.

196.    GBMI had contracts with retail stores, department stores and other customers, including but not limited to Genesco, Van Maur and Shoe Mania, for the sale of Diesel-branded products.

197.    The Diesel Entities tortiously interfered with those contracts through the use of dishonest, unfair or improper means.

198.    The actions of the Diesel Entities have proximately caused damage to GBMI.

199.    Greystone, as assignee of GBMI's causes of action, seeks damages in an amount to be proven at trial, presently estimated to exceed $7 million.

## FIFTH COUNTERCLAIM / FIFTH THIRD-PARTY CAUSE OF ACTION

### UNJUST ENRICHMENT AGAINST DIESEL SpA, DIESEL PROPS AND DIESEL KID

200.    Greystone repeats and restates the allegations of Paragraphs 1-161 as if fully set forth herein.

201.    The Diesel Entities have been unjustly enriched at the expense of Greystone through their: (a) assertion of control over the Long Beach Shoes; (b) breaches of the Distribution Agreements; (c) interference with GBMI's contractual relationships; (d) interference with GBMI's business relationships; (e) solicitation of GBMI's employees; (f) breach of oral agreements with GBMI; (g) appropriation of the benefits of GBMI's efforts to develop and sell shoes for the Spring/Summer 2008 and Fall/Winter 2008 seasons, including the $16 million in

orders that had already been booked by GBMI for the Fall/Winter 2008 season; and (g) failure to make payments due and owing to GBMI under the Sourcing Agreement.

202.    These actions have produced benefits to the Diesel Entities that they have accepted and retained in circumstances in which it would be inequitable for them to do so without paying the value of those benefits to Greystone.

203.    Greystone seeks disgorgement and restitution for those ill-gotten benefits in an amount to be proven at trial, presently estimated to exceed $30 million.

### SIXTH COUNTERCLAIM

### BREACH OF DISTRIBUTION AGREEMENT AGAINST DIESEL PROPS AND DIESEL KID

204.    Greystone repeats and restates the allegations of Paragraphs 1-165 as if fully set forth herein.

205.    The Distribution Agreements are valid and enforceable.

206.    GBMI has performed all of its obligations, including all conditions precedent, under the Distribution Agreements.

207.    Diesel Props and Diesel Kid have breached the Distribution Agreements by making late deliveries, failing to make deliveries, making deliveries that contain improper bar-coding and labeling, and attempting to terminate the agreement without justification.

208.    The breaches by Diesel Props and Diesel Kid have proximately caused damage to GBMI.

209.    Greystone, as assignee of GBMI's general intangibles, contract rights, and rights to indemnification, seeks damages, attorney's fees and costs in an amount to be proven at trial, presently estimated to exceed $30 million.

## SEVENTH COUNTERCLAIM / SIXTH THIRD-PARTY CAUSE OF ACTION

### BREACH OF ORAL AGREEMENT AGAINST
### DIESEL PROPS, DIESEL KID AND DIESEL SpA

210. Greystone repeats and restates the allegations of Paragraphs 1-171 as if fully set forth herein.

211. On or about October 4, 2007, Mezzasoma, on behalf of the Diesel Entities, orally promised to release the Long Beach Shoes to GBMI so that GBMI could use them to fulfill open customer orders.

212. GBMI has performed all of its obligations, including all conditions precedent, under the oral agreement with the Diesel Entities.

213. The Diesel Entities have breached the oral agreement by failing to release the Long Beach Shoes to GBMI.

214. The breach by the Diesel Entities has proximately caused damage to GBMI.

215. Greystone, as assignee of GBMI's general intangibles and contract rights, seeks damages in an amount to be proven at trial, presently estimated to exceed $750,000.

### EIGHTH COUNTERCLAIM

### BREACH OF SOURCING AGREEMENT AGAINST DIESEL PROPS

216. Greystone repeats and restates the allegations of Paragraphs 1-177 as if fully set forth herein.

217. The Sourcing Agreement between GBMI and Diesel Props is a valid and enforceable agreement.

218. GBMI has performed all of its obligations, including all conditions precedent, under the Sourcing Agreement.

219.    Diesel Props has breached the Sourcing Agreement by failing to pay commissions due and owing to GBMI, attempting to terminate the Sourcing Agreement without justification, and soliciting GBMI's employees and former employees.

220.    The breaches by Diesel Props have proximately caused damage to GBMI.

221.    Greystone, as assignee of GBMI's general intangibles, contract rights, and rights to indemnification, seeks damages, attorney's fees and costs in an amount to be proven at trial, presently estimated to exceed $1 million.

## NINTH COUNTERCLAIM / SEVENTH THIRD-PARTY CAUSE OF ACTION

## FRAUD AGAINST DIESEL SPA, DIESEL PROPS AND DIESEL KID

222.    Greystone repeats and restates the allegations of Paragraphs 1-183 as if fully set forth herein.

223.    The Diesel Entities made false representations regarding: (a) their ability to deliver shoes on time to GBMI for the Spring/Summer 2007 and Fall/Winter 2007 seasons; (b) their willingness to help GBMI overcome the consequences of the late delivery of the Spring/Summer 2007 shoes; (c) their intention to continue their relationship with GBMI through the Spring/Summer 2008 season and beyond; and (d) their willingness to release bills of lading for the Long Beach Shoes.

224.    The Diesel Entities made these representations with the intent to induce GBMI to continue developing and marketing Diesel shoes. The Diesel Entities also made these representations with the intent to induce Greystone to continue lending to GBMI. The Diesel Entities knew of the falsity of the representations at the time they were made.

225.    GBMI relied to its detriment on the false representations made by the Diesel Entities.

226.    Greystone relied to its detriment on the false representations made by the Diesel Entities.    Greystone chose not to foreclose on its collateral under the Financing Agreement following the initial default by GBMI, but rather continued to lend under that Agreement.

227.    The actions of the Diesel Entities have proximately caused Greystone to lose millions of dollars under the Financing Agreement with GBMI.    Had Greystone foreclosed on its collateral at the time of GBMI's initial default, Greystone could have realized the full value of its loans plus all interest and fees.    Similarly, had the Diesel Entities not devastated GBMI's business, GBMI would have been in a position to repay the loans from Greystone.

228.    Greystone, in its own right and as assignee of GBMI's general intangibles, seeks damages in an amount to be proven at trial, presently estimated to exceed $30 million.

WHEREFORE, Greystone demands judgment as follows:

A.    On the First Counterclaim/ First Third-Party Cause of Action, damages in an amount to be determined at trial, presently estimated to exceed $30 million.

B.    On the Second Counterclaim/ Second Third-Party Cause of Action, damages equal to the fair market value of the Long Beach Shoes, presently estimated to exceed $2 million.

C.    On the Third Counterclaim/ Third Third-Party Cause of Action, damages in an amount to be proven at trial, presently estimated to exceed $30 million.

D.    On the Fourth Counterclaim/ Fourth Third-Party Cause of Action, damages in an amount to be proven at trial, presently estimated to exceed $7 million.

-44-

E.   On the Fifth Counterclaim/ Fifth Third-Party Cause of Action, Greystone seeks disgorgement and restitution in an amount to be proven at trial, presently estimated to exceed $30 million.

F.   On the Sixth Counterclaim, damages, attorney's fees and costs in an amount to be proven at trial, presently estimated to exceed $30 million.

G.   On the Seventh Counterclaim/ Sixth Third-Party Cause of Action, damages in an amount to be proven at trial, presently estimated to exceed $750,000.

H.   On the Eighth Counterclaim, damages, attorney's fees and costs in an amount to be proven at trial, presently estimated to exceed $1 million.

I.   On the Ninth Counterclaim/ Seventh Third-Party Cause of Action, damages in an amount to be proven at trial, presently estimated to exceed $30 million.

J.   Prejudgment interest and costs; and

K.   Granting Greystone such other and further relief as the Court deems just and proper.

Dated: New York, New York
        March 25, 2008

                        MOSES & SINGER LLP


                        By:  /s/ Danielle S. Friedberg_____
                            Mark N. Parry
                            Danielle S. Friedberg
                        The Chrysler Building
                        405 Lexington Avenue
                        New York, NY 10174
                        (212) 554-7800
                        mparry@mosessinger.com
                        dfriedberg@mosessinger.com
                        *Attorneys for Defendant*
                            *Greystone Business Credit II, L.L.C.*

                        Of Counsel:

                        Richard M. Kohn
                        Daniel P. Shapiro
                        Stephen H. Locher
                        GOLDBERG KOHN BELL BLACK
                          ROSENBLOOM & MORITZ, LTD.
                        55 East Monroe Street
                        Suite 3300
                        Chicago, Illinois  60603
                        (312) 201-4000

-46-

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

DIESEL PROPS S.R.L. and                                :
DIESEL KID S.R.L.,                                     :
                                                       :        Docket No. 07 CV 9580 (HB)
                Plaintiffs/Counter-Defendants,          :
                                                       :
            v.                                          :
                                                       :
GREYSTONE BUSINESS CREDIT II LLC                       :        **AFFIRMATION OF SERVICE**
and GLOBAL BRAND MARKETING INC.,                       :
                                                       :
                Defendants/Counter-Plaintiffs           :
                                                       :
            v.                                          :
                                                       :
DIESEL S.p.A.                                          :
                                                       :
                Third-Party Defendant                   :
                                                       :

        I, Danielle S. Friedberg, declare under penalty of perjury that on March 25, 2008,

I have served a copy of the attached:

        • **Answer, Counterclaims and Third-Party Complaint**

dated March 25, 2008 upon:

                Ira S. Sacks, Esq.
                Mark S. Lafayette, Esq.
                Dreier LLP
                499 Park Avenue
                New York, NY 10022

                Glen A. Silverstein, Esq.
                Michael J. Tiffany, Esq.
                Leader & Berkon, LLP
                630 Third Avenue
                New York, N.Y. 10017

by electronic mail and by depositing the same, properly enclosed in a post-paid, properly

addressed wrapper, in an official depository under the exclusive care and custody of the

United States Post Office Department within the City and State of New York.

Dated:  New York, New York
        March 25, 2008

                                        /s/ Danielle S. Friedberg
                                        Danielle S. Friedberg
                                        Moses & Singer LLP
                                        405 Lexington Avenue
                                        New York, New York 10174-1299
                                        Tel.: 212-554-7800
                                        Fax: 212-554-7700