**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x
DIESEL PROPS S.R.L. and DIESEL KID S.R.L., :
                                            :
        **Plaintiffs / Counter-Defendants,** :

                                            :    **07 Civ. 9580 (HB)**
  - against -                             :
                                            :    <u>**OPINION & ORDER**</u>
GREYSTONE BUSINESS CREDIT II LLC and :
GLOBAL BRAND MARKETING INC., :
                                            :
        **Defendants / Counter-Plaintiffs,** :
                                            :
-against- :
                                            :
DIESEL S.p.A., :
                                            :
        **Third-Party Defendant.** :
-------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

      This case involves relationships among two Italian shoe companies, their Italian parent corporation, their distributor in the United States and the distributor's secured lender. The shoe companies, Plaintiffs Diesel Props S.r.l. ("Props") and Diesel Kid S.r.l. ("Kid"), have sued their U.S. distributor, Global Brand Marketing Inc. ("GBMI"), and GBMI's secured lender, Greystone Business Credit II LLC ("Greystone"), for breach of contract, conversion and unjust enrichment, among other claims. GBMI and Greystone have asserted various counterclaims against Props and Kid and a third-party complaint against Plaintiffs' parent company, Diesel S.p.A. ("Diesel SpA"). Prop, Kid and Diesel SpA will herein be referred to, collectively, as the "Diesel Entities." The Diesel Entities move to dismiss Defendants' counterclaims.

      After filing their motions to dismiss, Props and Kid filed a third amended complaint, and in response GBMI and Greystone amended their answers, counterclaims and third-party complaints. Now, in addition to their motions to dismiss, the Diesel Entities request the Court to strike certain portions of the amendments to Defendants' pleadings. For the reasons set forth below, the Diesel Entities' motion to strike is denied. Their motions to dismiss are granted in part and denied in part.

# I. FACTUAL BACKGROUND

Diesel SpA owns certain Diesel trademarks that it licenses to two subsidiaries, Props and Kid, for the manufacture and sale of Diesel footwear for adults and children. 3d Am. Compl. ¶¶ 3-5, 8. In November 2005, Props and Kid entered into separate, but substantially similar, distribution agreements ("Distribution Agreements") with GBMI, a California corporation. Distribution Agreements, Ex. B to Decl. of Ira Sacks (Mar. 25, 2008) ("Sacks Decl."). Under the Distribution Agreements, GBMI would order and buy footwear from Plaintiffs to resell to GBMI's customers in the United States for the period of May 1, 2006 to December 31, 2008. *Id.*

In 2001 and 2002, Diesel SpA and Kid, but not Props, entered into licensing agreements with GBMI which granted GBMI a license to use certain Diesel trademarks. 3d Am. Compl. ¶¶ 9-10. Further, Props, but not Kid or Diesel SpA, entered into a Diesel Adult Footwear Developing, Sourcing and Buying Agreement ("Sourcing Agreement") with GBMI, pursuant to which GBMI agreed to act as Prop's developing, sourcing and buying agent in exchange for commissions. Sourcing Agreement, Ex. A to Decl. of Ira Sacks (Jan. 22, 2008).

Due to financial difficulties, GBMI underwent various recapitalization and restructuring transactions in late 2006. On December 4, 2006, Greystone provided GBMI with a $25 million revolving loan to finance GBMI's business, including GBMI's purchase and resale of Diesel footwear, pursuant to a loan and security agreement ("Loan Agreement"). *See* Loan Agreement, Sacks Decl., Ex. C. To secure its full payment and performance under that agreement, GBMI granted Greystone a security interest in its assets. Loan Agreement § 3.1.

Before executing the Loan Agreement, GBMI and Greystone obtained the consent of Diesel SpA and Kid, as GBMI's licensors. In letter agreements dated November 30 and December 1, 2006 ("Non-Interference Agreements"), Diesel SpA and Kid (but not Props) each consented to the Loan Agreement. Diesel SpA and Kid also agreed, among other things, that they would not interfere with Greystone's rights and remedies under the Loan Agreement, including Greystone's liquidation of its collateral in the event of GBMI's default. *See* Non-Interference Agreements, Sacks Decl., Ex. D.

Because GBMI would be borrowing money from Greystone to pay for Diesel footwear, the parties agreed on a procedure by which Greystone would make payments directly to Props and Kid for shoes purchased by GBMI. Such payments would be deducted from the amount available under Greystone's $25 million revolving loan to GBMI. Props and Kid each memorialized these payment procedures in separate letter agreements with GBMI and Greystone

effective December 4, 2006. Collectively, these two letters are referred to as the "Tripartite Agreements" or the "TPA." The TPA provided that when Props or Kid shipped shoes to GBMI, Props or Kid would send an invoice to Greystone, which would pay the amount owed by GBMI. Upon Props' or Kid's request, Greystone was obligated to confirm that revolving loans were available under the Loan Agreement to pay for the goods. TPA, Sacks Decl., Ex. F.

GBMI later went into default under the Loan Agreement. Greystone alleges that on January 29, 2007, it notified the Diesel Entities of GBMI's default. Greystone's 3d Am. Answer ¶ 121.[1] However, Greystone chose not to foreclose on its collateral and instead increased GBMI's revolving loan limit by $2 million to help accommodate GBMI's losses. *Id.* ¶ 124.

By September 2007, GBMI's and Greystone's relationships with Props and Kid had deteriorated. In a letter dated September 4, 2007, Props and Kid notified Greystone that it was in default of the Tripartite Agreements due to its alleged failure to pay Props' and Kid's invoices, and that if the default were not cured within thirty days Props and Kid would terminate the TPA. Sacks Decl., Ex. J. The same day, Props and Kid notified GBMI that it was in default of its obligations under both the Distribution Agreements and the TPA due to its failure to pay for Diesel footwear. Props and Kid gave GBMI thirty days to cure. Sacks Decl., Ex. K. In October and November 2007, Props and Kid notified GBMI and Greystone that they were terminating the Distribution and Sourcing Agreement and the TPA. *See* 3d Am. Answer ¶ 135.

## II. PLAINTIFFS' AND DEFENDANTS' CLAIMS

Props and Kid claim that GBMI and Greystone failed to pay for approximately $20 million of Diesel footwear that Plaintiffs shipped to GBMI. They also allege that Defendants converted 158,527 pairs of Diesel footwear that were owned by Props and Kid. 3d Am. Compl. ¶¶ 23, 38. Props and Kid sue GBMI and Greystone for breach of the Tripartite Agreements, unjust enrichment, conversion and account stated. *Id.* ¶¶ 43-56. The third amended complaint also includes causes of action against GBMI, but not Greystone, for fraud and/or negligent misrepresentation and promissory estoppel. *Id.* ¶¶ 57-62. To support these new claims against GBMI, Plaintiffs' third amended complaint contains several additional factual allegations of promises made by officers of GBMI to Plaintiffs. *See, e.g.*, *id.* ¶ 21.

---

[1] The factual allegations in Defendants' third amended answers are virtually identical. Unless otherwise indicated, citations herein are to paragraphs as numbered in Greystone's answer and will be referred to as "3d Am. Answer."

In their counterclaims and third-party complaints, GBMI and Greystone allege that beginning in December 2006, the Diesel Entities breached their contracts with GBMI by, for example, making late deliveries of shoes, and that the Diesel Entities' actions forced GBMI into default under its Loan Agreement with Greystone. 3d Am. Answer ¶ 76. Defendants assert that the Diesel Entities attempted to steal GBMI's orders, customers and employees, and wrongfully refused to ship or release certain products for which GBMI had open customer orders waiting to be fulfilled. *Id.* Greystone claims that the Diesel Entities harmed it by interfering with its collateral, *i.e.*, GBMI's assets. *Id.*

GBMI makes the following claims against Props, Kid and Third-Party Defendant Diesel SpA: conversion, tortious interference with business relations, tortious interference with contract, unjust enrichment, breach of an oral agreement, and fraud. GBMI also counterclaims against Props and Kid for breach of the Distribution Agreements, and against Props for breach of the Sourcing Agreement. Greystone alleges that it is GBMI's assignee and on this ground brings causes of action for tortious interference with business relations, tortious interference with contract, breach of an oral agreement, breach of the Distribution Agreements and breach of the Sourcing Agreement. Greystone also makes claims in its own stead against the Diesel Entities for conversion, unjust enrichment, fraud and breach of the Non-Interference Agreements.

### III. MOTIONS TO STRIKE AND RENEW

Soon after the Diesel Entities' motions to dismiss were fully submitted, this Court permitted Plaintiffs to file a third amended complaint, to which Defendants responded by filing amended pleadings. The Diesel Entities now move to strike certain parts of Defendants' amended answers, counterclaims and third-party complaints,[2] and to renew their motions to dismiss as against Defendants' amended pleadings.

### A. Defendants' Amended Allegations

Some of Defendants' amended allegations appear to respond to the Diesel Entities' arguments in support of their motions to dismiss. For example, the Diesel Entities argue that Defendants' third-party complaint against Diesel SpA should be dismissed because they failed to

---

[2] Specifically, the Diesel Entities move to strike the amended portions of the following paragraphs: the second sentence of ¶ 55 of GBMI's answer (same as Greystone's ¶ 55); ¶ 83 of GBMI's answer (same as Greystone's ¶ 82); ¶ 87 of GBMI's answer (same as Greystone's ¶ 86); ¶¶ 123-25 of GBMI's answer (same as Greystone's ¶¶ 122-24); ¶ 127 of GBMI's answer (same as Greystone's ¶ 126); and ¶ 163 of GBMI's answer (same as Greystone's ¶ 162). The Diesel Entities also move to strike GBMI's amended ¶ 17 and reinstate GBMI's previous ¶ 17. Finally, the Diesel Entities move to strike the amended portions of ¶¶ 85, 88, 99, 101, 113, 116, 119, 130, 132, 155 and 209 of Greystone's answer.

allege facts sufficient to pierce the corporate veil. In their amended pleadings, Defendants add allegations that Diesel SpA made all decisions on behalf of the Diesel Entities, that Plaintiffs could not take significant action without Diesel SpA's approval, that the Diesel Entities operated as a single entity, that Diesel SpA employees made decisions regarding Plaintiffs' business activities, that no one from the Diesel Entities ever differentiated between Diesel SpA and Plaintiffs in the performance of the parties' various agreements, that Diesel SpA employees were heavily involved in the GBMI-Diesel relationship, and that Diesel SpA employees directly participated in the decision to enter the Tripartite Agreements and in meetings regarding the Distribution Agreements. 3d Am. Answer ¶¶ 82, 86, 122.

As another example, the Diesel Entities argue in their motions to dismiss that Defendants failed to allege sufficient facts to support their claim that Props breached the Sourcing Agreement by soliciting GBMI employees. In their amended pleadings, Defendants have added the names of former GBMI employees who were allegedly solicited regarding employment opportunities. *Id.* ¶ 162.

Some amendments to Greystone's answer bolster Greystone's counterclaims and third-party complaint. For example, in its amended pleading Greystone alleges that the Diesel Entities not only failed to disclose to GBMI that they would be unable to ship shoes on time, but also failed to disclose this knowledge to Greystone, and that had the Diesel Entities shipped shoes on time, GBMI would have generated enough revenue to pay off its debt to Greystone and the Diesel invoices. *Id.* ¶¶ 113, 119. Greystone now alleges, too, that it agreed to forebear from asserting remedies under the Loan Agreement in reliance on the representations by a Props official to GBMI that the Diesel Entities would continue to work with GBMI. *Id.* ¶ 132.

The Diesel Entities seek to strike other amendments to Defendants' pleadings that are relatively inconsequential.[3]

## B.     Diesel Entities' Motion to Strike Is Denied

*Sua sponte*, or upon a party's motion, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike are disfavored by the courts. *See Boreri v. Fiat S.p.A.*, 763 F.2d 17, 23 (1st Cir. 1985); *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007). In considering a motion to strike, courts generally apply the same test used to determine a Rule

---

[3] *See, e.g.*, GBMI's 3d Am. Answer ¶¶ 17, 55; Greystone's 3d Am. Answer ¶¶ 85, 88, 99, 116, 130.

12(b)(6) motion and thus will deem the non-moving party's well-pleaded facts to be admitted, draw all reasonable inferences in the pleader's favor, and resolve all doubts in favor of denying the motion to strike. *See Breedlove v. Cabou*, 296 F. Supp. 2d 253, 274-75 (N.D.N.Y. 2003); *Solvent Chem. Co. ICC Indus., Inc. v. E.I. Dupont De Nemours & Co.*, 242 F. Supp. 2d 196, 212 (W.D.N.Y. 2002).

Plaintiffs point to Rule 4(A)(i) of this Court's individual practices, which requires that, within ten days after being served with a motion to dismiss, the non-moving party must notify the Court and its adversary in writing whether it intends to file an amended pleading or to rely on the pleading being attacked. The rule provides that "[i]f the non-moving party elects not to amend its complaint, no further opportunities to amend will be granted." Plaintiffs argue that, because Defendants declined to amend their claims upon the motion to dismiss and instead filed an opposition brief, they may not amend their claims now.

Here, however, Defendants have not violated this Court's individual practices because Plaintiffs' third amended complaint invited a responsive pleading and Defendants timely filed answers to the amended complaint. *See* Fed. R. Civ. P. 15(a)(3). The issue is whether an answer filed in response to an amended complaint may contain additional factual allegations that are unrelated to the complaint's amendments.

While the Second Circuit has been silent on the issue, the Seventh Circuit and district courts in this Circuit and elsewhere have held that an amended complaint opens the door to new affirmative defenses and even new counterclaims. *See, e.g.*, *Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999) ("Because a plaintiff's new complaint wipes away prior pleadings, the amended complaint opens the door for defendants to raise new and previously unmentioned affirmative defenses."); *Plon Realty Corp. v. Travelers Ins. Co.*, 533 F. Supp. 2d 391, 394 (S.D.N.Y. 2008) (permitting defendant to raise affirmative defense in answer to amended complaint); *Sidari v. Orleans County*, 174 F.R.D. 275, 283 (W.D.N.Y. 1996) ("The plaintiff's filing of the Amended Complaint gives the defendants a new opportunity to respond to the amended complaint, to assert new affirmative defenses, counterclaims, . . . ."); *Joseph Bancroft & Sons Co. v. M. Lowenstein & Sons, Inc.*, 50 F.R.D. 415, 419 (D. Del. 1970) (permitting new counterclaims because "[s]ince the amending pleader chooses to redo his original work, and receives the benefit of this *nunc pro tunc* treatment, he can hardly be heard to complain that

claims filed against him are improper because they should have been asserted in response to his original pleading").[4]

In these cases and others, courts have permitted defendants to assert new affirmative defenses and counterclaims in response to an amended complaint. Therefore, *a fortiori*, a defendant may be permitted to amend its answer to add new factual allegations, which cause less prejudice to the plaintiff than new counterclaims, when the plaintiff files an amended complaint. Following the weight of the authority, this Court holds that the amendments to Defendants' pleadings were permissible and will not be stricken.

### C.  Diesel Entities' Motion to Renew Is Granted

Defendants argue that this Court should not renew the Diesel Entities' motions to dismiss because they address Defendants' original counterclaims and third-party complaints, which are superseded by Defendants' amended pleadings. The case relied upon by Defendants is inapposite, however, because there the party never sought to renew its motion after its adversary filed an amended pleading. *See Kelley v. Crosfield Catalysts*, 135 F.3d 1202 (7th Cir. 1998). Here, the Diesel Entities seek to renew their motions to dismiss regardless of this Court's disposition of their motion to strike. *See* Reply at 3.

## IV.  MOTIONS TO DISMISS

### A.  Forum Selection Clauses

The Diesel Entities argue that the forum selection clauses in the Distribution Agreements and Sourcing Agreement necessitate the dismissal of *all* of Defendants' claims.[5] The Distribution Agreements between GBMI and Props and GBMI and Kid provide that

> for any dispute between the Parties and arising out of or connected with this Agreement regarding in particular, but without prejudice to the generality of the

---

[4] At least one court has held that a defendant may assert new counterclaims without leave of the court only when the amended complaint changes the "theory or scope of the case." *See Tralon Corp. v. Cedarapids, Inc.*, 966 F. Supp. 812, 832 (N.D. Iowa 1997). Here, however, Defendants have not brought new counterclaims, and, nevertheless, Plaintiffs' third amended complaint does change the scope of this case by adding two new causes of action against GBMI.

[5] "The Supreme Court has not specifically designated a single clause of Rule 12(b) as the proper procedural mechanism to request dismissal of a suit based upon a valid forum selection clause." *Asoma Corp. v. SK Shipping Co., Ltd.*, 467 F.3d 817, 822 (2d Cir. 2006) (internal quotations omitted). *See also Cfirstlcass Corp. v. Silverjet PLC*, 560 F. Supp. 2d 324, 326-27 (S.D.N.Y. 2008) ("There is a split of authority in the Second Circuit regarding the appropriate procedural mechanism [*i.e.*, Fed. R. Civ. P. 12(b)(1), (3) or (6)] by which to enforce a forum selection clause."). Although the Diesel Entities fail to identify a clause of Rule 12(b), this Court need not address the issue because neither GBMI nor Greystone contests that a motion to dismiss may be brought on the basis of a forum selection clause.

foregoing, its conclusion, execution, validity, breach, termination and determination of damages, which cannot be settled amicably, the exclusive jurisdiction shall be the Court of Milan, Italy.

Distribution Agreement ¶ 21.2.  The Sourcing Agreement between GBMI and Props provides:

[a]ny dispute that may arise or should be associated with this Agreement, concerning in particular but not limited to, its termination, execution, validity, default, withdrawal and damages assessment, shall be submitted to the exclusive jurisdiction of the Court of Milan, Italy.

Sourcing Agreement ¶ 24.

This Court engages in a four-part inquiry to determine whether a claim must be dismissed by reason of a forum selection clause.  The first question is whether the plaintiff has shown that the clause was reasonably communicated to the party resisting enforcement.  Second, has the plaintiff shown that the clause was mandatory?  Third, has the plaintiff shown that the claims and parties are subject to the clause?  *See, e.g.*, *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007); *John Boutari & Sons, Wines & Spirits, S.A. v. Attiki Imps. & Distribs. Inc.*, 22 F.3d 51, 53 (2d Cir. 1994); *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1358-61 (2d Cir.), *cert. denied*, 510 U.S. 945 (1993).

Fourth, if the plaintiff has met its burden as to the first three prongs, the burden shifts to the defendant to "rebut the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'"  to "rebut the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'"  *Phillips*, 494 F.3d at 383-84 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972) (establishing federal standard relating to enforcement of forum selection clauses applicable in admiralty and international transactions)); *see Bense v. Interstate Battery Sys. of Am., Inc.*, 683 F.2d 718, 721 (2d Cir. 1982) (applying *Bremen* standard to contractual dispute in non-admiralty context).

Several courts in this circuit have puzzled over what law to apply to this analysis when the contract also contains a choice of law provision, as here.  *See, e.g.*, *Phillips*, 494 F.3d at 384. There is no doubt that the first and fourth steps of the analysis—whether the clause was communicated to the resisting party and whether enforcement would be unreasonable or unjust— are procedural in nature and are analyzed under federal law.  *See id.* ("Despite the presumptive validity of choice of law clauses, our precedent indicates that federal law should be used to

determine whether an otherwise mandatory and applicable forum clause is enforceable under *Bremen*, *i.e.*, step four in our analysis.").

However, the *Phillips* court was troubled by the application of federal law to the second and third parts of the analysis, which concern the meaning and scope of the forum selection clause, and noted that "[l]ittle discussion of the issue can be found in federal court decisions." *Id.* at 385. Agreeing with the Tenth Circuit's holding in *Yavuz v. 61 MM, Ltd.*, 465 F.3d 418 (10th Cir. 2006), the court "[could not] understand why the interpretation of a forum selection clause should be singled out for application of any law other than that chosen to govern the interpretation of the contract as a whole." *Id.* at 386; *see Yavuz*, 465 F.3d at 428-30 ("[U]nder federal law the courts should ordinarily honor an international commercial agreement's forum-selection provision *as construed under the law specified in the agreement's choice of law provision*." ) (emphasis in original).

Nevertheless, the *Phillips* court found that the parties had consented to the application of federal precedent because they had neither objected to the lower court's citation to federal law nor construed the clause under English law in their briefs. 494 F.3d at 386 (citing *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) ("[T]he parties' briefs assume that New York law controls this issue, and such implied consent . . . is sufficient to establish choice of law.") (citation omitted)).

Here, the Distribution and Sourcing Agreements contain a choice of law clause that provides that Italian law governs any interpretation of the contract. Although the Diesel Entities have submitted a declaration by an Italian attorney who purports to interpret the forum selection clause under Italian law, *see* Declaration of Carlo Pascotto ("Pascotto Decl."), all parties cite extensively to federal law in their briefs. *See, e.g.*, Pls.' Mem. of Law in Support of Mot. to Dismiss Counterclaims of GBMI, at 10 (citing *Coregis Ins. Co. v. Amer. Health Found., Inc.*, 241 F.3d 124, 128-29 (2d Cir. 2001), for meaning of terms in forum selection clause). Moreover, with the exception of two citations to Italian court cases, Pascotto's declaration makes no more than conclusory assertions to the effect that Italian law mandates the dismissal of Defendants' counterclaims. Therefore, this Court analyzes the effect of the forum selection clauses on each of GBMI's and Greystone's counterclaims according to federal precedent.

### *1. GBMI's Claims*

The first two parts of the analysis are not at issue because GBMI contests neither that it was informed of the forum selection clauses, nor that the clauses are mandatory. GBMI was a

party to the Distribution and Sourcing agreements, and the clauses expressly establish Milan, Italy as the "*exclusive* jurisdiction" for disputes.

With respect to the third step of the analysis, the Second Circuit has held that the scope of forum selection clause "is a contractual question that requires the courts to interpret the clause and, where ambiguous, to consider the intent of the parties." *New Moon Shipping Co., Ltd. v. Man B & W Diesel AG*, 121 F.3d 24, 33 (2d Cir. 1997). Courts have consistently analyzed a clause's scope by reference to the meaning of its terms. In *Phillips*, where the clause covered "legal proceedings that may arise out of" the contract, the court relied on federal precedent and the dictionary to determine whether the claims were within the clause. 494 F.3d at 388-89. The language of the forum selection clauses here is broader: the Distribution Agreements' clause encompasses disputes arising out of or "connected with" the agreement, and the Sourcing Agreement's clause applies to disputes that arise from or are "associated with" the agreement. *See id.* at 389 ("connection with" and "associated with" broader in scope than "arise out of").

To "arise" out of means "to originate from a specified source." *See Coregis*, 241 F.3d at 128 (citing Webster's Third New International Dictionary 117 (1986) and Black's Law Dictionary 102 (7th ed. 1999)). The phrases "in connection with" and "associated with" are synonymous with the terms "with respect to," "with reference to" and "relating to," which mean "connected by reason of an established or discoverable relation." *See id.* (citing Webster's Third New International Dictionary, *supra*, at 1916). In *Coregis*, the Second Circuit held that tort claims based on alleged misrepresentations were "related to" the companies' insolvency or financial impairment within the meaning of the insurance policy at issue. Although in that case the term "related to" appeared in an insurance policy and not in a forum selection clause, the Second Circuit's broad reading of the term is applicable in this context, as well. *See Phillips*, 494 F.3d at 390 (applying the *Coregis* court's interpretation to forum selection clauses).

Similarly, in *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070 (3d Cir. 1997), cited favorably in *Phillips*, the court held that the phrase "in relation to" in a forum selection clause meant that "the origin of the dispute has some logical or causal connection" to the contract. *Id.* at 1074. The *Wyeth* court held that the plaintiff's claims were subject to the forum selection clause because the defendant's defense was that it did not need to pay certain amounts to the extent they exceeded payments under the contract which contained the clause. *Id.* This, the court reasoned, showed that the plaintiff's claims had a "logical" relationship to the contract. The meaning of "related to" is "extremely broad." *Id.* at 1075.

Judge Stein recently observed that

> courts, including this one, have held that 'a contractually-based forum selection clause will also encompass tort claims if the tort claims ultimately depend on the existence of a contractual relationship between the parties, or if resolution of the claims relates to interpretation of the contract, or if the tort claims involve the same operative facts as a parallel claim for breach of contract.'

*Cfirstclass Corp. v. Silverjet PLC*, 560 F. Supp. 2d 324, 329 (S.D.N.Y. 2008) (quoting *Direct Mail Prod. Servs. Ltd. v. MBNA Corp.*, No. 99 Civ. 10550, 2000 WL 1277597, at *6 (S.D.N.Y. Sept. 7, 2000)). *See also Anselmo v. Univision Station Group, Inc.*, No. 92 Civ. 1471, 1993 WL 17173, at *2 (S.D.N.Y. Jan. 15, 1993) ("A forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if 'the gist' of those claims is a breach of that relationship."); *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993) ("Regardless of the duty sought to be enforced in a particular cause of action, if the duty arises from the contract, the forum selection clause governs the action.").

With this background in mind, we turn to GBMI's counterclaims and third-party complaint. As set forth below, all of GBMI's claims against the Diesel Entities are subject to the scope of the forum selection clause in either the Distribution Agreements or the Sourcing Agreement.[6]

***GBMI Counterclaim #1.*** GBMI's first counterclaim is for conversion, against all the Diesel Entities, and is based on GBMI's allegations that the Diesel Entities induced a customs agent at the port in Long Beach, California, to release several shipments of shoes (the "Long Beach Shoes") back to Diesel. GBMI contends that it had ordered these shoes from the Diesel Entities specifically for delivery to one of its customers pursuant to a customer order. When the shipments, which totaled more than 50,000 pairs of shoes, arrived at port in Long Beach between September 20 and October 15, 2007, GBMI paid customs and demurrage charges for them, with

---

[6] Although Third-Party Defendant Diesel SpA is not a party to the Distribution Agreements or the Sourcing Agreement, it may nevertheless invoke the forum selection clauses in those agreements. This is because Defendants' causes of action against Diesel SpA rest solely on their veil-piercing theory that the Diesel Entities operated as a single entity. *See* 3d Am. Answer ¶¶ 83, 87, 123-25, 127. Further, Diesel SpA is "closely related" to Props and Kid such that its enforcement of the clauses is "foreseeable by virtue of the relationship." *See Cfirstclass*, 560 F. Supp. 2d at 329. "A non-party is 'closely related' to a dispute if its interests are 'completely derivative' of and 'directly related to, if not predicated upon' the signatory party's interests or conduct." *Cuno, Inc. v. Hayward Indus. Prods., Inc.*, No. 03 Civ. 3076, 2005 WL 1123877, at *6 (S.D.N.Y. May 10, 2005) (quoting *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998)).

funds provided by Greystone, but alleges that the Diesel Entities refused to tender bills of lading. According to GBMI, this prevented it from obtaining possession of the shoes, and the shoes were ultimately returned to Diesel. GBMI's 3d Am. Answer ¶¶ 146-47.

GBMI's conversion claim depends on its assertion that it had the right to possess and control the Long Beach Shoes as a result of section 5.4 of the Distribution Agreements. *Id.* ¶¶ 149, 168. GBMI has also asserted that the failure to tender bills of lading was a breach of the Distribution Agreements. *Id.* ¶ 152. GBMI's own allegations thus establish that its conversion claim is "connected with" the Distribution Agreements, within the meaning of the forum selection clause. Indeed, the issue of whether title to the shoes passed to GBMI when they reached Long Beach depends on the meaning of the retention-of-title provision in the Distribution Agreements, which are governed by Italian law. Therefore, GBMI's conversion claim is subject to the forum selection clause in the Distribution Agreements. *See Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 514 (9th Cir. 1988) ("Whether a forum selection clause applies to tort claims depends on whether resolution of the claims relates to interpretation of the contract."); *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir. 1994) (choice of law provision that covers any controversy "arising out of or relating to" the contract "is sufficiently broad to include tort claims as well as contract claims.").

**GBMI Counterclaim #2.** GBMI's second counterclaim is for tortious interference with business relations, against all the Diesel Entities. GBMI alleges that beginning in October 2007, the month in which Props and Kid gave notice of termination of the Distribution Agreements, the Diesel Entities tried to convince GBMI's customers to have their orders filled by the Diesel Entities themselves, refused to ship shoes that were necessary to fill GBMI's customer orders, and told GBMI's customers that GBMI was out of business. GBMI's 3d Am. Answer ¶ 155. GBMI alleges that these actions not only give rise to liability for tortious interference but also constitute breaches of the Distribution Agreements. *Id.* ¶ 159. Further, Plaintiffs' tort liability depends on whether they properly terminated the Distribution Agreements because if they did GBMI was no longer their distributor.

This counterclaim, therefore, is "connected with" the Distribution Agreements and subject to the forum selection clause therein. *See Hugel*, 999 F.2d at 208-09 (claim of tortious interference with business relations was subject to a forum selection clause that applied to "any dispute and/or controversy . . . arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's"); *Brennan v. Phyto-Rider Pharms., Ltd.*, No. 01

Civ. 11815, 2002 WL 1349742, at *4 (S.D.N.Y. June 20, 2002) (claim for tortious interference with business opportunity was subject to forum selection clause that applied to "any action, suit or proceeding arising out of or relating to this Agreement"); *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, No. 98 Civ. 3099, 2001 WL 300735, at *20 (S.D.N.Y. Mar. 27, 2001) (forum selection clauses covering "any questions arising from the performance of," and disputes "arising under," the contracts applied to tortious interference claim because claim was "dependent on" and "derivative of" the contractual relationship).

*GBMI Counterclaim #3.* GBMI's third counterclaim, for tortious interference with contract is grounded in the same actions as the tortious interference with business relations claim. Therefore, this counterclaim is within the scope of the forum selection clause, too.

*GBMI Counterclaim #4.* GBMI's fourth counterclaim is for unjust enrichment, against all the Diesel Entities. GBMI asserts that the Diesel Entities have been unjustly enriched at GBMI's expense through their (1) assertion of control over the Long Beach Shoes, (2) breaches of the Distribution Agreements, (3) interference with GBMI's contractual relationships, (4) interference with GBMI's business relationships, (5) solicitation of GBMI's employees, (6) breach of oral agreements with GBMI, (7) appropriation of the benefits of GBMI's efforts to develop and sell shoes, and (8) breach of the Sourcing Agreement.

Because arguments (1), (3) and (4) are identical to GBMI's conversion and tortious interference claims, described above, these grounds for unjust enrichment are "connected with" the Distribution Agreements and thus subject to the forum selection clause. Because (2) and (8) depend directly on GBMI's claims of breach of the Distribution and Sourcing Agreements, these grounds for unjust enrichment are also subject to the forum selection clauses.

The fifth ground for GBMI's unjust enrichment claim, that the Diesel Entities solicited former GBMI employees, is the same allegation on which GBMI bases its separate counterclaim for breach of the Sourcing Agreement. *See* GBMI's 3d Am. Answer ¶ 163. This basis for unjust enrichment, therefore, is subject to the forum selection clause in the Sourcing Agreement.

GBMI's sixth ground for unjust enrichment is that the Diesel Entities breached an oral agreement to release the Long Beach Shoes held at port in Long Beach, California. GBMI alleges that Luigi Mezzasoma ("Mezzasoma"), an officer of Props, represented to GBMI's chief executive officer that the Diesel Entities would deliver the bills of lading for the Long Beach Shoes, but they never did so. *Id.* ¶ 148. As explained *supra* in connection with GBMI's

conversion claim, actions relating to the possession and ownership of the shoes are connected with the Distribution Agreement, and thus this claim is subject to the forum selection clause.

GBMI's seventh argument for unjust enrichment is that the Diesel Entities appropriated the benefits of GBMI's efforts to develop and sell shoes for the spring/summer and fall/winter 2008 seasons, including $16 million in orders that had already been booked by GBMI for the fall/winter season. This claim depends on GBMI's allegation that the Diesel Entities had no right to terminate the Distribution and Sourcing Agreements. GBMI alleges that at the time of Props' and Kid's purported termination notices in October and November 2007, GBMI already had invested millions of dollars to develop and market Diesel-branded products for the spring/summer and fall/winter 2008 seasons and had expected to recoup these costs through its commissions under the Sourcing Agreement and its profit margins on sales under the Distribution Agreements. *Id.* ¶¶ 136-38. Therefore, the "appropriation" basis for unjust enrichment, too, is connected and associated with the Distribution and Sourcing Agreements and, like the rest of GBMI's counterclaim for unjust enrichment, is subject to the forum selection clause. *See Cfirstclass*, 560 F. Supp. 2d at 330 (forum selection clause applied to unjust enrichment claim that was "expressly premised on assertions regarding [the party's] rights involving the aircraft pursuant to the two agreements . . . and resolution of these claims will thus necessarily require analysis of the parties' rights and duties under the agreements").

**GBMI Counterclaim #5.** GBMI's fifth counterclaim is for breach of the Distribution Agreements, against Plaintiffs Props and Kid, but not Third-Party Defendant Diesel SpA. This counterclaim is obviously within the scope of the forum selection clause.

**GBMI Counterclaim #6.** GBMI's sixth counterclaim is for breach of oral agreement, against all the Diesel Entities. GBMI makes the same allegations that it uses to support one of the grounds for its unjust enrichment claim: that Mezzasoma promised to release the Long Beach Shoes to GBMI but failed to do so. As discussed *supra*, the alleged breach relates to the passage of title to the shoes, which depends on an interpretation of section 5.4 of the Distribution Agreement. Therefore, GBMI's cause of action for breach of oral agreement is "connected with" the Distribution Agreement and within the scope of the forum selection clause.

**GBMI Counterclaim #7.** GBMI's seventh counterclaim is for breach of the Sourcing Agreement, against Props, but not Kid or Diesel SpA. As with GBMI's claim of breach of the Distribution Agreements, this counterclaim is clearly subject to the forum selection clause.

***GBMI Counterclaim #8.*** GBMI's eighth counterclaim is for fraud, against all the Diesel Entities. The fraud counterclaim is based on GBMI's allegations that the Diesel Entities made false representations regarding (1) their ability to deliver shoes on time for the spring/summer and fall/winter 2007 seasons, (2) their willingness to help GBMI overcome the consequences of the late delivery of the spring/summer 2007 shoes, (3) their intention to continue their relationship with GBMI through the spring/summer 2008 season and beyond, and (4) their willingness to release bills of lading for the Long Beach Shoes. 3d Am. Answer ¶ 204. GBMI's allegation that the Diesel Entities failed to deliver shoes on time is also the foundation of its cause of action for breach of the Distribution Agreement. *Id.* ¶ 119. If the Diesel Entities represented that they would compensate GBMI for late deliveries, such representation would be connected to their relationship as governed by the Distribution Agreements. Similarly, the alleged promise to continue the relationship is tantamount to a promise to continue performance under the Distribution Agreements. Finally, as explained *supra*, the parties' actions with respect to the Long Beach Shoes are related to the Distribution Agreements.

Therefore, the forum selection clause covers GBMI's counterclaim for fraud. *See Turtur*, 26 F.3d at 310 (applying forum selection clause to fraud claim because claim "clearly 'arises out of' or 'relates to' their investment in" the investment partnership governed by the contract); *U.S. Fid. & Guar. Co.*, 2001 WL 300735, at *20 (fraud claim subject to forum selection clause because the alleged misrepresentations concerned the party's "intent to honor and perform, among other things, the Construction Contracts and is similar to the . . . claims for breach of contract").

For the foregoing reasons, each of GBMI's claims is subject to one or more of the forum selection clauses because each claim "relates in some way to rights and duties enumerated in the" Distribution or Sourcing Agreements. *See Manetti-Farrow*, 858 F.2d at 514.

### *2. Greystone's Claims*

Greystone seeks relief in its own right and "as assignee of GBMI's rights pursuant to its security interest in GBMI's assets." Greystone's 3d Am. Answer ¶ 54. Specifically, five of Greystone's claims, which are identical to GBMI's, are made as an "assignee" of GBMI's rights: tortious interference with business relations, tortious interference with contract, breach of the Distribution Agreements, breach of Mezzasoma's oral agreement, and breach of the Sourcing Agreement.

It is questionable whether Greystone is the assignee of GBMI's causes of action.[7] However, the Court need not address this issue now because the claims that Greystone makes as an assignee fall under the purview of the forum selection clauses. "Under New York law, an assignee cannot sue to enforce its rights under the contract without also assuming the other terms of the contract, including a forum selection clause." *GMAC Comm. Credit, LLC v. Dillard Dep't Stores, Inc.*, 198 F.R.D. 402, 407 (S.D.N.Y. 2001); *see also Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 682 (2d Cir. 1989) ("It has always been the law in New York that an assignee stands in the shoes of its assignor."). Here, because all of GBMI's claims are subject to the forum selection clauses, as set forth above, the causes of action brought by Greystone as the assignee of GBMI's rights are also within the clauses' scope.[8]

Greystone makes its remaining four claims in its own right: breach of the Non-Interference Agreements; conversion of the Long Beach Shoes, to which Greystone claims a senior security interest; unjust enrichment; and fraud. Because Greystone is not a party to the contracts that contain the forum selection clauses, these four claims are properly brought in this forum. *See L-3 Commc'ns Corp. v. Channel Techs., Inc.*, 737 N.Y.S.2d 366, 367 (N.Y. App. Div. 2002) (declining to apply forum selection clause to non-party).[9]

### 3. Forum Selection Clauses Are Reasonable

With respect to all of GBMI's eight claims and the five claims that Greystone brings as an assignee, the burden now shifts to the Defendants to "mak[e] a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *See Phillips*, 494 F.3d at 383-84 (quoting *Bremen*, 407 U.S.

---

[7] The assignment allegedly arises out of the Loan Agreement, which grants Greystone a security interest in GBMI's "General Intangibles (including, without limitation, all . . . contracts rights . . .)". *See* Loan Agreement ¶ 3.1. However, the Distribution Agreements required Props' or Kid's written approval before GBMI could assign any of its rights or the agreement itself. Distribution Agreements § 19(a). Greystone asserts that Diesel Spa and Kid's written consent to the Loan Agreement constituted the Diesel Entities' permission to GBMI to assign its contract rights to Greystone. This assertion is tenuous because Diesel SpA and Kid gave their written consent as GBMI's licensors, Props never consented in writing to the Loan Agreement, and there is no allegation that any of the Diesel Entities specifically consented in writing to an "assignment," as required by section 19(a) of the Distribution Agreements.

[8] It is undisputed that the same result would obtain pursuant to Italian law. *See* Pascotto Decl. ¶ 9 (forum selection clauses enforceable against Greystone pursuant to art. 2900 of Italian Civil Code).

[9] Diesel's reliance on *International Private Satellite Partners, L.P. v. Lucky Cat Ltd.*, 975 F. Supp. 483 (W.D.N.Y. 1997) for its contention that a non-party may nevertheless be subject to a forum selection clause is misplaced because in that case the non-party was a successor to the company that was a party to the contract and thus it was foreseeable that the successor would be bound by the clause. *Id.* at 486.

at 15). Defendants "bear[] a heavy burden; in order to escape the contractual clause, [they] must show 'that trial in the contractual forum will be so gravely difficult and inconvenient that [they] will for all practical purposes be deprived of [their] day in court.'" *New Moon*, 121 F.3d at 32 (quoting *Bremen*, 407 U.S. at 18).

In *Roby*, the court listed the following factors for courts to consider in determining if a forum selection clause is unreasonable:

> (1) if their incorporation into the agreement was the result of fraud or overreaching . . . ; (2) if the complaining party 'will for all practical purposes be deprived of his day in court,' due to the grave inconvenience or unfairness of the selected forum . . . ; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy . . . ; or (4) if the clauses contravene a strong public policy of the forum state.

996 F.2d at 1363 (citations omitted). Here, there is no reason to set aside the forum selection clauses.

Defendants argue that enforcing the forum selection clauses would contravene the public policy favoring judicial economy. Their reliance on a case from the District of Minnesota, which disregarded a forum selection clause so that the court could dispose of all claims among the parties with respect to the product at issue, is unpersuasive. *See Taylor Inv. Corp. v. Weil*, 169 F. Supp. 2d 1046, 1061 (D. Minn. 2001). In that case, the court reasoned that if it were to dismiss a part of the lawsuit on the basis of a forum selection clause, the defendants would have to re-file their counterclaims in Texas, resulting in the potential for conflicting judgments and an inefficient use of judicial resources. *Id.* However, in addition to the fact that *Taylor* is not binding in this circuit, keeping Defendants' claims in this Court would fail to resolve all disputes among the parties with respect to the Diesel footwear. Specifically, Plaintiffs have represented that they have not brought claims pursuant to the license agreements or the Sourcing Agreement here because those contracts identify Milan, Italy as the forum for disputes.[10]

Moreover, the Second Circuit, which is binding on this court, has honored a forum selection clause even where so doing resulted in different claims between the parties being adjudicated in different jurisdictions. *See Phillips*, 494 F.3d at 393 (dismissing claims subject to forum selection clause, even though court was "aware that the commencement of separate proceedings in two countries is a likely inconvenience to the parties," because "our twin

---

[10] As of December 31, 2006, GBMI allegedly owed Diesel SpA and Kid more than $11.2 million in back royalties and advertising contributions pursuant to the License Agreement. 3d Am. Compl. ¶ 11.

commitments to upholding forum selection clauses where these are found to apply and deferring to a plaintiff's proper choice of forum constrain us in the present context to treat Phillips' claims separately"); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985) (holding that district courts are required to compel arbitration of claims subject to arbitration clause "even if the result is 'piecemeal' litigation"); *U.S. Fid. & Guar. Co.*, 2001 WL 300735, at *17 ("That inefficiency [due to dismissal of some claims pursuant to forum selection clause] is a result of the extraordinary complexity of the transactions and the number of agreements involved and the parties' decision to include different forum selection clauses in different agreements.").[11]

Further, that New York may be the most convenient forum for litigating some of Defendants' claims, because some parties and witnesses are located here, does not make the clauses unreasonable. *See Sony Fin. Servs., LLC v. Multi Video Group, Ltd.*, No. 03 Civ. 1730, 2005 WL 91310, at *19 (S.D.N.Y. Jan. 18, 2005). Similarly, that some of the alleged wrongful acts were committed in the United States, with their harmful effects suffered by GBMI and Greystone in the United States, does not defeat the forum selection clauses. *See Manetti-Farrow*, 858 F.2d at 515 (enforcing forum selection clause that identified an Italian forum for the resolution of disputes, where contract was with an Italian corporation for the distribution of Italian goods, even though some acts and effects took place in the United States).

### 4. TPA Did Not Amend Distribution Agreements' Forum Selection Clause

The Distribution Agreements require that "amendment or modification of this Agreement nor waiver of any of the terms and provisions hereof shall be deemed valid unless made in writing and signed by both Parties hereto." Distribution Agreements ¶ 22.1.

Nevertheless, Defendants argue that the Distribution Agreement's forum selection clause was amended by the TPA, which contains the following forum selection clause: "[t]his letter shall be governed by the laws of the State of New York and the parties submit to the jurisdiction of the state and federal courts located in New York County, New York for the resolution of disputes." TPA at 3.

Defendants' argument is not well taken. First, the TPA contains no language to the effect that it amends the Distribution Agreements' forum selection clause. Instead, the TPA provides

---

[11] Greystone's reliance on *Nippon Fire & Marine Insurance Co. v. M/V Spring Wave*, 92 F. Supp. 2d 574 (E.D. La. 2000), has less merit. In that case, the court found the forum selection clause to be unreasonable because it violated the "strong public policy against limiting liability in contravention of Section 1303(8) of COGSA [the Carriage of Goods by Sea Act]." *Id.* at 575. No such public policy exists here.

that "[t]his letter agreement is not in any way intended to limit any of Supplier Obligations of [GBMI] to [Props or Kid], and shall in all respects be cumulative thereto."[12] Sacks Decl., Ex. F at 2. Second, the fact that the TPA's governing law clause is limited to "[t]his letter," *i.e.*, the TPA, suggests that the forum selection clause also is so limited. As Italian law governs the Distribution Agreements, it would seem absurd for the TPA to require disputes under such agreements to be litigated in New York applying Italian law.

Further, in a letter dated December 2, 2006, Plaintiffs told Defendants that they would sign the TPA "only and exclusively" if certain amendments were made to the Distribution Agreements. Sacks Decl., Ex. E. Those amendments, which were executed by Props, Kid, and GBMI, do not modify the forum selection clause. Indeed, they provide that "[a]ll other terms and conditions of the Distribution Agreement remain[] unimpaired." *Id.* This strongly evinces the parties' intent to leave the forum selection clause unchanged.

Therefore, the TPA amended the Distribution Agreements' forum selection clause only with respect to disputes arising under the TPA itself, and not with respect to Defendants' claims here. *See Marine Transp. Lines, Inc. v. Int'l Org. of Masters, Mates & Pilots*, 878 F.2d 41, 46 (2d Cir. 1989) ("Modifications do not necessarily abrogate the original contract entirely; indeed, the terms of the old contract are still to be followed so far as not changed or as inconsistent with the new terms.") (quotation marks and citations omitted); *Beacon Terminal Corp. v. Chemprene, Inc.*, 429 N.Y.S.2d 715, 717-18 (N.Y. App. Div. 1980) ("The modification of a contract results in the establishment of a new agreement between the parties which *pro tanto* supplants the affected provisions of the original agreement while leaving the balance of it intact.").

### *5. Plaintiffs Did Not Waive Their Right to Enforce Forum Selection Clauses*

Defendants argue that Plaintiffs waived their right to enforce the forum selection clauses because their own claims are connected with the Distribution Agreements. Plaintiffs make claims for breach of the TPA, unjust enrichment, conversion, account stated, fraud and/or negligent misrepresentation and promissory estoppel. All these actions, however, are related to the parties' relationships under TPA. Four of Plaintiffs' claims—breach of the TPA, unjust enrichment, conversion and account stated—are against both GBMI and Greystone and the conduct giving rise to them occurred after the parties agreed to the payment procedures as set

---

[12] *TMC Co., Ltd. v. M/V Mosel Bridge*, No. 01 Civ. 9860, 2002 WL 1880722 (S.D.N.Y. Aug. 15, 2002), relied on by Defendants, is distinguishable because the contract in that case expressly stated that its forum selection clause superseded any other agreement. *Id.* at *2.

forth in the TPA. Unlike Defendants' claims, which extend to obligations under the Distribution Agreements, such as the timely delivery of shoes, Plaintiffs' claims center around GBMI and Greystone's failure to make payments for footwear as required by the TPA.

The waiver of a chosen forum "is not to be lightly inferred." *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir. 1985). "Courts have found implied waiver of venue where a party has repeatedly represented that venue is appropriate . . . or actively pursued substantive motions." *Ferraro Foods, Inc. v. M/V Izzet Incekara*, No. 01 Civ. 2682, 2001 WL 940562, at *4 (S.D.N.Y. Aug. 20, 2001) (citation omitted).

In *Sony*, the plaintiffs moved to dismiss the defendant's counterclaims on the grounds that they were subject to a California forum selection clause in their agreement. 2005 WL 91310, at *6. The defendant argued, as here, that the California forum selection clause was inapplicable because the plaintiffs had filed suit in New York. The court found that the plaintiffs had not waived their right to enforce the forum selection clause and dismissed the counterclaims, reasoning that

> while a 'party's . . . representations to the court that it is the proper forum may waive its right to subsequently raise the claim that venue lies elsewhere,' . . . [the plaintiff] has never represented to the court that New York was the appropriate forum for [the defendant's] action against it.

*Id.* at *19 (quoting *Krape v. PDK Labs Inc.*, 194 F.R.D. 82, 86 (S.D.N.Y. 1999)). Similarly, here, Plaintiffs have never represented that this venue is the appropriate forum for the causes of action brought by Defendants.

Further, because Greystone is not a party to the Distribution Agreements, the claims that Plaintiff makes against GBMI and Greystone collectively must be related to the TPA. The claims that Plaintiff makes against only GBMI, for fraud and/or negligent misrepresentation and for promissory estoppel, depend upon promises allegedly made by GBMI with respect to amending the TPA. These claims, like Plaintiffs' other claims, arise from the performance of the TPA and thus were properly brought by Plaintiffs to this Court.[13]

---

[13] The cases upon which Greystone relies for its waiver argument, *Licensed Practical Nurses, Technicians & Health Care Workers of New York v. Ulysses Cruises, Inc.*, 131 F. Supp. 2d 393 (S.D.N.Y. 2000), *General Electric Co. v. Marvel Rare Metals Co.*, 287 U.S. 430 (1932) , and *Lesnik v. Public Industrials Corp.*, 144 F.2d 968 (2d Cir. 1944), are distinguishable. In *Licensed Practical Nurses*, the issue before the court was which contract was the source of the plaintiff's claim. *See* 131 F. Supp. 2d at 395. The holding of *General Electric* depended on an interpretation of the Judicial Code relating to the patent laws. *See* 287 U.S. at 434. There was no forum selection clause at issue in *Lesnik*, which primarily discusses the meaning of "compulsory counterclaim" under Fed. R. Civ. P. 13(a). *See* 144 F.2d at 975.

Finally, Plaintiffs' conversion claim alleges that Defendants took unlawful control of 160,000 pairs of shoes that Plaintiffs shipped to GBMI in August and early September 2007 and that GBMI moved to a warehouse in California (the "Warehouse Shoes"). Plaintiffs brought this claim in "response to a perceived emergency," *i.e.*, Greystone's intention to foreclose on such shoes under the theory that they were part of its collateral and sell them to a third party. Plaintiffs sought, and received, from this Court a temporary restraining order and preliminary injunction with respect to these shoes. At least one court has held that this is "not a legally sufficient circumstance to overcome the rules favoring enforcement of forum selection clauses." *See Lifeco Servs. Corp. v. Superior Court*, 222 Cal. App. 3d 331, 336-37 (Cal. Ct. App. 1990) (filing of preliminary action did not waive parties' right to enforce forum selection clause).

Because Plaintiffs' claims depend on rights and duties expressed in the TPA and their conversion claim was proper in this forum due to the impending sale of the Warehouse Shoes, Plaintiffs have not waived their right to enforce the forum selection clauses.

A forum selection clause is "an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516 (1974) (honoring forum selection clause in international business contract); *see also Bremen*, 407 U.S. at 9 ("We cannot have trade and commerce in world markets and international waters exclusively on our terms, governed by our laws, and resolved in our courts."); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 629 (1985) ("[C]oncerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes require that we enforce the [agreed-upon forum selection clause], even assuming that a contrary result would be forthcoming in a domestic context.").

For the foregoing reasons, all of GBMI's counterclaims and all of the counterclaims brought by Greystone as the alleged assignee of GBMI's rights are dismissed due to the forum selection clauses. The counterclaims that remain are Greystone's claims for breach of the Non-Interference Agreements, conversion, unjust enrichment and fraud.

**B.      Motions to Dismiss for Failure to State a Claim**

In the alternative, the Diesel Entities move to dismiss Defendants' counterclaims and third-party complaints for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss on this basis, a counterclaim must plead "enough facts to state a

claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). The factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 1965. The court must accept all the well-pleaded allegations of the claim as true and must draw all reasonable inferences in the claimant's favor. *Id.* In assessing the legal sufficiency of a claim, the court may consider facts alleged in the counterclaim, as well as "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

Because all of GBMI's counterclaims and third-party complaint must be dismissed due to the forum selection clauses, this Court need not address whether those claims meet the requirements of Rule 12(b)(6). Similarly, this Court need not address whether the claims made by Greystone's as an alleged assignee meet such requirements.

### 1. Greystone's Claims against Diesel SpA

Diesel SpA argues that Greystone's third-party complaint should be dismissed because its claims against Diesel SpA are based solely on a veil-piercing theory and Greystone has failed to allege sufficient facts to make such a theory plausible. Diesel SpA was not a party to the Distribution Agreements. With respect to Greystone's claim that Diesel SpA breached the Non-Interference Agreement, to which it was a party, Diesel SpA argues that Greystone has failed to allege any specific act by it. Indeed, Greystone's allegations refer repeatedly to the Diesel Entities and hardly ever to the conduct of any particular party.

"It is well settled that New York courts are reluctant to disregard the corporate entity." *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989) (collecting cases). Under New York law, the party seeking to pierce a corporate veil must make a two-part showing: "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) (citing *Morris v. New York State Dep't of Taxation & Fin.*, 623 N.E.2d 1157, 1160-61 (N.Y. 1993) (citing cases)).

As to the first prong, "[c]ontrol is the key. The parent must exercise complete domination 'in respect to the transaction attacked' so that the subsidiary had 'at the time' no separate will of its own . . . ." *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988); *see also Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 421 (S.D.N.Y.

2007).  In considering whether a parent corporation exercised "complete domination" over its subsidiary, courts consider such factors as:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*MAG Portfolio Consultant, GBMH v. Merlin Biomed Group LLC*, 268 F.3d 58, 63 (2d Cir. 2001) (quoting *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997)).

Here, Greystone has alleged that "Diesel SpA was heavily involved in the relationship between Diesel, GBMI and Greystone, and made all decisions on behalf of the Diesel Entities," 3d Am. Answer ¶ 82; that "Diesel Props and Diesel Kid could not take action on significant matters without the approval, authority and consent of Diesel SpA," *id.*; and that

> [t]he Diesel Entities effectively operated as a single entity, with decision-making responsibility vested in Diesel SpA.  At all times relevant to this case, employees of Diesel SpA participated in and made decisions regarding the business activities of Diesel Props and Diesel Kid.  In March 2007, for example, the Diesel Entities sent representatives to California for discussions with GBMI regarding the parties' performance of the Distribution Agreement and related issues.  Diesel SpA employees took the leading role for the Diesel Entities in those meetings.  All significant decisions were made by those two individuals and others at Diesel SpA.

*Id.* ¶ 86.  Finally, Greystone alleges that

> [n]o one from Diesel ever differentiated between Diesel SpA and Diesel Props or Diesel Kid in the day-to-day performance of the various agreements between Greystone, GBMI and the Diesel Entities.  Moreover, Diesel SpA employees were heavily involved in the GBMI-Diesel relationship. . . . Given the substantial involvement of Diesel SpA in the GBMI relationship, and the absence of any effort by Diesel to differentiate Diesel SpA from Diesel Props or Diesel Kid, the parties understood that Mezzasoma was representing Diesel Props, Diesel Kid *and* Diesel SpA in his communications with GBMI.

*Id.* ¶ 122 (emphasis in original).

Here, the parties differentiated between Diesel SpA and Kid when Greystone signed a Non-Interference Agreement with each of them.  However, Greystone has alleged sufficient facts which, if true, make it plausible that the Court or a jury could find that Diesel SpA exercised complete domination over Props and Kid.

With respect to the second prong, "such domination must have been used to 'commit fraud or wrong' against plaintiff, which proximately caused plaintiff's injury." *Am. Protein Corp.*, 844 F.2d at 60. "[S]ome showing of a wrongful or unjust act toward [the party seeking piercing] is required." *Morris*, 623 N.E.2d at 1161. Here, Greystone has alleged throughout its counterclaims that officers of Diesel SpA made decisions that proximately caused its injury. Such allegations, which on a motion to dismiss must be accepted as true, sufficiently meet the second prong of the test. Therefore, Greystone's third-party complaint against Diesel SpA may not be dismissed at this juncture.

### 2. Greystone's Claim for Breach of the Non-Interference Agreements

Greystone claims that the Diesel Entities breached the Non-Interference Agreements (1) by interfering with Greystone's ability to liquidate the Warehouse Shoes; (2) by asserting control over the Long Beach Shoes; (3) by breaching the Distribution Agreements; (4) by interfering with GBMI's contracts; (5) by interfering with GBMI's business relations; (6) by soliciting GBMI's employees; (7) by breaching oral agreements with GBMI; (8) by preventing GBMI from recouping the costs it incurred to develop and sell products for the spring/summer and fall/winter 2008 seasons; and (9) by failing to make payments to GBMI pursuant to the Sourcing Agreement. Greystone's theory is that all these alleged actions interfered with its security interest in GBMI's assets, in violation of the Non-Interference Agreements.

Plaintiffs argue that the claim should be dismissed as to Props because Props is not a party to the Non-Interference Agreements. Plaintiffs also argue that Greystone has not alleged any actionable wrongs by Kid. Greystone argues that its claims are based on its veil-piercing theory, discussed *supra*, that "[t]he Diesel Entities effectively operated as a single entity." However, Props could be liable for breach of the Non-Interference Agreements only under a *reverse* veil-piercing theory, *i.e.*, that Props is responsible for the actions of its parent.

"Typically, piercing analysis is used to hold individuals liable for the actions of a corporation they control. However, "New York law recognizes 'reverse' piercing, which, for example, seeks to hold a corporation accountable for actions of its shareholders." *Am. Fuel*, 122 F.3d at 134; *see also Kingston Dry Dock, Co. v. Lake Champlain Transp. Co.,* 31 F.2d 265, 267 (2d Cir. 1929) (Judge Learned Hand recognized reverse veil-piercing theory). Courts have required the party making a veil-piercing argument to show that the subsidiary controlled the parent. *See, e.g.*, *G.M. Leasing Corp. v. United States,* 514 F.2d 935 (10th Cir. 1975), *aff'd in part and rev'd in part on other grounds,* 429 U.S. 338 (1977); *Am. Fuel,* 122 F.3d at 134-35.

"Although reverse veil piercing is rare, it may be appropriate in cases where the alter ego is being used as a 'screen' for the dominating entity." *Miramax Film Corp. v. Abraham*, No. 01 CV 5202, 2003 WL 22832384, at *7 (S.D.N.Y. Nov. 25, 2003) (citing *Kingston*, 31 F.2d at 267).

Greystone fails to allege that Props controlled Diesel SpA, or that Diesel SpA was used as a screen for Props. To the contrary, Greystone alleges that Diesel SpA had the decision-making responsibility for all the Diesel Entities. Therefore, Greystone has not alleged sufficient facts which, if true, would make Props liable for the acts of its parent, and Greystone's breach of contract claim is dismissed as to Props.

Kid and Diesel SpA, unlike Props, were parties to the Non-Interference Agreement. Because Greystone alleges that certain acts by the "Diesel Entities" constituted a breach of that agreement, Greystone has succeeded in stating a claim against Kid and Diesel SpA.

### 3. *Greystone's Claim for Conversion*

Greystone alleges that the Diesel Entities converted the Long Beach Shoes by refusing to tender bills of lading and thereby preventing GBMI from obtaining possession of them. Greystone further alleges that it had and continues to have the right to possession and control of the Long Beach Shoes as a result of its senior security interest.

Plaintiffs argue that Greystone's conversion claim must be dismissed as against Kid because Greystone has failed to identify any representatives of Kid that were responsible for the alleged conversion. It is not necessary, however, for Greystone to identify specific representatives. Greystone's repeated references to acts of conversion by the Diesel Entities satisfy the notice pleading requirements of Fed. R. Civ. P. 8(a).

### 4. *Greystone's Claim for Unjust Enrichment*

Greystone rests its unjust enrichment claim on the same allegations as its claim for breach of the Non-Interference Agreements. Plaintiffs argue that the claim must be dismissed because New York does not recognize an unjust enrichment claim where a valid written contract governs the parties' relationship. *See Telstar Res. Group v. MCI*, 476 F. Supp. 2d 261, 274-75 (S.D.N.Y. 2007).

Under New York law, the party bringing a counterclaim for unjust enrichment must allege that (1) the plaintiff was enriched, (2) the enrichment was at the defendant's expense, and (3) the circumstances were such that equity and good conscience require the plaintiff to make restitution. *See id.* at 274. The sole basis for Greystone's unjust enrichment claim is that the

Diesel Entities interfered with its collateral. That claim, however, is the essence of Greystone's claim of breach of the Non-Interference Agreements that were executed by Kid and Diesel SpA.

"The notion of unjust enrichment applies where there is no contract between the parties . . . ." *Maryland Cas. Co. v. W.R. Grace & Co.,* 218 F.3d 204, 212 (2d Cir. 2000); *see also Telstar,* 476 F. Supp. 2d at 274. "An exception to this rule exists in cases where there is a 'bona fide dispute as to the existence of a contract, or where the contract does not cover the dispute in issue.'" *Id.* (quoting *Joseph Sternberg, Inc. v. Walber 36th St. Assocs.,* 594 N.Y.S.2d 144, 146 (N.Y. App. Div. 1993)).

Here, the Non-Interference Agreements are valid contracts between Greystone and Kid and Diesel SpA, respectively, and thus Greystone's unjust enrichment claim must be dismissed as against Kid and Diesel SpA. However, Props is not a party to the Non-Interference Agreements, and Greystone has sufficiently alleged that Props, as one of the "Diesel Entities," unjustly enriched itself at Greystone's expense by interfering with Greystone's collateral. Therefore, Greystone's unjust enrichment claim against Props survives the motion to dismiss.[14]

### 5. Greystone's Claim for Fraud

Plaintiffs argue that Greystone has failed to plead its fraud claim with particularity pursuant to Fed. R. Civ. P. 9(b), which requires that "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Under New York law, to prevail on a fraudulent misrepresentation counterclaim, the defendant must show that (1) the plaintiff made a misrepresentation (2) as to a material fact, (3) which was false, (4) known to be false by the plaintiff and (5) made for the purpose of inducing the defendant to rely on it, and that (6) the defendant reasonably did so rely (7) in ignorance of its falsity (8) to its injury. *See Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994). "The failure to fulfill a promise to perform future acts is not ground for a fraud action unless there existed an intent not to perform at the time the promise was made." *Id.*

To support its fraud claim, Greystone alleges that the Diesel Entities made misrepresentations to GBMI regarding (1) their ability to deliver shoes on time and with proper

---

[14] Plaintiffs also argue that Greystone's unjust enrichment claim must be dismissed as against Kid because Greystone has failed to identify any specific acts by Kid. As explained *supra*, however, it is not necessary for Greystone to allege specific acts by Kid at this stage in the litigation; it has alleged sufficient acts by referring to the conduct of the "Diesel Entities."

barcoding for the spring/summer and fall/winter 2007 seasons, (2) their willingness to help GBMI overcome the consequences of late deliveries, (3) their intention to continue the GBMI-Diesel relationship through the spring/summer 2008 season and beyond, and (4) their willingness to release bills of lading for the Long Beach Shoes. 3d Am. Answer ¶ 209. The basis for Greystone's claim is that it relied on these fraudulent misrepresentations in continuing to lend to GBMI under the Loan Agreement after GBMI's default under that agreement.

Because Greystone properly alleges that the Diesel Entities fraudulently misrepresented their "intention," "ability" or "willingness" to perform future acts, the claim cannot be dismissed on the ground that the misrepresentations were mere promises. Moreover, Greystone has stated with particularity the circumstances constituting fraud. It alleges, for example, that Mezzasoma—a Props officer and allegedly also a "senior-level employee for the Diesel Entities" under the veil-piercing theory—admitted to GBMI that the Diesel Entities were at fault for late and non-compliant deliveries and encouraged GBMI to collect orders for the fall/winter 2007 season and to inform its customers that "Diesel is back." *Id.* ¶ 123. This occurred after Greystone sent notice of GBMI's default under the Loan Agreement to the Diesel Entities. *Id.* ¶ 121. Greystone further alleges that GBMI forwarded Mezzasoma's correspondence to Greystone and that Greystone relied on it in choosing not to foreclose on its collateral following GBMI's default and instead increasing GBMI's revolving loan limit by $2 million. *Id.* ¶¶ 123-24. Greystone also alleges that it relied on Mezzasoma's representation to GBMI that the Diesel Entities would permit GBMI to obtain and deliver the shoes that arrived in the United States after September 4, 2007, and that this representation turned out to be false. *Id.* ¶ 134. Had Greystone foreclosed on its collateral at the time of GBMI's initial default, according to Greystone, it could have realized the full value of its loans plus interest and fees. *Id.* ¶ 213.

These allegations are sufficient to meet the heightened pleading requirements of Rule 9(b) and thus Greystone's fraud claim will not be dismissed at this juncture.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' and Third-Party Defendant's motion to strike is DENIED and their motions to dismiss are renewed with respect to Defendants' amended counterclaims and third-party complaints.

Plaintiffs' and Third-Party Defendant's motions to dismiss are GRANTED with respect to all of GBMI's counterclaims and third-party complaint. Greystone's third, fourth, sixth, seventh and eighth counterclaims against Plaintiffs and Third-Party Defendant, for tortious

interference with business relations, tortious interference with contract, breach of Distribution Agreements, breach of oral agreements and breach of Sourcing Agreement, are dismissed in their entirety. Greystone's first counterclaim, for breach of the Non-Interference Agreements, is dismissed as to Plaintiff Props, and Greystone's fifth counterclaim, for unjust enrichment, is dismissed as to Plaintiff Kid and Third-Party Defendant.

Therefore, the remaining counterclaims are Greystone's first counterclaim, for breach of the Non-Interference Agreements, against Plaintiff Kid and Third-Party Defendant; Greystone's second counterclaim, for conversion, against both Plaintiffs and Third-Party Defendant; Greystone's fifth counterclaim, for unjust enrichment, against Plaintiff Props; and Greystone's ninth counterclaim, for fraud, against both Plaintiffs and Third-Party Defendant.

Any motion for summary judgment must be fully briefed and submitted to the Court by December 1, 2008. Any summary judgment materials which have not yet been filed should exclude any discussion of the claims that are dismissed herein. The trial of this matter is scheduled to take place in February 2009.

**IT IS SO ORDERED.**

**New York, New York**
**November ⎯5⎯, 2008**

U.S.D.J.

28