UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
DIESEL PROPS S.R.L. and DIESEL KID S.R.L.,          :
                                                    :
        Plaintiffs / Counter-Defendants,            :
                                                    :   07 Civ. 9580 (HB)
  - against -                                      :
                                                    :   <u>OPINION & ORDER</u>
GREYSTONE BUSINESS CREDIT II LLC and                :
GLOBAL BRAND MARKETING INC.,                        :
                                                    :
        Defendants / Counter-Plaintiffs,            :
                                                    :
-against-                                           :
                                                    :
DIESEL S.p.A.,                                      :
                                                    :
        Third-Party Defendant.                      :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**

      The reader's familiarity with this Court's prior decisions is assumed.[1]  Plaintiffs Diesel Props S.r.l. and Diesel Kid S.r.l. are referred to herein as "Props" and "Kid," or, collectively, "Plaintiffs."  Defendants Greystone Business Credit II LLC and Global Brand Marketing Inc. are referred to as "Greystone" and "GBMI," or "Defendants."  Third-party Defendant Diesel S.p.A. is referred to as "Diesel SpA."  Plaintiffs and Diesel SpA are referred to as "Diesel."

      This opinion resolves several motions.  Greystone's motion to reconsider this Court's decision with respect to Diesel's motions to dismiss is denied.  Greystone's motion to strike Plaintiffs' jury demand is granted.  Greystone's motion for summary judgment is denied. Plaintiffs' motion for summary judgment with respect to their claim of breach of the Tripartite Agreements is denied.  GBMI's motion for summary judgment is granted.  Plaintiffs' motion for summary judgment dismissing all counterclaims is granted in part and denied in part.  Diesel SpA's motion for summary judgment is granted.

### I. GREYSTONE'S MOTION FOR RECONSIDERATION

      Greystone urges this Court to reconsider its dismissal of Greystone's counterclaims for tortious interference with business relations, tortious interference with contract, breach of the

---

[1] *See Diesel Props S.r.l. v. Greystone Business Credit II LLC*, 2008 WL 5099957 (S.D.N.Y. Dec. 3, 2008); 2008 WL 4833001 (S.D.N.Y. Nov. 5, 2008); 2008 WL 594773 (S.D.N.Y. Mar. 5, 2008).

1

Distribution Agreements, breach of alleged oral agreements, breach of the Sourcing Agreement, breach of the Non-Interference Agreements as to Props and unjust enrichment as to Kid and Diesel SpA.  *See Diesel Props S.r.l. v. Greystone Business Credit II LLC*, No. 07 Civ. 9580, 2008 WL 4833001 (S.D.N.Y. Nov. 5, 2008) (hereinafter "*Diesel* (Nov. 5, 2008)").

The Court dismissed these claims because they are subject to a forum selection clause that identifies Milan, Italy as the locus for the resolution of disputes, and held that Plaintiffs did not waive their right to enforce the forum selection clause because all of Plaintiffs' claims arise under the Tripartite Agreements ("TPA"), pursuant to which this forum selection clause is applicable.

The fact that Plaintiffs recently indicated that their conversion claim arises under the Distribution Agreements does not change this Court's view.  Moreover, as Plaintiffs have consistently maintained that their conversion claim is based on an interpretation of the Distribution Agreements, Greystone cannot point to any new development on which to base its motion for reconsideration.  Plaintiffs' conversion claim did not constitute a waiver of the forum selection clause because it was brought in this forum in response to a perceived emergency, *i.e.*, Defendants' intention to sell the "Warehouse Shoes" to a third party.  *See Lifeco Servs. Corp. v. Superior Court*, 222 Cal. App. 3d 331, 336-37 (Cal. Ct. App. 1990); *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 887 (2d Cir. 1985) (waiver of a chosen forum "is not to be lightly inferred").  *See also* 2d Am. Compl. ¶ 34.  Moreover, the conversion claim against Greystone does not arise under the Distribution Agreements, to which Greystone is not a party.

Further, Plaintiffs' conversion claim must be dismissed, as the parties have settled their dispute with respect to the Warehouse Shoes and Plaintiffs no longer pursue their conversion claim.  *See* Settlement Agreement, Ex. A to Greystone's Reply in Support of Its Motion for Reconsideration, at 3-4.  Greystone's motion to reconsider is denied.

## II.  GREYSTONE'S MOTION TO STRIKE JURY DEMAND[2]

In the TPA, Plaintiffs and Defendants waived "to the fullest extent permitted under applicable law the right to trial by jury in any action brought hereunder."  *See* Greystone's Mot. to Strike Jury Demand, Oct. 17, 2008, Ex. A (hereinafter, "TPA") at 3.  A jury trial may be knowingly and voluntarily waived by contract in a civil action.  *See Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 437 (S.D.N.Y. 2004) (citing *Herman*

---

[2] Surprisingly, this is the first motion by either Defendant to strike Plaintiffs' jury demand.

*Miller, Inc. v. Thom Rock Realty Co.*, 46 F.3d 183, 189 (2d Cir. 1995)).

In its prior opinion, this Court held that all of Plaintiffs claims depend on rights and duties expressed in the TPA and that filing suit in this district complied with the TPA's forum selection clause. *See Diesel* (Nov. 5, 2008), at *15. All Plaintiffs' claims, therefore, are subject to the TPA's jury waiver provision.

Further, Plaintiffs' claims that are based on equitable theories of relief are likely not to require a jury trial irrespective of their relationship to the TPA. *See, e.g.*, *CSC Holdings, Inc. v. Westchester Terrace at Crisfield Condo.*, 235 F. Supp. 2d 243, 264 (S.D.N.Y. 2002). Plaintiffs' second, fourth and sixth causes of action (unjust enrichment, account stated and promissory estoppel) are generally considered to be equitable in nature even though they seek monetary damages. *See G.A. Modefine S.A. v. Burlington Coat Factory Warehouse Corp.*, 888 F. Supp. 44, 45-46 (S.D.N.Y. 1995); *EMI Music Mktg. v. Avatar Records, Inc.*, No. 03 Civ. 2783, 2005 WL 743071, at *6 (S.D.N.Y. Mar. 31, 2005); *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, No. 98 Civ. 861, 2003 WL 1345136, at *4-5 (S.D.N.Y. Mar. 19, 2003).

The jury waiver in the TPA is clear and conspicuous, as it is plainly worded and the only provision that appears in all capital letters. This Court thus strikes Plaintiffs' jury demand.

### III.  SUMMARY JUDGMENT MOTIONS

**A.     Legal Standard**

A court will not grant a motion for summary judgment pursuant to Fed. R. Civ. P. 56 unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986). The court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

**B.     Greystone's Motion for Summary Judgment on Plaintiffs' Breach of TPA Claim**

Plaintiffs claim that Greystone breached the TPA by failing to make payments or to provide notice pursuant to its terms. Greystone contends that it was not required to make payments or provide notice because the parties failed to meet the following requirements, *inter alia*, which Greystone alleges were conditions precedent to its obligations: (1) GBMI's delivery

to Greystone and Plaintiffs of a purchase order from its customer ("Customer Purchase Order"); (2) Plaintiffs' delivery to Greystone of its invoice to GBMI ("Diesel Invoice"); (3) GBMI's delivery to Greystone and Plaintiffs of its invoice to its customer ("Customer Invoice"); and (4) a matching of the Diesel Invoice to the Customer Invoice for any particular shipment of shoes.

"Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwilliger v. Terwilliger,* 206 F.3d 240, 245 (2d Cir. 2000). *See also RJE Corp. v. Northville Indus. Corp.,* 329 F.3d 310, 314 (2d Cir. 2003) ("Where a contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.") (internal quotation marks omitted). If a contract is unambiguous, then its proper construction is a question of law. *Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir. 1990). However, "[w]here the intent of the parties is too ambiguous to be gleaned from the contract alone, the Court should receive evidence that might better clarify that intent." *Gitnik v. Home Depot U.S.A., Inc.,* No. 07 Civ. 1244, 2007 WL 2728358, at *2 (S.D.N.Y. Sept. 18, 2007) (internal quotation marks and citation omitted).

### 1. *Genuine Issue: Whether Customer Purchase Order Was Condition Precedent*

Greystone asserts that a Customer Purchase Order from one of GBMI's customers was a condition precedent to Greystone's payment and notice obligations. However, the unambiguous language of the TPA required only two events to occur before Greystone was required to pay Plaintiffs: (1) GBMI had to send to Greystone a copy of its Customer *Invoice*, and (2) the Customer Invoice had to correspond to a Diesel Invoice, which would determine the amount of Greystone's payment. To wit, the TPA provides that "[t]he delivery of the Customer Invoice to Greystone shall be deemed to be an irrevocable request for a Revolving Loan in the amount of the corresponding Diesel Invoice."[3] TPA at 2. The delivery of a Customer Invoice to Greystone also triggered Greystone's obligation to provide written notice to Plaintiffs if such a request for a revolving loan was prohibited by the Loan Agreement. *See id.* at 2-3.

The plain language of the TPA undermines Greystone's contention that the Customer *Purchase Order* was a condition precedent. "[I]t must clearly appear from the contract itself that the parties intended a provision to operate as a condition precedent . . . , and . . . where there is

---

[3] In all quotes herein, the terms "Supplier," "Borrower" and "Lender" have been replaced with Props, Kid, GBMI, Greystone or Plaintiffs, as appropriate.

4

ambiguity in a contractual term, the law does not favor a construction which creates a condition precedent." *Lui v. Park Ridge at Terryville Ass'n, Inc.*, 601 N.Y.S.2d 496, 499 (N.Y. App. Div. 1993) (internal citations omitted).  There is no indication in the TPA that the parties intended the Customer Purchase Order requirement to be a condition precedent.  *See* Mezzasoma Decl. ¶ 16, Nov. 14, 2008 ("The parties did not intend the various conditions in the TPA to be interdependent.").[4]

       To support its position, Greystone also points to a separate agreement, embodied in a letter dated December 2, 2006, from Diesel to Defendants ("December 2 Letter") and a letter dated December 7, 2006, from GBMI to Diesel SpA ("December 7 Letter").  Diesel sent the December 2 Letter to Defendants two days before the execution of the TPA.  The December 2 Letter indicates that Diesel would not sign the TPA unless, *inter alia*, the TPA were applied only to shoes for which GBMI had a Customer Purchase Order.  The logical inference is that Diesel requested this protection so that they would not have to manufacture shoes that had not been ordered by a customer of GBMI.  Without any response from Defendants, Plaintiffs nevertheless signed the TPA on December 4, 2006.  Three days later, in the December 7 Letter, GBMI (but not Greystone) responded to Diesel SpA (but not Props or Kid) to the effect that GMBI accepted and agreed to Plaintiffs' terms as set forth in the December 2 Letter.  *See* Diesel's Mots. Summ. J. Ex. C.  However, there is no evidence that Greystone ever agreed to the terms proposed by Diesel in the December 2 Letter.  Moreover, the December 2 Letter itself makes clear that "Greystone, as directed and in accordance with the [TPA], shall pay Diesel Kid and Diesel Props, as the case may be, *upon receipt of GBMI customer invoice* [*i.e.*, Customer *Invoice*]."  *Id.* (emphasis added).  Therefore, there is a genuine issue as to whether the parties intended for the December 2 Letter to make the Customer *Purchase Order* requirement a condition precedent to the TPA.

       Even if the Customer Purchase Order requirement were a condition precedent, Plaintiffs

---

[4] The two cases upon which Greystone relies, *Republic Corp. v. Procedyne Corp.*, 401 F. Supp. 1061 (S.D.N.Y. 1975), and *Broad Props., Inc. v. Wheels, Inc.*, 43 A.D.2d 276 (N.Y. App. Div. 1974), are distinguishable because in each of those cases the successive acts to be performed by the parties were clearly interdependent.  *See* 401 F. Supp. at 1069 (plaintiff's obligation to wire console and thermoformer was a condition precedent, where defendant was *unable* to perform its obligation to maintain heater's temperature unless plaintiff did the wiring); 43 A.D.2d at 280 (landlord's obligation to have the defendant's property assessed for taxes was a condition precedent to the landlord's recovery for any taxes, where the tax recovery could not be determined unless the landlord performed its obligation).

have raised a genuine issue as to whether they waived it. "It is well established that a party for whose benefit a provision is inserted in a contract may waive that provision and accept performance of the contract as is." *DeFreitas v. Holley*, 461 N.Y.S.2d 351, 352 (N.Y. App. Div. 1983). Alternatively, there is a genuine issue as to whether Greystone continued to perform and thereby, under the election of remedies doctrine, waived its right to claim that the Customer Purchase Order was a condition precedent.[5] *See ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 389 (S.D.N.Y. 1999) ("[O]nce a party has elected a remedy for a particular breach, her choice is binding with respect to that breach."). *See also* Sartori Decl. ¶¶ 8, 12, 17, Nov. 14, 2008; Mezzasoma Decl. ¶ 29, Nov. 14, 2008; Dalla Bona Decl. ¶ 21, Oct. 15, 2008; Diesel's Mots. Summ. J. Exs. E-G, S; Sacks Decl. Exs. 18, 20, 22. Finally, there is a genuine issue as to whether GBMI received Customer Purchase Orders for some Diesel shoes. *See* Sacks Decl. Exs. 1, 4, 6; Mezzasoma Decl. ¶ 7, Nov. 14, 2008.

For these reasons, and drawing all inferences in favor of the Plaintiffs, as it must, this Court holds that any failure by GBMI to submit Customer Purchase Orders to Greystone and Plaintiffs is not a ground for summary judgment in favor of Greystone.

## 2. *Genuine Issue: Whether GBMI Submitted to Greystone Customer Invoices that Corresponded to Diesel Invoices*

Under the TPA, when GBMI submitted a Customer Invoice to Greystone, Greystone had to make a revolving loan payment to Props or Kid in the amount of the corresponding Diesel Invoice. Whether GBMI submitted Customer Invoices to Greystone and whether such Customer Invoices corresponded to Diesel Invoices present genuine issues of material fact. For example, Santico Sarrica ("Sarrica"), a vice president of Greystone, stated in his deposition that he did not receive any Customer Invoices from GBMI that were related to Diesel Invoices. Sarrica Dep. 200:6-9, Sept. 3, 2008, Greystone's Mot. Summ. J. Vol. 2. Yet the deposition testimony of Robyn Laguette ("Laguette"), the vice president of finance for GBMI, and Martin McDermut ("McDermut"), an employee of GBMI, indicates that GBMI regularly sent Customer Invoices to Greystone. Laguette Dep. 160:23-161:9, Aug. 13, 2008, Sacks Decl. Ex. 27; McDermut Dep. 19:18-25, 21:1-17, 137:13-17, July 25, 2008, Sacks Decl. Ex. 28. There is also evidence that

---

[5] Similarly, there is a genuine issue as to whether the parties orally modified the contract to eliminate the Customer Purchase Order requirement. *See* Sacks Decl. Exs. 16-17. An oral modification would be enforceable if the parties' performance were unequivocally referable to it and inconsistent with the underlying agreement. *See Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998).

GBMI sent Customer Invoices to GCS, Greystone's agent for the processing of Customer Invoices.  *See* Sacks Decl. Exs. 25, 26.

Moreover, contrary to Greystone's assertions, the TPA does not assign the responsibility of "matching" Customer Invoices to Diesel Invoices to any party.  Plaintiffs assert that they sent all Diesel Invoices to Greystone, an assertion that Greystone does not dispute.  *See* Sacks Decl. Ex. 24; Mezzasoma Decl. ¶ 38, Nov. 14, 2008.  Greystone presumably could have identified the corresponding Customer Invoices, if any.

In light of these ambiguities, this Court finds a genuine issue of material fact as to whether corresponding Customer and Diesel Invoices were submitted to Greystone, which together would have triggered Greystone's payment obligations.[6]  Therefore, summary judgment in favor of Greystone on Plaintiffs' claim of breach of the TPA is not appropriate.

**C.     Plaintiffs' Motion for Summary Judgment on Their Breach of TPA Claim**

Plaintiffs argue that they are entitled to summary judgment as to Greystone's liability for breach of the TPA, on the ground that Greystone provided them neither with notice of GBMI's defaults under the Loan Agreement nor with notice of the lack of availability of revolving loans to pay for GBMI's orders of Diesel shoes.  The evidence is undisputed that Plaintiffs made fifty-seven requests for such notice between January and September 2007.  *See* Diesel's Mots. Summ. J. Exs. E, S.  The evidence suggests that on all but two occasions, Greystone failed to respond. *See id.* Exs. F, G; Mezzasoma Decl. ¶¶ 34, 39, Oct. 15, 2008; Ferraro Decl. ¶¶ 26, 30, Oct. 15, 2008; Dalla Bona Decl. ¶¶ 14-15, Oct. 15, 2008.  Plaintiffs assert that GBMI had at least twenty-four defaults or covenant breaches under the Loan Agreement and that revolving loans were not available to pay for GBMI's orders of Diesel shoes.  *See* Diesel's Mots. Summ. J. Exs. MM, NN, OO; Lafayette Decl. ¶ 11.  A failure to provide notice pursuant to the TPA would constitute a material breach.  *See Daniel Perla Assocs. v. Krasdale Foods, Inc.*, 12 A.D.3d 555, 557 (N.Y. App. Div. 2004).

However, summary judgment is inappropriate at this stage because, as discussed *supra*, there is a genuine issue as to whether the failure of a condition precedent obviated Greystone's obligation to provide such notice under the TPA.

It is worth noting that two of Greystone's arguments in opposition to Plaintiffs' motion

---

[6] There is also a genuine issue as to whether the TPA relieved Greystone of its payment obligations due to GBMI's indebtedness under the Loan Agreement.  *See* TPA at 2; Greystone's Mot. Summ. J. Ex. N § 1.

7

lack merit. First, Greystone's claim that the term "availability" in the TPA means "line availability" is unavailing. The TPA obligated Greystone to notify Plaintiffs if there was insufficient "availability" under the Loan Agreement for a revolving loan in the amount of a Diesel Invoice. Generally, "availability" in this context can mean either "line availability," which is the difference between the outstanding loan balance and the maximum available loan limit, or "collateral availability," which was defined in the Loan Agreement here by means of a formula based on the value of GBMI's inventory and accounts receivable. *See* Greystone's Statement of Facts ("SOF"), Nov. 20, 2008, ¶ 46; Greystone's Mot. Summ. J. Ex. N § 1.1. Even if there was insufficient "collateral availability" to cover a Diesel Invoice, there was always enough "line availability." *See* Greystone's SOF ¶ 93, Nov. 20, 2008. Because, according to Greystone, "availability" in the TPA means "line availability," GBMI always had sufficient availability and therefore Greystone had no notice obligation.

       This line of reasoning is faulty because the TPA's notice provision would be meaningless if "availability" meant "line availability." "It is a cardinal rule of construction that a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract . . . without force and effect.'" *Corhill Corp. v. S. D. Plants, Inc.*, 9 N.Y.2d 595, 599 (N.Y. 1961) (quoting *Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 46 (N.Y. 1956)). The purpose of the notice provision was clearly to inform Plaintiffs whether a revolving loan was available to GBMI under the Loan Agreement so that the Diesel Invoice could be paid. Therefore, the notice provision only makes sense if "availability" is interpreted to refer to the revolving loans on hand, as calculated by Greystone pursuant to the Loan Agreement. The evidence is clear that Greystone did *not* calculate the availability of revolving loans according to "line availability."[7]

       Instead, Sarrica, the Greystone account executive who was responsible for the GBMI loan, indicated in his deposition that Greystone made revolving loans to GBMI on the basis of the borrowing base certificates certified to Greystone by GBMI. There is evidence that the availability of revolving loans is shown on lines 22 and/or 28 of such certificates  *See* Lafayette

---

[7] Greystone's argument that the maxim *inclusio unius est exclusio alterius* dictates a different conclusion is not well taken. It is true that the TPA provides that capitalized terms have the meanings ascribed to such terms in the Loan Agreement, and that the term "availability" in the TPA is not capitalized, while "Availability" in the Loan Agreement is. However, to give "availability" different meanings under the TPA and the Loan Agreement, on the basis of *capitalization*, when this would render the notice provision meaningless, would hardly constitute well-reasoned contractual interpretation. The Court has carefully considered Greystone's other arguments in this regard and found them to be similarly without merit.

Decl. ¶¶ 15-25; Diesel's Mots. Summ. J. Exs. LL (Sarrica Dep. 44:20-45:10, 54:17-55:15, 268:7-22), RR, SS, TT.  The evidence suggests that, on at least some occasions, both lines 22 and 28 showed that GBMI had insufficient availability to request a revolving loan in the amount of a shipment of shoes planned by Props or Kid at the time of its request.  *See* Lafayette Decl. ¶¶ 19-20; Pls.' Exs. E, S, RR.

Finally, Greystone's argument that Plaintiffs would have continued to ship shoes to GBMI, even if Greystone had provided the requested notice, is unavailing.  First, this argument corresponds only to damages and thus is irrelevant to Plaintiffs' motion for summary judgment on liability.  *See, e.g.*, *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, No. 02 Civ. 7689, 2005 WL 832050, at *3 (S.D.N.Y. Apr. 12, 2005) (granting partial summary judgment on liability on contract claim).  Second, although the two default notices that Greystone did send to Plaintiffs failed to stop Plaintiffs from shipping more shoes to GBMI, there is a genuine issue as to whether Plaintiffs would have ceased their shipments had Greystone notified them of the full extent of GBMI's defaults and lack of availability under the Loan Agreement.  *See, e.g.*, Mezzasoma Dep. 106:15-18, Aug. 27, 2008, Sacks Reply Decl. Ex. JJJJ.

**D.     Greystone's Motion for Summary Judgment on Plaintiffs' Unjust Enrichment and Account Stated Claims[8]**

Greystone argues that Plaintiffs' unjust enrichment claim must be dismissed on the ground that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."  *See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987).  Greystone's argument is not well taken.  Plaintiffs assert their unjust enrichment claim as an alternative to their claim for breach of the TPA, in the event that this Court finds that Greystone was not obligated to make payments pursuant to the TPA.  In such a case, recovery in quasi contract for unjust enrichment would not be precluded.  *See id.*; *Cal Distrib., Inc. v. Cadbury Schweppes Ams. Beverages, Inc.*, No. 06 Civ. 496, 2007 WL 54534, at *10 (S.D.N.Y. Jan. 5, 2007) ("Because the parties disagree as to whether the [operative agreements] are binding on the Defendants, the Court cannot conclude that the unjust enrichment cause of action is precluded.").  Therefore, Plaintiffs' "unjust enrichment claim survives, although solely as an alternative to the breach of contract claim."  *See Bridgeway Corp. v. Citibank, N.A.*, 132 F. Supp.

---

[8] As noted *supra*, Plaintiffs' conversion claim is now moot, since it has been settled, and is dismissed.

2d 297, 305 (S.D.N.Y. 2001).

Similarly, Greystone argues that Plaintiffs' account stated claim must be dismissed on the ground that it is used "simply as another means to attempt to collect under a disputed contract." *Grinnell v. Ultimate Realty, LLC*, 832 N.Y.S.2d 244, 245 (N.Y. App. Div. 2007). In *Grinnell*, however, the court dismissed the account stated claim because there was no evidence of a contractual relationship. Such is not the case here. Under New York law, an account stated claim requires "an agreement between the parties to an account based upon prior transactions between them." *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999). Such an agreement may be implied if a party keeps a statement of account delivered by another party without objecting to it within a reasonable time, or if the debtor makes partial payment. *See Meadowbrook-Richman, Inc. v. Associated Fin. Corp.*, 325 F. Supp. 2d 341, 360 (S.D.N.Y. 2004). Here, the emails and Diesel Invoices that Plaintiffs sent to Greystone, which Greystone held without objection and on which Greystone appeared to have made some payment, present a genuine issue as to whether they constituted statements of account. *See* Sacks Decl. Ex. 19. Therefore, Plaintiffs' account stated claim survives summary judgment, but to the extent that amounts are duplicative, solely as an alternative to the breach of contract claim.

**E.     GBMI's Motion for Summary Judgment on Props' Fraud or Negligent Misrepresentation Claim**[9]

GBMI moves for summary judgment on Props' claim of fraud or negligent misrepresentation. To prove fraud under California law,[10] Props must show (1) a misrepresentation; (2) knowledge of its falsity, *i.e.*, "scienter"; (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage. *See Unterberger v. Red Bull N. Am., Inc.*, 162 Cal. App. 4th 414, 423 (Cal. Ct. App. 2008). To prove negligent misrepresentation, Props must show "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." *See Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App.

---

[9] Kid has withdrawn its fraud or negligent misrepresentation claim against GBMI.

[10] California law governs Props' claim because the alleged misrepresentations were made in California, GBMI is incorporated in California and has its principal place of business there, and Props conducted business in California relating to the contracts and representations at issue. *See, e.g.*, *GlobalNet Financial.com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 384 (2d Cir. 2006). Plaintiffs do not dispute the application of California law.

4th 226, 243 (Cal. Ct. App. 2007).  However, California law "does not recognize the more specific type of negligent misrepresentation that involves a negligent false promise."  *Color Match Pool Fittings, Inc. v. Aquastar Pool Prods., Inc.*, No. 06 Civ. 781, 2007 WL 5193737, at *3 (C.D. Cal. Aug. 10, 2007).

Props' claim is based on two alleged promises by GBMI officers:  (1) an email dated January 5, 2007, from Killick Datta, president of GBMI, who promised that GBMI would provide Props with an open letter of credit for any unsold shoes before Props shipped those shoes to GBMI, 3d Am. Compl. ¶ 21; and (2) an email dated March 21, 2007, from Laguette, who promised that GBMI would pay $2 million to Props by March 31, 2007, *id.* ¶ 27.[11]  Props must show that each promise was made with *no* intention to perform, since California law does not recognize a claim for negligent false promise.  *See Trans World Int'l, Inc. v. Weiss/Watson, Inc.*, No. 97-56254, 1999 WL 1211641, at *2 (9th Cir. Dec. 16, 1999) ("A misrepresentation relating to a promise of future conduct is actionable only if the promise was made with *no* intention to perform.") (emphasis added).

Props has provided no evidence that suggests that Datta lacked all intention of fulfilling his promise at the time it was made.  Props points only to evidence that during the weeks following Datta's promise, other employees of GBMI informed Datta that a substantial amount of shoes could not be sold by February 9, 2007.  *See* Sacks Decl. Ex. 12 at 30204, 3526.  However, Props provides no evidence that Datta himself ever promised to perform by that date, and the emails shed no light on Datta's intent at the time of his email on January 5, 2007.  Moreover, the emails relate only to GBMI's ability to sell the shoes, and not to GBMI's ability to obtain a letter of credit.

Props also contends that Datta knew that a letter of credit was impossible, since the borrowing base certificates dated January 3 and 9, 2007, showed the total availability of the revolving loan to be in the *negative* before an overadvance from Greystone, and just over $1 million after an overadvance.  *See* Sacks Decl. Ex. 13.  According to Luigi Mezzasoma, the managing director for Props, the shoes that Props put into production for GBMI were worth over $7 million at GBMI's cost, far in excess of GBMI's available loan.  Mezzasoma Decl. ¶ 18, Nov. 14, 2008.  However, there is no evidence that Datta believed, at the time of his promise, that the

---

[11]  Plaintiffs have renounced their allegation of a misrepresentation by Steve Eden, general counsel for GBMI.  Moreover, it would have been unreasonable for Plaintiffs to rely on Eden's statement, which allegedly indicated that *Greystone* had agreed to an amendment of the TPA.

unsold shoes, for which Datta promised a letter of credit, would cost more than the amount of available loan, or that GBMI would be unable to negotiate a letter of credit for unfilled orders at a later date.

Therefore, drawing all inferences in favor of Props, no reasonable fact finder could conclude that Datta lacked all intention to sell the shoes or provide a letter of credit at the time of his promise.

Because Laguette's promise was essentially a promise to perform GBMI's contractual obligation to pay for shoes under the Distribution Agreement, it cannot form the basis for a fraud claim. *See, e.g.*, *YTY Ind. SDN, BHD v. Dow Chem. Co.*, No. 05 Civ. 8881, 2008 WL 4184649, at *16 (C.D. Cal. Aug. 29, 2008). Moreover, as with Datta's promise, there is no evidence that Laugette lacked all intention to perform her promise at the time it was made.

Therefore, GBMI's motion for summary judgment with respect to Props' fraud or negligent misrepresentation claim is granted.

### F.     Diesel's Motions for Summary Judgment on Greystone's Counterclaims and Third-Party Complaint

Greystone has limited its counterclaims and third-party complaint to the following three claims: (1) a claim against Props for conversion of the "Long Beach Shoes"; (2) a claim against Diesel SpA for breach of the Non-Interference Agreement based on its alleged misappropriation of GBMI's "Open Order Book"; (3) a claim against Props for unjust enrichment based on its alleged benefit derived from the Open Order Book.[12]  Diesel moves for summary judgment.

#### 1.     *Counterclaim against Props for Conversion of the Long Beach Shoes*

Props shipped the "Long Beach Shoes" to GBMI at Long Beach, California, in October 2007 for ultimate delivery to Genesco, one of GBMI's customers. The parties dispute whether the Long Beach Shoes were subject to the Distribution Agreement or a separate, one-time agreement between Props and GBMI. Either way, this Court holds that title to the Long Beach Shoes did not pass to GBMI, and therefore such shoes were never assets of GBMI, Greystone never had a security interest in them and Props cannot be held liable for conversion when it endorsed the bill of lading to Diesel USA.

---

[12] Greystone has renounced the other grounds alleged in its Third Amended Answer for its claims of breach of the Non-Interference Agreement, conversion and unjust enrichment. Because Greystone does not oppose Diesel's motion for summary judgment with respect to Greystone's fraud counterclaim, that claim is dismissed.

12

Props has submitted sufficient evidence to show that the parties did not intend for the Distribution Agreement to apply to the Long Beach Shoes. Even though Props told GBMI that it would not deliver the shoes unless GBMI posted a letter of credit, Props shipped the shoes to GBMI without a letter of credit but with the knowledge that GBMI was trying to obtain a letter of credit. *See* Diesel's Mots. Summ. J. Exs. K, BBBB; Gaudio Decl. ¶ 4; Mezzasoma Decl. ¶¶ 14-18, Dec. 1, 2008. The fact that Props retained the original bills of lading, which were required to release the shoes at port, suggests that the parties intended that GBMI would post a letter of credit before title to the shoes would pass to GBMI and before the shoes would be released and delivered to GBMI or Genesco. *See id.* ¶ 19. When GBMI was unable to obtain a letter of credit, Props refused to release the bills of lading to GBMI, and instead indorsed the bills for the Long Beach Shoes to Diesel USA. *See id.* ¶ 21; Gaudio Decl. ¶¶ 3, 6. Diesel USA, not GBMI, then paid duty, fees, inbound freight and storage charges. *See id.* None of this course of dealing between the parties corresponded to the Distribution Agreement.

Even if the Long Beach Shoes were subject to the Distribution Agreement, title to the shoes did not pass to GBMI. Paragraph 5.4 of the Distribution Agreement provides that the shoes would be deemed "delivered" to GBMI at either the manufacturing plant or Props' warehouse and that GBMI would bear the costs and risks from that point on as set forth in the applicable Incoterm.[13] However, GBMI would gain ownership, or title, to the shoes only when Props received total payment. Diesel's Mots. Summ. J. Ex. A ¶ 5.4.

Because the Incoterms define terms of delivery and address the passage of risk, but do not govern the passage of title, the fact that delivery and the transfer of title could occur at two separate times under the Distribution Agreement presents no contradiction. *See Italverde Trading, Inc. v. Four Bills of Lading*, 485 F. Supp. 2d 187, 200 (E.D.N.Y. 2007) (observing that "the meaning of the INCOTERMS does not govern change in title"); *S.K.I. Beer Corp. v. Baltika Brewery*, 443 F. Supp. 2d 313, 322 (E.D.N.Y. 2006) (holding that the "more credible authority" indicates that "transfer of title is not conclusively determined by Incoterms"); *Texful Textile Ltd. v. Cotton Express Textile, Inc.*, 891 F. Supp. 1381, 1388 (C.D. Cal. 1995) ("The International

---

[13] The Incoterms, set by the International Chamber of Commerce, are standards of international commercial trade. *See Wing Shing Prods. (BVI), Ltd. v. Simatelex Manufactory Co.*, 479 F. Supp. 2d 388, 394 n. 3 (S.D.N.Y. 2007). Definitions of the Incoterms, "EXW," and "FCA," used in the Distribution Agreement appear at http://www.iccwbo.org/incoterms/preambles/pdf/EXW.pdf and http://www.iccwbo.org/incoterms/preambles/pdf/FCA.pdf.

13

Chamber of Commerce's 'Incoterms 1990' do not deal with 'title or other property rights of the seller and buyer; title issues are resolved by the parties' agreement or by the applicable local law.'") (quoting *Sales & Leases in California Commercial Law Prac.*, Continuing Education of the Bar, § 8.1); *St. Paul Guardian Ins. Co. v. Neuromed Med. Sys. & Support, GmbH*, No. 00 Civ. 9344, 2002 WL 465312, at *4 (S.D.N.Y. Mar. 26, 2002) ("INCOTERMS, however, only address passage of risk, not transfer of title.") (citing Charles Debattista, *Incoterms and Documentary Practices, in Incoterms 2000: A Forum of Experts* 63, 86 (2000)).

Greystone's contention that, pursuant to the California Uniform Commercial Code ("UCC"), the retention of title provision in the Distribution Agreement is limited to a reservation of a security interest, which would be subordinate to Greystone's senior perfected security interest, is without merit. This Court adopts the reasoning set forth in its prior opinion on Plaintiffs' motion for a preliminary injunction to the effect that Italian law, and not the UCC, applies to the Distribution Agreement pursuant to the choice-of-law clause and therefore the retention of title provision must be given effect. *See Diesel Props S.r.l. v. Greystone Business Credit II LLC*, No. 07 Civ. 9580, 2008 WL 594773, at *3-5 (S.D.N.Y. Mar. 5, 2008).

Therefore, GBMI never owned the Long Beach Shoes because it never paid for them, and Props cannot be held liable for conversion.

### 2. *Counterclaim against Diesel SpA for Breach of Non-Interference Agreement*

The Non-Interference Agreement is embodied in a letter dated November 30, 2006, in which Diesel SpA promised not to

> (1) create, assert or possess any security interests, liens, retentions of title or similar rights on the assets of [GBMI] (the "Collateral"), (2) sell, assign, transfer, pledge or give a security interest in any of the Collateral or (3) hinder or otherwise interfere with Greystone's rights and remedies under the [Loan Agreement] . . . .

Greystone's Mot. Summ. J. Ex. F at 1.

Greystone claims that Diesel SpA violated the Non-Interference Agreement by misappropriating certain electronic spreadsheets that showed GBMI's open customer orders for Diesel shoes ("Order Book"). The Order Book was an asset of GBMI and thus part of Greystone's collateral.[14]

---

[14] Under the Loan Agreement, Greystone's collateral included "customer lists" and "all of GBMI's books and records." Greystone's SOF Ex. N ¶ 3.1.

However, Greystone has not provided any evidence that *Diesel SpA* was responsible for the acquisition of GBMI's Order Book.  The evidence shows that on November 8, 2007, one of GBMI's former sales representatives, Doug Nelson, emailed the Order Book to *Diesel USA*, a wholly owned subsidiary of Diesel SpA that replaced GBMI as distributor.  *Diesel USA* forwarded the Order Book to Mezzasoma, the managing director of Props.  Greystone's SOF Ex. BB.  Greystone alleges that *Diesel USA* then filled the orders that GBMI had generated and compiled in the Order Book.

The few allegations made by Greystone with respect to Diesel SpA do not suggest that Diesel SpA was involved in the "misappropriation" of the Order Book.  While Diesel SpA's managing director, Marina Tosin, appears to have met with Mezzasoma to discuss an "action plan" for filling customer orders, there is no evidence that their plan had anything to do with the Order Book.  *See* Tosin Dep. 126:11-127:25, Sept. 9, 2008 (Sacks Reply Decl. Ex. NNNN); Greystone's SOF Ex. FFF, GGG.  Greystone also points to evidence that Renzo Rosso, Diesel SpA's chief executive officer, asked Datta, president of GBMI, for a list of GBMI's customer orders.  Greystone's SOF Ex. HHH.  However, a mere request could hardly be found to have interfered with Greystone's collateral, or to have asserted any kind of property interest in the Order Book, and Datta refused Rosso's request.  There is no evidence that anyone at Diesel SpA ever had possession, or even saw, the Order Book, although it is clear that Tosin knew of it.  *See* Mezzasoma Decl. ¶¶ 22-27, Dec. 1, 2008; Greystone's SOF Exs. CC, DD.

Finally, Greystone has not opposed Diesel SpA's motion for summary judgment on Greystone's claim that the Diesel entities are alter egos or that Diesel SpA is liable for the acts of its subsidiaries.  Greystone has not shown any evidence of the complete domination that is required to pierce the corporate veil.  Therefore, this Court holds that no reasonable fact finder could conclude that Diesel SpA is responsible for the acts of its subsidiaries.  *See William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989) ("It is well settled that New York courts are reluctant to disregard the corporate entity.").  Therefore, summary judgment is granted in favor of Diesel SpA.

### 3.     *Counterclaim against Props for Unjust Enrichment*

Greystone claims that Props was unjustly enriched by the acquisition of the Order Book and that Greystone is entitled to recover in *quantum meruit*.  To prevail on a cause of action for unjust enrichment, Greystone must show that Props retained a benefit at Greystone's expense,

15

for example by receiving "a benefit of money or property belonging to" Greystone. *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 425 F. Supp. 2d 458, 475 (S.D.N.Y. 2006) ("A defendant is enriched at the expense of a plaintiff when the defendant receives a benefit of money or property belonging to the plaintiff.") (quotation marks and citation omitted).

"[Q]uantum meruit and unjust enrichment are not separate causes of action." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (quotation marks and citation omitted). The elements of an implied-in-law contract claim for *quantum meruit* damages are "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Id.*

Nelson sent the Order Book to Diesel USA after Props terminated its Distribution Agreement with GBMI. By this time, Greystone argues that GBMI had done extensive work collecting customer orders for Props' shoes in compliance with its obligation under the Distribution Agreement. The parties dispute whether the customer orders in the Order Book numbered 342,669 pairs of shoes or more than half a million pairs, but, either way, the number is substantial. Since the Order Book contained all the customer information, it represented at least some, if not great, value. There is a genuine issue of fact as to the extent to which Diesel USA relied on the Order Book to distribute Props' shoes.[15] As the Order Book was part of Greystone's collateral, a reasonable fact finder could conclude that Props was unjustly enriched and that Greystone may recover for the value of the services performed by GBMI in compiling the Order Book prior to the termination of the Distribution Agreement.[16] *See, e.g., Fehlhaber Corp. v. State*, 410 N.Y.S.2d 920 (N.Y. Ap. Div. 1978). Summary judgment is denied.

## IV.  CONCLUSION

The Court has carefully addressed all points raised by the parties not discussed herein, and has found them to be either without merit or irrelevant. The claims that will proceed to trial are the following:

(1) Plaintiffs' claim against Greystone and GBMI for breach of the TPA;

---

[15] Props argues that the Order Book was used merely to identify GBMI's "smaller customers, with whom Diesel USA may not have been familiar, [and] to contact those customers." *See* Strippoli Decl. ¶¶ 26-27, Dec. 1, 2008. This strikes the Court as an admission that Props was enriched to at least some degree.

[16] The Court is not persuaded by Props' argument that GBMI was required to provide it with the Order Book, since the relevant provision in the Distribution Agreement imposed such a duty only at the close of a season. Diesel's Mots. Summ. J. Ex. A ¶ 4.3.

16

    (2) Plaintiffs' claim against Greystone and GBMI for unjust enrichment, but solely as an alternative to the claim for breach of the TPA;

    (3) Plaintiffs' claim against Greystone and GBMI for account stated, which must not be duplicative of the breach of contract claim;

    (4) Plaintiff's claim against GBMI for promissory estoppel; and

    (5) Greystone's counterclaim against Props for unjust enrichment.

The *nonjury* trial of this matter is scheduled to commence on February 23, 2009. The parties should pay close attention to the trial notification form that will be sent to each party contemporaneously with this opinion. Note that the Court will endeavor to make all decisions with respect to the admissibility of evidence prior to trial. Finally, the Court will hear oral argument on any motions in limine during the morning of February 23, 2009, prior to trial; the parties should not submit written motions in limine to this Court. The number of forests—not trees—already felled in connection with this litigation is far and away beyond that which, in my view, was necessary for this case.

**IT IS SO ORDERED.**

New York, New York
January ___, 2008

_____
U.S.D.J.