UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
DIESEL PROPS S.R.L. and DIESEL KID S.R.L.,                 :
                                                           :
        Plaintiffs / Counterclaim Defendants,     :
                                                           :       07 Civ. 9580 (HB)
  - against -                                            :
                                                           :       <u>OPINION & ORDER</u>
GREYSTONE BUSINESS CREDIT II LLC and                       :
GLOBAL BRAND MARKETING INC.,                               :
                                                           :
        Defendants / Counterclaim Plaintiffs,     :
                                                           :
------------------------------------------------------------------------x

Hon. HAROLD BAER, JR., District Judge:

        This case involves a contractual relationship among two shoe companies, their United States distributor, and the distributor's secured lender that, in part because of its novelty, turned out to be more complicated than any of the parties envisioned.  Italian shoe companies Diesel Props S.r.l. ("Props") and Diesel Kid S.r.l. ("Kid") (collectively "Diesel") sued their distributor Global Brand Marketing Inc. ("GBMI") and GBMI's secured lender Greystone Business Credit II LLC ("Greystone") for, *inter alia*, breach of contract, unjust enrichment and account stated.[1]  Greystone asserted a counterclaim against Props for unjust enrichment.  This opinion follows a host of pretrial motions, a three-day bench trial and the submission of post-trial briefs.

<u>FINDINGS OF FACT</u>

I.     THE RELATIONSHIPS AMONG THE PARTIES

        The relationship between Diesel and GBMI began as licensor-licensee in 1997, when GBMI and Diesel S.p.A. ("S.p.A."), the parent company of Props and Kid and the owner of certain Diesel trademarks, first entered into a licensing agreement under which GBMI would design, manufacture and sell Diesel-branded adult and children's footwear in areas around the world.  *See* Declaration of Sudeepto Datta ("Datta Decl.") ¶ 5; Joint Pretrial Order ("JPTO") ¶ 1, 10.  On November 30, 2001, S.p.A. and GBMI entered into a second Licensing Agreement; Kid entered into a substantially identical Licensing Agreement with GBMI on June 3, 2002 (the "Licensing Agreements").  *See* Datta Decl. ¶ 5; Declaration of Luigi Mezzasoma ("Mezzasoma Decl.") ¶ 7; P-14; P-15.  Each of the Licensing Agreements was to expire at the end of 2006.

---

[1] Diesel's promissory estoppel claim against GBMI survived summary judgment, but based on the elicited trial testimony, Diesel voluntarily withdrew that claim.  *See* Trial Transcript ("Tr.") 197:6-9.

Datta Decl. ¶¶ 5-6.  Under the Licensing Agreements, GBMI designed, developed and manufactured Diesel-branded adult and children's footwear and sold it through GBMI's global sales network, which consisted largely of high-end retail stores and international distributors; in exchange, GBMI paid Diesel royalty fees on the footwear sales.  *Id.* ¶¶ 7.

In late 2005, the relationship between Diesel and GBMI changed.  Diesel informed GBMI that it would not be renewing the Licensing Agreements;[2] rather, Diesel intended to take over the production and design of its branded footwear itself, with GBMI acting as its exclusive distributor in the United States.  *See* Datta Decl. ¶ 10.  On November 4, 2005, Props and Kid each signed a Distribution Agreement with GBMI.  *See* P-1; P-16.  Under the Distribution Agreements, Diesel took responsibility for designing, manufacturing and shipping the footwear to the United States from Asia; GBMI would buy the footwear from Diesel and resell it to retail store customers.  *See id.* § 2.1; Datta Decl. ¶¶ 10-11; Mezzasoma Decl. ¶ 8.  The Distribution Agreements had specific terms which delineated GBMI's payment obligations (§ 5.3) and the circumstances under which Diesel's right to terminate arose (§ 11.2).  The Distribution Agreements also provided that "[a]t the end of each sales campaign [GBMI] shall provide [Diesel] with the updated list of all its retailers with their addresses including the quantity and value of the amount of the Products sold for each single retailer listed therein . . . ."  P-1 § 4.3; P-16, § 4.3.  The term "sales campaign" is a term of art that refers to the time period from when a collection was presented to when the orders were collected.  Mezzasoma Decl. ¶ 10.  For example, for a Spring/Summer collection, the sales campaign began in early July of the previous year and ended in October; similarly, for a Fall/Winter collection, the sales campaign began in December of the previous year and ended in early March.  *Id.*  Most relevant to this case, the sales campaign for the Spring/Summer 2008 ("SS08") collection began in mid-July 2007 and ended on October 3, 2007 for Kid and October 12 for Props.  *See* P-163; Mezzasoma Decl. ¶ 10.  The Distribution Agreements contained a forum selection clause that required all disputes that arose out of the Agreements be litigated in the Court of Milan, Italy.  P-1 § 21; P-16 § 21.

By the summer of 2006, GBMI was in dire financial straits and informed Diesel that it had begun to seek a solution by obtaining financing or an outside investor to keep its business afloat.  Mezzasoma Decl. ¶ 16.  During the fall of 2006, GBMI approached Greystone for loan financing to alleviate its cash flow problems.  Datta Decl. ¶ 20; *see* Declaration of Guy Smith ("Smith

---

[2] Diesel was aware that GBMI was in severe default of its royalty obligations and advertising contributions under the Licensing Agreements for the majority of 2006.  Mezzasoma Decl. ¶ 14; Declaration of Germano Ferraro ("Ferraro Decl.") ¶ 9.  By December 2006, GBMI owed SpA and Kid over $11.5 million in back royalties.  JPTO ¶ 15.

Decl.") ¶ 3.  On December 4, 2006, GBMI and Greystone executed a Loan and Security Agreement ("LSA"), which provided GBMI with a $25 million revolving credit facility.  P-39; Smith Decl. ¶ 4.  As security, Greystone took a senior security interest in GBMI's assets (including customer lists and books and records), inventory and accounts receivable, among other collateral.  P-39, § 3.1-3.3.  If GBMI defaulted under the LSA, Greystone was not required to fund any loan requests under the LSA.  P-39 § 8; *see also* Tr. 134:1-20 (Sarrica), 208:4-8 (Mezzasoma).

The LSA was structured and executed in contemplation of the concurrent execution of an agreement among Diesel, GBMI and Greystone whereby Diesel would be paid for shoes ordered by GBMI directly through loan disbursements from Greystone.  This "Tripartite Agreement," or TPA, was executed in the form of a document entitled "Instructions for Supplier Payment" on the same day as the LSA was executed.  *See* P-4; P-19.[3]  The LSA and TPA made express reference to one another, and the terms of each was conditioned on the performance and fulfillment of conditions of the other.  Thus, the LSA authorized Greystone to wire GBMI's funds directly to Diesel "pursuant to the terms of the [TPA]."  P-39, § 1.6.  Likewise, Greystone's payment obligations under the TPA was expressly "[s]ubject to the terms and conditions of the [LSA]."  P-4 at 2; P-19 at 2.  Thus, the standing instructions from GBMI to Greystone to advance revolver proceeds directly to Diesel applied only if the TPA applied to the particular orders for which payment was requested and all conditions under the TPA were met.  Declaration of Santino F. Sarrica ("Sarrica Decl.") ¶ 4.  That is, if the terms of the TPA did not apply to a particular order for which payment was requested (*i.e.*, the order was "outside" the structure set forth in the TPA), Greystone had no authority under the LSA to wire GBMI's revolver proceeds directly to Diesel; rather, GBMI, as the borrower under the LSA, would be required to send Greystone a separate instruction to disburse loan proceeds to Diesel as a third-party.  *See id.*

The TPA contained three primary independent provisions.  First, GBMI was required to obtain a purchase order from a bona fide customer ("Customer Purchase Order") before placing an order for shoes with Diesel.  P-4 at 1; P-19 at 1.  A copy of the Customer Purchase Order was to be delivered to both Diesel and Greystone.  *Id.*  Second, the TPA provided that at any time before shipping the shoes, Diesel had the right to request written notice from Greystone as to whether at the time of such request there were (a) sufficient funds to permit payment in the amount requested in the Diesel Invoice, (b) if not, GBMI would be prevented from requesting a loan under the LSA,

---

[3] Two separate agreements were executed – one with Props (P-4) and one with Kid (P-19).  The substance of the two agreements is identical, and they will hereinafter be referred to in the aggregate as the "TPA."

or (c) if GBMI was not in compliance with any of the covenants and/or warranties under the LSA, or is in default under the LSA, irrespective of whether that non-compliance or default has been waived by Greystone. *Id.* at 1-2 (the "Notice Provision"). Third, pursuant to the TPA, GBMI was required to deliver to Diesel and Greystone a copy of any invoices to customers ("Customer Invoice"), which were deemed an irrevocable request for disbursement of a revolving loan in the amount of the corresponding Diesel Invoice. *Id.* at 2 (the "Payment Provision"). In accordance with the terms and conditions of the LSA, within two days of its receipt of a Customer Invoice, Greystone was required to wire the proceeds of the new loan in the amount of the corresponding Diesel Invoice. *Id.* The only express conditions prior to payment was a receipt of a Customer Invoice and availability of funds under the LSA. Mezzasoma Decl. ¶ 26. The TPA also required that any modification of its terms were to be made in writing and signed by all three parties. *Id.* Finally, notices under the TPA were to be made in writing and sent to the addresses or fax numbers of the respective parties as set forth in Exhibit B to the TPA, or to any other address or fax numbers that were provided in writing. P-4 at 3; P-19 at 3. Greystone considered the TPA to be a "unique" agreement, because it had never before entered into a three-party contract that created direct obligations for Greystone to pay loan proceeds to a third-party. *See* Tr. 64:3-10 (Sarrica), 280:8-18 (Neidorf).

Two days prior to executing the TPA, Diesel signed a letter agreement (the "December 2 Letter") delineating a number of terms upon which Diesel was willing to enter into the TPA. *See* P-3. The December 2 Letter expressly stated that "the [TPA] should only be applied to orders placed by GBMI upon receipt of a purchase order for product from a bona fide customer of Diesel Products." *Id.* at ¶ 4. Although Greystone did not sign the December 2 Letter, it is undisputed that it would not have closed on the LSA if Diesel had not signed the December 2 Letter, and that Greystone agreed to the terms of the December 2 Letter by accepting the TPA and closing on the LSA. JPTO ¶ 16.

Under the LSA, GBMI was required to engage Greystone Commercial Services ("GCS") as a third-party credit and collections service provider. P-39; Tr. 284:2-8 (Neidorf). On January 26, 2007, GBMI and GCS entered into a Servicing Agreement under which GCS would provide factoring services, back-office support and credit collection services to GBMI. P-68; Tr. 141:6-12 (Sarrica), 460:9-21 (Smith). Specifically, GCS was to receive and track invoices, and ensure that invoices were collected and paid. *See* P-68; Tr. 289:4-14 (Neidorf). Although Greystone and GCS are technically separate corporate entities, *see* Declaration of James O'Connell ¶ 7,

Greystone required GBMI to engage GCS to provide the factoring services because it "thought it would be nice if [GBMI] used somebody within the Greystone family for no other reason than it could [provide] brownie points for [Greystone], that we could refer a piece of the business to another company that's indirectly or directly owned by" the same individual.  Tr. 284:13-23 (Neidorf).  The GCS Servicing Agreement expressly provided that all notices, including Customer Invoices, were to be sent to GCS at its address in Dallas, Texas.  P-68 at 4-5.

## II.      GREYSTONE'S PERFORMANCE UNDER THE NOTICE PROVISION

Pursuant to the TPA, prior to each shipment of shoes to GBMI, Props and Kid were to send a letter to Greystone requesting notice if any of the TPA requirements had not been met at the time of the contemplated shipment (the "Notice Letters"); through the life of the relationship among the parties, Props sent Greystone forty-five Notice Letters, and Kid sent twelve Notice Letters.  *See* P-5; P-20; JPTO ¶ 22.  While each of these 57 Notice Letters requested a response from Greystone within two business days of receipt, no such time requirement existed in the TPA.  *See* P-4; P-19; Tr. 140:2-18 (Sarrica).  Diesel's purpose in sending these 57 Notice Letters was to manage and lessen the risk of accepting orders from GBMI before GBMI had obtained customer orders. Declaration of Rosanna Sartori ("Sartori Decl.") ¶ 61.

### A.      GBMI's Defaults and Covenant Breaches Under the LSA

The parties do not dispute that GBMI was in default under the LSA on multiple occasions throughout the life of the TPA.  JPTO ¶ 24.  The first of such defaults became known to Greystone by mid-January 2007.  *Id.* ¶ 25; Smith Decl. ¶ 12.  On January 29, 2007, Guy Smith of Greystone wrote to Luigi Mezzasoma of Props to notify him that GBMI had failed to satisfy minimum revenue covenants under the LSA for December and January.  *See* P-6.  In that notice, Greystone advised Props that it was working with GBMI to be able to waive the default, and that it hoped to have a deal completed within one week.  *Id.*  In its January 29 notice, Smith asked Mezzasoma whether it was "necessary to repeat this fact in each separate notification or [was he] okay with simply one notice, such as this?"  *Id.*  Mezzasoma agreed there was no reason to repeatedly advise Props that Global was in a state of default due to the December/January covenant breach.  *See* Smith Decl. ¶ 12.

Although it was anticipated that a waiver of GBMI's default would be effected within one week of the January 29 notice, the waiver was not finalized until April 26, 2007.  *Id.* ¶ 13; Tr. 423:21-24 (Smith).  Between the January 29 notice and the April waiver, Greystone was aware that GBMI had breached at least three different LSA covenants.  *See* P-35.  Greystone knew that

the covenant breaches were significant but failed to notify Diesel.  Tr. 298:11-299:7 (Neidorf).
Moreover, by the end of February 2007, Greystone was sufficiently concerned regarding several
of the covenant breaches that it sent a Reservation of Rights letter to Martin McDermut, CFO of
GBMI, describing the serious nature of the breaches and Greystone's intent to pursue remedies.
P-185.  During the time period between the January 29 notice and the April 26 waiver, Props and
Kid had sent a combined 27 Notice Letters, but Greystone did not notify Diesel of any additional
covenant breaches.  *See* JPTO ¶ 23.

Once the April 26 waiver was effectuated, GBMI's slate was wiped clean of defaults.
However, very soon thereafter, by the end of May 2007,[4] Greystone learned that GBMI had once
again breached a covenant – the May 31, 2007 EBITDA covenant – and that GBMI was in default.
*See* Sarrica Decl. ¶ 43.  Diesel was not made aware of this covenant breach until July 18, 2007,
when GBMI advised Diesel of the breach.  *See* Smith Decl. ¶ 14.  Greystone did not send an
official notice under the TPA of the covenant breach until August 6, 2007.  *See* P-7.  Between the
time Greystone learned of the covenant breach in May and when it sent the notice in August,
Diesel shipped and invoiced more than $10 million in shoes to GBMI.  *See* P-5; P-20; P-31; P-32;
P-33; P-67; P-110; P-111.  Over the period between December 2006 and May 2007, GBMI
breached at least 24 LSA covenants, yet Greystone provided notice to Diesel of these breaches on
only two occasions – January 29 and August 6, 2007.

B.    **Availability under the LSA**

The Notice Provision of the TPA also obligated Greystone to notify Plaintiffs if there was
insufficient availability under the LSA for a revolving loan in the amount of a Diesel Invoice.
There is a deep schism between the parties as to the appropriate method to determine availability.
Both Diesel and Greystone agree that availability is determined based on certain figures as
delineated in the weekly Borrowing Base Certificates ("BBC's"), but that is where the parties part
company.  Diesel contends that availability is determined by Line 28 of a BBC, which represents
"total excess availability" after accounting for the GBMI loan request in that particular BBC plus
the $3 million over-advance limit.  Greystone, on the other hand, contends availability is
determined by taking "total excess availability" from Line 28 and adding the amount in Line 23
(the amount of the new loan request).  Sarrica Decl. ¶ 16.  The reason for doing so, Greystone

---

[4] Guy Smith testified that he learned of the breach of the May 31 EBITDA covenant in July 2007 when he received
GBMI's financial statements, *see* Smith Decl. ¶ 14; however, Santino Sarrica, account executive on GBMI's account,
testified that he was aware of the new default as of the end of May 2007, Sarrica Decl. ¶ 43.  Smith testified that, as
account executive, Sarrica was in a better position to know the date of notice to Greystone.  Tr. 429:15-430:7 (Smith).

contends, is "because at the time [Greystone] would be making such a determination (of whether there was sufficient availability), [it] would not have already deducted the new loan request."  *Id.*  Alternatively, Sarrica's trial testimony concluded that availability on a given date should have been determined by adding the value of the goods to be shipped (based on the Diesel Notice Letter), multiplied by 64%, to the availability reflected on the most recent BBC, because Greystone would have loaned up to 64% of the inventory "in transit."  *See* Sarrica Decl. ¶ 31; Tr. 50:14-51:2, 62:4-23 (Sarrica).  However, this latter contention does not comport with the purpose of the Notice Provision, as Greystone's obligation was to determine availability under the LSA as of the date it received a Diesel Notice Letter.  By definition, Diesel Notice Letters were sent before shipments were made; thus, the goods were not yet "in transit," and should not have been counted in the availability of funds at the time of the particular Notice Letter.  *See* Tr. 65:5-14 (Sarrica).  Irrespective of which of these approaches Greystone embraced, it is clear that there was actually $1 million less available than Greystone indicated, because Greystone failed to maintain the $1 million minimum availability requirement that it imposed on GBMI.  *See* Tr. 67:24-74:16 (Sarrica); P-64 at GS113029, GS113017, GS113753, GS112877, GS112879; P-175.  Ultimately, the testimony at trial revealed that Greystone did not, in fact, carefully calculate availability as of the date it received Diesel's Notice Letters; rather, Sarrica testified that he determined availability based on his "general understanding" and knowledge of the status of the GBMI loan in his head. *See* Sarrica Decl. ¶ 33; Tr. 52:19-53:14 (Sarrica).

I agree with Diesel that it does not make sense to include Line 23 (the amount of the new loan request) in the availability determination, because as of the date of a particular BBC, the amount reflected in Line 23 had already been requested, and Greystone was obligated to fund it; thus, it was no longer available for disbursement for other purposes.  Thus it appears that the most appropriate value for availability is represented by the value of Line 28 (total excess availability) on the BBC immediately preceding the receipt of a given Diesel Notice Letter.  Using this method to determine availability, there were at least ten occasions where there was insufficient availability for the amount of the shipments that Diesel advised it was prepared to make in its Notice Letters.[5]

---

[5] *Compare* P-5 (1/22/07 letter relating to $3,096,255.96 shipment) *with* P-40 (1/21/07 BBC, $1,017,698.28 availability); P-5 (1/29/07 and 2/2/07 letters relating to total $1,727,419.20 shipments) *with* P-40 (1/29/07 BBC, $1,715,876.11 availability); P-5 and P-20 (letters dated 2/5/07 and 2/6/07 relating to total $1,324,182.27 shipment) *with* P-40 (2/5/07 BBC, $756,698.49 availability); P-5 (letters 2/15/07 and 2/16/07 relating to total $2,564,107.08 shipments) *with* P-40 (2/19/07 BBC, $1,012,167.56 availability); P-5 (letters dated 3/28/07 relating to $2,117,012.28 shipment) *with* P-40 (4/2/07 BBC, $783,290.08 availability); P-5 (letters dated 4/13/07, 4/18/07, 4/24/07 for total $2,181,054.22 shipments) *with* P-40 (4/16/07 BBC, $1,000,486.12 availability); P-5 (letters dated 5/7/07, 5/8/07 and 5/11/07 relating to $4,415,493.60 total shipments) *with* P-40 (5/3/07 BBC, $1,030,784.30 availability); P-5 and P-20

Moreover, even under Greystone's view of the correct method to determine availability (*i.e.*, Line 28 + Line 23), Greystone acknowledges there was insufficient availability on at least one occasion, *see* Sarrica Decl. ¶ 27, line 4, and Plaintiffs demonstrated at trial that there were numerous other occasions where there were insufficient funds. *See, e.g.*, Sarrica Decl. ¶ 27, lines 14-15, 27-28, 33-36, 37-39. It bears repetition that Greystone never sent a single notification of a lack of availability under the LSA pursuant to the Notice Provision of the TPA. *See* Mezzasoma Decl. ¶ 88; Ferraro Decl. ¶ 31; Tr. 67:9-17 (Sarrica).

### C.   Diesel Shipped Shoes Regardless of Whether It Received Notice of Defaults or Lack of Availability from Greystone

Diesel witnesses testified that, had they received notice of any of the instances of covenant breaches or lack of availability, they would not have continued to ship shoes to GBMI, but would and should have terminated the Distribution Agreement and obtained a new United States distributor, as it did in October 2007. *See* Mezzasoma Decl. ¶¶ 92-93; Ferraro Decl. ¶¶ 33-34. However, this testimony is belied by the events as they actually unfolded. First, even on the two occasions when Diesel did receive notice of GBMI's defaults under the LSA, it continued to ship shoes virtually on the 'heels' of said notice. Specifically, on January 29, 2007, Diesel was informed of GBMI's breach of the December/January minimum revenue covenant (P-6); yet two days later it advised Greystone that it planned to ship over $1 million dollars worth of shoes (P-5 at GS0063107 and GS0063106). Only two days later, on February 2, Diesel again notified Greystone of another planned shipment for over $650,000. *See* P-5 at GS00631108. Thus, within four days of the first notice of default, Diesel advised Greystone that it planned to ship over $1.7 million worth of product to GBMI, even though it was clear that GBMI was in financial turmoil. Over the next month, Diesel shipped in excess of $4.3 million worth of shoes, knowing full well that GBMI had tripped at least one significant LSA covenant. *See* P-5 at GS063110, 63113, 63114, 63116, 36117; P-20 at GS063112, 063115. After it was informed of GBMI's default for the second time on July 18, 2007, Diesel again continued to ship shoes as if undisturbed by the information about GBMI's financial state. Indeed, the very next day, Diesel notified Greystone of a shipment for over $750,000 worth of shoes; two weeks later, on August 1, Diesel again notified Greystone of a shipment of over $500,000. *See* P-5 at GS0063151, 63152. Approximately one

---

(letters dated 5/14/07, 5/16/07, 5/17/07, 5/18/07 relating to total $1,592,801.64 shipments) *with* P-40 (5/14/07 BBC, $1,007,884.72 availability); P-5 and P-20 (letters dated 6/15/07, 6/18/07 and 6/20/07 relating to total $1,015,197.46 shipments) *with* P-40 (6/18/07 BBC, $842,258.42 availability); P-5 (7/23/07 letter relating to $584,004.00 shipment) *with* P-40 (7/31/07 BBC, $578.21 availability).

month later, Diesel sent another notice of its plan to ship over $40,000 worth of shoes. *Id.* at GS0063153. Moreover, not only did Diesel ship shoes in the face of disturbing information regarding GBMI's financial condition, there is no evidence that Diesel was concerned with whether they received a response to their Notice Letters. For example, on January 16, 2007, Diesel faxed a Notice Letter to Greystone, indicating its intent to ship shoes to GBMI valued at more than $750,000 and asking Greystone to respond within two business days. *See* P-5 at GS056654. Yet, Diesel did not bother to wait for a response, and shipped the shoes that very day. *See* Tr. 88:2-6 (Sarrica). This evidence, along with other evidence that Diesel was fully aware of GBMI's precarious financial condition throughout their relationship, supports the conclusion that Diesel continued to ship to GBMI because it had determined that it either continue to do so or risk losing its entire United States market share. Deposition of Marina Tosin ("Tosin Dep.") 99:14-101:4; Datta Decl. ¶ 30.

## III.   PERFORMANCE UNDER THE PAYMENT PROVISION

### A.   GBMI's Only Obligation to Pay Arose Under the Distribution Agreement

After the Distribution Agreements were executed, all shoes that Diesel shipped to GBMI were shipped pursuant to those Agreements. *See* Tr. 260:10-13 (Ferraro). When Diesel sent GBMI invoices for the shoes it shipped, those invoices likewise were rendered pursuant to the Distribution Agreements. Tr. 260:10-16 (Ferraro); Tr. 152:18-23 (Sartori). Diesel agreed at trial that it relied on the terms of the Distribution Agreements, in particular their provisions regarding remedies for non-payment, whenever it shipped shoes to GBMI. Tr. 152:18-23 (Sartori). Thus, the language of the relevant contracts, along with Diesel's admissions at trial, illustrated that GBMI's only payment obligation arose under the Distribution Agreements, not the TPA. Indeed, the only obligations imposed on GBMI under the TPA were to provide copies of Customer Purchase Orders and Customer Invoices (and, as discussed below, to "match" Customer Invoices to the corresponding Diesel Invoice), which in turn triggered Greystone's payment obligation.

### B.   GBMI Provided Customer Invoices to Greystone Through GCS

The TPA is unambiguous that Greystone's payment obligation was conditioned upon GBMI delivering a Customer Invoice. *See* P-4; P-19. The TPA provides that Customer Invoices were to be delivered pursuant to the notice provisions of the agreement, which in turn required notices to be sent to Greystone's address in New York City. *Id.* However, the TPA's Notice Provision also provided that notices could be sent to any other address or fax numbers designated in writing. *Id.* When Greystone required GBMI to engage GCS as its third party credit and

collections service provider, it designated GCS as its agent to collect GBMI's Customer Invoices and directed GBMI, in writing in the Servicing Agreement, to deliver Customer Invoices to GCS's address in Texas. *See* P-68. Although, under the TPA, GBMI was obligated to send Customer Invoices to Greystone, Greystone's account executive for the GBMI account testified that he "did not think [he] had to" set up any procedure to track the invoices. Tr. 78:16-21 (Sarrica). It appears that there in fact was no need for Greystone to track the Customer Invoices, because GCS was receiving and tracking them on Greystone's behalf. Moreover, each BBC that Greystone received weekly included a list of Customer Invoices, listed by "Billing Doc Number." *See* Tr. 104:2-5 (Sarrica). Each of the Customer Invoices was available on GCS's website, to which Sarrica and other executives involved on the GBMI account had access, but never used for this purpose. *See* Tr. 82:13-16 (Sarrica). Thus, contrary to Greystone's contentions, GBMI did provide it with Customer Invoices, as it was required to do under the TPA.

### C.   Diesel Shipped Shoes Not Supported by Customer Purchase Orders

Although Greystone received the required Customer Invoices, its payment obligation under the TPA would nonetheless not have been triggered unless the TPA actually applied to the shipments at issue. The effective date of the TPA was December 4, 2006. *See* P-4, P-19. At that time, there were 110,000 pairs of shoes being held at SNATT, Diesel's consolidator warehouse in Hong Kong, waiting to be shipped to the United States. Sartori Decl. ¶ 35; Mezzasoma Decl. ¶ 45. Although the procedure set forth under TPA was supposed to cover all orders after its execution, GBMI paid for these shoes by letter of credit because it wanted fast delivery, and the formalities required to implement the TPA were not yet in place on GBMI's end. Sartori Decl. ¶¶ 35-36. While Diesel contends "all parties" understood the rest of the shipments for the SS07 season would be paid for under the TPA, that does not appear to be what happened. Beginning in January 2007, Diesel began accepting orders from GBMI that were not supported by Customer Purchase Orders, understanding that the terms of the TPA would not apply to those shipments. *See* Mezzasoma Decl. ¶ 49; D-G; D-H. Diesel opted to take the risk of accepting those orders because it was anxious to have its shoes distributed into the United States in time for the Fall/Winter 2007 ("FW07") season. *See* Tr. 183:1-21 (Mezzasoma); D-G; D-H; Tosin Dep. 91:16-93:4. Diesel continued to ship to GBMI without requiring Customer Purchase Orders throughout the life of the TPA knowing full well that, based on the structure of the TPA and as made explicit in the December 2 Letter, those orders were not covered by the TPA. *See* P-3; D-E; D-G; D-I; D-J; D-K; D-P; D-Q.

Because the TPA simply did not apply to these shipments,[6] Greystone lacked any authority to lend funds to a third-party (such as Diesel) without the direct authorization of GBMI as its borrower under the LSA.  *See* Sarrica Decl. ¶ 35; Tr. 77:4-20 (Sarrica).  GBMI and Greystone's actions under the LSA were consistent with this understanding – on 18 occasions, GBMI requested that Greystone wire revolver funds directly to Diesel in specified amounts; Greystone honored each instruction.  *See* Sarrica Decl. ¶ 36; P-64; Tr. 127:15-21 (Sarrica).[7]  Moreover, Greystone's Loan Ledger Report, which reflects all disbursements of funds under GBMI's revolver, shows that Greystone continually advanced funds to GBMI at the end of 2006 and through 2007, which amounted to over $60 million.  *See* P-46.  Under the LSA, GBMI as borrower was entitled to authorize Greystone to send loan proceeds directly to a third-party; alternatively, GBMI could have requested the loan proceeds to be wired directly to it, and then forward the payments to Diesel on its own.

### D. The Payment Provision of the TPA Was Never Modified

Shortly after the TPA was executed, it became clear to all parties that it was a complicated, "cumbersome" procedure that, as the facts of this case bear out, none of the parties truly understood.  Indeed, Diesel's Managing Director could not even be sure that it was Greystone that failed to comply with its obligations.  He testified that "[a]lmost immediately upon the closing of the LSA and the TPA, it became apparent to Props that *GBMI and/or Greystone* were not complying with their payment obligations to Props pursuant to the *TPA and/or Distribution Agreement*, and that the TPA was cumbersome in its application."  Mezzasoma Decl. ¶ 48 (emphasis added).  All that was clear was that "GBMI was receiving shoes; [Diesel] was told that GBMI was shipping shoes to its customers; but [Diesel] was not getting paid."  *Id.*

As a result, Diesel met with GBMI in Santa Barbara, California in March 2007 to discuss amounts overdue to Props, Kid and S.p.A. under the various contracts among them.  The Diesel parties and GBMI "understood the need to modify the payment procedure specified by the TPA to make it more efficient."  *Id.* ¶ 51.  At the Santa Barbara meetings, Diesel and GBMI agreed among themselves to modify the payment procedure under the TPA to begin to operate on a first in/first out ("FIFO") basis for shoes sold under the TPA. *Id.* ¶ 5.  Props and Kid thus entered into a

---

[6] As will be discussed in more detail in the following section, Diesel and GBMI contemplated, though never executed, an amendment to the payment procedures under the TPA.  In that document, the parties expressly acknowledged that Diesel had "existing SS07 and FW07 product not covered by the [TPA]."  P-62 at DIESEL 231473.

[7] On only three of these occasions did GBMI provide to Greystone a Diesel Invoice that corresponded to a particular Customer Invoice.  *See* P-64.  However, the fact that GBMI did in fact do this "matching" exercise on at least these occasions is evidence that GBMI could have, and perhaps should have, been responsible for this role under the TPA.

written agreement entitled the "Tripartite Payment Procedure" ("TPP") setting forth its proposed procedure, whereby upon receipt of a Customer Invoice, Greystone would pay the oldest Diesel Invoices first, using, for simplicity, the average purchase price. *Id.* ¶ 54-55; P-62. That is, the first (oldest) Diesel Invoices would be the first to be paid under the proposed TPP. Greystone did not participate in the meetings except briefly by telephone, when Guy Smith advised Diesel and GBMI that Greystone would not object to the proposed modification, but that the TPA would have to be amended. Smith Decl. ¶ 10; *see* P-4, P-19 (requiring modifications to be in writing, signed by all three parties). Greystone neither drafted nor commented on the proposed amendment to the TPA, nor did Greystone ever receive a copy of the TPP or sign any written agreement creating an obligation to pay on a FIFO basis. *See* Mezzasoma Decl. ¶ 54; P-62; Tr. 235:25-236:11 (Mezzasoma). Diesel's witnesses testified that "[o]nce the [TPP] went into effect in mid-March 2007, all parties – Greystone included – operated under the modified procedures for the TPA." The trial testimony was different. In fact, as noted, Greystone at all times was listening to a different drummer and concluded that shipments not covered by the TPA, could be paid directly to Diesel only if it received express authorization from GBMI. Diesel presented no evidence to show that Greystone ever paid Diesel based on its proposed FIFO procedure, nor did it acknowledge any obligation to do so.

     At approximately the same time, GBMI and Diesel negotiated a separate Proposed Letter Agreement, the purpose of which was to "cover orders not covered by a purchase order or [letter of credit]." P-78; *see also* P-95. However, the proposed letter agreement did not contain a signature block for any Greystone representative, nor was it ever signed by either Diesel or GBMI. P-78; P-95; Tr. 237:18-24 (Mezzasoma). Diesel acknowledged that "the agreement should also be signed by Greystone" and that Greystone's signature "is the minimum to have a valid document." P-78. GBMI informed Props that Greystone was "unwilling to be a party to this letter," P-78, and had "expressly refused to enter into an amended TPA," Datta Decl. ¶ 31. Mezzasoma of Props admitted at trial that the TPA was never validly amended, either by the TPP or the Proposed Letter Agreement. *See* Tr. 238:9-239:1, 240:13-19 (Mezzasoma).

     **E.**     **Diesel's Complaints About Late Payments**

     Between March and September 2007, Props sent a number of emails containing documents entitled "Statements of Account – GBMI." *See* P-131; P-132; P-139; P-141; P-142; P-145; P-146. Greystone was copied on some, but not all, of these email transmissions. *Id.*; Sartori Decl. ¶¶ 72-73 (listing 21 statements of account generated by Props, 9 of which were sent to Greystone).

However, none of the statements specifically asked Greystone to pay GBMI's debt, nor did they refer to the attached documents as statements of Greystone's account.  *Id.*; Tr. 472:11-473:9 (Smith).  Each statement was attached to an email that stated that it was "copy to Greystone."  *See* P-131; P-132; P-139; P-141; P-142; P-145; P-146.  Guy Smith of Greystone received these nine statements of account, but did not take any action on them or forward them to Sarrica for any action.  Tr. 450:7-452:16 (Smith).[8]  In addition to these statements of account, from time to time Mezzasoma would email GBMI and threaten to stop shipping shoes unless Diesel was paid amounts that were overdue.  Mezzasoma Decl. ¶ 61; P-87; P-88; P-96; P-97; P-98.  Not coincidentally, within days of each threat, Props would receive payments directly from Greystone.  P-64; P-156.  Again, this is consistent with the finding that Greystone wired payments directly to Diesel upon direct authorization from GBMI.  It is also indicative of Diesel's understanding that it was indeed GBMI's responsibility to get Diesel Invoices paid by affirmatively contacting Greystone.  For example, on May 7, 2007, Props emailed GBMI complaining that it had agreed to pay upwards of $7 million for shipments of products, but that Diesel had, thus far, only been paid approximately $1.5 million; no representative from Greystone was copied on the email.  P-45.  Similarly, on May 11, 2007, Diesel complained to GBMI about unpaid invoices and told GBMI to "take action within your organization to solve" the issue relating to late payments for shipments made to GBMI.  Deposition of Massimo Dalla Bona ("Dalla Bona Dep.") Ex. 612 at DIESEL7299.

## IV.    DIESEL TERMINATES THE DISTRIBUTION AGREEMENTS AND THE TPA

On September 4, 2007, Diesel notified Greystone that it was in default of the TPA for, among other things, breach of the Payment Provision of the TPA, and advised Greystone that it had thirty days to cure the outstanding defaults.  P-10.  On the same day, Diesel notified GBMI that it had thirty days to cure specified defaults under the Distribution Agreements.  P-9; P-11.  When neither Greystone nor GBMI responded to these notices nor cured the defaults, Diesel sent each party a notice that the TPA and Distribution Agreements were terminated as of October 4, 2007.  *See* JPTO ¶ 34; P-12; P-13; P-102; P-103.  Thereafter, Diesel engaged Diesel USA, a wholly-owned subsidiary of Props, to replace GBMI as its exclusive distributor in the United States and released trade announcements advising customers to that effect.  *See* JPTO ¶ 36; P-41.

---

[8] It is unclear from the evidence presented at trial why Smith (a new business executive), and not Sarrica (the account executive) appeared to be the primary point person on the Diesel-GBMI matter.  What is clear is that it was primarily Smith who was involved in the major issues that arose in the relationship among the parties, and that there was a failure of communication between Smith and Sarrica on matters relating to the TPA.  *See* Tr. 174:8-19 (Mezzasoma); Tr. 113:4-114:8 (Sarrica); Tr. 386:10-389:1 (Datta); Tr. 402:24-403:16 (Smith); P-6; P-7; P-195; P-204; P-205.

## V.        PROPS AND DIESEL USA BENEFIT FROM GBMI'S SS08 ORDER BOOK

Props's notice of default under the Distribution Agreement was sent to GBMI on September 4, 2007 – one day after it notified Greystone that it planned to make a shipment of shoes to GBMI, and precisely thirty days before the end of the Kid SS08 sales campaign.  *See* P-5 at GS063153; P-9; P-163.  Thus, the cure date set in the termination letter coincided with the end of the Kid sales campaign.  By the time Props terminated the Distribution Agreement, GBMI had already collected orders for 520,202 pairs of Diesel shoes for the SS08 sales campaign.  *See* Declaration of Anthony Strippoli ("Strippoli Decl.") ¶ 55.  The collection of these orders had resulted in significant operating expenses for GBMI; indeed, "[n]early all of GBMI's costs were associated with developing and selling the Diesel product line."  Datta Decl. ¶ 13; *see* D-LL – D-RR.[9]  Props did not advise GBMI that the Distribution Agreement was officially terminated retroactively to October 4 until October 17, five days after the Props sales campaign had ended and just before shipments of SS08 shoes to customers were scheduled to begin.  Tosin Dep. 133:3-12.

Because the SS08 sales campaign had ended as of the termination of the Distribution Agreement, GBMI had obtained all orders for that season; for Diesel USA to fill those orders, Props needed to obtain GBMI order information including "who the customers were" and "what Diesel shoes they had ordered from GBMI."  *See* Tr. 314:7-11, 314:12-24 (Strippoli).  In the Fall of 2007, Diesel USA had never before been in the business of selling shoes, and it had no infrastructure or staff in place at the time to do so.  *See* Tr. 316:22-317:21.

The first GBMI customer that Props contacted after it terminated the Distribution Agreement was Genesco, one of GBMI's top three mass retailers.  *See* Tr. 306:25-307:5; Strippoli Decl. ¶ 19; Deposition of Martin McDermut ("McDermut Dep.") 99:6-17.  There was much trial testimony surrounding the conversion of GBMI's Genesco orders that were ready for distribution into Diesel USA orders; however, Props already had certain information relating to Genesco orders in its system, and the information given to Props to confirm and match up orders pending in Genesco's system was given directly to Props from Genesco based on its own records.  *See* P-89;

---

[9] GBMI's total operating expenses for the fiscal year 2007 reached $20,785,731 by July 2007.  D-RR (GS111779).  Greystone estimates that the average operating expenses through the termination of the GBMI Distribution Agreement in September was an additional $5,938,780, for a total of $26,724,511.  Because Diesel made up approximately 70% of GBMI's business (and, presumably, costs), it can be estimated that $18,707,157 of these costs through September 2007 was attributable to Diesel.  However, this figure represents costs for the three seasons SS07, FW07 and SS08.  No testimony or documentary evidence was presented at trial set out the precise costs that GBMI incurred for each individual season; however it is fair to estimate that the costs associated with collecting the orders for SS08 comprised one-third that amount, or $6,235,719.

P-90; P-118; P-161; *see also* Strippoli Decl. ¶¶ 28-33.  Other than for Genesco and Diesel USA (which had been a GBMI customer prior to the termination of the Distribution Agreements), neither Props nor Diesel USA had any information regarding SS08 orders from any other GBMI customers for Diesel-brand shoes.

At the time Diesel USA was transitioning for the first time into the distribution business, it hired two former GBMI employees, Doug Nelson and Mike Balzer.  Strippoli Decl. ¶ 35.  On November 8, 2007 – the same day he was hired – Nelson emailed Strippoli, of Diesel USA, a document that contained a complete list of all of GBMI's open orders for the SS08 season (the "Order Book").  *See* P-83; Strippoli Decl. ¶ 36.  The Order Book reflected orders from Genesco (the complete universe of which was provided to Diesel a week before it received the Order Book), Diesel USA and "other" customers.  Strippoli Decl. ¶ 55.  Props's view was that "[i]t looks like Christmas came early this year" and that by giving Props the "entire GBMI order portfolio," Nelson had brought Props "a dowry."  D-EE; D-FF; Tr. 323:9-18 (Strippoli); Tr. 250:18-251:11 (Mezzasoma); Mezzasoma ¶ 95.  In an effort to conceal the fact that it had the Order Book, and to make it appear to customers as though Diesel USA was collecting new orders for the SS08 season, Props cautioned that its possession of the Order Book should be kept in confidence, and should not be discussed by email.  *See* D-GG; Tr. 249:4-250:17 (Mezzasoma).

Strippoli admits that he made use "of the Order Book . . . to review and evaluate the list of GBMI's customers."  *Id.* ¶ 42.  After receiving the Order Book, Diesel USA sold on Prop's behalf a total of 369,266 pairs of SS08 Diesel shoes for net sales of $14,014,743.15.  *See* Strippoli Decl. 55; P-74; P-75, P-91; Tr. 335:6-10 (Strippoli).  Other than sales to Genesco and Diesel USA, Diesel USA's sales for SS08 totaled $2,377,086 for 58,105 pairs of shoes.  *Id.* ¶¶ 55, 60; P-74; P-91.

Props had received a list of customers similar to the Order Book from GBMI in July 2007.  P-51.  The July 2007 list contained 185 customers, while the Order Book contained 135 customers; of those 135 customers, only 42 were "new customers" who were not identified on the July 2007 list.  Strippoli Decl. ¶¶ 43-44; P-82.  Of those 42 "new customers," Diesel USA placed orders with 8 for a total of 10,081 units; the total net sales for these units was $402,281.  *Id.* ¶¶ 44-45.  Strippoli testified that Diesel USA "would have likely contacted" some of these customers – for example, Amazon.com and SMC Associates – without the aid of the Order Book.  *Id.* ¶ 46; this testimony stretches credulity, as Diesel USA had no previous relationship with the customers and learned of their interest in Diesel-brand footwear only after it received and evaluated the Order

Book.  Indeed, Strippoli admitted that "Diesel USA used the information in the Order Book and the July 2007 list . . . to identify GBMI's smaller customers, with whom Diesel may not have been familiar, to contact those customers to see if they wanted to order SS08 shoes."  *Id.* ¶ 49.

**CONCLUSIONS OF LAW**

**I.    DIESEL'S CLAIMS AGAINST GBMI AND GREYSTONE**

    **A.    <u>Claims Against GBMI Are Dismissed</u>**

    "[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 580 (2d Cir. 2006) (quoting *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002)).  In this case, which was brought under the TPA by Diesel essentially for payment for goods shipped to GBMI between December 2006 and October 2007, the clear and unambiguous language of the relevant contract imposes no payment obligations on GBMI.  Rather, pursuant to the TPA, GBMI had only to deliver Customer Invoices (with corresponding Diesel Invoices) and Customer Purchase Orders to Greystone.  The only party who had any obligation to pay Diesel under the TPA was Greystone.  *See* P-4 at 2; P-19 at 2 ("[Greystone] shall wire . . . the proceeds of a new Revolving Loan in an amount of a Diesel Invoice to [Diesel].").  GBMI was, in fact, obligated to pay for the goods Diesel shipped to it for distribution in the United States, but that obligation arose solely under the Distribution Agreements.  *See* P-1 § 5.2 & 5.3.  The testimony at trial made it clear that any demands for payment or remedies for non-payment on which Diesel relied in its claims against GBMI were premised on the Distribution Agreements, and the Distribution Agreements contained a forum selection clause.  *See* Tr. 260:10-16 (Ferraro); Tr. 152:18-23 (Sartori).  As this Court has previously recognized, "[a] forum selection clause is an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction."  *Diesel Props S.R.L. v. Greystone Business Credit II LLC*, No. 07 Civ. 9580 (HB), 2008 WL 4833001, at *16 (S.D.N.Y. Nov. 5, 2008) (citation omitted).  Because the forum selection clause is clear that any claim for payment (whether for breach, account stated or unjust enrichment) against GBMI necessarily arises out of the Distribution Agreements, and because the Distribution Agreements are subject to the mandatory forum selection clauses, the claims against GBMI in this action must be dismissed and may only be tried in Milan, Italy.  *See id.* at *6-10.

**B.**     **Greystone is Not Liable for Breach of the TPA**[10]

*1. Diesel's Claim Against Greystone for Breach of the Notice Provision*

To succeed in its claims for breach of the TPA against Greystone, Diesel must prove (1) the existence of a contract; (2) breach of the contract by Greystone; and (3) damages suffered as a result of the breach. *National Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). Causation is an essential element in a breach of contract action and, as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused the claimed damages. *Id.* (citation omitted); *see also Exxon Co. v. Sofec, Inc.*, 517 U.S. 830, 839-40 (1996) (finding that although principles of legal causation sometimes receive labels in contract analysis different from the "proximate causation" label most frequently employed in tort analysis, these same principles exist to restrict liability in contract as well); *Petitt v. Celebrity Cruises, Inc.*, 153 F. Supp. 2d 240, 263-64 (S.D.N.Y. 2001) (collecting cases); *Bi-Economy Market Inc. v. Harleysville Ins. Co. of N.Y.*, 10 N.Y.3d 187, 193 (2008). Damages that are "so remote as not to be directly traceable to the breach," or that are the result of intervening causes, cannot be allowed. *National Market Share*, 392 F.3d at 526; *see also Rose Lee Mfg., Inc. v. Chemical Bank*, 186 A.D.2d 548, 551 (2d Dep't 1992). Thus, a defendant may not be held liable for a plaintiff's injury that would have occurred regardless of the breach. *See Point Prods. A.G. v. Sony Music Entmt., Inc.*, 215 F. Supp. 2d 336, 344 (S.D.N.Y. 2002); *Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 96 CIV.7874 (RWS), 2002 WL 826956, at *5 n.5 (S.D.N.Y. May 1, 2002).

In this case, Diesel contends that it suffered damages as a result of Greystone's failure to advise it of either a lack of availability or of any breaches of covenant or defaults under the LSA, as it was required to do under the TPA. While on first blush it is clear that Greystone failed to do what was required of it under the TPA's Notice Provision, Diesel has, once we scratch the surface, failed to satisfy its burden of proof that such failure was the proximate cause of its damages. There is no dispute that Diesel was well aware of GBMI's dire financial situation, and that it chose to take the business risk associated with continuing to ship shoes to GBMI, because it wanted to ensure a market for its footwear in the United States. Tosin Dep. 99:14-101:4; Datta Decl. ¶ 30. One example is the occasion on January 16, 2007, when Diesel sent a Notice Letter requesting a

---

[10] Unlike the Distribution Agreements, the TPA contains a forum selection clause that provided that any claims arising under the agreement were to be litigated in New York state or federal court. The TPA also provided that its provisions were to be governed by New York law. Accordingly, Diesel's claims against Greystone were properly litigated in this forum.

response under the Notice Provision of the TPA, but failed to wait the requisite two business days for a response from Greystone, and shipped over three-quarters of a million dollars worth of shoes that same day.  To make the cheese more binding, the testimony revealed that on the two occasions when Diesel was notified of GBMI's defaults under the LSA, rather than discontinue its relationship with GBMI, it continued to ship goods.  In February, over the four days following the first default notice, Diesel shipped $1.7 million worth of shoes.  Thereafter, even though it knew GBMI was in financial difficulty and in default under the LSA, and that it had not been paid for its shipments, in the three months following the first notice of default, Diesel proceeded to ship over $13 million dollars worth of shoes to GBMI.  After it received the second notice of GBMI's default on July 18, 2007, undeterred by GBMI's financial state, Diesel continued to ship shoes, shipping over $1 million worth of shoes in the ensuing two weeks.  Diesel continued to ship shoes up until the day before it sent its notices to Greystone and GBMI of its intent to terminate the TPA and Distribution Agreements, almost two months after it received the second notice of default. Diesel's witnesses testified that, had they received notice of any of the additional instances of covenant breaches or lack of availability (in addition to the two notices of default actually received), they would not have continued to ship shoes to GBMI.  *See* Mezzasoma Decl. ¶¶ 92-93; Ferraro Decl. ¶¶ 33-34.  This testimony fails to satisfy the "but for" causation requirement for Diesel's breach of contract claim.  That is, Diesel has failed to prove the element of causation.  Its own actions and business decisions to continue to ship shoes irrespective of GBMI's financial condition was an intervening cause of its losses.  Accordingly, Diesel's claim against Greystone for breach of the Notice Provision of the TPA is dismissed.[11]

### 2. Diesel's Claim Against Greystone for Breach of the Payment Provision

Greystone argues that there are three independent reasons why it was not obligated (or authorized) to pay Diesel under the TPA: first, that GBMI ordered shoes from Diesel without first obtaining Customer Purchase Orders; second, that GBMI did not deliver to Greystone copies of its Customer Invoices; and third, that GBMI did not provide Greystone with Diesel Invoices that corresponded with the Customer Invoices.

---

[11] It is also worth noting, although the point was not raised by any of the parties, that Diesel's claim against Greystone for breach of the TPA is also barred under the contract theory of election of remedies.  Under that doctrine, upon learning of a material breach by Greystone, Diesel was obligated to choose between terminating the contract and continuing its own performance.  See, e.g., *Hallinan v. Republic Bank & Trust Co.*, 519 F. Supp. 2d 340, 351 (S.D.N.Y. 2007); *Albany Med. College v. Lobel*, 296 A.D.2d 701, 702 (3d Dep't 2002).  Diesel made its choice, as shown by the trial evidence, by continuing to ship shoes even in the face of what it now avers to have been material breaches by both GBMI and Greystone.  For this reason, too, Diesel has failed to show that it can recover against Greystone for breach of the TPA.

In this Court's summary judgment order, a genuine issue of fact was found as to whether the parties intended the December 2 Letter to make the Customer Purchase Order requirement a condition precedent to the TPA. *See Diesel*, 2009 WL 89115 at *4. By the express language of the December 2 Letter, "the [TPA] [was] only [to] be applied to orders placed by GBMI upon receipt of a purchase order for product from a bona fide customer of Diesel Products." P-3 ¶ 4. Additionally, contemporaneous correspondence among the parties exhibited their understanding that any orders shipped to GBMI that were not supported by Customer Purchase Orders were "outside" the payment structure of the TPA. *See* D-E; D-G; D-I; D-J; D-K; D-P; D-Q. Thus, although finding a condition precedent to a party's performance under a contract is generally disfavored, *e.g.*, *Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*, 03 Civ. 5539 (NRB), 2004 U.S. Dist. LEXIS 11761, at *17-18 (S.D.N.Y. June 25, 2004), in this case the words and actions of the parties demonstrate that all interested parties intended that the December 2 Letter make the Customer Purchase Order requirement a condition precedent to the operation of the TPA. Accordingly, as the TPA did not apply to those orders, Greystone's payment obligation under the TPA never arose, and it lacked authority to disburse GBMI's revolver funds to Diesel absent express authorization.

However, even if the Customer Purchase Order requirement were not a condition precedent to Greystone's payment obligation – or, if as Diesel contends, the condition was waived by Diesel – Greystone nonetheless was not required (or authorized) to disburse revolver funds to pay Diesel because it was not provided with Diesel Invoices that corresponded to Customer Invoices. In its summary judgment opinion, the Court found that "the unambiguous language of the TPA required two events to occur before Greystone was required to pay Plaintiffs: (1) GBMI had to send to Greystone a copy of its Customer Invoice, and (2) the Customer Invoice had to correspond to a Diesel Invoice, which would determine the amount of Greystone's payment." *Diesel*, 2009 WL 89115 at *3; *see also* P-4 at 2; P-19 at 2. The Court also noted that "the TPA does not assign the responsibility of 'matching' Customer Invoices to Diesel Invoices to any party." *Id.* at *5. In light of these ambiguities, I found a genuine issue of material fact as to whether corresponding invoices were submitted to Greystone. *Id.* As noted above, it is clear that the first condition – Greystone's receipt of Customer Invoices – was satisfied because GBMI

delivered the invoices to GCS, which collected them on Greystone's behalf. [12]  The evidence also shows that Greystone was only provided Diesel Invoices that corresponded to Customer Invoices on a very few occasions.  *See* P-64.  The fact that GBMI did in fact provide the invoices on a number of occasions suggests that it was the party in the best position to know the correlation between the two types of invoices.  That is, GBMI was in possession of both types of invoices, and its ability to provide a "matching" of the invoices to Greystone demonstrates that GBMI had the tools and expertise necessary to perform that matching exercise; Greystone, on the other hand, played no part in creating either invoice, and had no expertise in the footwear or shipping business so as to enable it to correla*te* the two types of invoices.  In short, nothing in the testimony elicited at trial implies that the parties intended Greystone to match the invoices before it received payment.  When a contract is silent as to the obligations of the parties, "the court must take a 'common sense' approach, and determine what the parties intended by considering 'the nature, purpose and particular circumstances of the contract known by the parties . . . as well as what liability the defendant fairly may be supposed to have assumed consciously.'"  *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (quoting *Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319 (1989)); *see Greenfield*, 98 N.Y.2d at 569 (interpreting parties' obligations notwithstanding contract's silence on the issue).  Accordingly, it was GBMI's obligation to perform the matching of Customer Invoices to Diesel invoices; where it failed to do so, Greystone's obligation under the Payment Provision never arose.

    As Diesel's witnesses admitted on numerous occasions throughout the trial, the matching of invoices, as well as the TPA payment structure, turned out to be significantly more difficult to enforce than any of the parties had anticipated.  As such, Diesel contends that the payment procedure was modified to use a FIFO assumption under the TPP.  New York law generally "does not permit oral modification when the original written agreement provides that modifications must be in writing and signed."  *John Street Leasehold LLC v. FDIC*, 196 F.3d 379, 382 (2d Cir. 1999); *see also* N.Y. Gen. Ob50l. Law § 15-301(1) (McKinney 2009).  However, even where it is provided that modifications must be in writing and signed, New York will enforce oral modifications in two instances – (1) where there has been partial performance or (2) reliance – "but only where the subsequent performance or reliance is unequivocally referable to the modification."  *Id.*; *see also Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343 (1977).  The evidence

---

[12] Indeed, as this Court previously has recognized, the evidence supports a finding that GCS acted as Greystone's agent for the purpose of collecting and processing Customer Invoices.  *Diesel Props S.R.L. v. Greystone Business Credit II LLC*, No. 07 Civ. 9580 (HB), 2009 WL 89115, at *5 (S.D.N.Y. Jan. 14, 2009).

at trial showed that the TPA payment procedures, including the "matching" requirement, were never amended in writing as required under the TPA. *See, e.g.*, Tr. 238:9-239:1, 240:13-19 (Mezzosoma). Nonetheless, Diesel contends that, by its words and actions Greystone agreed to the requirements of the TPP. However, this proposition is belied by Greystone's actions and the pattern of payments actually made to Diesel. Greystone did not begin to make payments on a FIFO basis following the purported amendment to the TPA payment structure; rather, consistent with its position at trial and with a plain reading of the LSA in conjunction with the TPA, the only times that Greystone wired funds directly to Diesel were on the 18 occasions when it received express authorization from GBMI to do so.[13] Thus, the TPA was never amended to do away with the "matching" requirement, and as such, Greystone's payment obligation under the TPA was never triggered.[14]

## C.   Greystone is Not Liable for Unjust Enrichment

As an alternative to its breach of contract claims, Diesel contends that it is entitled to recover from Greystone on an unjust enrichment theory. "The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what

---

[13] Similarly, Diesel's argument that Greystone is foreclosed from arguing that it was excused from performing pursuant to the election of remedies doctrine is not well-taken, for several reasons. As already noted, the doctrine of remedies requires that a party, upon learning of a material breach, choose between terminating the contract and continuing to perform. *E.g.*, *Hallinan*, 519 F. Supp. 2d at 351; *Albany Med. College*, 296 A.D.2d 701. Here, GBMI's failure to provide Customer Purchase Orders and/or to "match" invoices did not constitute a material breach of the TPA, but rather the failure of a condition precedent. *See Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 61 N.Y.2d 106, 112 (1984) (distinguishing between conditions and promises to perform). Second, as noted, Greystone did not "continue to perform" under the TPA, because it was not required to do so; rather, Greystone acted at all times consistently with the premise that its obligation to pay arose only where GBMI's orders were supported by Customer Purchase Orders and it was provided with a Diesel Invoice that corresponded to a Customer Invoice, or otherwise when it received direct separate authorization to pay.

Additionally, Greystone is not equitably estopped from asserting that it is excused from performing under the Payment Provision of the TPA. Estoppel requires three elements: (1) words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things; (2) wilfulness or negligence with regard to the acts, conduct or acquiescence; and (3) detrimental reliance by the other party. *See Rotter v. Leahy*, 93 F. Supp. 2d 487, 499 (S.D.N.Y. 2000). Diesel has not sustained its burden on any of these elements. Greystone never showed by its words, acts or conduct that it was making payments pursuant to the TPA. Diesel presented no evidence of "willfulness or negligence" on the part of Greystone, nor of its own detrimental reliance. Indeed, the evidence presented at trial reveals that Diesel did not, as it contends "detrimentally rel[y] on Greystone's adherence to the [TPP] in continuing to ship shoes to GBMI in the absence of prior Customer Purchase Orders" – Diesel took the calculated risk of shipping those orders to avoid losing its hold on the United States market. Accordingly, Diesel's estoppel argument fails.

[14] It is worth noting also that, even if all of the conditions to the TPA had been satisfied, and Greystone's payment obligation was triggered for orders covered by the TPA, the TPA nonetheless was at all times subject to the terms of the LSA. P-4 at 2; P-19 at 2. Under the LSA, Greystone was not obligated to fund any request for disbursements if GBMI was in default, and Diesel admitted as much at trial. Tr. 208:4-8 (Mezzosoma); *see also* Tr. 134:1-02 (Sarrica). Thus, as GBMI was in a state of near-continuous default through the life of the TPA, Greystone would not have been obligated to pay Diesel in any event, even if the TPA's conditions had been fulfilled.

plaintiff is seeking to recover." *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).  Diesel contends that Greystone benefited at the expense of Props and Kid because over the life of the TPA, Greystone collected revenues from GBMI's sales of shoes for which Diesel expected to be paid.  That is, by collecting revenues from GBMI's sales of shoes and in failing to pay Diesel approximately $20 million that Diesel claims to have been owed for those shoes, Diesel contends that Greystone retained a benefit of approximately $20 million for the value of shoes shipped to GBMI but not paid for.  The evidence in this case reveals the only benefit Greystone retained was to the extent it was, or could have been, repaid for loan funds disbursed to GBMI under the LSA.  However, GBMI was obligated to repay Greystone for those loans.  "Equity and good conscience do not require a party to give up what it rightfully obtained, or is entitled to, under a contract."  GLEN BANKS, NEW YORK CONTRACT LAW § 4:15 (2006) (citing *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 767 F. Supp. 1269, 1284 (S.D.N.Y. 1991), *aff'd in part, rev'd in part*, 970 F.2d 1138 (2d Cir. 1992)); *see also Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 467 (S.D.N.Y. 2009) ("[B]argained-for benefits cannot be deemed to unjustly enrich a contracting party.").  Thus, there is nothing unjust about Greystone retaining this benefit.  Diesel has pointed to no money or other value that Greystone has retained as a result of its failure to pay, at least none that it would be inequitable or unjust to allow it to keep.  Thus, Diesel's unjust enrichment claim must fail.

**D.**   **Greystone is Not Liable for Accounts Stated**

Diesel's claim against Greystone for account stated survived summary judgment, but only to the extent that it was shown not to be duplicative of the breach of contract claim.  *See Diesel*, 2009 WL 89115 at *7, 12.  Under New York law, an account stated claim requires "an agreement between the parties to an account based upon prior transactions between them."  *LeBoeuf, Lamb, Green & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 64 (2d Cir. 1999).  Such an agreement may be implied if a party keeps a statement of account delivered by another party without objecting to it within a reasonable time, or if the debtor makes partial payment.  *See Meadowbrook-Richman, Inc. v. Associated Fin. Corp.*, 325 F. Supp. 2d 341, 360 (S.D.N.Y. 2004).  "An account stated assumes the existence of some indebtedness between the parties, or an express agreement to treat the statement as an account stated.  It cannot be used to create liability where none otherwise exists."  *Erdman Anthony & Assocs., Inc. v. Barkstrom*, 298 A.D.2d 981, 982 (4th Dep't 2002).  "Generally when an account exists and the debtor raises no material objections to the balance owed, the debtor is liable for the amount due, absent a showing of fraud, mistake or other

equitable considerations.  However, the application of that principle depends upon satisfaction of the threshold requirement that a debtor/creditor relationship already exist." *Roberts & Finger v. Worldstyle, Inc.*, No. 88 Civ. 7559 (RWS), 1990 U.S. Dist. LEXIS 1475, at *11 (S.D.N.Y. Feb. 9, 1990) (citations omitted).

In this case, the evidence tells us that the "Statements of Account" that Diesel sent were not, in fact, statements of Greystone's account; rather, they were statements of GBMI's account for past-due payments on the shipments of shoes.  We see this by the fact that, while Diesel generated at least 21 statements of account, only 9 were ever transmitted to Greystone, and the ones that were, described the transmission as a mere "copy to Greystone."  *See* Sartori Decl. ¶¶ 72-73; P-131; P-132; P-139; P-141; P-142; P-145; P-146.  Moreover, each statement was entitled "Statement of Accounts – GBMI as of" the relevant date.  *See id.*  The documents show that Greystone was being kept informed of its borrower's indebtedness to its supplier, but Diesel failed to elicit testimony to show that the parties understood the relationship between Greystone and Diesel to be one of debtor/creditor, as is required for an account stated claim to succeed.  Thus, although Diesel presented evidence regarding Guy Smith's failure to address any of these statements, and while it may have been irresponsible for him to have failed to keep Sarrica informed of the worsening relationship between Greystone and its borrower.  When all the bells and whistles are swept away, that is all Diesel proved, and that's not enough to prevail on a cause of action for an account stated.  Perhaps even more harmful to Diesel, Greystone made no partial payments on these statements of account that would constitute an acceptance of the account; rather, each of the 18 disbursements that Greystone made to Diesel on behalf of GBMI was made pursuant to direct authorization under the LSA, as had occurred in the ordinary course of business since the outset of the parties' relationship.[15]

## II.  GREYSTONE'S COUNTERCLAIM FOR UNJUST ENRICHMENT

To prove its unjust enrichment counterclaim against Props, Greystone must show that (1) Props was enriched (2) at Greystone's expense and (3) "equity and good conscience militate against permitting" Props to retain what Greystone seeks to recover.  *See Briarpatch*, 373 F.3d at 306; *see also Federal Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 425 F. Supp. 2d 458, 475 (S.D.N.Y. 2006) ("A defendant is enriched at the expense of a plaintiff when the defendant receives a benefit of money or other property belonging to the plaintiff.") (internal quotation

---

[15] Indeed, Greystone continually advanced revolver funds to GBMI – the amount of upwards of $60 million – throughout the relevant time period.  See P-46.  That GBMI opted to use these proceeds to pay other creditors instead of Diesel is not a decision for which Greystone can be held responsible.

marks and citation omitted).  What Greystone seeks to recover, is the value that Props unjustly obtained by purloining Greystone's collateral.  Under the LSA, Greystone's collateral included "customer lists" and "all of GBMI's books and records," P-39 ¶ 3.1; thus, the essence of Greystone's counterclaim is that Props obtained GBMI's SS08 Order Book when it was not entitled to that information, and Props obtained value from the Order Book that it otherwise would not have obtained.  Props makes two arguments in opposition: first, that Props did not use or otherwise benefit from the Order Book; and second, that Props was entitled to the Order Book at the end of the SS08 sales campaign.  Neither has merit.

Props's latter argument is easily disposed of, as this Court has already considered and at least expressed doubt (if not flatly rejected) Props's argument that GBMI was required to provide it with the Order Book.  *See Diesel*, 2009 WL 89115 at *12 n.16.  Section 4.3 of the Distribution Agreement provides that "[a]t the end of each sales campaign [GBMI] shall provide [Props] with the updated list of all its retailers with their addresses including the quantity and value of the amount of the Products sold for each single retailer."  P-1, ¶ 4.3.  Here, the facts show that Props purposely timed its notice of default so that the end of the 30-day cure period would coincide with the end of the sales campaign.  *See* P-9.  The Distribution Agreement nowhere states that Props is entitled to the Order Book if the Agreement is terminated; Props timed its notice of default and termination to correspond exactly with the end of the sales period.  The Court is not persuaded by Props's arguments that GBMI was required to provide it with the Order Book.

Second, Props contends that it never used the Order Book and received no benefit from it.  Rather, Props contends that it sold its entire inventory to Diesel USA, which is not a party to this action.  While it is true that Diesel USA, and not Props, actually used the Order Book to obtain SS08 orders, there is abundant testimony that the benefits the Order Book provided inured to Props.  First, Diesel USA's sales force and distribution infrastructure was orchestrated by Props employees, including Mezzasoma and Strippoli.  Second, Strippoli continued to have daily contact with Props even after his position was transferred to Diesel USA.  Third, by using the Order Book to ensure that Props continued to maximize its presence in the US market, any work that Diesel USA performed using the Order Book clearly was to Props's benefit.  Finally, as a wholly-owned subsidiary of Props, any financial benefit to Diesel USA was ultimately a benefit to Props.  Indeed, it is well-settled that an unjust enrichment claim "does not require that the party enriched take an active role in obtaining the benefit." *Aetna Cas. & Sur. Co. v. LFP Const. Corp.*, 207 A.D.2d 274, 276 (1st Dep't 1994); *see Pro Bono Investments, Inc. v. Gerry*, 03 Civ. 4347 (JGK),

2008 U.S. Dist. LEXIS 87450, at *54-55 (S.D.N.Y. Oct. 29, 2008) (same); *Newbro v. Freed*, 409 F. Supp. 2d 386, 398 (S.D.N.Y. 2006), *aff'd*, 2007 U.S. App. LEXIS 4769 (2d Cir. Feb. 27, 2007). Moreover, an unjust enrichment claim may properly be brought both against the party that directly receives the benefits, and any party that shares in the benefit unjustly obtained by another.  *See MDO Dev. Corp. v. Kelly*, 726 F. Supp. 79, 85 (S.D.N.Y. 1989).  Accordingly, Props can be held liable for unjust enrichment based on benefits indirectly garnered from Diesel USA's use of the Order Book.

Diesel USA, clearly benefited from having the Order Book.  Indeed, Strippoli testified that he used the Order Book to review and analyze GBMI's customer list, *see* Strippoli Decl. ¶ 42, and that "Diesel USA used the information in the Order Book and the July 2007 list . . . to identify GBMI's smaller customers, with whom Diesel may not have been familiar, to contact those customers to see if they wanted to order SS08 shoes." *Id.* ¶ 49.[16]  As this Court previously noted, "[t]his strikes the Court as an admission that Props was enriched at least to some degree." *Diesel*, 2009 WL 89115 at *12 n.15.  However, the portion of Diesel USA's sales that constitutes an "unjust" benefit is less than Greystone contends.  As Strippoli credibly testified, a substantial number of orders reflected in the Order Book were Diesel USA's own orders, as it had previously been a customer of GBMI's for the purpose of carrying Diesel-brand footwear in Diesel retail stores in the United States.  Further, Props cannot be held accountable for information it received relating to Genesco orders, as the details of those orders were provided directly by Genesco at least one week before Props obtained the Order Book.

Strippoli's testimony shows that Diesel USA's estimated sales for orders other than to Diesel USA and Genesco totaled over $10.3 million.  However, the inquiry does not end there. Props and Diesel USA had customer information far in advance for the majority of the retailers in the Order Book.  For instance, in July 2007, Props received from GBMI a comprehensive list of FW07 and SS08 orders, including customer names.  *See* P-51.  Thus, the sum total of the sales for which Props and Diesel USA have been "unjustly enriched" can extend only to the sales made to customers that were not already known to Props as a result of the July 2007 list.  Strippoli testified

---

[16] Although a claim for unjust enrichment "does not require the performance of any wrongful act by the one enriched," *ESI, Inc. v. Coastal Power Prod. Co.*, 995 F. Supp. 419, 436 (S.D.N.Y. 1998), the evidence shows that Props knew what it was doing was wrong and that it was not, in fact, entitled to the Order Book. For example, Strippoli explained that "Christmas came early this year" and that Nelson had brought the Order Book as a "dowry" when he joined Diesel USA from GBMI.  P-83; D-FF.  Props also directed employees to keep their possession of the Order Book a secret and to avoid further distribution of the document by email.  *See* D-GG; Tr. 249:4-250:17 (Mezzasoma).

that, based on a comparison of the July 2007 list to the Order Book, 42 customer accounts appeared on the latter that did not appear on the former. Of those 42 "new accounts," Diesel USA succeeded in placing orders with 8 new customers for 10,081 units for a total net sale of $402,381.00.[17]

In addition to the actual value that Props obtained as a result of these sales to these new customers, it also benefited from the costs and expenses that Diesel USA saved as a result of taking complete order lists from GBMI after GBMI had done its work for the entire SS08 season. "A person has conferred a benefit upon another if he . . . saves the other from expense and loss or in any way adds to the [other's] security or advantage." *U.S. E. Telecomm., Inc. v. U.S. W. Info. Sys., Inc.*, No. 87 Civ. 2924 (KTD) (THK), 1993 WL 385810, at *20 (S.D.N.Y. Sept.30, 1993), *aff'd*, 38 F.3d 1289 (2d Cir. 1994); *see also Banco Popular N. Am. V. Lieberman*, 22 Misc. 3d 1, 2 (1st Dep't 2008) (a party "receives a benefit where his debt is satisfied or where he is saved expense or loss") (citing *Blue Cross of Central N.Y. v. Wheeler*, 93 A.D.2d 995, 996 (4th Dep't 1983)). As noted, GBMI's costs and expenses relating to its collection of SS08 orders totaled $6,235,719.00. This amount, of course, relates to the sum total of the SS08 orders, which covered 369,266 units. The units that make up the sales for which Props was unjustly enriched totaled 10,081 net units, or 2.73% of all SS08 sales. Accordingly, Props is liable for 2.73% of GBMI's total costs that it saved; that amounts to $170,235.75. Combined with the actual net sales by which Props was unjustly enriched, Greystone is entitled to damages on its unjust enrichment counterclaim of $572,616.75.[18]

New York law governs the availability of prejudgment interest. *Schwimmer v. Allstate Ins. Co.*, 176 F.3d 648, 650 (2d Cir.1999); *Campbell ex rel. Campbell v. Metropolitan Property and Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001). A claim for unjust enrichment is entitled to

---

[17] The Court is not persuaded by Strippoli's protestations that Diesel USA "would have likely" placed orders with these accounts even without the Order Book, as Diesel USA was previously unaware of these customers and was able to place orders with them only after having reviewed and evaluated the Order Book.

[18] It should be noted that, although Greystone was not itself involved in the manufacture or sale of the footwear products at issue in this case, pursuant to the LSA Greystone did have a security interest in all of GBMI's assets, including customer lists, books and records, inventory and accounts receivable, among other collateral. P-39, § 3.1-3.3. Thus, to the extent Diesel obtained a benefit by placing orders for sales using the Order Book that it otherwise would not have been able to place, Greystone is entitled to recover the value of that unfair benefit insofar as it would have inured to the value of Greystone's security interest in GBMI's assets. Therefore, Greystone need not have been directly involved in the manufacture or sale of the shoes to be able to recover on a claim for unjust enrichment. Further, it is also worth noting that nowhere in the many pages that Diesel submitted to the Court in both its pretrial memorandum and post-trial proposed conclusions of law did it ever advance the argument that Greystone lacks standing to bring its claim for unjust enrichment or to collect damages based on its security interest in GBMI's assets should it prevail on such a claim.

prejudgment interest under N.Y. C.P.L.R. § 5001. *Steinberg v. Sherman*, 07 Civ. 1001 (WHP), 2008 U.S. Dist. LEXIS 35786, at *14 (S.D.N.Y. May 2, 2008); *Newbro*, 409 F. Supp. 2d at 402. "New York law does not permit the trial court to exercise any discretion where a party is entitled to such interest as a matter of right." *New England Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.* 352 F.3d 599, 603 (2d Cir. 2003). Interest will be computed from the "earliest ascertainable date the cause of action existed." N.Y. C.P.L.R. § 5001(b). New York law requires that this interest shall be calculated at nine percent per annum unless otherwise provided by statute. *See* N.Y. C.P.L.R. 5004; *Bessemer Trust Co.*, 544 F. Supp. 2d at 392-393. Here, the earliest ascertainable date on which Greystone's unjust enrichment cause of action accrued was November 8, 2007, the date on which Diesel obtained the Order Book. *See* P-83. Accordingly, I find that interest of 9% per annum on Greystone's $572,616.75 unjust enrichment award shall be calculated by the judgment clerk from November 8, 2007.

## III. CONCLUSION

For the foregoing reasons, all of Diesel's claims against defendants GBMI and Greystone are dismissed. Props is liable to Greystone for unjust enrichment damages in the amount of $572,616.75, plus interest of 9% as calculated by the judgment clerk. The Clerk of Court is directed to enter a judgment in accordance with this Opinion and close this case and remove it from my docket.

SO ORDERED
New York, New York
August 1, 2009

U.S.D.J.

27